**DILWORTH PAXSON LLP**
457 Haddonfield Road, Suite 700
Cherry Hill, NJ  08002
Telephone: (856) 675-1900
Facsimile:  (856) 663-8855
*Attorneys for Plaintiffs*
*CarePoint Health Management Associates, LLC; Hudson Hospital OPCO, LLC, d/b/a CarePoint Health—Christ Hospital; IJKG, LLC, IJKG PROPCO, LLC and IJKG OPCO, LLC, d/b/a CarePoint Health—Bayonne Medical Center; and HUMC OPCO, LLC, d/b/a CarePoint Health—Hoboken University Medical Center*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAREPOINT HEALTH MANAGEMENT ASSOCIATES LLC, HUDSON HOSPITAL OPCO LLC d/b/a CAREPOINT HEALTH – CHRIST HOSPITAL, IJGK, LLC, IJGK PROPCO LLC and IJGK OPCO LLC d/b/a CAREPOINT HEALTH – BAYONNE MEDICAL CENTER, and HUMC OPCO LLC d/b/a CAREPOINT HEALTH – HOBOKEN UNIVERSITY MEDICAL CENTER<br><br>Plaintiffs,<br><br>v.<br><br>RWJ BARNABAS HEALTH, INC.<br><br>Defendant. | Hon. _____, U.S.D.J<br><br>Hon. _____, U.S.M.J.<br><br>Civil Action No.<br><br><br>**COMPLAINT AND<br>JURY DEMAND** |

For their Complaint against Defendant RWJ Barnabas Health, Inc. ("RWJ"),

Plaintiffs CarePoint Health Management Associates, LLC d/b/a CarePoint Health

("CarePoint Health"); Hudson Hospital OPCO, LLC d/b/a CarePoint Health –

122902214-8

Christ Hospital ("Christ Hospital"); IJGK, LLC, IJKG PROPCO, LLC and IJGK OPCO, LLC d/b/a CarePoint Health – Bayonne Medical Center ("Bayonne Medical") and HUMC OPCO, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC") (together "Plaintiffs" or "CarePoint"), by and through their attorneys, Dilworth Paxson LLP hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This case involves a years-long systematic effort by RWJ, in conspiracy with others, to destroy competition and to monopolize the provision of general acute care hospital services and related health care services in northern New Jersey.  This effort particularly targeted Hudson County, New Jersey, to the detriment of CarePoint and the public by aiming to destroy the three hospitals operated by CarePoint as independent competitors.

2.      RWJ's goal was to force CarePoint into insolvency and, through this: (i) force a shutdown of Christ Hospital – the preeminent hospital in Hudson County, (ii) force a shutdown of Bayonne Medical and (iii) acquire HUMC because of its demographics and better payor mix.  RWJ's goal explicitly disregarded the needs of the poor, underinsured and charity care patients which CarePoint serves in its role as the safety net hospital system in Jersey City and surrounding areas.

3.     The facts of this case reveal an intertwined web of schemes by RWJ and its conspirators to stifle marketplace competition that would otherwise benefit the consuming public by destroying CarePoint, which has been creating centers of medical excellence which benefit the Hudson County community.

4.     This conduct is only part of the long history of RWJ's monopolistic conduct to tighten its control on general acute care hospital services ("GAC") and related health care services in New Jersey generally, and specifically in Hudson County.

5.     RWJ's conspirators include real estate players Avery Eisenreich ("Eisenreich") and Yan Moshe ("Moshe") whose sole goals are profit and greed and who have little interest in safety net hospitals.  These conspirators have faced numerous legal challenges including RICO complaints against Moshe and Nizar Kifaieh ("Kifaieh") and a recent weapons-related federal investigation within Moshe-controlled and Kifaieh-run Hudson Regional Hospital ("HRH").

6.     Eisenreich is the subject of longstanding litigation brought by CarePoint in the Delaware Chancery Court for tortious interference with CarePoint's business dealings and has been involved in several actions adverse to CarePoint over the past few years.

7.     He has transacted in property under the hospitals in Hoboken and Bayonne with conspirators Medical Properties Trust ("MPT") and HRH without

review by the New Jersey Department of Health ("NJDOH").  These dubious land transactions have been used to undermine CarePoint and create uncertainty among its employees.

8.    President and soon-to-be CEO of RWJ, Mark Manigan has been the strategist for RWJ working to drive CarePoint to insolvency.  His background in healthcare, and specifically as a healthcare attorney, makes him familiar with some of the actors conspiring against CarePoint.  He also has a close relationship with Eisenreich and influence with the Governor's office, which he has used along with RWJ's vast political, administrative and real estate lobby to undermine competition – with a specific goal of eliminating CarePoint as a competitor of RWJ.

9.    RWJ's pattern of serial acquisitions of competing hospitals and health care providers, as well as of the real estate necessary to operate competing hospitals, has gone unchecked by the state and NJDOH and has been tailored to destroy competition.   Indeed, the recent attempted acquisition by RWJ of St. Peter's Hospital in New Brunswick was blessed by the state but later prevented by antitrust enforcement action taken by the Federal Trade Commission.

10.    In pursuing its plan to achieve and extend its dominance in Hudson County, RWJ recognized the critical importance of maintaining a preferred relationship with the state's largest health insurer, Horizon Blue Cross-Blue Shield ("Horizon"), as a factor in attracting insured patients.   It also recognized the

significance of emergency room traffic as a significant driver of inpatient volume, particularly among the uninsured and those covered by government programs, such as Medicare, Medicaid and TriCare.  Thus RWJ engaged, in coordination with Horizon, in the establishment of a Satellite Emergency Department ("SED") in Bayonne (in an area adjoining Jersey City), specifically targeting the CarePoint Hospitals.

11.   RWJ engaged in improper efforts to increase its emergency room traffic at CarePoint's expense both through the SED, which was constructed and began operation without having received the legally required approval of the NJDOH, and by the flagrant disregard of a 2016 agreement settling earlier litigation regarding ambulance service in Jersey City and its environs – whereby RWJ improperly diverted ambulances to its wholly owned Jersey City Medical Center ("JCMC") to boost RWJ's revenue, at the expense of patient health.

12.   JCMC shut down the majority of its charity care clinics in Hudson County and effected a shift of uninsured or underinsured patients to CarePoint while using the ambulance service to move more lucrative, insured patients, to RWJ hospitals.

13.     Further, RWJ and its conspirators including, without limitation, HRH,[1] Eisenreich, Horizon, Moshe and Kifaieh, have asserted undue influence on the NJDOH and the Governor's office to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to create roadblocks in CarePoint's evolution into a regional powerhouse in healthcare with a stable financial base.

14.     The conspirators colluded to pursue a common objective: to destabilize and eventually shut down CarePoint such that patients and revenue flow to the conspirators instead.  These parties' efforts, both public and surreptitious, sowed uneasiness among CarePoint employees and doctors and have directly contributed to economic harm to the CarePoint Hospitals in the form of decreased revenue and increased costs, threatening their very existence.

15.     Of the CarePoint Hospitals, HUMC, is the most desirable target for RWJ to take over, either by arm's length acquisition or through bankruptcy, as HUMC has the most profitable payor mix of any of the CarePoint Hospitals. Further, RWJ already had its SED in Bayonne, so it had little incentive to acquire Bayonne Medical and would have much preferred to continue to drive it into the ground.

---

[1]     As explained later herein, HRH and its principals, while not defendants in this litigation, were intimately involved with Eisenreich in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors.

16.    The growth and success of HUMC, coupled with the decision to continue operating the CarePoint Hospitals through physician-led leadership, made RWJ leadership uneasy and prompted RWJ to use its political connections in Hoboken, including the Hoboken Municipal Hospital Authority ("HMHA"), to drive HUMC into dire financial straits.

17.    Eisenreich also was, and remains, close with RWJ management and has at all pertinent times engaged in detailed conversations about the plan to, together with RWJ, destroy CarePoint for their mutual financial and strategic benefit.  Eisenreich has, on numerous occasions, used his control of the real estate under the Hospitals to frustrate potential transactions involving CarePoint.

18.    Another effort to push CarePoint toward bankruptcy was a sham effort by RWJ to sign a 2019 LOI for the acquisition of Christ Hospital and HUMC. RWJ's real intent was to gain market knowledge and gather competitive intelligence, and use this newly-acquired information to freeze programmatic growth and any significant hiring or construction at Christ Hospital.

19.    Notably, the offer included a provision whereby RWJ would fund operational losses after a certain date in 2021.  Based on this provision, RWJ was aware of the cash burn, and knew that Christ Hospital and CarePoint would experience drastic consequences without additional funding.  Based on this fact,

RWJ knew it could push the CarePoint Hospitals closer to the brink of closure without having to buy them.

20.     While CarePoint welcomed this original offer from RWJ, reasonably expecting that the offer was brought in good faith, RWJ and Eisenreich were engaging in backroom negotiations concealed from CarePoint.  RWJ's interest in acquiring any of the CarePoint Hospitals was contingent upon controlling the real estate under them.  Eisenreich endeavored to preclude direct contact between RWJ and CarePoint with respect to any potential transactions involving the real estate.

21.     Negotiations between RWJ and CarePoint broke down as Eisenreich held the real estate "hostage."  RWJ circulated rumors of consolidation and closing of Christ Hospital or reducing it to a small Emergency Department.  This had a material adverse effect on Christ Hospital's operations, leading to attrition of physicians, employees and patients.

22.     This type of rumor-mongering also negatively affected employee retention at HUMC, and the other CarePoint Hospitals where after the departure of a significant number of nurses as a result of this news, the Hospitals were forced to cover the departures with a large number agency nurses paid at a premium rate about three times the rate of a typically-employed nurse.  Specifically, HUMC incurred expenses averaging nearly $120,000 per pay period during 2022, or $3.1 million annually.  Moreover, the CarePoint Hospitals, together, incurred an

average of nearly 6,200 contract nursing hours per pay period during 2022 which totals approximately $20.1 million in additional cost to the Hospitals.

23.    RWJ's interest was never to actually carry out a transaction, but rather to eliminate CarePoint.  In 2021, HMHA improperly sent out a Request for Indications ("RFI") through Raymond James to garner interest, without CarePoint's consent, for the sale of HUMC.  Ahead of this distribution, RWJ, through its leadership, John Doll and Mark Manigan, engaged with HMHA and its contractor, Raymond James.  This interaction with HMHA and Raymond James was calculated to devalue HUMC, and RWJ used insider information to assist HMHA and Raymond James on a plan of attack.  RWJ's entering into of a letter of intent with CarePoint came two years after reneging on its prior LOI based upon the bogus issue that it was unable to obtain the hospital real estate from Eisenreich.

24.    RWJ continued to spread false information and undermine confidence in the CarePoint system, with no intention to actually acquire CarePoint, but rather inflict upon it a "death by a thousand cuts," striking strategic blows and inflicting damage until it was eliminated as a competitor.

25.    Further, there is significant reason to believe that RWJ influenced NJDOH in its decision to prevent CarePoint from being granted one or more Certificates of Need ("CN"), which were necessary for many initiatives, including the addition of behavioral health beds at Bayonne Medical.  It is believed that

RWJ's purpose in interfering with the NJDOH's decision-making process was for RWJ to continue to monopolize the behavioral health beds for involuntary commitment in Hudson County. The effect of this was profound on patients and staff in the Emergency Department as beds were not available in other facilities due to the ongoing epidemic of mental health issues in the community.

26.     The cost to Bayonne Medical in lost revenue from these behavioral beds exceeds $80 million since the original Certificate of Need request submitted in 2018 through 2022.

27.     CarePoint also has not received any funds from the State of New Jersey from the American Rescue Plan Act ("ARPA"), through which the Federal Government earmarked billions of dollars for healthcare and other facilities suffering losses from COVID and provided these funds to states to administer. While CarePoint has provided care to a disproportionate share of underinsured patients and "HHS distributed $10 billion in Provider Relief Funds to safety net hospitals that serve our most vulnerable citizens,"[2] including $292,828,986 to New Jersey hospitals, CarePoint has received no ARPA funds. This surprising result is a direct result of RWJ's influence in Trenton and close ties between Mark Manigan and the Governor's office.

---

[2]     Targeted distributions. HRSA. (https://www.hrsa.gov/provider-relief/data/targeted-distribution)

28.    Upon information and belief, and along the same lines, RWJ has used its deep pockets to offer employment to influential government officials and administrators with the aim of helping RWJ push competing healthcare systems into financial trouble.

29.    Additionally, the intentional, ongoing disparaging remarks by principals of HRH to local politicians and NJDOH caused negative effects on the business operations of all of the CarePoint Hospitals.

30.    Further, RWJ tried to steer referrals away from CarePoint, using information obtained through Horizon.  Letters were sent to certain doctors who regularly referred patients to CarePoint specialists and facilities to induce these physicians to refer patients to RWJ instead.  These letters included discussion of incentives such as enhanced rates and patient management fees to physicians to refer patients to RWJ.  Furthermore, RWJ poached one of the leading CarePoint practitioners, who RWJ encouraged to violate his restrictive covenant.

31.    After RWJ made clear its lack of interest in acquiring Bayonne Medical in late 2019, HRH made a hollow offer to purchase Bayonne Medical that left many of CarePoint's requirements on the cutting room floor.  HRH had no real incentive to expend significant resources to acquire Bayonne Hospital for itself. While licensed as a general acute care hospital, HRH had a significant focus on

same day surgery (primarily orthopedic).   This was the same focus as BMC Hospital LLC ("BMC"), its rival to acquire the Bayonne facility from CarePoint.

32.    It was important for HRH that BMC not succeed in acquiring that facility.   It is significant that HRH acquired the Bayonne real estate from Eisenreich the same day that CarePoint and BMC announced their sale of the Bayonne Medical assets to BMC.  Moreover, HRH did not put up the money for the land acquisition, which was financed entirely by the seller, one of Eisenreich's entities.  HRH's clear motivation, as facilitated by Eisenreich, was to block the sale and put Bayonne Medical Center out of business in collusion with RWJ.

33.    RWJ states its vision as to "[c]reate and sustain healthy communities, together," noting that it is "committed to the ongoing improvement of the health, quality of life, and vitality of our communities."[3]  The idea that RWJ would use its influence to jeopardize the health of that community and the care providers of a competing hospital not only directly contradicts its own vision, but clearly demonstrates that RWJ is far more interested in anti-competitive and predatory business activities than serving the New Jersey community.

34.    The efforts of RWJ and its conspirators have created a stalemate in the progress of health care in Hudson County, mired in litigation in two states with a

---

[3]    RWJBarnabas Health – (https://www.rwjbh.org/)

very real risk of eliminating any Hudson County based provider from having a meaningful role in the delivery of acute hospital care.

35.    Plaintiffs seek relief from this Court under the Federal Antitrust Laws and the New Jersey Antitrust Act.

## PARTIES

36.    Plaintiff CarePoint Health is a limited liability company organized under the laws of the State of New Jersey, having a principal place of business located at 10 Exchange Place, 15th Floor, Jersey City, New Jersey 07302.

37.    Plaintiff Christ Hospital is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 176 Palisade Avenue, Jersey City, NJ 07306.

38.    Christ Hospital operates a 349-bed fully accredited acute care hospital.  With a highly-qualified team – including more than 500 doctors with specialties ranging from allergies to vascular surgery – Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, respiratory, and newborn care.  As a state-certified Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions with outcomes that rank among the best of New Jersey.  In 2021, Christ Hospital

was ranked the most "Socially Responsible" hospital in the United States by the prestigious Lown Institute, for equitable care.[4]

39.     Plaintiff Bayonne Medical is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey.

40.     Bayonne Medical operates a 244-bed, fully accredited acute care hospital that provides quality, comprehensive, community-based health care services to more than 70,000 people annually.  Its facilities include 19 full-service emergency room bays, 205 medical/surgical beds, 10 obstetrical beds, 14 adult ICU/CCU beds, and 15 adult, acute psychiatric beds.  The service complement consists of six inpatient operating rooms, two cystoscopy rooms, one full-service cardiac catheterization lab, 12 chronic hemodialysis stations, one MRI unit, emergency angioplasty services, elective angioplasty, two hyperbaric chamber units, and a PET-CT diagnostic imaging unit.

41.     Plaintiff HUMC is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 308 Willow Avenue, Hoboken, NJ 07030.

---

[4]     Christ Hospital ranked #1 on Lown Institute's Most Socially Responsible Hospitals in America list – (https://carepointhealth.org/2021/09/21/christ-hospital-ranked-1-on-lown-institutes-most-socially-responsible-hospitals-in-america-list/)

42.     HUMC operates a 348-bed fully accredited general acute care hospital.  HUMC provides advanced medical technologies in support of its medical staff, nursing team, and other caregivers, to enable state-of-the-art care to citizens of Hoboken and the surrounding communities.  HUMC offers excellence in emergency medicine in the 34-bay emergency room and the dedicated OB/GYN ED; inpatient rehabilitation; transitional care; child and adult behavioral health; women's care; wound care; and numerous surgical subspecialties.  The American Heart and Stroke Association awarded the Silver Award to HUMC for its dedication to improving quality of care for stroke patients.  Overall, HUMC was ranked in the top ten hospitals in New Jersey for care quality among all hospitals in the state with 350 beds or fewer.

43.     Defendant RWJ is a New Jersey corporation with its principal place of business at 95 Old Short Hills Rd, West Orange, NJ 07052.  RWJ is one of the largest health care systems in New Jersey.  As described further below RWJ owns and operates Jersey City Medical Center (JCMC), a full service, acute care hospital in Hudson County, and many other healthcare facilities.

## **VENUE AND JURISDICTION**

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and over the state law claims asserted herein under 28 U.S.C. § 1367.

45.     This Court has personal jurisdiction over the defendant RWJ as it resides, does business in, and has a principal place of business in New Jersey. Venue in this district is proper because the parties are located in and/or a substantial part of the events took place in this district.

## FACTUAL BACKGROUND

### A.     The CarePoint Hospitals

46.     Between 2008 and 2012, Vivek Garipalli, James Lawler and Jeffrey Mandler (together, the "Founders"), by and through various entities, purchased out of bankruptcy the assets of HUMC, Christ Hospital, and Bayonne Medical (the "CarePoint Hospitals" or "the Hospitals").

47.     The CarePoint Hospitals are affiliated through overlapping ownership of entities and trusts associated with the Founders.

48.     After buying the Hospitals' assets, the Founders invested time, labor, and capital to improve the Hospitals' physical plants, equipment, and finances, as well as the overall quality of healthcare services provided by the Hospitals.  Under the Founders' leadership and with the incredible support of all the physicians, nurses and staff, the Hospitals became leading acute health care service facilities in Hudson County and the State of New Jersey.

49.     In addition to demonstrably improving health care for New Jersey residents, the Founders' efforts to rescue the Hospitals from bankruptcy have saved

thousands of jobs and generated substantial economic benefits to Hudson County and, more generally, to the State of New Jersey.  The new owners' efforts to rescue the Hospitals from bankruptcy generated huge economic benefits to Hudson County and the State.  CarePoint Hospitals create a significant positive economic impact for New Jersey in terms of both in-state operating expenditures of hundreds of millions of dollars annually (e.g. $384 million in 2014) and significant capital expenditures (e.g. $177.8 million for the years 2014-2017).

50.     To illustrate, the economic impacts for New Jersey of the above-referenced CarePoint expenditures include:

      a.     8,167 direct and indirect jobs or job-years (one job lasting more than one year);

      b.     $815.2 million in gross domestic product;

      c.     $653.9 million in compensation to employees;

      d.     $23.5 million in state government revenues; and

      e.     $8.7 million in local government (county, municipal, school district) revenues outside Hudson County.

51.     Most recently CarePoint's leadership team have taken steps to transition the CarePoint Hospitals to a new non-profit entity – a move lauded by the communities which the Hospitals serve.  Unless they are destroyed by the unlawful and predatory conduct of RWJ and others (which is the subject of this

and other pending litigation), CarePoint Health's three hospitals will continue to operate in their current form and will be controlled by a new nonprofit organization. CarePoint's top priority as a non-profit is to work collaboratively with the Hudson County community to maintain critical health care for those who need it most. CarePoint has also taken significant strides in partnering with Columbia University Hospital, New York Presbyterian, the Rothman Institute and has a pending memorandum of understanding with Mt Sinai Health Systems to bring world class specialty care to Hudson County patients.

52.     The announcement of CarePoint's conversion to non-profit status was praised by Jersey City Mayor Steve Fulop, who stated that "Christ Hospital and CarePoint have been critical partners with the city and the community before and during the pandemic, ensuring residents throughout the area have access to the top-quality health care they deserve, and, so, if transitioning to a nonprofit organization is the best way to further the life-saving services they offer, then we will, of course, support that," noting that the move "only strengthens the importance of Christ Hospital for the entire community."[5]

---

[5]     Tom Bergeron - *CarePoint Health beginning process of becoming a nonprofit (here's why — and what happens next)*, ROI-NJ.com (https://www.roi-nj.com/2021/10/06/healthcare/carepoint-health-beginning-process-of-becoming-a-nonprofit-heres-why-and-what-happens-next/)

53.     Further Bayonne Mayor Jimmy Davis stated that "CarePoint's conversion into a nonprofit will allow the residents of Bayonne to continue having the broadest range of quality health care services made available to them." *Id.*

**B.      RWJ Barnabas Health**

54.     RWJ is the largest and most comprehensive healthcare system in the state of New Jersey, providing treatment and services to more than three million patients each year.[6]  In 2021, RWJ reported approximately $6.6 billion in revenue.

55.     RWJ has become the largest healthcare system in New Jersey through a series of acquisitions.  In 2016, Barnabas Health and Robert Wood Johnson Health System merged to create RWJ, which then controlled eleven general acute care hospitals across New Jersey.

56.     On January 1, 2022, RWJ closed on its acquisition of Trinitas Regional Medical Center in Union County.  RWJ now operates 12 hospitals, several ambulatory surgical centers, a pediatric rehabilitation hospital, and a freestanding behavioral health center.  RWJ also operates many other health care facilities and medical practices, especially in Hudson County, which generate significant patient revenue and provide increased patient flow to its inpatient acute care hospitals.

---

[6] RWJ Barnabas - https://www.rwjbh.org/why-rwjbarnabas-health-/

57.    Starting in 2019, RWJ began discussions to acquire St. Peter's Healthcare, based in New Brunswick, Middlesex County, which operates an independent hospital.  In addition to the hospital, Saint Peter's Healthcare employs physicians, and has other healthcare-related subsidiaries and joint ventures.   In 2021, Saint Peter's Healthcare reported approximately $579 million in revenue.

58.    New Jersey State officials and the NJDOH quickly approved the merger in May 2022.  However, the FTC unanimously moved to block it, stating the RWJ-Saint Peter's merger would create an entity with control of 50% of the acute care market in Middlesex County.  FTC Bureau of Competition Director Holly Vedova concluded that "There is overwhelming evidence that this acquisition would be bad for patients[.]"[7]

59.    After the Federal Trade Commission commenced its proceeding to block the St. Peters acquisition, RWJ abandoned the proposed transaction, stating that it was "disappointed" that the FTC had acted to block the transaction after it had "received full approval from New Jersey's Attorney General" and received support from "managed care organizations and elected officials at all levels within the State of New Jersey."[8]

---

[7]    Spencer Kent - *Two N.J. health systems want to merge. But the feds say it's bad for patients.* NJ.com, June 3, 2022  (https://www.nj.com/healthfit/2022/06/two-nj-health-systems-want-to-merge-but-the-feds-say-its-bad-for-patients.html)

[8]    Jeffrey Kanige - *FTC moves to block RWJBarnabas-Saint Peter's deal,* NJBIZ June 3, 2022 (https://njbiz.com/ftc-moves-to-block-rwjbarnabas-saint-peters-deal/)

60.    It is unsurprising that the RWJ/St. Peter's merger required FTC intervention, as RWJ has a long history of "smooth sailing" at all levels of New Jersey local and state government and specifically with the NJDOH.

61.    To that end, RWJ CEO Barry Ostrowsky asked in a May 2022 interview regarding the St. Peter's acquisition "Who's making health care policy in New Jersey?" – then posited that it should not be "the FTC, a federal agency that may not best know the needs of the people of New Jersey," but rather should be "the government of New Jersey" and "the elected officials" noting specifically that RWJ has "a bunch of support from people at every level of elected officials[.]"[9]

62.    As noted later, RWJ's confidence that it could operate unchecked at all levels of government in New Jersey led to RWJ making business decisions such as constructing and opening a facility in Bayonne before even being approved by the state.  Clearly RWJ is so well entrenched in New Jersey bureaucracy that it views required governmental approvals as little more than a rubber stamp.

---

[9]    Tom Bergeron - *Transformative academic medical center in N.J. is 1 approval away from reality — those involved are concerned but hopeful*, NJBIZ, May 12, 2022 (https://www.roi-nj.com/2022/05/12/healthcare/transformative-academic-medical-center-in-n-j-is-1-approval-away-from-reality-but-those-involved-fear-it-wont-come/)

C.    **RWJ's Decade-Long Mission to Monopolize New Jersey Healthcare Markets**

1.    **RWJ's Efforts to Decimate CarePoint through Opening an SED in Bayonne Medical's Backyard**

63.    In its first foray directly into Hudson County, RWJ purchased Jersey City Medical Center in 2013.  At that time, high-level executives at RWJ and Horizon conducted a series of transition meetings.  In particular, it is believed that these meetings included specific discussions concerning how to dominate emergency medical service, including in Bayonne, and ultimately to wrest control of Bayonne Medical from CarePoint.

64.    The CarePoint Hospitals, including Bayonne Medical did not participate in Horizon's network, which caused a great deal of tension between Horizon and CarePoint, as Bayonne Medical was the only acute care facility in Bayonne – and it was out of network for Horizon's policyholders.

65.    Horizon and RWJ colluded to intentionally steer patients away from Bayonne Medical and towards RWJ facilities.

66.    Upon information and belief, an early step in this plan was the development of a satellite emergency department ("SED") in Bayonne to be run by JCMC.  At that time, CarePoint's Bayonne Medical operated the only emergency department in Bayonne.  Not only is access to emergency care essential to the welfare of the community, it is also a major driver of inpatient admissions for

22

hospitals.  CarePoint's role as the sole Emergency Department provider in the City of Bayonne was an important element in not only keeping Bayonne's residents healthy, but also Bayonne Medical healthy as a community hospital.

67.     Upon information and belief, during the transition to RWJ's control of JCMC, Dr. Garay, JCMC's Chief Medical Officer, communicated with representatives at Horizon about "enhanced rates" – that is, rates substantially higher than what JCMC understood to be Horizon's prevailing in-network rates, if RWJ were to take over Bayonne Medical's market share in Bayonne.

68.     Upon information and belief, at this time, Jay Picerno, RWJ's Chief Financial Officer communicated with a Horizon representative about RWJ taking over the Bayonne market, leveraging Horizon's offer to provide enhanced rates, by starting a free-standing emergency department.

69.     Upon information and belief, Picerno raised the issue of opening a SED on several occasions during transition meetings as part of the "Horizon/Bayonne" strategy and confirmed that Horizon was actively supporting, encouraging, and directing RWJ's development of the SED.

70.     Upon information and belief, Barry H. Ostrowsky, President and Chief Executive Officer of RWJ, was also involved directly in conversations with Horizon regarding the "Horizon/Bayonne" strategy.

71.     Upon information and belief, the objective of the "Horizon/Bayonne" strategy was to "choke Bayonne Medical out of the market," and Horizon shared this goal.

72.     Upon information and belief, Picerno, on behalf of RWJ, had discussions with incoming Mayor of Bayonne Jimmy Davis and his chief of staff, Mary Jane Desmond, in which they expressed concerns that the SED might cause Bayonne Medical to close, in response to which Picerno replied "don't worry, we'll buy it."

73.     Upon information and belief, Mayor Davis then asked "why would RWJ buy Bayonne Medical?" and Picerno responded that RWJ would "strip the place," and that "our [RWJ] goal is to kill CarePoint, and Horizon is helping us!" Horizon's leadership conveyed to Picerno and others Horizon's animosity toward the owners of the CarePoint Hospitals.

74.     Indeed, beginning in at least the fall of 2015, RWJ "touted a 24/7 emergency department as a main feature of its medical facility planned for Broadway and 24th Street" in Bayonne.[10]   Picerno had several conversations with Horizon's leadership who actively supported RWJ creating the proposed SED at the Bayonne location.   Indeed, Horizon would prefer to deal with an in-network

---

[10]     Jonathan Lin - *Battle looms between CarePoint and Barnabas Health over proposed Bayonne ER,* The Jersey Journal, November 2, 2016 (http://www.nj.com/hudson/index.ssf/2016/11/battle_looms_between_carepoint_and_barnabas_health.html)

RWJ facility than an out of network competitor in CarePoint – even if RWJ monopolized GAC services in the market.

75.    Horizon offered to pay RWJ enhanced rates at its Bayonne SED in order to ensure that the SED endeavor would be profitable.  Integral to the purpose of the Horizon-RWJ cooperation was the steering of patients away from CarePoint Hospitals, including Bayonne Medical which is a mere six blocks away from the SED.

76.    In materials submitted to the NJDOH in support of its SED proposal, RWJ specifically noted the presence of Bayonne Medical (not then in Horizon's network) in the area and touted the proposed SED as an "in-network option" for emergency care in the City of Bayonne — a direct reference to RWJ's network relationship with Horizon.

77.    Notably, it was reported that "[t]he [RWJ] application was backed by a trio of health insurance companies, a variety of elected officials, and hundreds of people who signed a petition to support the Bayonne SED, according to state documents."[11]

78.    In that same article, it was reported that RWJ CEO Barry Ostrowsky told NJ Spotlight that Horizon "had encouraged his organization to construct a

---

[11]    Lilo H. Stainton - *The Battle of Bayonne: Turf Wars Over Satellite Emergency Departments,* NJ Spotlight News, August 2, 2017 (https://www.njspotlightnews.org/2017/08/17-08-01-the-battle-of-bayonne-turf-wars-over-satellite-emergency-departments/)

free-standing emergency facility as a way to connect more Horizon patients in the area with providers that are part of its network."[12]

79.    Emboldened by this backing, RWJ opened the SED, despite not receiving initial NJDOH approval until later, on July 24, 2017 with final approval to come months after that.

80.    Since its opening in 2017, the SED has caused a substantial decrease in emergency patients to Bayonne Medical, which in turn led to a substantial decrease in inpatient admissions.  The annual losses to Bayonne Medical directly as a result of the SED are approximately $20 million, and the total loss for the period from 2019 through 2022 is approximately $80 million.

81.    In contrast to the approval by NJDOH to RWJ for its already-opened SED in Bayonne, NJDOH stalled or "forgot" to rule on at least a half-dozen CarePoint applications which were properly submitted in advance of opening and many of which are still pending.  CarePoint's applications are also being backed by significant stakeholders including community advocates and two-dozen clergy members associated with the National Action Network, a justice advocacy organization led by Rev. Al Sharpton.

82.    These stakeholders have voiced concern over the lack of healthcare services in certain neighborhoods and have urged the state to grant the CarePoint

---

[12]    Notably, NJ Spotlight news lists "Major funding" provided by both "Horizon Blue Cross Blue Shield of New Jersey" and "RWJ Barnabas Health."

applications.   Yet NJDOH has failed to act on CarePoint's applications while promptly responding to RWJ's requests.   By way of example only, NJDOH, at the behest of RWJ, has unreasonably delayed consideration of CarePoint's application for approval of the addition of 27 behavioral health beds at Bayonne Medical, resulting in a significant loss of revenue.

### 2.      The Jersey City Ambulance Contract

83.     As noted above, RWJ has been engaged for many years in a continuing pattern of conduct, including agreements with others such as Horizon, to drive the CarePoint Hospitals out of business as independent competitors. Another manifestation of this desire and pattern of conduct was the Jersey City ambulance contract.

84.     In September 2013, the City of Jersey City, New Jersey ("CJC") issued a request for bid proposals to provide ambulance services to residents of Jersey City.   Ultimately, CJC awarded the ambulance contract on November 12, 2014 to JCMC.

### a)      The Ambulance Settlement Agreement

85.     On December 8, 2014, the losing applicant, McCabe, an affiliate of CarePoint, commenced a lawsuit against CJC and JCMC.   McCabe asserted, among other things, that the City had improperly and unlawfully awarded the ambulance contract to JCMC.

86.    On July 1, 2016, CarePoint, McCabe, JCMC, and CJC (collectively, the "Settlement Parties") entered into a Settlement Agreement resolving the claims asserted in the McCabe Action.

87.    Under the Settlement Agreement, JCMC agreed, among other things, to provide ambulance transports pursuant to a grid-based protocol (the "Grid Protocol").   The purpose of the Grid Protocol was to identify the closest appropriate facility for all Emergency Medical Services ("EMS") patient transports originating within Jersey City.

88.    Specifically, the Grid Protocol identifies six separate geographic zones, based on the closest medical facility to each particular zone.

89.    Under the Settlement Agreement, JCMC must transport patient pick-ups originating from a designated grid zone to the medical facility identified by the Grid Protocol for the specific geographic zone, subject to specific, narrow exceptions.   Additionally, where the distance to JCMC and Christ Hospital are approximately equal, JCMC must transport such patients to JCMC and a CarePoint facility on an equal basis.

90.    The Settlement Agreement prohibits JCMC's EMS personnel from taking any action or making any statements designed to influence or persuade a patient's choice when asking the patient whether it prefers to go to a particular facility.

91.     An ambulance transport company's decision as to where to transport a patient has significant financial implications for the receiving medical facility. Among other things, federal and state law require the receiving medical facility to treat and stabilize any patient coming into the facility's emergency department, regardless of the patient's insurance status or ability to pay.  At the same time, depending on the patient's insurance coverage, the medical facility to which the patient is delivered can reasonably expect to earn significant revenue and profit in the form of insurance reimbursements for the life-saving and life-sustaining services and supplies the facility renders to the patient, both in the facility's emergency department and through any subsequent emergency or in-patient treatment provided to patients thereafter.

92.     Thus, if an ambulance service improperly steers patients to specific medical facilities based on the patients' ability to pay and/or insurance coverage, such conduct can cause significant financial harm to the medical facility that receives a disproportionately high share of patients without private insurance coverage or who are otherwise unable to pay, while depriving that facility of the revenues it can reasonably expect from patients covered by private health insurance.

93.     The parties designed the Settlement Agreement and accompanying Grid Protocol to prevent such improper redirecting, diverting or steering and

ensure equitable distribution of EMS patient transports. Furthermore, the Settlement Agreement and Grid Protocol prevent the inequitable result that any given medical facility would have an unfair advantage by redirecting, diverting or steering EMS transport patients to facilities that are not the closest medical facility.

94.     Upon information and belief, and as set forth below, JCMC has misused its position as CJC's ambulance provider to steer underinsured and uninsured patients to Christ Hospital and steer patients insured by private insurers to JCMC.

95.     The Settlement Agreement also requires JCMC to provide the Settlement Parties with monthly audit reports for each EMS patient transport originating in Jersey City. These monthly audit reports must contain data showing, among other things, the number of EMS patient transports conducted per month by JCMC, where those transports originated, the payor source (i.e., public or private insurance), and to which medical facility the transports are distributed. JCMC has not fully complied with this requirement, nor has it retained an independent auditor to monitor EMS patient transports within Jersey City and to provide periodic reports of the analyzed data, as the Settlement Agreement requires.

> **b)      JCMC's Redirecting, Diverting or Steering of Patients Away from CarePoint Facilities**

96.     Upon information and belief, JCMC began redirecting, diverting and/or steering EMS patient transports away from CarePoint facilities and to

JCMC, particularly those patients having private medical insurance or who otherwise had the financial wherewithal to pay the fees and costs associated with the EMS transport and any resultant emergency or in-patient services.

97.   Conversely, upon information and belief, JCMC began redirecting, diverting or steering patients who relied on Medicare or Medicaid, government sponsored healthcare, and charity, and patients who otherwise are unable to pay such fees, to CarePoint facilities.

98.   Upon information and belief, JCMC EMS personnel have been maliciously, knowingly and intentionally redirecting, diverting or steering EMS patient transports away from CarePoint facilities and toward JCMC, even where a CarePoint facility is the closest facility geographically.

99.   As a result of JCMC's patient redirecting, diverting and/or steering, CarePoint has suffered significant losses for three inter-related reasons.

100.   First, CarePoint suffered a loss in revenue from the decrease in EMS transports to CarePoint facilities when patients were steered away from CarePoint to RWJ.

101.   These losses are estimated to be at least $187 million from 2019 to 2022 and are calculated by aggregating the average revenue for each zone from an EMS patient transport.  This includes both (i) required emergency or in-patient care services, and (ii) revenue from continuing care in CarePoint's health system

after the ambulance drop off including primary care, specialty care, imaging, labs, and other non-acute services.

102.   This per-patient aggregated revenue is then multiplied by the decrease in EMS transport volume from 2019 through 2022 as compared to the average EMS patient transports during the period from 2016 through 2018.

103.   Second, as a result of JCMC's patient redirecting, diverting and/or steering, the percentage of patients arriving at CarePoint by EMS transport either relying on public healthcare or other assistance, or patients having a general inability to pay the costs associated with the EMS transport and any resultant emergency or in-patient services, has increased.   Had JCMC followed the methodology set out in the Grid Protocol, the mix of patients arriving at CarePoint facilities would include a higher percentage of patients having private medical insurance and/or more financial wherewithal and a correspondingly lesser percentage of patients who relied on Medicare or Medicaid, government sponsored healthcare, and charity.

104.   Third, JCMC's actions forced CarePoint to negotiate with insurance providers from a disadvantaged position, due to the decreased volume of patients. This lack of volume forced CarePoint to renegotiate managed care contracts with various insurance providers from a position of weakness resulting in substantially

decreased insurance receivables.  From the years 2019 to 2022, these losses are estimated to exceed $40 million in insurance receivables.

105.   The total estimated loss to CarePoint as a result of JCMC's patient redirecting, diverting and/or steering exceeds $227 million.

### 3.   RWJ's Attempt to Induce CarePoint-Referring Doctors to Steer Patients to RWJ Facilities

106.   RWJ's march towards monopoly continued to not only decimate the CarePoint facilities through steering paying emergency room patients to its own facilities, but also by seeking to incentivize doctors to stop referring patients to CarePoint facilities and start referring them only to RWJ facilities.

107.   Beginning in mid-February 2016, RWJ in conjunction with Horizon, launched a campaign of sending letters (the "RWJ Letter") to physicians who have, over the years, consistently referred patients to CarePoint Hospitals for treatment (hereinafter the "CarePoint Referring Physicians").  The RWJ Letter was intended to induce physicians to refer patients to RWJ and away from the CarePoint Hospitals.  The letter confirmed the collaboration between RWJ and Horizon, and touted incentives to physicians to refer patients to RWJ.

108.   For example, the RWJ Letter stated that "If you have privileges at a Barnabas Health facility, you are eligible to join Barnabas Health Care Network (ACO).  Through this network, you may receive **enhanced fee-for-service fees**, be

eligible for **patient management fees** and have the ability to **participate in shared savings** for most Horizon patients."

109.   In effect, Horizon, in conjunction with RWJ, sought to lure CarePoint Referring Physicians to steer paying, insured patients to Horizon's "Tier 1" hospitals at the expense of the CarePoint Hospitals.

110.   These decreases in revenue, which were directly caused by RWJ, contributed to the CarePoint Hospitals experiencing difficult economic times late in the prior decade.

### D.   CarePoint Explores Selling Hospitals

111.   Between 2011 and early 2018, CarePoint stabilized the operations of the Hospitals, employing thousands of people, serving hundreds of thousands of patients, and investing significant funds in the real estate on which each Hospital operated and in the community served by each Hospital.   However, the latter portion of the prior decade presented significant financial challenges to the CarePoint Hospitals as a result of RWJ's monopolization efforts.

112.   In addition, efforts to navigate the economic shoals and develop a strategy for success, indeed survival, were complicated by the fact that the CarePoint Hospitals were not in full control of the real estate on which the Hospitals were located.   By way of example, MPT of Hoboken TRS, MPT of Hoboken Hospital, MPT of Hoboken Real Estate, and MPT of Bayonne (together

"MPT") are limited liability companies that, at pertinent times, own(ed) portions of the real estate under the CarePoint Hospitals.  MPT is a national medical REIT.

113.   The property on which Christ Hospital operated was owned by Hudson Propco, LLC (owned 75% by the Founders and 25% by JC Opco, LLC, an entity owned by Eisenreich), and the property on which HUMC operated was owned 70% by an MPT entity and 30% by the Founders.  The Bayonne property was wholly owned by an MPT entity and was subleased to IJKG, the CarePoint affiliate that operated Bayonne Medical Center.

114.   Beginning in 2018, CarePoint began to explore strategic alternatives, including a sale of the Hospitals to new operators.  As one of his companies was the minority owner of Christ Hospital, Eisenreich was included in all of CarePoint's discussions involving strategic alternatives.

115.   The primary goal for each of CarePoint's strategic alternatives was to ensure that all potential suitors agree that the Hospitals would continue operating as acute care facilities for the benefit of the communities that they serve.  This crucial baseline requirement was communicated by CarePoint to all who expressed interest in acquiring or otherwise becoming involved in the operation of any of the CarePoint Hospitals.   In selecting an acquirer or other strategic partner, CarePoint's primary focus has been to avoid any interruption in providing quality healthcare to the residents of Hudson County; therefore, CarePoint rejected any

proposal that did not guarantee a seamless transition of employees, physicians, nurses, operations, and health care services.

116.   In April, 2019, RWJ expressed interest in all three CarePoint Hospitals.  In July, 2019, RWJ made a proposal for CarePoint's HUMC and Christ Hospital facilities, but not for Bayonne Medical.  CarePoint also engaged in discussions with another potential purchaser, Atlantic Health, which does not have acute care operations in Hudson County or in communities bordering Hudson County.

### 1.    Eisenreich and His Affiliates Conspired with RWJ to Utilize the Ownership of Hospital Realty to Squeeze CarePoint

117.   Potential acquirers, including RWJ and Atlantic, were aware of the importance of controlling the real estate on which the Hospitals were built, for predictability of cost and planning.

118.   Eisenreich also recognized the critical relationship between hospital operations and control of the hospital real estate, and the opportunity for him to personally benefit from and control the sale of the CarePoint Hospitals.  Eisenreich devised a scheme to do exactly that, in part by conspiring with RWJ.

119.   In August, 2019, Eisenreich began an ongoing dialogue with Michael Manigan of RWJ.  Much of this dialogue was conducted secretly, and not disclosed to CarePoint, even though it often involved the use of confidential information by Eisenreich.

120.   In late August, 2019, RWJ advised CarePoint that it was not interested in purchasing HUMC at the offered price, but that it might still be interested in acquiring Christ Hospital.

121.   On September 10, Eisenreich (through his counsel) told CarePoint's counsel that RWJ was interested in bidding for the assets of Christ Hospital.

122.   On September 17, MPT offered to sell the Hoboken and Bayonne real estate to CarePoint.   CarePoint accepted this offer, but such transaction never closed.

123.   Eisenreich separately communicated to RWJ and to CarePoint that he had a "plan" that could work for everyone.   He warned CarePoint that RWJ contemplated closing Bayonne Medical as an acute care hospital.

124.   On September 23, RWJ emailed to CarePoint an offer for the Christ Hospital assets only.

125.   From   mid-September   into   November,   Eisenreich   orchestrated communications regarding the implementation of his "plan" to which RWJ had agreed.   Eisenreich endeavored to preclude direct contact between RWJ and CarePoint with respect to any potential transactions.

126.   RWJ's interest in any acquisition was contingent upon its ability to negotiate new leases.  On September 28, 2019, RWJ tendered a revised LOI for the assets of HUMC and Christ Hospital, with that contingency.

127.   Eisenreich, through his affiliate, Alaris Health ("Alaris"), executed an LOI with MPT for the sale of the HUMC and Bayonne Medical real estate and for the acquisition of MPT's minority equity interest in HUMC, on October 18, 2019. He promptly reported this to RWJ, but not to CarePoint.

128.   On October 21, RWJ submitted another LOI to CarePoint for the acquisition of Christ Hospital and HUMC (expressly contingent on new leases for the HUMC and Christ Hospital real estate), which CarePoint accepted the next day.

129.   Eisenreich continued to meet secretly with RWJ regarding lease terms.  He agreed with RWJ that it would not respond to CarePoint's inquiry about lease terms.

130.   On October 27, without notice to CarePoint, Eisenreich (through Alaris) executed definitive agreements with MPT for the sale of the HUMC and Bayonne Medical real estate and MPT's minority equity interest in the operator HUMC.  These transactions closed on November 5, 2019.  CarePoint did not learn of this until two days later.  Alaris subsequently assigned its interests to other Eisenreich affiliates – WTFK Bayonne and SB Hoboken.

131.   On November 1, 2019, RWJ filed an application with the NJDOH for expedited consideration of its request for a CN to proceed with its proposed transactions concerning Christ Hospital and HUMC.

132.   Using the pretense of uncertainty over the real estate, but in truth knowing the damage it would cause to CarePoint, RWJ – in collusion with Eisenreich – intentionally backed out of the proposed transaction to acquire the Christ Hospital and HUMC facilities.

133.   The sale of the real estate on which HUMC and Bayonne Medical operate and the assignment of the affected leases is presently subject to claims brought by, among others, HUMC and IJKG (the CarePoint affiliate that owns and operates Bayonne Medical) in the Chancery Court in Delaware in the matter entitled *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, C.A. No. 2019-0972-KSJM.

134.   In that litigation, the Court has issued a number of interlocutory rulings in favor of the CarePoint entities, including (i) a finding that MPT violated a right of first refusal when it purported to sell the HUMC equity interest to an Eisenreich affiliate, (ii) the Court has denied the Eisenreich parties efforts to obtain summary judgment on tortious interference claims against Eisenreich and (iii) most recently has stricken all of Eisenreich's counterclaims against CarePoint.

### 2.   Eisenreich and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint

135.   In January 2020, HRH approached CarePoint about a possible acquisition of all or part of, or investment in, the group of entities comprising CarePoint Health– by way of a merger, asset sale, or other transaction.

136.   In connection with this potential transaction, HRH requested an extensive list of confidential information about CarePoint and the Hospitals. Accordingly, CarePoint granted HRH access to a "data room" where confidential data, including financial data, regarding Bayonne Medical and the other CarePoint Hospitals was stored.

137.   As a condition to receiving information about the Company, HRH entered into a confidentiality agreement with CarePoint, dated January 9, 2020. Under the confidentiality agreement, HRH agreed to treat any "Evaluation Material" in "accordance with the provisions" of the confidentiality agreement.

138.   After having access to, reviewing, and downloading copies of most of the Evaluation Material in the data room for not only Bayonne Medical – but all the CarePoint Hospitals, on March 16, 2020, HRH submitted an offer to IJKG, which included a provision that the offer was "[c]ontingent upon the ability to acquire the Land and Property for $30 million or less."  Despite HRH revising its bid several times, no version of HRH's modified offer for the assets of Bayonne Medical included all of the requirements requested by IJKG.

139.   At the same time it was negotiating with HRH, IJKG was negotiating with BMC and others.

140.   Given the offers before it, IJKG determined that BMC presented the best bid for Bayonne Medical's assets, considering the potential for successful operation of the hospital, and financial stability.

141.   On March 23, 2020, BMC signed a letter of intent (the "BMC LOI") to purchase the assets of Bayonne Medical – keeping substantially all of Bayonne Medical's employees and staff, and providing the same services provided as an acute care hospital.

142.   Given the execution of the BMC LOI, IJKG informed the other bidders, including HRH, that it had an exclusive letter of intent with another bidder for the assets of Bayonne Medical, and could not entertain any further proposals or discussions about Bayonne Medical.

143.   In May 2020, notwithstanding the existence of the BMC LOI between IJKG and BMC, Eisenreich, through WTFK Bayonne, agreed to sell the Bayonne Medical real estate to HRH – and HRH promptly and publicly announced its ownership and control of the Bayonne Medical real estate.

144.   Eisenreich tried to use his political influence to undermine the BMC transaction.  On May 13, 2020, Eisenreich, through counsel, sent a letter to Hudson County indicating that he "is aware of at least one such potential replacement licensee [HRH]" and proposed "to enter direct conversations with the [Hudson

County Improvement Authority][13], as well as the New Jersey Department of Health, toward installation of a replacement tenant [HRH] for CarePoint in both Bayonne and Hoboken."

145.   Joining in this effort to sabotage CarePoint, HRH (newly in control of the Bayonne Medical real estate) hired a lobbyist in an effort to convince the County to push HRH as the new operator for Bayonne Medical.

146.   On May 14, 2020, the Board of Chosen Freeholders of the County of Hudson adopted three resolutions authorizing the Hudson County Improvement Authority ("HCIA") to condemn the Christ Hospital, Bayonne Medical, and HUMC real estate.   HRH and Eisenreich opposed the condemnation process, which would have derailed Eisenreich's real estate play.

147.   These resolutions stated that the Bayonne property could only be "utilized for the operation of health care and medical facilities," and that the HCIA "has determined that it is necessary to acquire the [Bayonne] Property… for the general welfare, health and safety of the residents of the County and the City" of Bayonne.

148.   Calling out Eisenreich and HRH's play here, Jersey City Mayor Steven Fulop chastised them, stating that "[i]t seems [RWJ] and CarePoint have come to an agreement and the last obstacle is the landlord [Eisenreich], who is

---

[13] The Hudson County Improvement Authority is a county public agency which is empowered to use eminent domain to condemn properties in Hudson County for public use.

holding up the deal," and whose "greed is ultimately putting tens of thousands of people's health at risk here in Hudson County."[14]

149.   Mayor Fulop further scolded Eisenreich and his entities, stating that Eisenreich's affiliate "Alaris is the obstacle, clearly, and it's all about real estate . . . . It's all about greed and dollars and we're collectively saying that that's unacceptable."[15]

150.   Senator Brian Stack stated at the same time, "We all know how important healthcare is. . . .  It's sad that one person [Eisenreich] could hold it up and we need stop this from happening not only in Hudson but all over the state of New Jersey."[16]

151.   In an op-ed for The Jersey Journal, Hudson County Executive Tom DeGise admonished Eisenreich's interference, stating that Eisenreich "has blocked for months the sale of these two hospitals to RWJ Barnabas Health as part of separate deal that Hoboken Mayor Ravi Bhalla, and Jersey City Mayor Steve Fulop

---

[14]   Joshua Rosario, *Hudson County officials say Alaris Health owner is blocking deal for 2 Hudson County hospitals*, The Jersey Journal, March 9, 2020 (https://www.nj.com/hudson/2020/03/hudson-county-officials-say-alaris-health-owner-is-blocking-block-deal-for-2-hudson-county-hospitals.html)

[15]   David Cruz, *Hudson officials say fate of three hospitals is threatened by 'greed'*, NJTV News, March 9, 2020 (https://www.njtvonline.org/news/video/hudson-officials-say-fate-of-three-hospitals-is-threatened-by-greed/)

[16]   Joshua Rosario, *Hudson County officials say Alaris Health owner is blocking deal for 2 Hudson County hospitals*, The Jersey Journal, March 9, 2020 (https://www.nj.com/hudson/2020/03/hudson-county-officials-say-alaris-health-owner-is-blocking-block-deal-for-2-hudson-county-hospitals.html)

have both publicly supported as a way to allow these hospitals to go on serving their residents."[17]

152.   In that same article, it was reported that Executive DeGise further stated, "imagine the crushing stress our heroic doctors and nurses endure at Bayonne Medical Center, Hoboken University Medical Center and Christ Hospital in Jersey City as they work to save lives during the COVID-19 pandemic.  Then imagine their stress being cruelly ramped up further — not by a spike in caseloads — but by [Eisenreich,] a profiteering nursing home bandit whose actions threaten their jobs and the health of all of us they serve."

153.   DeGise further noted that the "supply of hospital beds cannot be simply be viewed as a source of private profit, but as a critical community resource."

154.   Notably, however, HRH had no real incentive to expend significant resources to acquire Bayonne Medical – but rather set out to ensure that BMC could not come in as an operator of Bayonne Medical.  Despite HRH being licensed as a general acute care hospital, its main focus had been, and continues to be, on same day surgery.  Unsurprisingly, this was also the focus of BMC, who signed the BMC LOI with CarePoint to operate the Bayonne Medical facility.

---

[17]   Terri West, *DeGise says he's ready to use eminent domain on 3 CarePoint Health hospitals*, The Jersey Journal, May 12, 2020 (https://www.nj.com/hudson/2020/05/degise-says-hes-ready-to-use-eminent-domain-on-3-carepoint-health-hospitals.html)

155. HRH's motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County, preferably at its existing Secaucus facility.

156. HRH also desired to bankrupt CarePoint – a desire shared by Eisenreich (who could benefit from the land) and RWJ (which would benefit by the closure of Bayonne Medical – thus driving all ER traffic from their SED in Bayonne to JCMC.)

157. Notably, the land transaction through which HRH acquired the Bayonne Medical real estate from Eisenreich not only occurred the same day that CarePoint and BMC announced their asset purchase for Bayonne Medical, but further, the deal was 100% seller-financed.  That is to say that HRH did not put up one cent to acquire the Bayonne Medical real estate.  The financing, also unsurprisingly, was through one of Eisenreich's entities.

### 3.    Eisenreich's Collaborators at HRH

158. To further demonstrate HRH's penchant for greed and subterfuge, its Board of Directors is headed by Moshe, who has been sued in at least half a dozen

federal lawsuits, which have accused Moshe of RICO and insurance fraud over the last decade.[18]

159.   Moshe has such an extensive history of alleged fraud and wrongdoing that another Federal Court based its granting of a preliminary injunction on the then-seven prior lawsuits filed against Moshe alleging his engagement in fraudulent billing activities.  *See* In *Gov't Employees Ins. Co. v. Moshe*, 2020 WL 3503176, at *1 (E.D.N.Y. June 29, 2020).

160.   In fact, a putative class action was filed in this very Court, alleging that Moshe colluded with his sister, a New York-based physician, to refer New York-resident patients to HealthPlus – a Hackensack, NJ-based surgery center owned by Moshe, despite the existence of less expensive facilities closer to the patients.  The class alleges that poor sterilization and other deficiencies may have exposed these wrongly referred patients to HIV and hepatitis. *C.S. v. HealthPlus Surgery Center, LLC*, 2020 WL 6074457, at *1 (D.N.J. Oct. 14, 2020).

161.   Further, in a complaint filed late last year, State Farm alleged numerous claims, including fraud, based on Moshe's alleged orchestration of a fraudulent scheme to bill and profit from a series of medical facilities, a billing company, and a series of ambulatory surgical centers which he "secretly owns and

---

[18]     Peter D'Auria, *This man wants to create a new for-profit hospital chain in Hudson County. Can he do it?*, The Jersey Journal October 26, 2020 (https://www.nj.com/hudson/2020/10/this-man-wants-to-create-a-new-for-profit-hospital-chain-in-hudson-county-can-he-do-it.html)

controls." *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C.*, 21-cv-5523, Complaint ¶ 2 (E.D.N.Y. Oct. 5, 2021).

162.   About the same time as the State Farm suit, Allstate Insurance Company separately sued Moshe for having "engineered" a fraud scheme in which he, through affiliated entities, "aggressively" sought to collect payments from Allstate even though the entities were not eligible for reimbursement. *Allstate Ins. Co. v. Metro Pain Specialists P.C.*, 21-cv-5586, Complaint (E.D.N.Y. Oct. 7, 2021).

163.   Perhaps most relevant to the instant action is that Allstate also alleged that Moshe sought to evade prohibitions against his ownership of certain types of medical facilities and fraudulent billing of medical services from the same by installing "sham owner" physicians, but retaining operations, control, and profit for himself and the medical facilities he owns. *Id.*

164.   Moshe's colleague, HRH's President and Chief Executive Officer, Dr. Nizar Kifaieh, is the subject of an active litigation in Hudson County brought by CarePoint based on Kifaieh's legally binding separation agreement.

165.   As part of that separation agreement, and in return for over $2,600,000 in cash as well as other valuable consideration, Kifaieh agreed not to disparage CarePoint, yet after obtaining the CEO job with HRH, Kifaieh published

and made a number of disparaging, false and defamatory statements in violation of his separation agreement.

166.   Also, most recently, Reuven Alonalayoff, Director of Marketing for HRH, was arrested after police found a "large cache of firearms and ammunition inside an office closet" at HRH.  Secaucus police "recovered 11 handguns, 27 rifles or shotguns, and a .45 caliber semi-automatic rifle with a high-capacity magazine, which is an assault rifle, inside [a] hospital closet," as well as "another high-capacity handgun magazine with 14 rounds." [19]

167.   Notably, Alonalayoff "who is also known as Reuven Alon and Rob Alon," has been named alongside Moshe as a co-owner of certain shell corporations in numerous lawsuits, including federal lawsuits brought by GEICO and State Farm in which he, with Moshe were accused of "submitting fraudulent claims for medical services related to car accidents."[20]

---

[19]    Emily Mae Czachor, *Hospital employee arrested after 39 guns, ammo found in office closet* August 9, 2022 CBS News (https://www.msn.com/en-us/news/crime/hospital-employee-arrested-after-39-guns-ammo-found-in-office-closet/ar-AA10u5IV)

[20]    Ed Shanahan - *Employee Kept Arsenal, Including Assault Rifle, at Hospital, Police Say* – NY Times, August 9, 2022  (https://www.nytimes.com/2022/08/09/nyregion/guns-hospital-employee-threat-new-jersey.html)

E.     **Hoboken Municipal Hospital Authority Engages Raymond James to Issue RFI and Collude with RWJ to Interfere with CarePoint Hospitals**

168.   On or about December 18, 2020, the Hudson Municipal Hospital Authority (HMHA) was reconstituted, pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15, *et. seq.*

169.   The applicable Ordinance B-312 states that HMHA was created because "CarePoint Health has notified the City that it no longer desires to continue its operation of the Hospital [HUMC]." This assertion was false, as CarePoint never notified the City or any of its government officials that it intended to cease operating HUMC.

170.   CarePoint made repeated requests to HMHA to provide the basis upon which this assertion was made, but HMHA failed to supply any basis.

171.   Ordinance B-312 recognizes that N.J.S.A. § 30:9-23.15 "authorizes municipalities to create, by ordinance, an instrumentality for the **sole purpose** of carrying out an acquisition and to operate and maintain a hospital." (emphasis added)  However, HMHA has neither obtained funding from the City of Hoboken that would permit it to acquire HUMC, nor otherwise raised funds to support an acquisition of HUMC.

172.   Furthermore, HMHA has neither made an offer to CarePoint for the purchase of HUMC nor communicated an interest to CarePoint in purchasing

HUMC – thus HMHA has not pursued its sole permitted purpose under the Local Hospital Authority Law – to acquire a hospital.

173.   Instead of pursuing any of its permitted purposes under the Local Hospital Authority Law, HMHA sought to broker a sale of CarePoint – a private hospital system – to another private hospital system.   This is not a permitted purpose under the Local Hospital Authority Law.

174.   To effectuate this brokering, HMHA engaged Raymond James to issue a RFI, which sought potential buyers for not only HUMC, the only hospital under HMHA's City of Hoboken jurisdiction, but, incredibly, CarePoint's other hospitals in Hudson County.

175.   To make matters worse, HMHA was not properly constituted pursuant to N.J.S.A. § 30:9-23.19(a), which sets out requirements for the number and nature of members the HMHA Board is required to have.

176.   In short, HMHA was operating completely outside of its permitted scope, both from the perspective of purpose (*i.e.*, attempting to broker a sale between privately owned entities), its scope (*i.e.*, seeking to operate beyond the bounds of the City of Hoboken), and its constitution (*i.e.*, failing to properly adhere to the Local Hospital Authority Law as to how many and what type of board members should comprise the HMHA Board).

177.   RWJ interacted with HMHA and Raymond James in order to further its goals of devaluating HUMC and pursuing an anticompetitive sale of HUMC to RWJ.

178.   In June 2021, ahead of HMHA circulating its RFI in December 2021 for the improper purpose of brokering a sale of HUMC and CarePoint's other hospitals, HMHA provided advance notice to RWJ that Raymond James represented HMHA in identifying a new operator of HUMC, and that an RFI would be circulated seeking potential buyers.

179.   Specifically, Vinton Rollins of Raymond James reached out to Mark Manigan of RWJ, noting their "prior introduction and past Zoom call," that Rollins was "[l]ooking forward to [his] next zoom" with Manigan on June 14, and to give Manigan "a Heads-up that Raymond James is now representing the City of Hoboken/Mayor in working to find a replacement operator/owner for CarePoint's Hoboken University Medical Center[.]"

180.   Even before this June 2021 advance notice, in February 2021 RWJ and Raymond James exchanged updates concerning CarePoint Health, including regarding Vivek Garipalli, the then-current majority owner of CarePoint Health – in an attempt to identify weaknesses that RWJ could leverage to devalue HUMC and to further its anticompetitive conduct.

181.   Upon information and belief, Raymond James was engaged by both RWJ and HMHA, and had an inherent conflict in representing both HMHA for the RFI and RWJ in other dealings.

182.   On or about October 8, 2021, CarePoint publicly announced its intention to convert HUMC to non-profit ownership.  Despite this announcement, on or about December 20, 2021, without CarePoint's knowledge or consent, HMHA and Raymond James circulated the RFI to numerous entities, including RWJ, soliciting potential buyers or operators for the Hospital, even though HMHA did not own HUMC and had no intention of ever owning HUMC.

183.   In the RFI, HMHA and Raymond James stated that "[i]n 2019, the City of Hoboken became aware that CarePoint was engaged in reviewing the sale of the operating assets of HUMC," despite CarePoint informing HMHA and Raymond James on multiple occasions that this assertion was false.

184.   In an attempt to exclusively control the means and method of communication with RFI respondents and remove CarePoint from the negotiation of the sale of its own hospital(s), the HMHA warned in its RFI that "[i]n no event should any RFI Respondent directly contact any officer, member, agent or employee of . . . CarePoint without the prior consent of Raymond James." The RFI directed recipients to direct all questions to Raymond James, not the supposed seller, CarePoint.

52

185.   Boldly and without authority to do so, HMHA encouraged recipients to "consider expressing in their response whether they would be interested in proposing a transaction involving the other operations and/or assets of CarePoint in Hudson County, such as Bayonne Medical Center and Christ Hospital, as CarePoint has indicated its interest in maintaining a coordinated system of facilities in its service area."

186.   HMHA then continued the conversation it started more than six months earlier with RWJ to discuss how to take over the CarePoint Hospitals, which led to RWJ, despite backing out of a previous potential acquisition of one or more of the CarePoint facilities, to express interest in operating and owning HUMC, and potentially other CarePoint Hospitals.

187.   Upon information and belief, RWJ leveraged connections in Hoboken to drive the reconstitution of the HMHA for sole purpose of sowing doubt and discord among the CarePoint Hospitals and leading to further defections of doctors and staff.

188.   Furthermore, the HMHA RFI enclosed confidential information concerning CarePoint and HUMC that HMHA, through Raymond James, obtained without authorization, from unidentified "private sources." This confidential information included financial and operational data concerning HUMC, which Raymond James reported obtaining from an unidentified "proprietary database."

189.   Inclusion of this confidential information in the HMHA RFI intentionally and misleadingly represented to third parties that HUMC and CarePoint authorized such data to be contained in the RFI.

190.   As a result of the RFI's circulation, and RWJ's interest, certain RFI recipients halted ongoing negotiations and reconsidered prospective business relationships with CarePoint.  More broadly, the RFI (which states that the current operator will be displaced) and RWJ's interest therein put CarePoint at a disadvantage to enter into any new agreements and retain staff.

191.   Upon information and belief, RWJ and HMHA understood how CarePoint and, specifically HUMC, would be affected by the circulation of the RFI—and likely intended these effects.  Also, circulating the RFI improperly interfered with HUMC's operations and management—including HUMC's development of relationships with strategic partners.

192.   CarePoint successfully brought an action against HMHA and others in Superior Court in Hudson County, NJ captioned *Carepoint Health Management Associates, LLC d/b/a Carepoint Health And Humc Opco, LLC d/b/a Carepoint Health – Hoboken University Medical Center v. Hoboken Municipal Hospital Authority, Raymond, James & Associates, Inc.* (Case No. HUD-C-000019-22) to enjoin distribution of the RFI.

54

193.   RWJ's interest in the RFI likely was intended to have the same effect – to increase costs to CarePoint and sow confusion and uncertainty concerning CarePoint.

194.   Through all the above actions RWJ and its conspirators including, without limitation, Eisenreich, Horizon, HRH, Moshe, and Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public.

195.   RWJ has carried out these actions without intervention from, and sometimes with the explicit support and authority of state and local government and New Jersey healthcare providers such as Horizon.

196.   RWJ's conduct, as alleged herein, has caused significant financial injury to CarePoint and, unless enjoined, will risk significant competitive harm to CarePoint and to the public.

## COUNT I – VIOLATION OF THE SHERMAN ACT SECTION TWO (15 U.S.C. § 2)

197.   Plaintiffs incorporate by reference paragraphs 1 through 196 above.

### A.   Relevant Markets

198.   Inpatient general acute care ("GAC") services provided in Hudson County is a relevant market in which to assess RWJ's monopolistic effect on competition and consumers of GAC services.

### 1.    Relevant Product Market

199.   Inpatient GAC services is the relevant product market.  Inpatient GAC services include a broad cluster of hospital services— medical, surgical, and diagnostic services requiring an overnight hospital stay—for which competitive conditions are substantially similar.  Here, inpatient GAC services cover all such overlapping services that both RWJ and CarePoint provide.  GAC services implicate interstate trade and commerce in that supplies used in providing care, as well as funding for the services, travel in interstate commerce.

200.   Outpatient services (i.e., services that do not require an overnight hospital stay) are not included in the inpatient GAC services market because patients cannot substitute outpatient services for inpatient services in response to a price increase on inpatient GAC services.  This is because the decision to administer services on an inpatient or outpatient basis is a medical determination based on each patient's specific clinical need.

201.  A hypothetical monopolist of all inpatient GAC services could profitably impose a small but significant and non-transitory increase in the price of those services.

## 2.    Relevant Geographic Market

202.   Hudson County, New Jersey, is a relevant geographic market in which to evaluate RWJ's monopolistic effect on competition.  Hudson County is the focal area of competition between RWJ and CarePoint.

203.   Hudson County is the fourth-most populous, most dense, and fastest-growing, county in New Jersey, with a population of more than 700,000 residents.

204.   Hudson County is an area that is economically significant to commercial insurers.  Patients typically prefer to have access to inpatient GAC services close to where they live.  For this reason, a commercial insurer would be unable to sell a health plan successfully in Hudson County that did not include in its network any Hudson County GAC hospitals.

205.   Commercial insurers must meet regulatory requirements that mandate a certain level of geographic access.  Insurers could not meet geographic access requirements for marketing commercial plans in Hudson County if those insurers did not include any Hudson County hospitals as in-network hospitals in their commercial insurance plans.

206.   Hudson County's population includes a disproportionate high number of patients who receive health care from government funded programs, or the uninsured.  Hudson County has the most diverse population of any county in the eastern United States.

207.   Hudson County also has a large number of patients for whom travel outside of Hudson County to receive GAC services would constitute a substantial hardship.

208.   A hypothetical monopolist of all inpatient GAC services in Hudson County could profitably impose a small but significant and non-transitory increase in price of those services.

### B.   Market Effects

209.   There is direct evidence that the conduct of RWJ, injuring and threatening the elimination of the CarePoint facilities as independent competitors, is likely to further lessen competition in the relevant market.  Today, RWJ (through JCMC) and CarePoint are important competitors to each other.  That competition benefits commercial insurers and patients.  Elimination of this important head-to-head competition will result in anticompetitive effects.

### C.   Competition Among Hospitals Benefits Consumers

210.   Under a model of hospital competition that has been developed in merger enforcement cases brought by the Federal Trade Commission, competition among hospitals is viewed as a "two-stage" market, in which the first stage is centered on the formation of networks of providers, including hospitals, by commercial insurers.  At this stage, both insurers and hospitals are viewed as competitors in the process of network formation.  In theory, this process allows

insurers to negotiate for lower prices and other favorable terms which, in turn, benefit consumers by lowering the insurers' costs that must be passed on to their subscribers.

211.   Under this model, in the first stage of hospital competition, hospitals compete to be included in commercial insurers' health plan networks.  To become an in-network provider in a health plan, a hospital negotiates with an insurer and enters into a contract if it can agree with the insurer on terms.  The hospital's reimbursement terms for services rendered to a health plan's members are a central component of those negotiations.   This is true regardless of whether reimbursements are tied to fee-for-service contracts, value-based contracts, or other types of contracts.

212.   Insurers attempt to contract with local hospitals (and other healthcare providers) that offer services that current or prospective members of the health plan want.  In-network hospitals are typically significantly less expensive for health plan members to seek care from than a hospital that is not included in the health plan's network (an "out-of-network provider").  A hospital likely will attract more of a health plan's members when it is in-network.  Hospitals, therefore, have an incentive to offer competitive terms and reimbursement rates to induce the insurer to include the hospital in its health plan network.

213.   From the insurer's perspective, having hospitals in-network is beneficial because it enables the insurer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically employers and their employees.

214.   A hospital has significant bargaining leverage if its absence would make the insurer's health plan network substantially less attractive (and therefore less marketable) to its current and prospective members.   This relative attractiveness to the insurer depends largely on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of the plan's members. The presence of alternative, conveniently located, high-quality hospitals is important competition that constrains the ability of hospitals to raise prices and seek other terms adverse to consumers in negotiations with insurers.   Where there are fewer meaningful alternatives (i.e., less competition), a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more onerous contract terms.

215.   In the second stage of competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services. Once patients select a health plan, they generally do not face different out-of-pocket costs to access hospitals included in their commercial health plan network. As a result, in-network hospitals often compete on non-price features, such as

location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, conveniences, and patient satisfaction.

216.   Non-price competition to attract patients benefits all patients at the competing hospitals, regardless of whether those patients are covered by commercial insurance, government funded programs, such as Medicare, Medicaid and Tri-Care, or are uninsured.

217.   In Hudson County, RWJ-JCMC and CarePoint are close competitors to each other because they sell many of the same services in essentially the same place.

218.   RWJ-JCMC and CarePoint currently serve as important alternatives to one another for insurers constructing networks that include Hudson County.  RWJ-JCMC and CarePoint's Christ Hospital are two of the three largest hospitals in Hudson County, and they are the only hospitals in Jersey City, the largest city within Hudson County.

219.   Upon information and belief, quantitative analysis will provide direct evidence of the closeness of the competition between RWJ-JCMC, and CarePoint. Diversion analysis, an economic tool that measures substitution using data on where patients receive hospital services, will show that if CarePoint's hospitals were to become unavailable to patients for inpatient GAC services, a significant number of CarePoint's patients would seek care at an RWJ hospital.  Likewise, if

RWJ-JCMC were to become unavailable to patients for inpatient GAC services, a significant number of RWJ-JCMC's patients would seek care at one of CarePoint's hospitals.

220.   RWJ-JCMC and CarePoint compete with one another to attract patients to utilize their inpatient GAC services, regardless of a patient's insurer. This competition incentivizes RWJ and CarePoint to improve quality, technology, amenities, equipment, access to care, and service offerings.

221.   RWJ is attempting to prevent CarePoint's hospitals from competing against RWJ, either as independent competitors or as competitors partnered with a different healthcare system.

222.   The provision of acute care hospital services, as well as subsets of those services, implicate interstate commerce, *inter alia*, in that they involve the use of medicines and supplies that travel in interstate commerce, involve reimbursement by insurance companies and federal and state funds that move in interstate commerce.

223.   RWJ has a dominant share of the acute care hospital services market in Hudson County, and enjoys power over the setting of prices to be charged to commercial insurers, as well as uninsured patients.

224.   If RWJ should succeed in eliminating the CarePoint Hospitals as independent competitors in Hudson County, RWJ's already significant market power would be greatly enhanced.

225.   As alleged above, RWJ and its conspirators have adopted a many-faceted strategy to pursue the goal of eliminating the CarePoint Hospitals as independent competitors.  While some of those activities, including seeking the aid of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme, they nonetheless provide evidence of RWJ's monopolistic intent and purpose.

226.   RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for GAC services in Hudson County.

227.   RWJ's conspirators in this effort include, without limitation, Eisenreich, Horizon, HRH, Moshe, and Kifaieh.

228.   CarePoint has suffered damage to its business or property in the form of lost revenues and resulting profits, as well as being forced to incur significant expenses to mitigate the anticompetitive effects of the conduct of RWJ and its conspirators.

229.   Accordingly, RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for acute care hospital services in Hudson County, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

230.   The actions of RWJ and its conspirators have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

231.   Unless the continued unlawful conduct of RWJ and its conspirators is enjoined pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

## COUNT II – VIOLATION OF THE SHERMAN ACT SECTION ONE (15 U.S.C. § 1)

232.   Plaintiffs incorporate by reference paragraphs 1 through 231 above.

233.   The facts set forth above show that RWJ and its conspirators have engaged in a series of agreements in unreasonable restraint of interstate trade and commerce, affecting the markets for acute care hospital services in Hudson County, including but not limited to agreements intended to cripple and/or destroy the CarePoint Hospitals as independent competitors, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

234.  The actions of RWJ has caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

235.  Unless the continued unlawful conduct of RWJ and its conspirators is enjoined, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

### COUNT III – VIOLATION OF THE NEW JERSEY ANTITRUST ACT, N.J.S.A. 56:9-1, *et seq.*

236.  Plaintiffs incorporate by reference paragraphs 1 through 235 above.

237.  The New Jersey Antitrust Act (N.J.S.A. 56:9-1, *et seq.*) provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J.S.A. 56:9–3.

238.  The purpose of the Antitrust Act "is the prevention of trade-restraining practices which have tendency to deprive the public of benefits

ordinarily derived from a competitive market." *Boardwalk Properties, Inc. v. BPHC Acquisition, Inc*., 602 A.2d 733 (N.J.App.Div. 1991).

239.   Furthermore, N.J.S.A. 56:9–4(a) provides: "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State."

240.   New Jersey Courts have long held that "[t]he language of the New Jersey Antitrust Act is virtually identical to the antitrust provisions in the Sherman Act" and "the New Jersey act specifically provides that it be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." *St. Clair v. Citizens Fin. Group*, No. 08-1257, 2008 WL 4911870, at *5, (D.N.J. Nov. 12, 2008)(internal citation and quotation omitted); *see also State v. New Jersey Trade Waste Ass'n*, 472 A.2d 1050, 1056 (N.J. 1984) ("N.J.S.A. 56:9– 18 provides that the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.")

241.   RWJ has a dominant share of the acute care hospital services market in Hudson County, and enjoys power over the setting of prices to be charged to commercial insurers, as well as uninsured patients.

242.   If RWJ should succeed in eliminating the CarePoint Hospitals as independent competitors in Hudson County, RWJ's already significant market power would be greatly enhanced.

243.   As alleged above, RWJ and its conspirators have adopted a many-faceted strategy to pursue the goal of eliminating the CarePoint Hospitals as independent competitors.  While some of those activities, including seeking the aid of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme, they nonetheless provide evidence of RWJ's monopolistic intent and purpose.

244.   RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for GAC services in Hudson County.

245.   RWJ's conspirators in this effort include, without limitation, Eisenreich, Horizon, HRH, Moshe, and Kifaieh.

246.   CarePoint has suffered damage to its business or property in the form of lost revenues and resulting profits, as well as being forced to incur significant expenses to mitigate the anticompetitive effects of RWJ's conduct.

247.   Accordingly, RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for acute care hospital services in Hudson County, in violation of the New Jersey Antitrust Act N.J.S.A. 56-9:4.

248.   The actions of RWJ and its conspirators have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under the New Jersey Antitrust Act.

249.   Unless the continued unlawful conduct of RWJ and its conspirators is enjoined pursuant to N.J.S.A. 56:9-10, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

Date: September 6, 2022          By:     */s/ Patrick M. Harrington*
                                         Patrick M. Harrington, Esquire
                                         Dilworth Paxson LLP
                                         457 Haddonfield Road, Suite 700
                                         Cherry Hill, NJ  08002
                                         pharrington@dilworthlaw.com
                                         Telephone: (856) 675-1900
                                         Facsimile:   (856) 663-8855

                                                 -    and –

                                         Lawrence G. McMichael, Esquire
                                         (*Pro Hac Vice* Pending)
                                         James J. Rodgers, Esquire
                                         (*Pro Hac Vice* Pending)
                                         Dilworth Paxson LLP
                                         1500 Market St., Suite 3500E

Philadelphia, PA 19102
lmcmichael@dilworthlaw.com
jrodgers@dilworthlaw.com
Telephone: (215) 575-7100
Facsimile:  (215) 764-4603

*Attorneys for Plaintiffs*