Ryan P. Blaney (Bar No. 00618-2006)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6815
rblaney@proskauer.com
*Attorney for RWJ Barnabas Health, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **CAREPOINT HEALTH SYSTEMS INC.,** *et al*. | ) ) ) ) | Civil Action No: 2:22-cv-05421-EP-CLW |
| Plaintiffs, | ) ) | Hon. Evelyn Padin, USDJ |
| v. | ) ) | Hon. Cathy L. Waldor, USMJ |
| **RWJ BARNABAS HEALTH, INC.,** | ) ) | |
| Defendant. | ) ) ) | **Oral Argument Requested** |

## <u>RWJ BARNABAS'S MOTION TO DISMISS</u>
## <u>PLAINTIFFS' THIRD AMENDED COMPLAINT</u>

## **TABLE OF CONTENTS**

I.    INTRODUCTION. ...................................................................................1

II.   THE ALLEGED FACTS..........................................................................3

      A.    Barnabas Breaks Bayonne's Monopoly. ...............................................3

      B.    CarePoint Founders Attempt to Cash Out..............................................6

            1.    The Founders' Failed Efforts to Sell Hoboken and Christ. ........7

            2.    The Founders' Failed Efforts to Sell Bayonne. ........................10

III.  CAREPOINT FAILS TO ALLEGE ANTITRUST INJURY. .......................11

      A.    CarePoint's Reduced Profits Due to Barnabas's Entry into
            Bayonne Is Not an Antitrust Injury....................................................13

      B.    CarePoint Did Not Suffer Antitrust Injury Stemming from Its
            Founders' Less-than-Ideal Exit from the Market.................................19

IV.   CAREPOINT FAILS TO ALLEGE ANTICOMPETITIVE
      CONDUCT. ...........................................................................................22

      A.    CarePoint Does Not Plausibly Plead Anticompetitive Conduct
            Relating to its Entry into Bayonne....................................................23

      B.    CarePoint Does Not Plausibly Plead Anticompetitive Conduct
            Relating to Its Own Failed Sales Process.............................................28

            1.    Barnabas's Decision Not to Acquire CarePoint is Not
                  Anticompetitive Conduct. .........................................................28

            2.    CarePoint's Failure to Sell to Another For-Profit
                  Operator Is Not Attributable to Anticompetitive Conduct. ......32

      C.    Alleged Lobbying Activities and Regulatory Violations Are
            Immune, Not Plausibly Alleged, and Pro-Competitive. ....................36

V.    THE STATUTE OF LIMITATIONS BARS ANY CLAIM
      RELATING TO BARNABAS'S 2017 ENTRY INTO BAYONNE............39

VI.   CONCLUSION......................................................................................40

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*3Shape Trios A/S v. Align Technology, Inc.*,
2019 WL 3824209 (D. Del. 2019)........................................................................29

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
881 F.2d 1396 (7th Cir. 1989) ............................................................................30

*A.D.M. Corp. v. Sigma Instruments, Inc.*,
628 F.2d 753 (1st Cir.1980)................................................................................19

*ABU Chowdhury v. Marathon Oil Co.*,
1996 WL 19584 (N.D. Ill. 1996) ........................................................................20

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) .................................................................................35

*Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F.
Supp. 201 (N.D. Ill. 1986) .................................................................................23

*Anago, Inc. v. Tecnol Med. Prods., Inc.*,
976 F.2d 248 (5th Cir. 1992) ..............................................................................19

*Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d
1201 (C.D. Cal. 2011) ........................................................................................23

*Atl. Richfield Co. v. USA Petroleum Co. (Arco)*,
495 U.S. 328 (1990)......................................................................................12, 15

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ......................................................................11, 26

_____

[*] Unless otherwise noted, all emphasis added, capitalizations conformed, and internal citations and quotation marks omitted. "Cmplt." refers to the Third Amended Complaint, ECF 27. "Ex." refers to exhibits to the declaration of Ryan P. Blaney.

*Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*,
 113 F. Supp. 2d 1164 (S.D. Ohio 1999) ............................................................36

*Baum Rsch. & Dev. Co. v. Hillerich & Bradsby Co.*,
 31 F. Supp. 2d 1016 (E.D. Mich. 1998) ............................................................15

*Belcher Oil Co. v. Fla. Fuels, Inc.*,
 749 F. Supp. 1104 (S.D. Fla. 1990) ............................................................15, 16

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)...................................................................................*passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
 509 U.S. 209 (1993)............................................................................................12

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962)..............................................................................................1

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)....................................................................................12, 13

*Brunswick Corp. v. Riegel Textile Corp.*,
 752 F.2d 261 (7th Cir. 1984) ............................................................................36

*Burlington Indus., Inc. v. Edelman*,
 666 F. Supp. 799 (M.D.N.C. 1987) ..................................................................20

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011) ...............................................................33, 34, 35

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
 479 U.S. 104 (1986)....................................................................................12, 22

*Cent. Nat'l Bank v. Rainbolt*,
 720 F.2d 1183 (10th Cir. 1983) ........................................................................19

*Daniel v. Am. Bd. of Emergency Med.*,
 428 F.3d 408 (2d Cir. 2005) ......................................................................20, 21

*Doctor's Hosp. of Jefferson, Inc. v. Se. Medical Alliance, Inc.*,
 123 F.3d 301 (5th Cir. 1997) ............................................................................20

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,

608 F. Supp. 3d 298 (W.D.N.C. 2022) ...........................................................23

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
486 F. App'x 186 (2d Cir. 2012) ....................................................................23

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) ...........................................................................27

*Hobson v. Hartford Ins. Co. of the Midwest*,
2022 WL 4536470 (D.N.J. 2022) (Padin, J.)...................................................33

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
32 F. 4th 242 (3d Cir. 2022) .....................................................................*passim*

*Ill. Transp. Trade Ass'n v. City of Chi.*,
839 F.3d 594 (7th Cir. 2016) ..........................................................................14

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ...........................................................................12

*In re Bayonne Med. Ctr., Inc.*,
2009 WL 1025123 (Bankr. D.N.J. 2009) ..........................................................3

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ...........................................................................6

*Juster Assocs. v. City of Rutland*,
901 F.2d 266 (2d Cir. 1990) ...........................................................................15

*Laasko v. Endo Int'l, PLC*,
2022 WL 3444038 (D.N.J. 2022) ......................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................34

*McCabe Hamilton & Renny Co. v. Matson Navigation Co.*,
2008 WL 2233740 (D. Haw. 2008) ..................................................................19

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) .....................................................................24, 26

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ..........................................................................38

*Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*,
   907 F. Supp. 1545 (D. Del. 1995)........................................................................19

*Mylan Labs., Inc. v. Akzo, N.V.*,
   770 F. Supp. 1053 (D. Md. 1991)..................................................................34, 35

*N.W. Controls, Inc. v. Outboard Marine Corp.*,
   333 F. Supp. 493 (D. Del. 1971)........................................................................12

*Pac. Express, Inc. v. United Airlines, Inc.*,
   959 F.2d 814 (9th Cir. 1992) .............................................................................14

*Pennsylvania v. Susquehanna Area Reg'l Airport Auth.*,
   423 F. Supp. 2d 472 (M.D. Pa. 2006)................................................................38

*Pension Benefit Guar. Corp. v. White Consol. Indus.*,
   998 F.2d 1192 (3d Cir. 1993) ..............................................................................7

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
   886 F.3d 332 (3d Cir. 2018) ......................................................................*passim*

*Pulse Network, L.L.C. v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) ..............................................................................14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   922 F. Supp. 1055 (E.D. Pa. 1996)....................................................................30

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ..............................................................................30

*R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*,
   462 F.3d 690 (7th Cir. 2006) .............................................................................26

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
   1997 WL 689288 (7th Cir. 1992) ......................................................................35

*Rosenbaum & Co. v. H.J. Myers Co. Inc.*,
   1997 WL 689288 (E.D. Pa. 1997) .....................................................................38

*SEI Glob. Servs., Inc. v. SS&C Advent*,
   2022 WL 2356730 (3d Cir. 2022) .....................................................................22

v

*U.S. Airways Grp., Inc. v. British Airways Plc*,
  989 F. Supp. 482 (S.D.N.Y. 1997) ....................................................................27

*United States v. Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945) ...........................................................................24

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990).........................................................................23

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) .............................................................23, 24, 39

*Venzie Corp. v. U.S. Mineral Prods. Co.*,
  521 F.2d 1309 (3d Cir. 1975) ........................................................................29

*Verizon Commc'ns Inc. v. Trinko, LLP*,
  540 U.S. 398 (2004).........................................................................22, 23, 24, 29

*West Penn Alleghany Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) .......................................................................17, 18

**STATUTES**

Sherman Act, 15 U.S.C. § 1.....................................................................*passim*

Hart-Scott-Rodino Act, 15 U.S.C. § 15 ...........................................................31, 39

## I.      INTRODUCTION.

What do you do when you feel you are paying too much and have no choice? You look for an alternative.  And if there are none, you hope there soon will be.  That is what happened in the City of Bayonne.  Horizon Blue Cross and other insurers were frustrated with having to pay high, out-of-network rates to CarePoint, which operated the city's only emergency department.  But Horizon did not sit idly by; it encouraged Barnabas – New Jersey's largest health system – to construct a competing emergency department a few blocks away.  This, CarePoint alleges, set in motion the chain of events giving rise to this antitrust case.  The problem, though, is it is not an *antitrust* case.

This case turns on the old, now-familiar adage: antitrust law "protect[s] competition, not competitors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  Competitors are harmed every day at the hands of competition.  When that happens, the Sherman Act leans back and watches with approval.  It is doing that here.

CarePoint claims that Barnabas opened its emergency department – now over five years ago – as "in-network" at Horizon and other insurers, providing patients a lower cost alternative.  CarePoint says all this was part of a master plan to "dominate," "destabilize," and "destroy" it.  But consumers and courts view it differently.  They say this is just competition.  Despite CarePoint's 57 pages of

purported grievances – most having nothing to do with Barnabas – CarePoint seems to acknowledge that competition in Hudson County is alive and well: "*As it stands today*," CarePoint concedes, "there is *robust competition* for general acute care services in Hudson County," which "benefits commercial insurers and patients." Cmplt. ¶ 164.  That is itself enough to dismiss the complaint.

Perhaps recognizing this, CarePoint attempts to bring a so-called monopoly broth claim, saying that Barnabas's entry ultimately led its Founders to try to cash-out their investment through a sale of CarePoint's three hospitals.  Faced with losses throughout its system, CarePoint tried to sell the Bayonne facility to BMC, and its other two hospitals to *Barnabas*.  That would have *reduced* the number of competitors, not increased it.  Regardless, CarePoint's Founders had previously sold off the underlying land, and so could not sell the hospitals without the support of their own business partners – the owners of the real estate.  Eventually, the proposed deals with BMC and Barnabas fell through, and CarePoint converted itself to a non-profit, effectuating its Founders' – but not CarePoint's – exit from the market.

These events do not sound in antitrust.  Failure to accede to the Founders' demands is not antitrust injury.  And Barnabas's conduct – entry to break CarePoint's monopoly, and deciding not to acquire two CarePoint hospitals after expressing preliminary interest – is not exclusionary or anticompetitive.  CarePoint's claims must be dismissed.

## II.    THE ALLEGED FACTS.

CarePoint spins an intricate tale of alleged efforts to eliminate its Founders as "independent" operators of three Hudson County hospitals.  Cmplt. ¶ 1.  But its alleged "intertwined web of schemes," *see id*. ¶ 3, boils down to just two stories:  (1) Barnabas's successful efforts to inject competition into the Bayonne emergency services market by establishing a competing facility; and (2) CarePoint's implausibly-pled theory that Barnabas interfered with the Founders' attempt to exit the Hudson County healthcare market.  The alleged facts are as follows:

### A.    *Barnabas Breaks Bayonne's Monopoly.*

CarePoint's Founders acquired Bayonne Medical Center ("Bayonne") out of bankruptcy in February 2008.  *See* Cmplt. ¶ 45; *In re Bayonne Med. Ctr., Inc.*, 2009 WL 1025123, *3 (Bankr. D.N.J. 2009).  After extracting cash from the facility by selling the land underneath it to MPT – a national, publicly-traded REIT – it "subleased" the property back so that it could continue reaping the benefits of operating the only emergency department in Bayonne.  Cmplt. ¶¶ 78-79.

For nearly a decade, Bayonne maintained its monopoly position.  *See id*. ¶ 119.  With no "meaningful alternatives," this gave Bayonne "greater bargaining leverage to demand and obtain higher reimbursement rates and other more onerous contract terms" from insurers.  *Id*. ¶ 169.  One way this power manifested was in

Bayonne's refusal to participate in insurers' provider networks.[2]  As every patient knows, "[i]n-network hospitals are typically significantly less expensive" than out-of-network hospitals.  *Id*. ¶ 167.  Bayonne's refusal to participate in insurers' networks meant that insurers paid more, patients paid more, and CarePoint profited more.[3]

New Jersey's largest insurer, Horizon, was particularly frustrated with the lack of options for its insureds.  As CarePoint alleges, Bayonne's refusal to "participate in Horizon's network … caused a great deal of tension between Horizon and CarePoint."  Cmplt. ¶ 60.  Unwilling to sit by while Bayonne reaped monopoly profits at its expense, Horizon sought to sponsor entry of a new "free-standing emergency department" in an effort to lower the cost of care.  *Id*. ¶ 63.  It was joined

---

[2] Indeed, since Barnabas infused increased competition into the market, CarePoint concedes it is now "in-network with all major insurers…."  Cmplt. ¶ 69.  But now, it complains that the switch hasn't paid off because its "percentage of commercial payer[] [patients] remained flat rather than increased," blaming the loss of patients on Barnabas.  *Id.*  But that again is a complaint about competition, not the lack of it.

[3] Bayonne has the dubious distinction of being one of the nation's most expensive hospitals.  www.nytimes.com/2013/05/17/business/bayonne-medical-center-has-highest-us-billing-rates.html.  The Court may consider this article, though not specifically cited, because it summarizes government statistics, which themselves can be considered (Fed. R. Evid. 201, 1006), and because the Complaint references the body of publicly available articles concerning the events at issue.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n. 13 (2007) (courts may "take notice of the full contents of the published articles referenced in the complaint").

in this effort by "a trio of health insurance companies, a variety of elected officials, and hundreds of people who signed a petition to support [it]." *Id*. ¶ 67.[4]

As an "early step in this plan," Horizon held discussions with Barnabas, which had previously entered Hudson County through its 2013 acquisition of Jersey City Medical Center.   Cmplt. ¶¶ 61-65.   By 2015, Horizon "actively supported" the "development of a satellite emergency department ("SED")," to be run by Jersey City Medical Center.  *Id*.  This support allegedly took the form of agreeing to pay "enhanced rates" above Horizon's "prevailing in-network" rates (but presumably below Bayonne's out-of-network rates) to ensure that the SED "would be profitable" and to partially cover the extraordinary cost of erecting a new facility.  *Id*. ¶¶ 62, 65. CarePoint concedes this was in Horizon's unilateral interest because "Horizon would prefer to deal with an in-network … facility [rather] than an out-of-network competitor."  *Id*. ¶ 64.

---

[4] CarePoint alleges, "[u]pon information and belief," that Barnabas and Horizon wanted to "force its closure" of Bayonne. Cmplt. ¶¶ 62-63, 65.  The more plausible – *and alleged* – goal was that Barnabas wanted to increase its "market share," and Horizon wanted an alternative, in-network, lower cost option for its members.  Any adverse impact on CarePoint would then be in spite of, not because of, those procompetitive goals. *Id*. ¶¶ 62-64, 71.  And, as noted below, even if there was some effort to "hinder" CarePoint Hospitals by its competitors (Barnabas) and customers (Horizon), *see id*. ¶ 19, it is the type encouraged by the antitrust laws.

The fact that SED would be "in-network for the majority of health insurance plans in this region," while Bayonne was "currently out-of-network," was one of the many reasons the New Jersey Department of Health concluded – based on its "own analysis of [the] data" – that the establishment of SED would "mitigate problems of access to appropriate emergency care in Bayonne…."[5]   After receiving DOH approval, SED opened its doors in late 2017.  Cmplt. ¶ 69.  Because SED provided a lower-cost, in-network option, many patients chose it, leading to "a substantial decrease in emergency patients to Bayonne."  *Id.*  That is, CarePoint alleges only the normal consequence attendant to competition – a high-priced monopolist losing business to a lower-priced entrant.  *See id.* ¶¶ 173, 175.

## B.   *CarePoint Founders Attempt to Cash Out.*

CarePoint claims that the loss of its Bayonne monopoly "directly … contributed to CarePoint … experiencing difficult economic times late in the prior decade."  Cmplt. ¶ 76.   In fact, its difficult times were caused by the Founders' extraction of cash from their hospitals.  According to a report by the New Jersey Commission of Investigation, CarePoint hospitals paid the Founders over $157 million in "questionable management fees and allocations" that dwarfed the

---

[5] Ex. 1.  The Court may consider the DOH's waiver letter because it is a "matter[] of public record" and "explicitly" relied upon in the Complaint (Cmplt. ¶ 17). *Laasko v. Endo Int'l, PLC*, 2022 WL 3444038, *2 (D.N.J. 2022) (Padin, J.); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

hospitals' own "operating margins."[6]   But regardless of the reason, by 2018, the Founders decided to explore "strategic alternatives" to exit the market.  Cmplt. ¶ 80.

### 1.   *The Founders' Failed Efforts to Sell Hoboken and Christ.*

In July 2018, CarePoint initiated a formal sales process for its three hospitals: Bayonne, Hoboken, and Christ.  But it ran into a problem.  The Founders had earlier withdrawn cash from the facilities by selling the land underneath them.  *See* Cmplt. ¶¶ 78-79.  So, when CarePoint tried to sell the hospitals, it was no longer "in full control of the real estate on which [they] were located," with one third-party – MPT – owning 100% of Bayonne's land and 70% of Hoboken's land, and another third-party – Avery Eisenreich – indirectly owning 25% of Christ's land.  *Id*.

After obtaining and rejecting indications of interest from multiple suitors, CarePoint entered into discussions with two:  Barnabas and Atlantic Health, another acute care hospital operator.  *Id*. ¶¶ 81-82.  Choosing Barnabas, CarePoint executed a "***non-binding***" Letter of Intent on October 21, 2019 to sell Hoboken and Christ to Barnabas.[7]  *Id*. ¶ 93; Ex. 3 ¶ 15.  But because of the "importance of controlling the

---

[6] Ex. 2.  *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (courts may consider "published reports of administrative bodies.").

[7] Barnabas never submitted an offer for Bayonne.  Cmplt. ¶ 82.  Not only would such an acquisition raise antitrust concerns, CarePoint was not interested in selling Bayonne to Barnabas.  CarePoint alleges that its "primary goal for each of [its] strategic alternatives was to ensure that all potential suitors agree that the Hospitals would continue operating."  *Id*. ¶ 81.  But it believed that Barnabas would have "contemplated closing Bayonne" had it acquired it.  *Id*. ¶ 88.

real estate on which the Hospitals were built," Barnabas's offer was "expressly contingent" on obtaining "new leases."  Cmplt. ¶¶ 83, 91, Ex. 3 ¶ 1.i.

After Barnabas entered into this LOI, Avery Eisenreich, who already owned 25% of Christ's real estate, acquired MPT's 70% interest in the Hoboken real estate. *Id*. ¶¶ 79, 95.  This left the real estate in Eisenreich's and CarePoint's joint control. Eisenreich, as co-owner and agent for the ownership group, led the negotiations against Barnabas for the potential leases.  *Id*. ¶¶ 88, 94.  Indeed, CarePoint *chose* to "include[] Eisenreich in ***all*** of CarePoint's discussions involving strategic alternatives."  *Id*. ¶ 80.  Ultimately, no real estate agreement could be reached, and allegedly, Barnabas "backed out of the proposed transaction."  *Id*. ¶ 101.  But CarePoint does not allege that Barnabas breached any contractual obligation.

Instead, CarePoint accuses Eisenreich and MPT – ***CarePoint's own business partners*** – of "underhanded, self-serving" behavior.  *Id*. ¶ 149.  CarePoint says that MPT had no right to sell its interest in Hoboken to Eisenreich, and that Eisenreich failed to keep CarePoint sufficiently informed of his lease negotiations.[8]  *Id*. ¶¶ 94,

---

[8] CarePoint alleges that "Eisenreich endeavored to preclude direct contact between [Barnabas] and CarePoint with respect to any potential transactions involving the real estate" and that "Eisenreich continued to meet secretly with [Barnabas] regarding lease terms."  Cmplt. ¶¶ 24, 94, 96-99.  But nothing prevented CarePoint from picking up the phone if it wanted.  Nor does CarePoint allege that it asked Barnabas not to talk to Eisenreich outside of its presence.  In any event, the Sherman Act is not a federal corporate governance act; it does not impose either gag orders or

102.  But that is a contractual matter between CarePoint, MPT, and Eisenreich – and indeed, is the subject of recent litigation among them.  *Id*. ¶ 103.  It has nothing to do with Barnabas.  Other than a conclusory allegation that Barnabas inexplicably wanted to scuttle a deal it proposed, CarePoint does not allege any Barnabas involvement in Eisenreich's "scheme."  Nor does CarePoint's conclusory accusation about Barnabas's motive make sense.  *See id*. ¶ 21.[9]  The LOI was non-binding, so if Barnabas – or CarePoint for that matter – wanted out, they could have walked away for any or no reason at all.

After Eisenreich acquired the Hoboken land, government officials grew concerned about the hospital's future and began considering the use of "eminent domain" to solve the problem.  *Id*. ¶ 113 & n.13.  So, on December 18, 2020, the city council "reconstituted" the "Hudson Municipal Hospital Authority (HMHA) … pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15."  *Id*. ¶ 132.[10]

---

open access requirements on M&A discussions; and it does not mediate squabbles among joint owners and business partners.

[9] Nor does CarePoint identify these supposed "other potential suitors" that were allegedly "discouraged" by the LOI.  Cmplt. ¶ 21.

[10] CarePoint asserts numerous state law irregularities with HMHA's reconstitution. Cmplt. ¶¶ 132-36.  That is a state law matter, and irrelevant to the Sherman Act. Even if HMHA were a private actor, it is only accused of trying to "broker" a deal. *Id*.  As far as the Sherman Act is concerned, anyone in the world – public or private – is allowed to *consider* any M&A deal it wants with anyone it wants.  Were it otherwise, there would be no such thing as a hostile takeover.

HMHA undertook its own sales process for Hoboken, reaching out to Barnabas and others to gauge interest. Barnabas responded. *Id.* ¶¶ 134-43. But not wanting to lose control of the sales process, CarePoint sued to enjoin those proceedings, and nothing came of them. *Id.* ¶ 148. Instead, CarePoint converted Hoboken (and its other two hospitals) to a new non-profit organization – CarePoint Health Systems, Inc. – effectuating the Founders' and the predecessor entities' exit from the general acute care market.[11] *Id.* ¶ 50.

### 2.    *The Founders' Failed Efforts to Sell Bayonne.*

While it was trying to sell Christ and Hoboken to Barnabas, CarePoint continued to solicit buyers for Bayonne. In January 2020, CarePoint entered into discussions with Hoboken Regional Hospital ("HRH"), which was run by Yan Moshe and a former executive of CarePoint, Nizar Kifaieh. Cmplt. ¶¶ 104, 127. Neither has any affiliation with Barnabas.[12] CarePoint, however, decided to go a

---

[11] It is not clear from the face of the complaint that, other than the newly named CarePoint Health Systems Inc. as "owner" of the hospitals, any of the other plaintiffs are actually the "hospitals" themselves (the only entity that might have standing), as opposed to landlords, management consultants, or some other current or predecessor entity in CarePoint's labyrinthine corporate structure. As such, *all* the other plaintiffs' claims must be dismissed for failure to allege that *it* has antitrust standing.

[12] Other than accusing Barnabas of preferring HRH over BMC and conclusory allegations of "collusion" (*see id.* ¶ 116), there are no allegations that Barnabas had any role in Eisenreich's and HRH's efforts to mount a competing bid for Bayonne. Cmplt. ¶¶ 111-20; *see also, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("a court is not required to accept" "terms like 'conspiracy'" "as a sufficient basis for a complaint").

different direction, choosing BMC Hospital, LLC, as its preferred buyer.  Cmplt. ¶ 110.  But BMC ran into the same problem as Barnabas:  CarePoint had sold *all* the Bayonne land, which was now controlled by Eisenreich.  *Id*. ¶¶ 79, 95.  Eisenreich allegedly preferred HRH over BMC, which lead to "stalemate": the hospital operator preferred one bidder, the owner of the land preferred another.  *Id*. ¶ 33.  So, when the sell strategy failed, the Founders pursued the same solution as above:  wash their hands of the situation, convert to a non-profit, and sue everyone.

This motion follows.[13]

## III.   CAREPOINT FAILS TO ALLEGE ANTITRUST INJURY.

Competition is about winners and losers.  It is "a ruthless process."  *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986) (Easterbrook, J.).  A firm that "expands sales" by offering attractive products or prices "injures rivals – sometimes fatally," and the "deeper the injury to rivals, the greater the potential benefit" to consumers.  *Id*.  The "antitrust laws are not a balm for [these] rivals' wounds," because they are simply "byproducts of vigorous competition."  *Id*.

---

[13] CarePoint has now amended its complaint three times.  *None* of its amendments have addressed the deficiencies identified in Barnabas's Motion to Dismiss the First Amended Complaint.  Indeed, Barnabas's motion is virtually unchanged, save for revised citations to the Complaint and removal of some claims and allegations that CarePoint dropped.  No matter how it spins its allegations, CarePoint cannot change the fact that its claims amount to a complaint of *increased* competition, not its reduction.

"[N]either rough competition nor [even] unethical business conduct" gives rise to an antitrust claim. *N.W. Controls, Inc. v. Outboard Marine Corp.*, 333 F. Supp. 493, 517 (D. Del. 1971). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)). Indeed, the "antitrust laws are not merely indifferent" to such injuries; they actively *encourage* them. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-16 (1986). It would be "inimical to the purposes of these laws to award damages" for injuries resulting from "continued" or "increased competition." *Id.*; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977); *Atl. Richfield Co. v. USA Petroleum Co. (Arco)*, 495 U.S. 328, 334 (1990); *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343, 338 (3d Cir. 2018).

For this reason, but-for causation is not enough. A plaintiff must "prove more than harm causally linked to an illegal presence in the market." *Uber*, 886 F.3d at 334. There must be "antitrust injury," which is injury that "***flows from … the anticompetitive effect***" of the conduct. *Brunswick,* 429 U.S. at 489; *Arco*, 495 U.S. at 344. Because CarePoint's injuries from Barnabas's entry or CarePoint's failed

sales process do not stem from *reduced* competition, its claims must be dismissed for want of antitrust injury.

### A.   *CarePoint's Reduced Profits Due to Barnabas's Entry into Bayonne Is Not an Antitrust Injury.*

CarePoint protests that its own monopoly – as the sole Emergency Department provider in the City – was "important" to its financial health as a "community hospital" and that, after Barnabas opened a competing emergency facility, it suffered "a substantial decrease in emergency patients." Cmplt. ¶¶ 61, 69. But no case holds that injury resulting from competitive entry is an antitrust injury. The cases are to the contrary, and they are legion, as entry is the essence of procompetitive conduct. One cannot enter a market without increasing competition. Entry does not have anticompetitive effects.

In *Brunswick* – the original Supreme Court "antitrust injury" case – local bowling alleys complained about a larger chain's entry into their market through an alleged anticompetitive merger. 429 U.S. at 479. In rejecting plaintiffs' claims, the Court assumed, *arguendo*, that the merger was anticompetitive because it increased concentration and that the illegal merger reduced plaintiffs' profits. *Id*. at 487-88. But, the Court held it would be "inimical to the [antitrust] laws to award damages" for losses stemming from continued competition. *Id.* The "loss of windfall profits" caused by illegal entry, the Court said, was not "the type [of injury] the statue was intended to forestall." *Id.*

The Third Circuit recently reached a similar conclusion when taxi cabs sought to challenge Uber's alleged *illegal* entry into Philadelphia.  As the court explained:

> "[Taxi owners] decry Uber's entry into Philadelphia as a campaign to inflict economic harm and to cause [them] to lose their market share…. [But] Uber's entry into the Philadelphia market, ***regardless of its legality***, increased the number of vehicles-for-hire available to consumers …, thereby ***increasing*** competition….  Were we to award [plaintiffs] antitrust damages to compensate for their financial injuries, we would condemn vigorous competition, rather than encourage it."

*Uber*, 886 F.3d at 343-44.[14]

Using the antitrust laws – as CarePoint seeks to do here – to *punish* entry stands the Sherman Act on its head.  *See Uber*, 886 F.3d at 346.  It does not matter how disruptive that entry is or whether incumbents can survive in its wake.  If "incumbents could prevent new entrants or new technologies from competing because they fear loss of profits, then economic progress might grind to a halt…. Instead of taxis we might have horse and buggies; instead of the telephone, the telegraph; instead of computers, slide rules."  *Id.* (quoting *Ill. Transp. Trade Ass'n v. City of Chi.*, 839 F.3d 594, 597 (7th Cir. 2016) (Posner, J.)).  So too, here, instead

---

[14] *See also Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022) ("A plaintiff that sues a rival, complaining that the rival's mere presence in the market causes it injury, seeks to gain not the opportunity to compete in the marketplace but only the benefits of increased concentration [and] has therefore not shown antitrust injury."); *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 818 (9th Cir. 1992) ("Undoubtedly, the entry of United, a large, well-known carrier, into Pacific Express' markets injured Pacific Express' business opportunities," but that cannot "demonstrate an antitrust injury").

14

of a new, in-network SED, the citizens of Bayonne would be stuck with a monopolistic, high cost, out-of-network emergency room.

Nor can CarePoint save its claim by alleging a conspiracy between Barnabas and the insurers (Barnabas's customers) who allegedly "supported" and "encouraged" Barnabas's entry. Cmplt. ¶¶ 64, 68. Sellers do not conspire with buyers every time they sell their wares. Were it otherwise, Ford would have an antitrust claim against GM whenever someone buys a Chevrolet.

The term "conspiracy" is not a magic talisman obviating the need to show antitrust injury. Conspiracy allegations concern the existence of a violation, not whether a competitor suffered antitrust injury from it. Conspiracy or no, entry is entry, and increased competition is increased competition. *Arco*, 495 U.S. at 344 (no "antitrust injury" from *per se* illegal vertical price fixing conspiracy).[15]

---

[15] *See also Belcher Oil Co. v. Fla. Fuels, Inc.*, 749 F. Supp. 1104, 1107 (S.D. Fla. 1990) ("The need to satisfy the antitrust injury test is not affected by the degree of egregiousness with which the defendants are alleged, or even proven, to have violated the antitrust laws."); *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990) ("the mere fact of increased competition and reduced profits resulting from an agreement between other parties does not constitute an antitrust injury to a plaintiff"); *Baum Rsch. & Dev. Co. v. Hillerich & Bradsby Co.*, 31 F. Supp. 2d 1016, 1022 (E.D. Mich. 1998) (conspiracy to "manipulate the rules for baseball bats" did not cause "antitrust injury" to wooden bat manufacturer who faced increased competition from aluminum bats).

In fact, the antitrust laws cherish power buyers like Horizon who can sponsor entry.[16] *Belcher Oil* is directly on point.  749 F. Supp. at 1106-10.  There, a fuel supplier's customers, unhappy with paying the supplier's prices, "conspired" to sponsor new entry by committing to purchase sufficient fuel from the new entrant at "fix[ed] minimum prices" to make that entry "profitable."  *Id*.  The plaintiff showed that it "lost a considerable amount of business" as a result, but it had no claim.  *Id*.

There, as here, the plaintiff was an "an erstwhile monopolist seeking to maintain a [claim] against the parties who recently ended [its] monopoly and brought competition" to the "market for the first time in a decade."  *Id*.  As one seeking to "recover for losses growing out of an alleged conspiracy to facilitate the entry of a new firm," the plaintiff, the court said, would need to show "injury different in kind from losses it could incur as a result of the entry … by legitimate means."  *Id*.  But because entry increases competition, the plaintiff could not show "antitrust injury of any kind."  *Id*.  Here too, CarePoint was an erstwhile monopolist in Bayonne until Barnabas entered.  It alleges no injury "different in kind" from the injury any incumbent suffers when faced with a new competitor.  *Id*.

---

[16] *See, e.g., FTC and DOJ Horizontal Merger Guidelines*, § 8 ("powerful buyers may constrain the ability of [sellers] to raise prices … if [those] powerful buyers have the ability and incentive to … sponsor entry."), available at https://www.justice.gov/atr/merger-enforcement.

*W. Penn Alleghany Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010), is not to the contrary. That case did not involve new entry; it involved a boycott. There, a large health system and a dominant insurer entered into a *quid pro quo* agreement to "protect" each other from competition in their respective markets, including excluding the plaintiff – a small competing health care provider – from the insurer's network. *Id.* at 100. Here, in contrast, CarePoint alleges that ***it*** refused – of its own volition – to join the Horizon network, not the other way around.

Moreover, the agreement in *West Penn* helped "insulate" the insurer from competition in the insurance market, allowing the insurer to maintain its "***monopsony***" as the only significant insurer. 627 F.3d at 93, 103-04. Without any competing insurers to choose from, the plaintiff was forced to accept non-competitive reimbursement rates. *Id.* But these "depressed reimbursement rates" were not the result of an *increase* in the number of health care providers (as here), but rather a *reduction* in the number of insurers. *Id.* That is, West Penn's injury stemmed from a reduction of competition in the insurance market, not an increase of competition in the healthcare provider market.

There are no similar allegations here. CarePoint does not allege that Barnabas helped Horizon (or any other insurer) avoid competition in the insurance market.

Nor does it bring a claim for monopsonization of any insurance market.[17]   To the contrary, CarePoint admits that there are numerous insurers (all of whom actively supported Barnabas's entry).  Cmplt. ¶ 67.  Nor does CarePoint allege any agreement relating to the rates insurers paid to CarePoint.  It simply alleges that insurers negotiated independently with Barnabas and CarePoint, and that Barnabas secured rates sufficient to help offset the cost of entry.  That is not antitrust injury because even firms with market power are "free to bargain aggressively when negotiating" prices. *West Penn*, 627 F.3d at 103.

   In the end, CarePoint concedes that Barnabas's entry reduced prices and increased consumers' options.  While "[s]ailing a straight course through the murky waters of antitrust injury challenges courts to avoid the siren songs of illusory harm," the course here is clear.  *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F. 4th 242, 252 (3d Cir. 2022).  "[E]very plaintiff [must] show that its loss comes from acts that ***reduce output*** or ***raise prices*** to consumers in the relevant market."  *Id.*  CarePoint alleges the opposite.  That is fatal.[18]

---

[17] The difference between antitrust injury in monopoly and monopsony claims is clear:  In monopoly claims, *high* prices are charged to customers; in monopsony claims, *low* prices are paid to suppliers.  *West Penn* complained about the latter. CarePoint, however, complains about neither.  It alleges that Barnabas *lowered* prices and *increased* output – the exact *opposite* of what it must plead.

[18] CarePoint foresees future anticompetitive effects if it is driven from the market. Cmplt. ¶¶ 69-70.  Not only is that speculative, CarePoint alleges only past conduct

**B.** ***CarePoint Did Not Suffer Antitrust Injury Stemming from Its Founders' Less-than-Ideal Exit from the Market.***

CarePoint alleges that its Founders sought to exit their investment in the CarePoint hospitals beginning in 2019, and that Barnabas interfered with the sales process in some unspecified way. As a result, CarePoint says it was unable to close a deal with its favored suitors – Barnabas for Christ and Hoboken hospitals, and BMC for Bayonne – and instead was forced to convert to a non-profit.

But the Founders' inability to cash out on their preferred terms is not an antitrust injury. *McCabe Hamilton & Renny Co., Ltd. v. Matson Navigation Co., Inc.*, 2008 WL 2233740, *5 (D. Haw. 2008) ("the majority of courts have found that a target's injury does not flow from any anticompetitive behavior") (collecting cases); *Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*, 907 F. Supp. 1545, 1566 (D. Del. 1995) ("A survey of both case law and scholarly commentary … spurs this Court to conclude that the target of a hostile takeover has no standing to bring [an antitrust] claim.").[19]

---

and not any current or ongoing conduct. And indeed, CarePoint has **not exited**. Regardless, harm from any exit of inefficient or overpriced rivals stems from *increased* competition. *Uber*, 886 F. 3d at 340 ("[I]nundating the Philadelphia taxicab market with Uber vehicles, even if it served to eliminate competitors, was not anticompetitive. Rather, this bolstered competition.").

[19] *See also Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 250–52 (5th Cir. 1992) (target does not suffer antitrust injury); *Cent. Nat'l Bank v. Rainbolt*, 720 F.2d 1183, 1186 (10th Cir. 1983) (same); *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir. 1980) ("The interests of the target corporation itself … are

Indeed, there has never been an antitrust case challenging a failed acquisition or merger.  *See Host*, 32 F. 4th at 250 (rejecting "novel" claim that "failing to contract" is an antitrust violation); *ABU Chowdhury v. Marathon Oil Co.*, 1996 WL 19584, *5 (N.D. Ill. 1996) (no antitrust injury where the "wrong complained of is that, after having seen plaintiff's business strategy and other confidential information, [the defendant] reneged on a preliminary agreement to grant a franchise to plaintiff and induced [the prior owner] to sell the business to Marathon").

The lack of antitrust injury is apparent.  If the sale to Barnabas had closed, as CarePoint hoped, there would be *fewer* competitors – a reduction in competition. CarePoint recognizes this, alleging that today, "there is robust competition for general acute care services in Hudson County," which "benefits commercial insurers and patients."  Cmplt. ¶ 164.  Because competition was preserved – not eliminated – CarePoint cannot complain that its sale to Barnabas did not happen.  *See Doctor's Hosp. of Jefferson, Inc. v. Se. Medical Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) (no antitrust injury when hospital system refused to let plaintiff join network); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005) ("plaintiffs

---

outside of section seven's protection. Nor do we see any reason why the result in this case should be any different under the Sherman Act merely because the sale itself is characterized as a 'conspiracy', or because boilerplate language concerning an 'attempt to monopolize' is included in the complaint."); *Burlington Indus., Inc. v. Edelman*, 666 F. Supp. 799, 805 (M.D.N.C. 1987) (granting defendant's motion to dismiss target's antitrust claims).

cannot … state an antitrust injury when their purpose is to join the [collaboration] rather than disband it").

Nor can CarePoint complain about the failed sale of Bayonne to BMC. Even if Barnabas could somehow be blamed for the demise of a deal it had nothing to do with, the failed sale is not an antitrust injury. As with the proposed Christ and Hoboken transactions, CarePoint does not allege any diminution in *competition* from the failed sales process at Bayonne. It does not allege that CarePoint plans to close its doors, reduce its output, or raise its prices. It only alleges a change in ownership different from what the Founders wanted.

The antitrust laws express no preference for a company's ownership structure. The law is indifferent to whether CarePoint operates as a for-profit or a non-profit. Neither is inherently competitively superior to the other. Indeed, Barnabas – New Jersey's largest health system – is itself a non-profit organization. Cmplt. ¶¶ 42, 121 n.14. And local leaders allegedly touted CarePoint's conversion to a non-profit. *Id.* ¶ 51. Nor does CarePoint contend that it is unable to compete as a non-profit. In short, it does not matter whether the Founders retained their interest in CarePoint, sold it to some other suitor, or donated it to the public weal.

CarePoint instead says it was entitled to conduct a sales process free of Barnabas's alleged interference. But the sales process took place in a different market than the one alleged. CarePoint has not alleged an "investment" or

"ownership" market for the sale of interests in hospitals or other businesses. It alleges a market for the provision of general acute care hospital services – a market unaffected by CarePoint's conversion to a non-profit. *Id.* ¶ 153.

In any event, a sales process is just a contractual negotiation governed by the protocols of the seller's own devising. The antitrust laws are not a treble-damages hammer to enforce those self-ascribed rules. They are "not intended to be as available as an over-the-counter cold remedy," or as a supercharged business tort remedy, "because were [antitrust's] heavy power brought into play too readily it would not safeguard competition, but destroy it." *Host*, 32 F. 4th at 253. Thus, "[w]hatever remedy exists for [a party's] disappointment" in its "[c]ontractual negotiations," it "must lie outside the antitrust law." *Id.*; *see also SEI Glob. Servs., Inc. v. SS&C Advent*, 2022 WL 2356730, *3 (3d Cir. 2022).

## IV.   CAREPOINT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT.

CarePoint's claims also fail because it has not alleged anticompetitive conduct, an essential element under Section 1 and Section 2 of the Sherman Act. Firms large and small are entitled – indeed encouraged – to "engage in vigorous competition" for "increase[d] market share." *Cargill*, 479 U.S. at 116. To "safeguard the incentive" to compete, not even the "possession of monopoly power" will be "found unlawful unless it is accompanied by an element of anticompetitive

conduct." *Verizon Commc'ns Inc. v. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Here, CarePoint fails to allege anything other than vigorous competition.[20]

**A.      *CarePoint Does Not Plausibly Plead Anticompetitive Conduct Relating to its Entry into Bayonne.***

CarePoint alleges that, "an early step" in the alleged "plan to achieve and extend its dominance in Hudson County" was the "development of a satellite emergency department (SED) in Bayonne."  Cmplt. ¶¶ 15, 61.  But entry is a quintessential procompetitive activity that "avert[s] anticompetitive effects." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 989 (D.C. Cir. 1990).  It does not prevent or restrain competition, and it does not exclude or foreclose CarePoint from the market.  As the Ninth Circuit explained,

> "The record here demonstrates in graphic detail that Syufy's entry … resulted in a vast improvement for movie distributors and consumers alike.  By all accounts, Raymond Syufy's theatres are among the finest

---

[20] CarePoint relies on a "monopoly broth" theory, essentially conceding that none of Barnabas's alleged actions are anticompetitive but instead *might* be if "considered together as a whole rather than considering each aspect in isolation."  Cmplt. ¶¶ 7, 180.  But no matter how pled or argued, zero plus zero will always equal zero. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 608 F. Supp. 3d 298, 319 (W.D.N.C. 2022) ("Adding up several instances of lawful conduct cannot total unlawful conduct.  In simple mathematical terms, 0+0=0."); *Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F. Supp. 201, 215 n.23 (N.D. Ill. 1986) ("But it requires no sophistication in mathematical theory to recognize that zero plus zero plus zero still equals zero. … If no incident has probative value, all incidents taken together have no probative value."); *see also, e.g.*, *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either."); *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1211 (C.D. Cal. 2011) (same).

> built and best run in the nation, making him somewhat of a ***local
> hero***…. As is often the case when a vigorous competitor enters the
> market, more complacent theatre operators were eliminated, but there
> was no credible evidence that Syufy did anything improper to drive
> them out."

*United States v. Syufy Enters.*, 903 F.2d 659, 672 (9th Cir. 1990).

Here too, Barnabas and CarePoint are "important alternatives to one another for insurers constructing networks that include Hudson County." Cmplt. ¶¶ 173-79. As a result of Barnabas's entry, competition is finally thriving. CarePoint may lose business, but the antitrust laws only provide competitors with an *opportunity* to compete; they do not guarantee that they will win. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (Easterbrook, J.) ("Competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress"); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").[21]

---

[21] None of the ancillary allegations relating to SED change this fact. CarePoint, for example, claims that the SED did not meet certain "regulatory criteria". Cmplt. ¶ 17. But CarePoint already lost the regulatory fight before the DOH. And even if that allegation were true and even if the allegation fell within the statute of limitations, violation of state regulations are not exclusionary acts. *Trinko*, 540 U.S. at 414 (regulatory violations "have nothing to do with exclusion" and "are difficult for antitrust courts to evaluate").

The antitrust laws do not provide private plaintiffs with a private right of action, a federal forum, and treble damages to enforce state regulations. This is true regardless of whether the alleged regulatory violation prevented entry, as in *Trinko*, or whether the alleged regulatory violation facilitated early entry, as here. As the Third Circuit explained in *Uber*:

> "[T]he Supreme Court has squarely rejected illegal conduct as a basis for [a claim].... Appellants do not cite any case in support of the contention that Uber's violation of state regulations, even if that gave Uber a competitive advantage, renders its operation in violation of antitrust laws. Even if we were to find Uber's operation in Philadelphia unlawful in its first two years, we would do so under PPA regulations, and not under antitrust laws.... Uber's presence in the market, as alleged, created *more* competition for medallion taxicabs, not *less*."

*Uber*, 886 F. 3d at 345. *Uber* is dispositive and compels dismissal.

Nor can CarePoint obtain a different result by alleging that Horizon "offered to pay … enhanced rates … to ensure that the SED endeavor would be profitable." Cmplt. ¶ 65. As an initial matter, the conclusory allegation of "enhanced" rates is disingenuous. It studiously avoids any comparison between CarePoint's *out-of-network* rates and Barnabas' *in-network* rates. Not one word in the Complaint even hints that Horizon paid more to Barnabas than it paid to CarePoint.

Instead, CarePoint only purports to compare the rates Horizon offered to Barnabas to build a new facility and the "prevailing in-network" rates Horizon generally paid to established, in-network third parties in other areas. *Id.* ¶ 62. But the antitrust laws do not prevent insurers from negotiating independently with, and

25

establishing separate rates for, each provider.  The Sherman Act is not an anti-price-discrimination law, and antitrust courts are not "little versions of the Office of Price Administration." *Ball Mem'l*, 784 F.2d at 1340; *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 695 (7th Cir. 2006) ("So far as the Sherman Act is concerned … there's nothing wrong with price discrimination.").

Moreover, as a customer, Horizon had every right to invest in a new competing facility to provide its members *additional* choice.  The form of that investment is irrelevant.  That Horizon preferred incentivizing new construction through "enhanced rates" rather than, say, a large upfront capital outlay does not suggest that Horizon acted out of malice or against self-interest.  To the contrary, the Complaint alleges that "Horizon would prefer to deal with an in-network [Barnabas] facility than an out of network competitor in CarePoint."  Cmplt. ¶ 64.  An antitrust claim cannot be premised on the notion that customers should have preferences more to plaintiff's liking.  *Menasha*, 354 F.3d at 663 ("When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition.").

For the same reason, CarePoint's allegations of "steering" are just pejorative words attached to legitimate competitive activity.  So-called "steering" is fundamental to "two-stage" competition in healthcare markets.  As CarePoint concedes, in the first-stage, "hospitals compete to be included in commercial

insurers' health plan networks" because insurers will offer lower co-payments when members use in-network hospitals.   Cmplt. ¶¶ 166-67.   Because these in-network hospitals are "significantly less expensive for health plan members," they "will likely attract" more patients than similarly situated out-of-network hospitals.   *Id.* Some may call this steering; others just call it competition.   It is not illegal.   In fact, the Third Circuit's healthcare jurisprudence is premised on protecting this form of competition, as CarePoint concedes.   *Id.* ¶ 165; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016).

Nor can CarePoint complain of SED's inclusion in Horizon's network. Barnabas had as much right to join Horizon's network as any other provider, and its decision to do so did not "exclude" CarePoint – or anyone else – from the market. CarePoint does not allege that participation in the network was "exclusive" or that joinder by one foreclosed joinder by another – in fact, CarePoint has since joined Horizon's network.   Cmplt. ¶ 66.   That it did not "at the time" – but instead chose to maintain its exorbitant out-of-network rates – is an allegation of "self-inflicted" injury, not of anticompetitive conduct.   *Id.*; *U.S. Airways Grp., Inc. v. British Airways Plc*, 989 F. Supp. 482, 489 (S.D.N.Y. 1997).[22]

---

[22] CarePoint's pre-statute of limitations allegation – that Barnabas informed doctors in February 2016 of the opportunity to participate in Horizon's network – is similarly an allegation of competition.   Cmplt. ¶ 73.   The letter is not false or misleading.   And it did not prevent CarePoint from joining Horizon's network or responding with its

**B.**  ***CarePoint Does Not Plausibly Plead Anticompetitive Conduct Relating to Its Own Failed Sales Process.***

CarePoint's Founders may not have made as much money as they wanted when they converted their hospitals to non-profits, but that is not because of any anticompetitive conduct.  CarePoint alleges nothing more than that Barnabas backed out of a *non-binding* LOI to acquire Hoboken and Christ Hospitals, and that it supposedly interfered with CarePoint's sale of Bayonne Medical to BMC.  The latter is not plausibly pled, but even if it were, neither constitutes "exclusionary" or "anticompetitive conduct."

**1.**  ***Barnabas's Decision Not to Acquire CarePoint is Not Anticompetitive Conduct.***

CarePoint was always free to enter into a binding deal with Barnabas, just as Twitter did with Elon Musk.  CarePoint did not.  Twitter, with its contract in hand, sued under contract, not antitrust, to enforce its deal.  Here, if CarePoint has any recourse at all, it does not sound in antitrust.  The Sherman Act does not turn non-binding letters of intent into enforceable obligations to buy competitors.  *Host,* 32 F.

---

own competitive offer.  *See Uber*, 886 F. 3d 341 (hiring drivers from rivals "does not give rise to an inference of anticompetitive or exclusionary conduct and suggests … that Uber's ability to attract these drivers was due to its cost efficiency and competitive advantage").  Nor is there any allegation that this six-year-old letter – as opposed to the fact of Barnabas's entry itself – had any appreciable impact on CarePoint's ability to do business, let alone on competition in the relevant market.

4th at 250-51 ("Host seeks something novel: recognition that failing to contract for commercial space states a Section 1 claim. We decline that invitation.").

A non-binding letter of intent is nothing more than an expression of interest. It is not even an offer to enter into a contract that can be accepted by a counter-party. How can expressing preliminary interest in acquiring a business and then deciding not to make an actual offer for it violate the antitrust laws? It cannot. *3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, *6 (D. Del. 2019) ("[A] mere offer to enter into a business deal … does not amount to anticompetitive conduct."). Just imagine the injunction needed to remedy the alleged wrong: a forced sale of CarePoint's hospitals to its alleged closest competitor. Antitrust courts have blocked sales to competitors, but they have never compelled one. Indeed, there is no duty to deal with competitors at all, as all businesses are generally free to "choose the parties with whom they will deal." *Host*, 32 F.4th at 250; *Trinko*, 540 U.S. at 408; *Venzie Corp. v. United States Mineral Prods. Co.*, 521 F.2d 1309, 1318 (3d Cir. 1975) ("To adopt plaintiffs' position would revolutionize the antitrust field. Every refusal by a franchisor to deal with one not a franchisee would automatically lead to a per se violation of the Sherman Act.").

Anticompetitive conduct is conduct that raises prices or restricts output in a relevant market. But Barnabas's decision not to make a binding offer did not have this effect. Whether or not Barnabas acquired CarePoint's hospitals does not itself

adversely impact prices or output in the alleged general acute care hospital services market; it impacts only the identity of the owner.

Nor can CarePoint turn its negotiations with Barnabas into an antitrust violation by maligning Barnabas's motives. An allegation of bad *intent* does not cure a failure to allege ***anticompetitive conduct***. "If courts use the vigorous, nasty pursuit of sales as evidence of a forbidden 'intent,' they run the risk of penalizing the motive forces of competition." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989) (Easterbrook, J.). Nor do the antitrust laws impose a duty of "good faith and fair dealing" on contract negotiations. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055 (E.D. Pa. 1996), *aff'd*, 124 F.3d 430, 435 (3d Cir. 1997) (affirming dismissal because where claims "implicate principles of contract, and are not the concern of the antitrust laws").

In any event, the Complaint demonstrates the opposite of ill intent. CarePoint alleges that during negotiations, Barnabas discovered that – far from being a viable business – Christ Hospital was facing a severe "cash burn" and that "CarePoint would experience drastic consequences without additional funding." Cmplt. ¶ 23. That Barnabas did not want to buy a money pit or be the white knight that saved "the CarePoint Hospitals [from] the brink of closure," *id.*, is not an allegation of bad faith.

And it certainly is not an allegation of anticompetitive conduct.[23]

Taking a different tack, CarePoint claims that Barnabas did not really want to acquire CarePoint's hospitals, but rather engaged in a "sham" to "discourage other potential suitors" and "access[] a data room set up by CarePoint[] to gain market knowledge" in an effort to freeze "business development, including new programs and onboarding of new physicians." Cmplt. ¶¶ 21-22, 28. But CarePoint does not identify any competitively sensitive information that it turned over (of its own volition) to Barnabas, or how Barnabas used that information to unfairly compete *in the marketplace*. All CarePoint alleges is that *CarePoint* chose not to invest in its own facilities without a cash infusion from Barnabas. Whether that decision was due to its own "cash burn" or a case of counting chickens before they hatch, CarePoint's investment decisions were its own. Indeed, the antitrust laws – specifically the Hart-Scott-Rodino Act, 15 U.S.C. § 15a – *required* CarePoint to act

---

[23] The Complaint offers conflicting explanations for the breakdown in negotiations. Paragraph 23 asserts that the transaction failed due to CarePoint's disclosures about its deteriorating financial condition. Cmplt. ¶ 23. But paragraph 28 claims that RJW withdrew "because of its inability to gain control of the real estate underlying the facilities." *Id*. ¶ 28. Neither one is Barnabas's fault. CarePoint did not need to sell the land underneath its hospitals, and it could have reacquired it if it wanted to facilitate a sale of the hospitals. That a landowner may have different preferences for the disposition of its property than a tenant is of no concern to the antitrust laws; it is a matter reserved for the law of property and contract.

independently prior to any closing; and there is no allegation that CarePoint did not in fact do so.[24]

In the end, CarePoint's quixotic assertion – that Barnabas should have both consummated the CarePoint transaction but not accepted any information about CarePoint during the sales process – cannot form the basis of an antitrust claim.

>    2.    ***CarePoint's Failure to Sell to Another For-Profit Operator Is Not Attributable to Anticompetitive Conduct.***

The bulk of CarePoint's complaint actually has nothing to with Barnabas. CarePoint repackages its state-law litigation against its business partners and former employees, claims that Barnabas was happy that CarePoint's Founders could not consummate a deal, and – from this, and this alone – asserts that Barnabas conspired to interfere with the Founders' attempt to sell their interests in CarePoint. But CarePoint has not plausibly pled a conspiracy involving Barnabas; and even if it had,

---

[24] CarePoint asserts that Barnabas "circulated rumors" of "consolidation and/or closure of ***Christ Hospital***." Cmplt. ¶ 25. But there are no non-conclusory allegations that *Barnabas* spread rumors about a sales process that was widely reported on in the local press. But even if there were, the Sherman Act is not a statutory Non-Disclosure Agreement, and the disclosure of truthful information is not anticompetitive. CarePoint's alleged harm – that rumors led to unspecified "attrition of physicians, employees, and patients," *id*. – would also be caused by its own decision to sell to a competitor, not disclosure of those plans. Similarly, CarePoint speculates that "rumor-mongering" at ***Hoboken*** in ***2020*** "negatively affected employee retention" and "forced" CarePoint to pay "premium rate[s]" to nurses two years later in ***2022***. *Id*. ¶¶ 26-27. But the need to pay nurses competitive wages cannot be attributed to unspecified and stale rumor-mongering, especially given the unprecedented nationwide nurse shortage that occurred in the wake of the pandemic.

any alleged interference with CarePoint's sales process does not constitute exclusionary or anticompetitive conduct.

### i.   *CarePoint Does Not Plausibly Allege that Barnabas Conspired to Interfere with CarePoint's Sales Process.*

Antitrust complaints cannot be based on pure speculation that a defendant conspired to bring about an unwanted result. *See Hobson v. Hartford Ins. Co. of the Midwest*, 2022 WL 4536470, *5 (D.N.J. 2022) (Padin, J.) (*"Twombly* forbids" speculation as to any essential element of plaintiff's claim). Here, CarePoint alleges that its business partners held the land under the hospitals hostage, and that Barnabas would "benefit" if the hospital sales did not go through. Cmplt. ¶¶ 11, 118, 149. CarePoint even concedes that these partners worked according to their own self-interest: their "individual motivations separate from the goals of RWJ." *Id.* ¶ 5. That is not a well-pled allegation of conspiracy.

Because an allegation of a "conspiracy" is just a "conclusory allegation," a plaintiff must plead facts that, if true, would constitute either direct or circumstantial evidence of an unlawful agreement. *Twombly*; 550 U.S. at 570, 557; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) ("conspiracy" allegation "not entitled to assumptions of truth;" dismissing claim for failure to plead direct or circumstantial evidence of an unlawful agreement).

Here, CarePoint does not attempt to allege direct evidence of conspiracy. It points to no eye witness or documentary memorialization of agreement. Instead,

CarePoint proceeds solely on circumstantial evidence, asking this Court to infer a conspiracy. But the Supreme Court has limited the inferences that can be drawn in antitrust cases to avoid "chill[ing] the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986). To plead a conspiracy circumstantially, a plaintiff must allege facts "not merely consistent with" conspiracy, but "suggestive" of it, meaning the non-conclusory "factual context," if true, must "tend to rule out the possibility" of unilateral conduct. *Twombly*, 550 U.S. at 553-57; *Burch*, 662 F.3d at 227. Conduct "in line with [a firm's] rational and competitive business strategy" cannot support a conspiracy inference. *Twombly*, 550 U.S. at 554. Rather, a conspiracy inference requires parallel conduct and "plus factors," which are suspicious facts that ordinarily would not occur absent conspiracy. *Burch*, 662 F.3d at 227. CarePoint makes no attempt to meet this pleading burden.

Instead, the Complaint details how CarePoint's dysfunctional relationship with its business partner, Avery Eisenreich, interfered with its desire to sell the Bayonne hospital to BMC. Cmplt. ¶¶ 104-30. There are no allegations of **Barnabas's** involvement in that process. Barnabas never bid for Bayonne and was not involved in the discussions between CarePoint and BMC, or any other bidder. *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1066-67 (D. Md. 1991) (plaintiff

"must show that each alleged conspirator participated in the conspiracy with knowledge of the essential nature of the plan.").

Nor does the Complaint allege that Eisenreich or HRH needed Barnabas's help to carry out their plans.  Without an interest in Bayonne's operations or property, Barnabas had no power or ability to influence who acquired it.  And "nothing in the complaint intimates that resisting" CarePoint's entreaties to sell Bayonne real estate to BMC "was anything more than the natural, unilateral reaction" of Eisenreich seeking to maximize the value of his property interests or of HRH seeking to acquire the hospital.  *Twombly*, 550 U.S. at 566; *Burtch*, 662 F.3d at 229 (dismissing complaint because there were "no allegations that [defendants' conduct] was against each company's interest.").  Without an allegation that *anyone's* actions would not make economic sense absent a conspiracy, the Court cannot infer a conspiracy.  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994) ("[T]he absence of action contrary to one's economic interest renders consciously parallel business behavior meaningless, and in no way indicates agreement."); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49 (7th Cir. 1992) ("The plaintiff must demonstrate … that the defendant acted in a way that, but for a hypothesis of joint action, would not be in its own interest.").

### ii.   *Alleged Interference with CarePoint's Sales Process is Not "Anticompetitive Conduct."*

Even if Barnabas had been involved in the Eisenreich/HRH-CarePoint/BMC saga, CarePoint's claims fail because interference with its sales process is not "anticompetitive conduct."  Such interference may impact the ownership of the hospital, but it does not impact the number of competitors, the number of patients treated, or the prices charged.  Changes in ownership – without any associated change in market structure – raise matters of corporate law, but are not regulated by the antitrust laws.  *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266-67 (7th Cir. 1984) ("shift[ing] a lawful monopoly into different hands … has no antitrust significance"); *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*, 113 F. Supp. 2d 1164, 1174-75 (S.D. Ohio 1999) (no claim where conduct did not "alter[] the market structure [or] increased prices or reduced the quantity").

### C.   *Alleged Lobbying Activities and Regulatory Violations Are Immune, Not Plausibly Alleged, and Pro-Competitive.*

Delving into the underbelly of local politics, CarePoint touts its own lobbying efforts when things went its way and complains when they didn't.  But allegations of interactions with regulators and legislators are not allegations of *wrongful* conduct.  It is First Amendment immune.  In a refreshing display of candor, CarePoint acknowledges this, conceding that "activities, including seeking the aid

of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme."[25]  Cmplt. ¶ 180.

All of CarePoint's allegations here are conclusory.  But even if they were not, they relate to core protected conduct under the *Noerr-Pennington* doctrine. CarePoint points to interactions with the Hoboken Municipal Hospital Authority, which tried to facilitate a sale of CarePoint's hospitals after the contemplated sale to Barnabas fell through.  Nothing about these interactions support an antitrust claim.

CarePoint alleges that, after the discussions with Barnabas over the sale of the Hoboken hospital broke down, the Hoboken Municipal Hospital Authority ("HMHA") explored efforts to "broker a sale of CarePoint" to a suitable buyer. Cmplt. ¶ 134.  CarePoint concedes that HMHA "was reconstituted … pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15," which "authorizes municipalities to create … an instrumentality for the sole purpose of carrying out an acquisition and to operate and maintain a hospital."  *Id*. ¶ 132.

CarePoint speculates that, if HMHA had proceeded with its plans beyond this exploratory level, it *might* have chosen to improperly structure any transfer of assets

---

[25] CarePoint argues that Barnabas's (unspecified) lobbying activities can still shed light on Barnabas's "intent," even if not "material" to the alleged "monopolistic scheme." Cmplt. ¶ 180.  But CarePoint's claim fails, not because of inadequately pled intent, but because CarePoint has not alleged exclusionary **conduct**.  In any event, engaging in *lawful* lobbying activities does not suggest *unlawful* intent.

because HMHA had no money of its own.  *Id.*  But CarePoint's prediction that, in a hypothetical future world, HMHA would have violated state law is beside the point. HMHA did not acquire or transfer any rights in the CarePoint hospitals.  And even if it had and even if such acquisitions violated state law, such actions could not be challenged under federal antitrust law.  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 837 (7th Cir. 2011) (*Noerr-Pennington* "shelters from antitrust liability … misrepresentations made during … local zoning proceedings"); *Pennsylvania v. Susquehanna Area Reg'l Airport Auth.*, 423 F. Supp. 2d 472, 483 (M.D. Pa. 2006) (*Parker* precludes challenge to eminent domain proceedings).

Unable to complain about HMHA's efforts to find a suitable buyer for CarePoint's hospitals, CarePoint tries to allege spill-over effects.  It claims that Barnabas obtained some unspecified "market knowledge and competitive intelligence."  Cmplt. ¶ 21.  But complaints based on misappropriation or misuse of information must "specify what confidential or material nonpublic information [the defendant] possessed" and – in antitrust cases – how it was used to the detriment of competition.  *See, e.g.*, *Rosenbaum & Co. v. H.J. Myers Co. Inc.*, 1997 WL 689288, *3 (E.D. Pa. 1997).  There are no such allegations here.[26]

---

[26] It is also not clear *how* Barnabas could have obtained access to confidential information.  CarePoint says that Raymond James disclosed unspecified information from an unidentified "proprietary database."  Cmplt. ¶ 144.  But if that were true, it would have come from CarePoint itself.  Indeed, CarePoint specifically admits that

Nor is there any allegation that this information was – or could be – used to raise prices, restrict output, or reduce competition.  Indeed, the only "effect" alleged was that other bidders "halted ongoing negotiations" because they believed Barnabas was "interest[ed]" in buying Hoboken.  Cmplt. ¶ 146.  But CarePoint had announced that it was converting to a non-profit more than two months earlier, *see id.* ¶ 140, so it is not clear what "negotiations" were halted.  In any event, a potential bidder deciding to step away in the face of interest by a larger, more efficient, or better-equipped rival is an everyday occurrence, not an antitrust claim.  *Syufy*, 903 F.2d at 667 ("the [plaintiff] trots out a shopworn argument we had thought long abandoned: that efficient, aggressive competition is itself a structural barrier to entry").

## V.   THE STATUTE OF LIMITATIONS BARS ANY CLAIM RELATING TO BARNABAS'S 2017 ENTRY INTO BAYONNE.

CarePoint concedes that SED opened in July 2017.  That is more than four years prior to the filing of the complaint, so any challenge to Barnabas's entry, including pre-entry letters to doctors or others informing them of the option to treat patients or receive care at Barnabas's new facility, is barred by the statute of limitations.  15 U.S.C. § 15b.  CarePoint does not try to allege fraudulent concealment or any ongoing unlawful acts at SED following its entry.  As such, any claims relating to SED must be dismissed as untimely.

---

this information could have come "from Eisenreich through ***his dealings with CarePoint***." *Id.*

## VI.  CONCLUSION.

For the foregoing reasons, the Court should dismiss CarePoint's claims.


Dated: March 10, 2023                    Respectfully submitted,

                                         */s/ Ryan P. Blaney*
                                         Ryan P. Blaney (Bar No. 00618-2006)
                                         Colin R. Kass*
                                         Erica T. Jones*
                                         PROSKAUER ROSE LLP
                                         1001 Pennsylvania Ave, N.W.
                                         Washington, D.C. 20004
                                         (202) 416-6800
                                         rblaney@proskauer.com
                                         ckass@proskauer.com
                                         ejones@proskauer.com

                                         David A. Munkittrick*
                                         PROSKAUER ROSE LLP
                                         Eleven Times Square
                                         New York, NY 10036
                                         (212) 969-3000
                                         dmunkittrick@proskauer.com

                                         *Attorneys for Defendant*
                                         *RWJ Barnabas Health, Inc.*

                                         * Admitted Pro Hac Vice

## **CERTIFICATE OF SERVICE**

I, Ryan P. Blaney, hereby certify that on March 10, 2023, RWJ Barnabas's

Motions to Dismiss was served on counsel of record for Plaintiffs via email.

*/s/ Ryan P. Blaney*
Ryan P. Blaney