NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAREPOINT HEALTH SYSTEMS INC., *et al.*, | |
| Plaintiffs, | No. 22cv5421 (EP) (CLW) |
| v. | **OPINION** |
| RWJ BARNABAS HEALTH, INC., | |
| Defendant. | |

**PADIN**, **District Judge.**

Plaintiff CarePoint Health Systems Inc. ("CarePoint")[1] alleges that Defendant RWJ Barnabas Health ("RWJ"), a competing healthcare system, has engaged in a yearslong conspiracy with a health insurer and various entities who own the land under CarePoint's hospitals to monopolize the market for general acute care ("GAC") hospital services in Hudson County, New Jersey. RWJ moves to dismiss, arguing that CarePoint has not adequately alleged a conspiracy or attempted monopoly, or adequately alleged antitrust injury. D.E. 28. RWJ also appeals/objects to Judge Waldor's denial of a stay of discovery pending a decision on RWJ's motion to dismiss. D.E. 39. For the reasons below, RWJ's motion and appeal will be **DENIED**.[2]

---

[1] Though there are other Plaintiffs, this Opinion, like the parties' briefs, refers to the entities collectively as "CarePoint."
[2] The Court decides the motions without oral argument. Fed. R. Civ. P. 78; L.Civ.R.78(b).

I.  **BACKGROUND**[3]

A.  **Parties**

Plaintiff CarePoint is a New Jersey non-profit corporation which owns and operates three acute care hospitals in Hudson County: Christ Hospital in Jersey City, Bayonne Medical, and Hoboken University Medical Center ("Hoboken Medical"). D.E. 27 ("Compl." or "Complaint")[4] ¶¶ 35-41.

Defendant RWJ, one of the largest health care systems in New Jersey, owns and operates Jersey City Medical Center ("JCMC"), a full service, acute care hospital. *Id.* ¶ 42. JCMC, purchased by RWJ in 2013, was RWJ's first Hudson County hospital. *Id.* ¶ 59. Among many other healthcare facilities, RWJ also owns and operates a stand-alone emergency department ("SED") in Bayonne, a few blocks away from Bayonne Medical. *Id.*

Non-party Horizon Blue Cross-Blue Shield ("Horizon") is New Jersey's largest health insurer. *Id.* ¶ 15. Avery Eisenreich and Yan Moshe, also non-parties, are real estate investors who own the land under CarePoint's hospitals. *Id.* ¶ 8.

B.  **RWJ Opens the SED**

In July 2017, RWJ opened its SED in Bayonne, the first of its kind in New Jersey. *Id.* ¶¶ 15, 17. The SED provides "only first-level triage" to patients; patients requiring higher-level care "would have to be sent miles away" to JCMC. *Id.* ¶ 17.[5] According to CarePoint, the SED was

---

[3] This section is based on the Complaint's well-pled factual allegations, which the Court considers true for the purposes of this motion.
[4] Unless noted otherwise, all references to the "Complaint" are to the Third Amended Complaint. D.E. 27.
[5] JCMC applied to waive the requirement that an SED "shall be licensed only to replace the full service emergency department of a licensed general acute care hospital which has approval from [NJDOH] to cease operation of all of its licensed acute care beds. The [SED] shall be located in as close proximity to the closed full service emergency department as is possible." N.J.A.C. 8:43G-36.1(b). NJDOH granted the waiver, finding that JCMC had demonstrated that the SED

2

established primarily to divert emergency patients from CarePoint's Bayonne Medical to JCMC, "despite the fact that the SED has inferior resources" and that transfer between the SED and JCMC presents patient safety risks. *Id.* ¶ 17. Since the SED opened, decreased emergency admissions to CarePoint have likewise reduced CarePoint's inpatient admissions.[6] *Id.* ¶¶ 69-70. RWJ and CarePoint together account for 91.5% of Bayonne's ER admissions. *Id.* ¶ 119.

When RWJ opened the SED, Horizon offered RWJ offered "enhanced rates," *i.e.*, more than Horizon would usually pay to in-network providers, in an effort to eliminate CarePoint as a competitor. *Id.* ¶¶ 18, 62. To date, even after CarePoint became "in network" with Horizon, Horizon has refused to offer similar reimbursement rates to CarePoint. *Id.*

### C. RWJ Induces CarePoint-Referring Doctors to Steer Patients to RWJ

Beginning in mid-February 2016, RWJ, in conjunction with Horizon, launched a letter campaign to doctors who had consistently referred patients to CarePoint (the "RWJ Letter"). *Id.* ¶¶ 72-73. The RWJ Letter, which touted incentives like "enhanced fee-for-service" and "patient management" fees, was intended to induce doctors to refer patients to RWJ instead of CarePoint. *Id.* ¶¶ 73, 74.

### D. CarePoint Explores Selling its Hospitals

In 2018, amidst financial difficulties, CarePoint began to explore a potential sale of its hospitals. *Id.* ¶ 80. In April 2019, RWJ expressed an interest in purchasing all three hospitals. *Id.*

---

would "serve to eliminate or substantially mitigate problems of access to appropriate emergency care affecting a community or communities." D.E. 28-3 (Ex. 1). The Court may consider the waiver letter because it is a matter of public record and "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But whatever the regulatory dispute's relevance to the overall case, it is non-dispositive here. Neither CarePoint's Complaint nor its opposition specify how the SED violated state regulatory criteria, though. *See* Compl. ¶ 17; Opp'n at 7.

[6] CarePoint estimates approximately $80 million in resulting losses. Compl. ¶¶ 69-70.

¶ 82. Atlantic Health, a healthcare organization without acute care operations in Hudson County, also discussed a CarePoint sale. *Id.* Ultimately, in July 2019, RWJ tendered a letter of intent (the "2019 LOI") for Hoboken Medical and Christ Hospital, but not Bayonne Medical. *Id.*

However, any sale was complicated by the fact that CarePoint did not own the land under its hospitals. *Id.* ¶ 78. Medical Properties Trust ("MPT") of Hoboken TRS, MPT of Hoboken Hospital, MPT of Hoboken Real Estate, and MPT of Bayonne (collectively "MPT," a national medical real estate investment trust) have owned portions of the real estate under the CarePoint hospitals. *Id.* The property under Christ Hospital was owned by Hudson Propco, LLC.[7] *Id.* ¶ 79. The property under Hoboken Medical was owned 70% by an MPT entity. *Id.* The property under Bayonne Medical was wholly owned by an MPT entity.

On September 23, 2019, RWJ emailed CarePoint an offer to purchase Hoboken Medical and only Christ Hospital's assets, which CarePoint took to mean that RWJ did not actually intend to operate Christ Hospital. *Id.* ¶¶ 86, 89. Because RWJ's interest in any acquisition was expressly contingent upon its ability to negotiate new leases, RWJ tendered a revised LOI for the assets of Hoboken Medical and Christ Hospital with that contingency on September 28, 2019 and on October 21, 2019. *Id.* ¶¶ 90-91.

From mid-September into November 2019, Eisenreich, who had a stake in the land under Bayonne Medical and Hoboken Medical, "orchestrated communications regarding the implementation of his 'plan' to which RWJ had agreed." *Id.* ¶ 90. Eisenreich and RWJ CEO Mark Manigan met secretly regarding lease terms, and agreed not to respond to CarePoint's inquiries about lease terms. *Id.* ¶ 94. Shortly thereafter, with notice to RWJ but not to CarePoint, Eisenreich

---

[7] Owned 75% by CarePoint's Founders and 25% by JC Opco, LLC, an Eisenreich-owned entity. Compl. ¶ 79.

4

executed agreements with MPT for the purchase of Hoboken Medical and Bayonne Medical's real estate and MPT's minority equity interest in Hoboken Medical's operator.  *Id.* ¶¶ 94-95.

After RWJ submitted its LOI, CarePoint ceased business development expenditures and planned for potential staffing reduction.  *Id.* ¶ 98.  But neither Manigan nor Eisenreich ever intended to facilitate RWJ's acquisition; rather, RWJ intended to use the 2019 LOI to obtain valuable confidential and proprietary information from CarePoint, to freeze growth at CarePoint, and to preclude other hospital operators from engaging in meaningful negotiations with CarePoint.  *Id.* ¶¶ 97-99.  RWJ ultimately withdrew from the proposed transaction.  *Id.* ¶ 101.[8]

In January 2020, Hudson Regional Hospital ("HRH"), owned by Moshe, approached CarePoint about a possible merger, sale, or other transaction involving the entities comprising CarePoint.  *Id.* ¶ 104.  In response to HRH's request for confidential information, CarePoint granted HRH access to a "data room" where confidential data, including financial data, regarding Bayonne Medical and the other CarePoint Hospitals was stored.  *Id.* ¶ 105.  The access was conditioned upon compliance with a January 9, 2020 confidentiality agreement.  *Id.* ¶ 106.

CarePoint later entered into an exclusive LOI with another company, BMC, to sell Bayonne Medical with the intent to continue operations as an acute care hospital.  *Id.* ¶¶ 108-110.  However, in May 2020, Eisenreich agreed to sell the land under Bayonne Medical to HRH.  *Id.* ¶ 112.  CarePoint alleges that HRH, Eisenreich, and RWJ "remained in constant communication throughout this series of events, and created a plan to convert Bayonne Medical into a skilled nursing facility and thus eliminate Bayonne Medical as a competitor of both HRH and RWJ."  *Id.*

---

[8] The sale of the land on which Hoboken Medical and Bayonne Medical operate and the assignment of the affected leases was subject to claims brought by, among others, Hoboken Medical and IJKG, the CarePoint affiliate that owns and operates Bayonne Medical) in the Chancery Court in Delaware.  *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, C.A. No. 2019-0972-KSJM.  Compl. ¶ 102.  The matter settled.  *Id.* ¶ 103.

¶¶ 116-120. HRH's purchase of the Bayonne Medical land was designed to "sabotage BMC's acquisition of Bayonne Medical" and ensure that HRH would "own the market for same day surgery in Hudson County, preferably at its existing Secaucus facility." *Id.* ¶ 115.

### E. Raymond James and HMHA

In December 2020, the Hudson Municipal Hospital Authority ("HMHA") was reconstituted.[9] *Id.* ¶ 132; Hoboken, N.J., Mun. Ord. B-312, Ch. 36A. (as amended December 18, 2020). According to CarePoint, this was premised on the false assertion that "CarePoint Health has notified the City that it no longer desire[d] to continue its operation of [Hoboken Medical]." *Id.* ¶ 133.

The HMHA then retained Raymond James, who had previously worked with RWJ. *Id.* ¶¶ 134, 135. The aim of this joint venture was to strengthen RWJ's market position by brokering a sale of CarePoint to another private hospital system and/or devalue Hoboken Medical such that RWJ could purchase it out of bankruptcy. *Id.* ¶¶ 135-138. To effectuate this plan, James solicited buyers through a Request for Indications ("RFI").

The RFI sought buyers not only for Hoboken Medical, but for CarePoint's other Hudson County hospitals—hospitals not governed by the HMHA. *Id.* ¶¶ 139, 142. The RFI also directed RFI respondents not to contact CarePoint without James' consent. *Id.* ¶ 141. And the RFI included confidential information regarding CarePoint and Hoboken Medical that CarePoint alleges was obtained from Eisenreich or the 2019 LOI. *Id.* ¶ 144. The RFI's circulation interfered with ongoing negotiations and business relationships. *Id.* ¶ 146.

---

[9] The Local Hospital Authority Law ("Hospital Law"), authorizes municipalities to form local hospital authorities whose "sole purpose . . . shall be to carry out an acquisition and to operate and maintain a hospital." N.J.S.A. § 30:9-23.18(b). While CarePoint refers to the HMHA as the Hudson Municipal Hospital Authority, the ordinance refers to it as the Hoboken Municipal Hospital Authority. They appear to be the same entity.

6

### F. The Complaint and Pending Motions

CarePoint asserts two Sherman Act claims against RWJ and seeks damages and injunctive relief. Count I alleges monopolization and/or attempted monopolization of the Hudson County market for acute care hospital services. Compl. ¶¶ 152-186 (citing 15 U.S.C. § 2). Count II alleges a conspiracy in restraint of trade, affecting the Hudson County market for acute care hospital services, including but not limited to agreements intended to cripple and/or destroy CarePoint's hospitals as independent competitors. Compl. ¶¶ 187-190 (citing 15 U.S.C. § 1).

RWJ moves to dismiss the entire Complaint. D.E. 28 ("Mot."). CarePoint opposes. D.E. 29. RWJ replies. D.E. 30.

While the motion to dismiss was pending, Judge Waldor denied RWJ's request for a stay of discovery. D.E. 37. RWJ appealed. D.E. 39. CarePoint opposes. D.E. 40. RWJ replies. D.E. 48.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (cleaned up). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

To survive a Rule 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

7

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679.  Finally, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

"Judging the sufficiency of a pleading is a context-dependent exercise; [s]ome claims require more factual explication than others to state a plausible claim for relief."  *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).  "For example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." *Id.*  However, it is inappropriate to apply *Twombly's* plausibility standard with extra bite in antitrust and other complex cases.  *Id.*

### III.   ANALYSIS

CarePoint asserts conspiracy and attempted monopolization claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  Specifically, CarePoint alleges that "RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for GAC services in Hudson County, resulting in lost revenues and profits and significant additional expenses." Compl. ¶¶ 181-85.

But before examining the claims' substance, RWJ raises two threshold issues: that CarePoint fails to adequately allege antitrust injury, and that at least some of CarePoint's claims are barred by the Sherman Act's statute of limitations.  Neither is persuasive.

### A. CarePoint Adequately Pleads Antitrust Injury

A private plaintiff "who shall be injured in . . . business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15(a). But "plaintiffs must also have 'antitrust standing.'" *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 341 (3d Cir. 2018) (quoting *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015)). Antitrust standing, unlike Article III standing, does not affect subject matter jurisdiction, "but prevents a plaintiff from recovering under the antitrust laws." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013).

Requiring antitrust injury advances the goals of antitrust law—"protect[ing] competition, not competitors." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018). "[O]nly anticompetitive conduct, or a competition-reducing aspect or effect of the defendant's behavior" is curtailed. *Id.* at 338 (3d Cir. 2018); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 ("[I]t is inimical to the antitrust laws to award damages for losses stemming from continued competition."). "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers" and, as relevant here, "competitors in the restrained market." *W. Penn*, 627 F.3d at 102.

To establish antitrust injury, a "plaintiff must do more than show that it would have been better off absent the violation." *Id.* at 101 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1997)). Rather, a plaintiff must demonstrate "injury of the type the antitrust laws were intended to prevent," and that the injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489; *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010). Plaintiff bears the burden of this showing. *See Phila. Taxi*, 886 F.3d at 343.

At this early stage, however, the pleading standard is permissive. "The existence of antitrust injury is not typically resolved through motions to dismiss." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 684 (E.D. Pa. 2014); *see also Ethypharm.*, 707 F.3d at 232 n.15 (antitrust standing is a "merits issue"). An antitrust plaintiff is only required to "allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced" the purported harm. *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 577 (E.D. Pa. 2018) (quoting *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 2785, 2017 U.S. Dist. LEXIS 209710, at *58 (D. Kan. Dec. 21, 2017)).

As illustrated by *W. Penn*, the Complaint contains allegations supporting an inference of antitrust injury. In *W. Penn*, the district court granted the alleged monopolist's motion to dismiss, finding insufficient the plaintiff/competitor's allegations of antitrust injury. But the Third Circuit reversed, finding that the plaintiff's complaint had adequately alleged antitrust injuries. Many of those allegations are echoed in CarePoint's Complaint, and therefore likewise counsel against dismissal. For example:

- RWJ engaged in bad faith in the 2019 LOI discussions for the potential sale of Christ Hospital and Hoboken Medical to obtain confidential and proprietary information later used to assist HMHA and Raymond James to devalue CarePoint's assets. Compl. ¶¶ 29, 97, 105-06, 144-46; *see W. Penn*, 627 F.3d at 94 (finding injury where defendant insurer leaked confidential financial information regarding plaintiff to defendant/competitor hospital, "which in turn leaked a distorted version of the information to credit-rating agencies and to the business media in an attempt to destroy investor confidence in" plaintiff).

10

- RWJ influenced Horizon to offer "enhanced rates" only to RWJ despite CarePoint being in network with Horizon and CarePoint's "superior outcomes, regional partnerships and national accolades," steering patients toward RWJ's inpatient facilities, in some cases at greater risk to their health. Compl. ¶ 18; *W. Penn*, 627 F.3d at 104 (finding injury where defendant insurer maintained plaintiff hospital's reimbursement rates at artificially depressed levels and repeatedly refused to increase them because defendant/alleged monopolist hospital would retaliate).

- RWJ "poached one of CarePoint's leading practitioners by encouraging him to intentionally violate a restrictive covenant." Compl. ¶ 31; *W. Penn*, 627 F.3d at 109 (finding injury where defendant hospital "raided" physicians from the plaintiff hospital (by offering unsustainable inflated salaries) in an attempt to "drive the hospital out of business")

- RWJ "spread false information and undermine[d] confidence in the CarePoint system[,]" which resulted in decreased revenue and increased costs. Compl. ¶ 30; *W. Penn*, 627 F.3d at 110 (finding injury where defendant hospital made false statements about plaintiff's financial health to potential investors, which caused plaintiff to pay artificially inflated financing costs on its debt).

**B.  CarePoint's Claims Are Not Barred by the Statute of Limitations**

RWJ also briefly argues that the Sherman Act's statute of limitations bars any claim relating to RWJ's 2017 entry into Bayonne when the SED opened, over four years before CarePoint first filed this action on September 6, 2022. Mot. at 39. The Court disagrees.

Antitrust actions must be commenced "within four years after the cause of action accrued." 15 U.S.C. § 15b. Where a statute of limitations defense is raised in a Rule 12(b)(6) motion to

dismiss, the plaintiff's tardiness in bringing the action must be apparent from the face of the complaint. *W. Penn*, 627 F.3d at 105 n.13.

Additionally, an antitrust cause of action generally "'accrues and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business.'" *W. Penn*, 627 F.3d 85, 105-06 (3d Cir. 2010) (cleaned up) (quoting *In Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). However, "in the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." *Id.*

As detailed below, CarePoint has plausibly alleged a conspiracy spanning from RWJ's entry into the relevant market and continuing through more recent conduct and ongoing harm. At least some of the conduct occurred after September 6, 2018, four years before CarePoint filed its initial Complaint. *See, e.g.*, Compl. ¶¶ 77, *et seq.* (allegations regarding RWJ's interference with attempted sale and misuse of LOI in 2019 and 2020).

Though RWJ argues, in reply, that "[a]llegations of a 'continuing conspiracy' cannot save the claim because the pre-limitation acts concerning SED are distinct from alleged post-limitations sales process interference," Reply at 10, n.7, RWJ does not explain this distinction, nor can the Court discern a meaningful one. Accordingly, this branch of RWJ's motion to dismiss will be denied.

**C. The Complaint Adequately Pleads Antitrust Claims**

Having determined that CarePoint has adequately pled an antitrust injury, the Court turns to whether CarePoint has plausibly alleged Sherman Act violations. The Court finds that it has.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Section 1 prohibits "only *unreasonable* restraints of trade." *W. Penn*, 627 F.3d at 99 (emphasis added) (quoting *Standard Oil Co. v. United States*, 221 U.S. 1 (1911)). While some agreements are *per se* anticompetitive and conclusively presumed to unreasonably restrain trade, others "are condemned only if evaluation under the fact-intensive rule of reason indicates that they unreasonably restrain trade." *Id.*

Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. The elements of attempted monopolization are (1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power. *W. Penn*, 627 F.3d at 108 (citations omitted).

RWJ focuses on Section 1 and Section 2's second element, arguing that CarePoint has not plausibly pled anticompetitive conduct relating to RWJ's entry into Bayonne or CarePoint's attempted sale of its properties. Mot. at 22-39. The Court disagrees.

"Anticompetitive conduct is . . . generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." *Id.*

RWJ characterizes CarePoint's antitrust case as a "'monopoly broth' theory," *i.e.*, that CarePoint aims to have individual allegations coalesce into a cohesive theory of anticompetitive conduct. Mot. at 23 n.20. RWJ argues that the individual ingredients are insufficient. As RWJ

13

puts it, "zero plus zero will always equal zero." *Id.* The problem with this approach is that it is too early to substantively evaluate each instance of allegedly anticompetitive conduct. It is too early to value either side of the equation—the worth of the individual ingredients, or what they amount to.

What matters at this phase is the presence and plausibility of the allegations—whether the monopoly broth's ingredients are there, not whether they make a meal. And those ingredients are here; as discussed above, CarePoint alleges numerous instances of RWJ's conduct that, evaluated together, plausibly coalesce into an alleged scheme: RWJ entered the Hudson County acute care market by opening the SED with the aid of enhanced reimbursement from Horizon, steered patients and doctors away from CarePoint, and interfered surreptitiously with CarePoint's attempted sale and employees, all in an effort to take over the relevant market from CarePoint.

Moreover, the Third Circuit has cautioned that courts examining such claims "should consider a defendant's anticompetitive conduct *as a whole* rather than considering each aspect in isolation." *Id.* (emphasis added) (citing *Lepage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[I]n a case . . . [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it."))). The cases cited by RWJ to support its case for early dismissal are distinguishable on procedural grounds—the motions were decided on summary judgment after discovery—or on other grounds. *See Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,* 608 F. Supp. 3d 298, 308 (W.D.N.C. 2022) (granting summary judgment and finding insufficient evidence of anticompetitive conduct after "expansive" discovery); *Am. Floral Servs., Inc. v. Florists' Transworld Delivery Asso.*, 633 F. Supp. 201, 207 n.11 (N.D. Ill. 1986) ("exhaustive" discovery); *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201,

14

1210 (C.D. Cal. 2011) (granting summary judgment); *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 826 F. Supp. 2d 705, 708 (S.D.N.Y. 2011) (granting motion to dismiss because patent infringement is not considered anticompetitive conduct). Accordingly, CarePoint's Complaint has adequately pled its claims and RWJ's motion to dismiss will be denied.

### D. RWJ's Objection to/Appeal of Judge Waldor's Denial of a Stay of Discovery is Denied as Moot

After Judge Waldor denied RWJ's request to stay discovery based on RWJ having filed its motion to dismiss, RWJ objected. D.E.s 38, 39. The Court having now decided that motion to dismiss and determined that discovery is warranted, the objection is denied/overruled as moot.

## IV.   CONCLUSION

For the reasons above, RWJ's motion to dismiss and objection to Judge Waldor's denial of a stay of discovery will be **DENIED**. An appropriate Order follows.


November 17, 2023

*Evelyn Padin*
Evelyn Padin, U.S.D.J.

15