

William T. Walsh<br>
212-969-3908<br>
WWalsh@proskauer.com

April 18, 2024

<u>*Via ECF*</u>

Hon. Cathy L. Waldor, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse

      Re:    *CarePoint Health Management Assocs. LLC. v. RWJ Barnabas Health Inc.*, 2:22-cv-05421-EP-CLW

Dear Judge Waldor:

    Barnabas writes to request an order compelling two of CarePoint's Founders – Vivek Garipalli and James Lawler – to produce documents responsive to Barnabas's subpoenas.[1] Garipalli and Lawler are the architects of a scheme to bilk the CarePoint hospitals of over **half a billion** dollars, leaving it unable to invest in maintaining a viable hospital system. Those actions – and not Barnabas's opening of a competing emergency department to provide another option to patients and insurers being price gouged at CarePoint – is what caused CarePoint's financial difficulties that it now seeks to lay at Barnabas's feet. Barnabas seeks the evidence of Garipalli's and Lawler's scheme – and the intricate web of shell companies they used to hide their activities – to prove this point at trial.

    Garipalli and Lawler, however, have stonewalled. Specifically, Garipalli and Lawler have refused to: 1) fashion a reasonable search designed to capture responsive documents that Garipalli and Lawler have agreed to produce; 2) search for and produce communications with CarePoint; and 3) search for and produce documents regarding CarePoint's transition to a non-profit and Garipalli's and Lawler's exit from the company. These are critical documents central to CarePoint's claims and Barnabas's defenses. They should be produced.

### A. *Garipalli and Lawler Extract Hundreds of Millions from the Hospitals.*

    A decade ago, Garipalli seized on an opportunity to buy the CarePoint hospitals out of bankruptcy. Then, he, along with Lawler and Jeffrey Mandler (the three CarePoint "Founders"), proceeded to jack up prices and extract a **half a billion dollars** from the CarePoint System over the ensuing 10 years, through a serious of fraudulent management services agreements and shell companies, that are largely off the CarePoint books.

    Their scheme made them rich, but it had consequences that ultimately led to CarePoint's situation today. When the Founders took control of the system, they funded the transaction by

---

[1] Garipalli was served on October 17, 2023 and Lawler was served on October 19, 2023.

**Proskauer**

Page 2

extracting most of its value by selling off the underlying real estate. The benefit was obvious: the Founders took control of the system for a mere $10,000 personal investment.

With control of the system's operations, the Founders were free to engage in self-dealing transactions in total secrecy. Upon seizing control, the Founders pulled out of insurer networks, enabling them to charge virtually anything they wanted for patient care, particularly emergency services. Indeed, one CarePoint hospital became the second most expensive hospital ***in the nation.*** To line their pockets, the Founders created a bogus "management" company, Sequoia Health Management, to divert 4% of CarePoint's gross revenue – that is before paying a single penny for patient care and other operations. This management company did ***nothing***. It had no employees and provided no actual services. This was not an "arms length" contract. Garipalli, himself, signed both sides of the contract, on behalf of both Sequoia and CarePoint. The Founders also authorized additional capital distributions – totaling hundreds of millions of dollars – directly to themselves. When this was not enough, they caused CarePoint to take out a loan for $60 million, of which they pocketed almost every single cent.

The Founders' actions had consequences. CarePoint's decision to stop competing for insured patients – actually ***turning away*** patients seeking an in-network choice so that it could price gouge the rest – created a dire need for an alternative medical center unconnected to the Founders. The New Jersey Department of Health recognized this. Barnabas's SED satisfied that need, lessening the monopoly grip that CarePoint's Bayonne hospital had on local residents.

But CarePoint's scheme had an even more profound consequence. The New Jersey legislature – fed up with the Founders' tactics, and others like them – passed special legislation (the 2018 Surprise Bill Act) limiting the rates out-of-network hospitals could charge. This brought the Founders' scheme to an end. With the hospitals on the brink of failure, the Founders rejoined insurers' networks, and tried to sell off their now virtually worthless interests in the hospitals that had suffered from years of underinvestment and neglect. But it was too little, too late. In less than a year, CarePoint was defaulting on its loan obligations, and preparing for bankruptcy. It had informed the Department of Health that it was shutting down operations at Christ Hospital, and was preparing to do the same for Bayonne. Indeed, it sent layoff notices to thousands of hospital workers.

The sales process did not go smoothly. Again, actions have consequences. When the Founders sold off the land underneath the hospitals, they effectively gave the landlords a veto right over any future conveyance of the hospitals. Chaos, and disputes, ensued. CarePoint's Founders sought to enlist local politicians to exercise eminent domain to strip the landowners of their title. CarePoint initiated litigation against the landowners. The Founders sued each other. And CarePoint's own employees sued CarePoint, including for the fraudulent misuse of hospital funds.

Ultimately, with the prospect of continued paydays from the CarePoint system dimming and their schemes starting to come to light, the Founders decided to walk away, half-a-billion dollars richer. In response to pressure from the State, they suspended their bogus management service agreement through Sequoia. And they converted the hospitals to a non-profit (donating their now-worthless interests in the systems), leaving the hospitals to their fate.

**Proskauer**

Page 3

    This is the real story behind CarePoint's lawsuit. This explains the situation CarePoint finds itself in. It has nothing to do with Barnabas. But it has everything to do with this lawsuit. Barnabas is entitled to discovery to prove that CarePoint's failures are the consequence of its own actions. That discovery cannot just come from CarePoint. It must also come from the Founders, who orchestrated the scheme, directed it at every turn, and profited immensely from it.

    **B.    *Garipalli and Lawler Are Stonewalling Discovery.***

    On October 17 and October 19, 2023, Barnabas served subpoenas on Garipalli and Lawler, respectively, seeking:

- The entities involved in the Founders' ownership interests (Requests 2-4).
- Sale of the real estate underlying the hospitals (Request 5).
- The services the Founders provided to the hospitals, and payments from CarePoint to the founders or entities they controlled (Requests 6-9).
- The SCI investigation (Request 10).
- The financial performance of the hospitals (Requests 11-12).
- The potential sale, closure, or re-organization of CarePoint (Requests 13, 21-26)
- Competition, and Barnabas (Requests 14-16).
- CarePoint's participation or non-participation in insurance networks (Request 17-20).
- The Founders' decision to convert to a non-profit (Requests 27-29).

    In response, one Founder – Mandler – has already produced nearly 150,000 documents. Garipalli and Lawler, however, have only produced 21 and 1, respectively. While Garipalli and Lawler have, at least on paper, largely agreed to search for and produce documents responsive to Barnabas's requests, their offers suffer from three fundamental deficiencies: 1) they have limited their searches to a set of search terms that do not include basic terms as "Sequoia" – Garipalli's entity to which CarePoint paid millions; 2) they exclude from their search and production any correspondence with CarePoint; and 3) they refuse to produce any documents regarding their decision to convert to a non-profit.

    Barnabas has met and conferred with Garipalli and Lawler numerous times over these issues, to no avail.[2] Garipalli's and Lawler's objections should be overruled.

---

[2] Barnabas met with Garipalli and Lawler jointly three times in November 2023: November 3rd, 10th and 28th. Barnabas met with Garipalli and Lawler on February 15, 2024 and again with Lawler alone on March 1, 2024. During the course of this period, the parties also engaged in numerous email exchanges and letter correspondences.

The accompanying exhibits are as follows: Ex. A (Subpoena to Lawler); Ex. B (Subpoena to Garipalli); Ex. C (Letter attaching Barnabas's Proposed Search Terms); Ex. D (Garipalli's Responses and Objections); Ex. E (Lawler's Responses and Objections); Ex. F (Letter Correspondence with Garipalli); and Ex. G (Letter Correspondence with Lawler). The full correspondence is available upon request.

**Proskauer**

Page 4

### C. Garipalli and Lawler's Proposed Search Terms Exclude Swaths of Relevant Information.

On November 11, 2023, in an attempt to aid Garipalli and Lawler and reduce any burden in responding to the subpoenas, Barnabas provided a list of proposed search terms. Ex. C. Both Garipalli and Lawler refused to utilize Barnabas's search terms, so Barnabas advised them that, while Barnabas had no objection to the use of reasonable terms to manage any burden, the terms must be calculated to capture all potentially responsive documents. While Mandler produced nearly 150,000 documents, Garipalli's terms would artificially reduce the universe of documents he would even review (much less produce) to under 20,000. That is because Garipalli's and Lawler's proposed terms are facially deficient.

For example, Garipalli refuses to search for *anything* related to Sequoia Management or CarePoint Health Management Associates, the two management services entities he owned. While Lawler includes "Sequoia" in his terms, it is unreasonably limited by terms unrelated to services provided or payments received. These terms would improperly exclude the foundational and financial documents regarding the entities holding the Founders' ownership of the hospitals. *See* Request No. 3. How are Lawler and Garipalli going to find and produce documents regarding their entities' agreements with and payments from CarePoint if their terms do not include such basic words as "pay," or "fee," or "contract"?

Garipalli and Lawler cannot agree to produce responsive documents only to fashion search terms designed to exclude responsive documents. Subpoena recipients have "an obligation to conduct a reasonable search for documents." *Top Jet Enters., Ltd. v. Kulowiec*, 2022 WL 280459, at *5 (S.D.N.Y. 2022). They "cannot engage in halfhearted or ineffective efforts to identify and produce relevant documents," and search terms must be "reasonably designed to locate relevant documents." *Id.* When Barnabas identified the deficiencies in Garipalli's search terms, he had no response.

Nor can Garipalli and Lawler assert burden to avoid a reasonable search. Their only objection to Barnabas's search terms has been the number of hits. But Barnabas's terms reduce Garipalli's email universe by nearly half – from over 800,000 to around 460,000. There can be no question Barnabas is meeting Rule 45's obligation to "take reasonable steps to avoid imposing undue burden." These are sophisticated, wealthy individuals[3] at the very middle – or, more precisely, at the very top – of the ills CarePoint complains of. There can be no question the documents Barnabas seeks are relevant and proportional.

Given their treatment of CarePoint and suspicious (to say the least) history of payments, Garipalli and Lawler's desire to grossly limit the documents they produce is understandable. But it is not countenanced by the Rules. Barnabas is entitled to documents necessary and relevant to its defenses. No one but Garipalli and Lawler have the documents regarding to their inner strategies and constructs that left CarePoint hollowed and hobbled. The documents should be

---

[3] Garipalli's and Lawler's ability to pay the cost of production is presumably why they have not specified or quantified any specific burden, and have not requested any cost shifting. Nor would such a belated request be appropriate in response to this letter.

produced, and if Garipalli and Lawler insist on using search terms, they should use the terms Barnabas proposed.

### D. Garipalli and Lawler Cannot Exclude CarePoint Emails.

After confirming their agreement to produce documents responsive to all but a few of Barnabas's requests, Garipalli and Lawler for the first time took the position they would exclude from any search "emails to, from, or copying anyone" with a CarePoint email domain. They claim they can exclude what are probably some of the most relevant documents in their possession simply because they are third parties. This argument is fundamentally flawed.

First, just because an email in the Founders' possession includes a CarePoint email domain does not mean it is easily obtained, or even obtainable, from CarePoint. While CarePoint has agreed to produce from certain custodians, it has not agreed to produce from all custodians that ever had a relevant communication with the Founders. It is far easier to go directly to Garipalli and Lawler for that. Thus, Garipalli and Lawler cannot show that CarePoint is a "more convenient, less burdensome, or less expensive" source for Garipalli's and Lawler's own communications. Fed. R. Civ. P. 26(b)(2)(C)(i). Additionally, particularly given that Garipalli and Lawler conducted their CarePoint business through their personal email accounts, they likely have relevant CarePoint communications that, because of employee departures or some other reason, are no longer in CarePoint's files. To completely exclude all emails with the CarePoint domain is simply unreasonable.

Second, "there is no general rule that [a party] cannot seek nonparty discovery of documents likely to be in [another party's] possession." *Viacom Intern., Inc. v. YouTube, Inc.*, 2008 WL 3876142, at *3 (N.D. Cal. 2008) (compelling production where there was no "reason to believe that YouTube retained *all* communications and documents shared with" third parties). Thus, "in appropriate circumstances, production from a third party will be compelled in the face of an argument that the 'same' documents could be obtained from a party." *Visto Corp. v. Smarner Info. Sys., Ltd.*, 2007 WL 218771, at *3 (N.D. Cal. 2007). This is such a circumstance. As Founders who ran CarePoint for most of the relevant period, Garipalli and Lawler are uniquely positioned to provide relevant discovery. And, as noted, the Founders' communications with CarePoint are a "non-well-defined set … whose completeness is not readily verifiable." *Software Rights Archive, LLC v. Google Inc.*, 2009 WL 1438249, at *2 (D. Del. 2009). As such, "allowing for discovery from both the party and non-party, completeness of discovery is more likely to be achieved." *Id.*[4]

### E. Garipalli and Lawler Should be Required to Produce Documents in Response to Barnabas's RFPs 27-29.

Garipalli and Lawler have refused to produce any documents in response to Barnabas's requests regarding their decision to convert CarePoint to a non-profit, claiming it is not relevant.

---

[4] Even the cases cited by Lawler agree with this principle and compel production. *See Miller v. Allstate Fire & Cas. Ins. Co.*, 2009 WL 700142, at *6 (W.D. Pa. 2009) (rejecting argument that "the documents could be discovered from a party to this matter" because "the Court believes that discovery of such documents from two differing sources may facilitate the bringing forth of all relevant facts in this matter, so as to allow the Court to promote the search for truth.").

**Proskauer»**

Page 6

But this is a critical event in the case: the Founders' exit from CarePoint.  CarePoint alleges that "RWJ's conduct … has caused significant financial injury to CarePoint," including by allegedly "thwart[ing] CarePoint's sale" process.  *E.g.*, TAC ¶ 151; ECF 29 at 24, 25.  CarePoint pursued conversion to a non-profit after its sales efforts failed, which, it claims, was the result of Barnabas's alleged conduct. And it touted its new non-profit status as a way to ameliorate its financial difficulties which, again, it says were the result of Barnabas's conduct.  But as Lawler and Garipalli have previously explained, the conversion was to provide them "with a clean exit."  By "clean exit," however, they mean that the conversion enabled them to extract one last ounce of value from the hospitals.  As part of the conversion, certain amounts owed to Garipalli or entities owned or controlled by him, would be paid.  Thus, the reasons for, and impact of, the conversion to a non-profit, and whether they have anything to do with Barnabas, are centrally relevant.

      Garipalli and Lawler should be compelled to produce their responsive information.

                          Respectfully submitted,

                          /s/ *William T. Walsh*