

William T. Walsh
212-969-3908
wwalsh@proskauer.com

May 10, 2024

*Via ECF*

Hon. Cathy L. Waldor, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse

   Re: *CarePoint Health Management Assocs. LLC v. RWJ Barnabas Health Inc.*,
     2:22-cv-05421-EP-CLW[1]

Dear Judge Waldor:

  One of the central questions in this litigation is whether the Founders destroyed CarePoint by extracting half-a-billion dollars from the system and driving it to the brink of bankruptcy, or whether Barnabas is at fault for opening a competing emergency department to provide patients and insurers with a more affordable in-network alternative. Evidence from the Founders – the architects of the scheme – is critical to resolve this core dispute.

  Nothing in the Founders' Opposition justifies their refusal to produce this evidence.[2] Indeed, the Founders have largely waived their objections by previously agreeing to produce documents responsive to the subpoena, as *written*, subject only to the three exceptions addressed by Barnabas's letter motion. Specifically, as further detailed in Appendix A below, Garipalli and Lawler ultimately agreed to search for and produce documents regarding:

- Their purchase and potential sale of the hospitals, and the underlying real estate;
- The web of entities used to operate CarePoint or extract funds from it;
- Their dealings with insurers relating to out-of-network charges;
- CarePoint's strategic planning and financial status; and
- Barnabas and competition in Hudson County.[3]

  Far from contesting this, the Founders tell the Court that they were prepared to produce this material "by May 13, 2024," this Monday. ECF 94. While they now suggest they won't comply with their own proposed deadline based on this Motion, this Court should not entertain any objection other than with respect to the three issues before the Court: (i) the Founders' refusal to produce any correspondence with anyone at CarePoint; (ii) their refusal to produce documents

---

[1] Unless otherwise noted, all emphasis added and internal citation and quotation marks are omitted. Documents referenced in this letter are available upon request. Because the Founders are not subject to the Protective Order, Barnabas is only serving the Founders with the redacted version of this letter. If the Court so orders, we will serve the Founders' counsel with an unredacted copy.

[2] The Founders' argument – that Barnabas's letter motion to compel is procedurally defective because it did not first seek leave to file it – lacks merit. Barnabas's letter is not a formal motion for which leave is required. It is a discovery dispute letter, in full compliance with the Court's rules.

[3] These positions and agreements are set forth in the parties' correspondence filed with the Court. ECF 85-6, 85-7.



Page 2

regarding their decision to convert to a non-profit; and (iii) their use of search terms, which are designed – not capture relevant evidence – but to exclude it.

### A. Evidence of the Founders' Cash Extraction, Price Gouging, and Mismanagement Is Plainly Relevant.

The Founders' opposition is littered with insults, calling Barnabas's description of the Founders' conduct as an "unsupported," "unfounded," "false," "baseless," "fictitious," "inflammatory," and "irrelevant" "strawm[an]." ECF 94, 88. But they **_do not deny_** the central facts: the Founders extracted half-a-billion dollars from the CarePoint hospitals, and Sequoia – the entity that supposedly provided "managements services" and received hundreds of millions of dollars in fees – was just a shell company with no employees and whose "services" were a sham. Indeed, it is telling that, in their April 23rd letter (ECF 88 at 2), the Founders promised to "fully address the false accusations" that Barnabas made, and yet, their Opposition does not identify a single falsity.

Nor do the Founders deny that the only way they could fund such large withdrawals was to: (i) cancel their in-network contracts with insurers, effectively getting out of the business of serving most commercial customers, allowing them to raise rates to exorbitant levels; (ii) severely reduce maintenance, upkeep, and investment in the aging hospital facilities, limiting their commercial viability; and (iii) default on their loan covenants and obligations to creditors.

Despite the clear relevance of this information, the Founders' curiously assert that evidence of their mismanagement and misconduct "has nothing to do with CarePoint's allegations or any _conceivable_ defense thereto." ECF 94 at 2. But they don't explain why evidence of the actual cause of CarePoint's financial distress is irrelevant to a case centering around this precise issue.

At best, the Founders dispute _factually_ that they were "responsible for the financial distress of CarePoint," and claiming that the evidence – _which they are refusing to produce_ – "will show" that the Founders acted properly, at least since the "beginning of 2019." ECF 94 at 1-2. But determining whether the Founders were responsible for lifting the hospitals out of bankruptcy in 2008-2011, or whether they extracted every last cent from the system in the ensuing years (or both), is exactly what discovery is for. Contrary to the Founders' assertion, they cannot avoid discovery simply by claiming they were good guys.

Moreover, the evidence the Founders drove CarePoint into the ground is overwhelming:

- **_CarePoint's Business Partners Exposed the Fraud._** As the Founders concede, their scheme was hatched out of the initial hospital bankruptcies, where they locked arms with Avery Eisenreich to buy the hospitals and the land underneath them. When their scheme came crashing down – as all fraudulent schemes eventually do – Mr. Eisenreich decided to come clean, noting that the Founders "systematically carried out a scheme to defraud [Hoboken] hospital out of tens of millions of dollars [by] causing the hospital to pay fictitious management fees and expense allocations

**Proskauer»**

Page 3

[and] falsifying the books and records of the hospital to cover up their fraud."[4] The Founders' other business partner, MPT – a national, publicly-traded REIT – similarly explained that the "payments … to the Founders and their entities [were] excessive, unreasonable, above market and the result of self-interest and … self-dealing," and "the genesis of [the] distress sale" of the hospitals.[5]

- ***CarePoint's Former CFO Blamed the Founders***.  Even the Founders began turning on each other, with one Founder (Mandler) suing the other two (Garipalli and Lawler).  In that litigation, CarePoint's then-CFO submitted a declaration laying the blame for CarePoint's financial distress ***solely*** at the Founders' feet.  As he explained, the Founders "entered into numerous harmful contracts that severely limited the ability of the Hospitals to deliver quality care and significantly contributed to the Hospitals' financial distress…. [Their] various failures … left the hospital[s] in ruins", in part due to "millions in fees that were unaccounted for."[6]

- ***Garipalli's and Lawler's Own Law Firm Blamed Them***.  Even the Founders' current law firm – Quinn Emanuel[7] – previously filed suit against CarePoint (when they were representing a creditor), explaining how the Founders defrauded their creditors.  As they alleged, "Garipalli's statement that 'everything that we've done is appropriate and compliant' was a direct misrepresentation ... meant to lull [creditors] into taking no further action….  Garipalli had actual knowledge that [Bayonne hospital] improperly and fraudulently distributed more that $43 million" to the Founders' shell companies.[8]

- ***The State of New Jersey Found "Questionable" Payments.***  The State Agency tasked with investigating "organized crime" expressly found that the Founders engaged in self-dealing, resulting in at least $157 million of "questionable" and unaccounted for payments over just four years.

Despite this overwhelming evidence, the Founders try to convince the Court that, contrary to being at fault, the evidence "will show that the opposite is true:  since at least the beginning of 2019, Lawler and Garipalli receive[d] no management or other service fees in connection with their role at CarePoint."  ECF 94 at 1-2.  The Founders' protestations of innocence are misleading, for three reasons.  *First*, the Founders did not stop receiving fictitious management fees in the

---

[4] Eisenreich's Answer and Counterclaims, ¶ 1, *HUMC Holdco, LLC v. MPT of Hoboken,* 2019-0972-KSJM (Del. Ch. Jan. 15, 2020).

[5] MPT's Answer and Counterclaims, ¶ 3, *HUMC Holdco* (Jan. 21, 2020).

[6] *See* ECF 90 at 2.  Pelino Declaration, ¶¶ 4, 6, *Strategic Ventures LLC v. Garipalli*, 2021-1040-KSJM (Del. Ch. July 12, 2022).

[7] The Founders cc'd Quinn Emanuel on their Opposition to the Motion to Compel, but they have not yet entered any appearance in the case.  As such, we assume – but cannot verify – that they are acting as counsel for the Founders.

[8] Complaint, ¶¶ 61, 72, *California Capital Equity, LLC v. IJKG, LLC*, 652373-2015 (N.Y. Sup. Ct. July 2, 2015).

**Proskauer** >>

Page 4

"beginning of 2019," but continued receiving them through June 2019.  *Second*, the Founders did not stop collecting these fees for altruistic reasons.  They reached an informal agreement with the State to end this particular fraudulent practice.  *Third*, the Founders did not stop extracting money from the system in 2019.  They simply shifted the form of their withdrawals from bogus management fees to unlawful profit distributions (which they were not entitled to because the hospitals were unprofitable).[9]  As Lawler wrote to the other Founders (in an email Mandler produced, ***but CarePoint, Garipalli, and Lawler did not***):

> "Let's throw the big issue out there for comment – that is, should we assume that, starting July [2019], we will replace management fees with an equal income stream based on a 'profit distribution.'"[10]

The evidence shows that the Founders continued to receive over $19 million in so-called "profit distributions" after July 2019, even as CarePoint laid off employees and informed the Department of Health that closure of Christ Hospital was imminent.  In any event, the fact that the well eventually ran dry does not mean that the extraction was not the genesis of CarePoint's distress.

In a last-ditch effort to avoid discovery, the Founders argue that discovery should be denied because the SCI "investigation was closed with no findings of liability," and so, "Barnabas should not be permitted to re-litigate or challenge [its] findings."  ECF 94 at 3-4.  But this argument also lacks merit for three reasons.

*First*, that there was no "finding of liability" should not be surprising because the SCI is not a law enforcement agency.[11]  It has no civil or criminal prosecutorial authority, and lacks the power to impose sanctions or levy fines.  Nor can it make "findings of liability."  The SCI was created as part of New Jersey's commitment to good government to provide oversight to the State's agencies, and to recommend ways those *agencies* can improve their policies and regulations.  So, the fact that the SCI did not "find liability" – because it could not – is of no moment.

*Second*, as noted, the Founders agreed with the SCI to cease extracting bogus management fees (but not other unlawful distributions).  The fact that they did so informally, and not through a formal consent decree, is also of no moment.

---

[9] Indeed, the Founders could not cease their distribution of cash from the system because they had previously pledged this future income stream (in 2014) as collateral for a $60 million loan to Sequoia, which then paid out $55 million to the Founders' other shell entities.  When the SCI forced the Founders to abandon their "management fee" scheme, they needed to replace foregone funds with another sources of money from the hospitals.

[10] Mandler0347948.

[11] *See* N.J.S.A. § 52:9M-3 (2023).  *See also History, Mission and Operations*, N.J. State Comm'n of Investigation, https://www.nj.gov/sci/history.shtm (the SCI's mission is to "maintain a constant vigil against the intrusion of organized crime into society; to identify and expose corruption and *governmental* laxity; to shed light on waste, fraud and abuse of *taxpayers*' dollars; and to *recommend new laws* and other remedies to protect the integrity of the *governmental process* on behalf of the citizens of New Jersey.").



Page 5

*Third*, Barnabas cannot be collaterally estopped from "re-litigating" the Founders' fraud. Putting aside the fact that Barnabas was not even involved in the investigation, if CarePoint objects to the admissibility of the SCI's findings, we may have to litigate this issue *de novo*. To do that, we need the underlying evidence – including transcripts, documents, white papers, and other submissions – provided to the SCI, as well as the evidence concerning the scheme itself.

Put simply, the Founders' conduct is at the core of this case. It is not irrelevant.

### B.    The Founders Have Significant, Nonduplicative Information.

The Founders do not deny that they have discoverable information. Indeed, they admit that "documents will show" whether or not they are responsible for CarePoint's financial distress.

Instead, the Founders argue that they should be excused from searching for any document with a CarePoint email address on it because "[n]either Lawler nor Garipalli are parties to the antitrust action … and have no interest in the outcome." ECF 94 at 1. But this just means they are third parties, not that they are immune from discovery. Were it otherwise, Rule 45 would be a dead letter. That is not the law.

In a variant of this argument, they point fingers at CarePoint, saying that CarePoint should be the exclusive source of evidence in this case. But as one court explained in refusing to quash a subpoena on exactly this ground:

> "This objection is meritless. While there may be some duplication between defendants' and the third parties' production of documents, there are sure to be many other documents in the possession of the third parties not in the possession of the defendants. Practically, there is no way for the [serving party] to frame its request to eliminate the possibility of duplication and at the same time ensure that it receives all of the documents it seeks from third parties. Moreover, … the defendants have not produced all of the documents [the serving party] requested. Thus, … it needs the third parties' documents, not only as a supplement to defendants' productions, but also to test the veracity of defendants' assertions that they have produced all the documents they were required to produce."

*New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc*., 2000 WL 62315, *5 (E.D. Pa. 2000). The Founders cite no law to the contrary,[12] nor do they contest the cases Barnabas cited holding that "there is no general rule that [a party] cannot seek nonparty discovery of documents likely to be in [another party's] possession." ECF 85 at 5.

Those same considerations apply here. Contrary to the Founders' assertion, not all relevant evidence either has "been or will be produced by CarePoint." ECF 94 at 4. As an initial matter, even though the substantial compliance deadline for CarePoint's production is Monday, CarePoint

---

[12] *Genus Lifesciences Inc. v. Lannette Co., Inc.*, 2019 WL 7313047, *4 (N.D. Cal. 2019), is inapposite. In that case, the non-party submitted an affidavit stating he had provided "all that he has" to his former employer, a party to the case. The Founders make no such claim here.

**Proskauer**»

Page 6

has yet to produce a ***single*** document from the custodian files of any Founders. Nor is it clear that CarePoint preserved this evidence, since the Founders left CarePoint before this litigation began. In fact, it appears that documents relating to the Founders' mismanagement were only produced by happenstance because some of them found their way into other custodians' files.[13]

Third-party discovery has already highlighted deficiencies in CarePoint's production. Jeffrey Mandler – the third Founder (who, unlike Garipalli and Lawler, complied with the subpoena) – produced thousands of emails that CarePoint has not. This includes the smoking-gun email highlighted above, where the Founders discussed transitioning the bogus management fees paid to Sequoia into bogus "profit" distributions directly to the Founders. This is reason alone to require Garipalli and Lawler to produce their files. *See Software Rights Archive, LLC v. Google Inc.*, 2009 WL 1438249, *2 (D. Del. 2009) (enforcing third-party subpoena where the "completeness [of a party's production] is not readily verifiable" and the "completeness of discovery is more likely to be achieved" through third-party discovery).

And even if CarePoint had retained the Founders' custodial files, there would still be significant gaps in the discovery record. As CarePoint informed Barnabas at the beginning of the discovery process, each of the Founders "regularly" used their personal email accounts for work purposes, by-passing CarePoint's document retention systems. Moreover, CarePoint would not even be privy to the behind-the-scenes financial machinations that funneled the money from CarePoint to the Founders' various shell companies. Most of these shell companies, such as Sequoia, are not parties to this litigation, but are instead controlled by the Founders. As such, this evidence would only reside in the Founders' files.

Nor is this Barnabas's speculation. In seeking to shirk its own discovery obligations, CarePoint has objected to providing discovery relating to the Founders' misconduct, arguing that the Founders "are better positioned to respond to discovery involving the 'services provided to any of the CarePoint Hospitals … by entities in which any Founder has any interest."[14] Discovery is not a hot potato to be passed between CarePoint and its Founders. It is an obligation to be complied with. The truth is that both CarePoint and the Founders have significant, probative, and non-duplicative evidence. It should be produced.[15]

---

[13] The representation – that "CarePoint's counsel confirmed that [its] production would include Garipalli emails to/from/cc/bcc anyone with a CarePoint domain," *see* ECF 94, at 4 – is not the same as a representation that CarePoint has retained or preserved the Founder's custodial files. Of course, *some* Founder emails would have made their way into *other* custodians' files, i.e., there would be other people on the "to/from/cc/bcc" line. But Founder emails sent to each other, to former employees, or to non-CarePoint employees will escape production. This would include, for example, communication with the Founders' co-conspirators, like Avery Eisenreich and the Founders' consultants and financial advisors. Similarly, non-emails – such as Word documents, PowerPoints, and spreadsheets – will similarly remain shielded from discovery, unless they happened to have been emailed to a CarePoint custodian.

[14] *See* CarePoint's Objections to Barnabas's Second Interrogatories to CarePoint at 4.

[15] Nor is there merit to the Founder's argument that Barnabas should first wait until CarePoint produces its documents and then seek discovery from the Founders only if it can prove that there is something missing. Besides the impossibility of that task, and the delay it would engender, the Rules foreclose that argument. The Rules make clear

**Proskauer》**

Page 7

### C.    The Founders Cannot Shield Probative Evidence from Discovery By Claiming Undue Burden.

The rule of proportionality governs third-party discovery under Rule 45. With no credible argument that the discovery is irrelevant, the Founders rest on conclusory assertions of "burden." ECF 94 at 2. But they do not claim any burden in collecting the documents. Nor can they. The Founders are one-man shops. Nor do they claim that their vast web of shell companies – like Sequoia – has their own employees that must be searched, or that they maintain separate repositories of documents.

They also do not argue that any specific request is too burdensome.

Instead, the Founders claim that it is unduly burdensome to review documents that contain search terms. Specifically, the Founders argue that "Barnabas' proposed search terms 'hit' on approximately 460,000 documents." ECF 94 at 6. But the Founders did not produce a search term hit report, so we have no idea how many "unique" documents are captured by these search terms. For example, if ten search terms "hit" on the same document, did the Founders count that as ten documents or just one? Since a document only needs to be reviewed once, no matter how many "hits" it contains, only the latter metric would be relevant. Nor have they identified any particular term that returned an unreasonably high proportion of unique documents.

Moreover, the hit count (even if non-duplicative) just suggests that the Founders indeed possess a significant amount of potentially relevant evidence. Certainly, over the course of 15 years of mismanagement and self-dealing, a hit rate of 460,000 documents is not facially unreasonable, especially considering the fact that Mandler had nearly 150,000 responsive documents and many of CarePoint's custodians had similar numbers

Nor should the Founders be permitted to shield probative evidence by crafting exclusionary search terms. As Barnabas explained, the Founders are responsible for constructing their search parameters. If they use search terms, they need to be reasonably calculated capture all responsive documents. But they do not even need to use search terms. They can use predictive coding, for example, as Barnabas has. If they choose to use search terms, they have three choices: (i) they can use search terms to identify a limited subset of documents for manual review, producing the remainder without review; (ii) they can try to reach agreement with Barnabas on the search terms used; or (iii) they can unilaterally pick their own search terms, running the risk the Court might find that their search was deficient if the terms are not sufficiently broad to reasonably capture all responsive documents.

Here, the Founders eschewed option 1. They then proceeded to option 2, asking for Barnabas's proposal. When that was not to their liking, they proposed their own terms, essentially

---

that "methods of discovery may be used in any sequence." Fed. R. Civ. P. 26(d)(3); *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 2008 WL 4853620, *2 (E.D. Ark. 2008) ("[w]hether a party should be required to seek documents first from an opposing party before seeking them from non-parties relates to the timing and sequence of discovery," and noting it "would be difficult for the parties to complete discovery … if … courts were to … impose [such] sequence requirements.").



Page 8

choosing the third option. Those terms, however, are facially deficient and would exclude documents they already agreed to produce.[16] The Founders' proposed search terms, for example, contain extremely limited connector terms that do not reflect the way people actually write documents. Their proposal is also destined to exclude thousands of responsive documents. Rather than delve into this issue, the Court should simply order the Founders to comply with the subpoena as agreed, and if they want to use search terms to do so, to use Barnabas's.[17]

### D.    The Founders' Specific Objections to the Non-Profit Conversion Requests Should Be Overruled.

Despite their agreement to produce documents responsive to the vast majority of Barnabas's subpoena, most of the Founders' complaints focus on the subpoena as whole rather than raising any specific concern with the scope of any request. The one exception concerns the requests seeking documents relating to CarePoint's conversion to a non-profit (RFPs 27-29). The objection lacks merit.

A core claim in CarePoint's Complaint focuses on Barnabas's alleged interference with a sales process that ultimately culminated with CarePoint's conversion to a non-profit. This raises many issues, including what impact the conversion had on CarePoint's ability to compete, and whether the non-profit structure was chosen because it enriched the Founders, as Barnabas believes, or whether Founders acted altruistically to leave a "legacy" to the community, as the Founders allege. Certainly, Barnabas's belief is sufficiently well supported to warrant discovery. As one Founder (Mandler) admitted in his lawsuit against the other two Founders:

> "In publicizing the Non-Profit Conversion, [Garipalli and Lawler] originally claimed that their motivation  [was] to benefit the public.  As they now admit [in their declarations, however, their] reasons … include to obtain personal financial benefits … in excess of $10 million based on one year alone."[18]

This real reason is crucial to understanding whether "Barnabas's … conduct caused the conversion to a non-profit," see ECF 94, at 3, or whether the Founder's greed was responsible. It is of no moment, then, whether "the non-profit conversion process … took place after the conduct alleged

---

[16] The Founders' terms are **designed** to exclude relevant evidence. For example, they do not contain the names of any of their shell companies despite their agreement to produce documents relating to them. Their only CarePoint-related terms are limited to the sales process, ignoring that the Founder misconduct allegations go well beyond that. They have no terms that would capture their agreements with CarePoint, or documents concerning CarePoint's strategic planning and financial condition. They have no terms relating to competition or Barnabas. Their terms would also exclude virtually every documents relating to the SCI investigation. They would exclude most of the documents relating to Horizon. And they would exclude any documents relating to their own fraud, limiting such documents to unrelated third-parties.

[17] After the Founders produce their documents, Barnabas can determine whether the Founders' search was deficient by comparing it to the productions from others and raise disputes about the reasonableness of the Founders' search mechanics after production.

[18] Second Amended Complaint, ¶ 9, *Strategic Ventures.*  Notably, neither Garipalli, Lawler (or even Mandler or CarePoint) has produced these clearly probative declarations.



Page 9

by CarePoint." *Id*. CarePoint claims it was a consequence of the alleged conduct. It is plainly relevant.

**E.    The Founders' Complaint about the Timing of Production is Meritless.**

The Founders' argument – that any motion to "compel production on a certain time frame … is inexplicable" – is an irrelevant strawman. ECF 94 at 7. The current dispute concerns *what* the Founders will produce, not *when* they will produce it. (As the Founders concede, they already committed to producing agreed-upon documents by May 13th). Nor is there merit to the Founders' assertion that – by raising a dispute about the scope of production, Barnabas has "wholly upend[ed] the document review process." *Id*. To the contrary, by raising scope issues now, Barnabas has *saved* the Founders resources from having to re-review their production for responsive documents that they are now refusing to produce. Moreover, if the search needs to be expanded, it is a simple matter to exclude all previously reviewed documents from the expanded universe.

*        *        *

Accordingly, the Court should order the Founders to comply with Barnabas's subpoena.

Respectfully submitted,

*/s/ William T. Walsh*



Page 10

# APPENDIX A

Garipalli and Lawler agreed to search for and produce documents in response to the following Requests:

- 1:  Documents regarding the Founders' purchase of the hospitals.

- 2: "Organizational charts … throughout the Relevant Period" showing entities involved in the Founders' interest in the hospitals.

- 3: Documents "sufficient to show any transfers of [Garipalli's / Lawler's] interests in the Relevant Hospitals during the Relevant Period."

- 4: "Documents sufficient to show [Garipalli's/ Lawler's] direct and indirect interests in CarePoint and any changes in such interests throughout the Relevant Period"

- 5: "Documents relating to the sale, lease, or lease-back of the Hospital Real Estate…."

- 6: "Documents sufficient to show the services that you provided, either directly or indirectly, to the Relevant Hospitals."

- 7: "All management services agreements and other contracts with the Relevant Hospitals relating to any services provided, directly or indirectly, by you to the Relevant Hospitals."

- 8: Documents "allowing [Barnabas] to trace money flowing from CarePoint" to Garipalli, Lawler, or their entities, including "transfers between [Garipalli's / Lawler's] Entities [that are] traceable to payments from CarePoint."

- 9: "Documents … raising inquiries, questions, or other concerns about any payments to [Garipalli], or any entities affiliated with [Garipalli], that were received, directly or indirectly, form the Relevant Hospitals."

- 10: "Documents relating to the New Jersey State Commission of Investigation's ("SCI's") investigation of CarePoint…."

- 11: Business planning and strategic documents prepared in the ordinary course of business regarding CarePoint.

- 12: Regularly prepared "financial statements and reports relating to the financial performance, financial viability, or operational losses of CarePoint…."

- 13: "Communications discussing the potential sale, closure, bankruptcy, re-organization, or cessation of services by CarePoint…."

- 14: Documents relating to "competition for general acute care in Hudson County…"

- 15: "Documents and communications regarding quality of care for any emergency or general acute care service provided by CarePoint … as compared to any other provider…."

- 16: "Documents and communications regarding Barnabas."

- 17: "Documents and communications relating to CarePoint's relationships with Horizon."

**Proskauer**〉〉

Page 11

- 18: "Documents and communications reflecting any complaints or concerns raised by insurers concerning CarePoint's reimbursement rates or … lack of participation as an in-network provider."

- 19: "Documents relating to CarePoint's eventual decision to become in-network with major insurers."

- 20: "Documents analyzing or comparing reimbursement rates paid by insurers to CarePoint … with reimbursement rates paid to any other provider."

- 21: "documents and communications relating to the sale or potential sale of the Relevant Hospitals during the Relevant Period"

- 22: "communications reflecting the criteria or factors considered by you, or CarePoint generally, in evaluating a potential acquirer or strategic partner"

- 23: "agreements, bids, or offers for CarePoint, any Relevant Hospital, or any assets of such entities…."

- 24: "documents and communications relating to the Letter of Intent dated October 21, 2019 to sell HUMC and Christ Hospital to Barnabas"

- 25: "documents relating to CarePoint's decision to allow Eisenreich to be 'included in all of CarePoint's discussions involving strategic alternatives,' as alleged in the Complaint."

- 26: "documents and communications regarding MPT's September 17, 2019 offer to sell the Hoboken and Bayonne real estate to CarePoint, including all subsequent communications relating to this potential transaction and its failure to close."