

400 Crossing Boulevard
8th Floor
P.O. Box 5933
Bridgewater, NJ  08807
T: 908-722-0700
F: 908-722-0755

Nicholas Pellitta, Esq.
Direct Dial: 908-252-4164
Email: nfpellitta@norris-law.com

December 23, 2024

**VIA: Electronic Filing**
Honorable Cathy L. Waldor
U.S. District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse

    Re:    *CarePoint Health Systems, Inc., et al. v. RWJ Barnabas Health, Inc.*
    C.A. No. 2:22-cv-05421-EP-CLW

Dear Judge Waldor:

    This letter is submitted on behalf of non-parties James Lawler and Vivek Garipalli (the "Former Shareholders") regarding non-party discovery pursuant to subpoenas issued by Defendant RWJ Barnabas ("Barnabas") in the above-referenced matter. For the reasons explained below, the Former Shareholders respectfully request a brief stay of their obligations to produce documents in response to the subpoenas, until at least January 15, 2024.

    As the Court is aware, Plaintiff CarePoint is currently a Chapter 11 debtor in a bankruptcy proceeding, pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). [*See* ECF 149]. Developments in the bankruptcy case over the past two weeks have called CarePoint's ability to proceed with this litigation into serious question. On December 9, 2024, the United States Trustee filed a motion in the Bankruptcy Court to appoint a Chapter 11 trustee to take control of CarePoint during the bankruptcy. [*See* Ex. 1 (the "US Trustee Motion") ¶¶ 20-31]. If a Chapter 11 trustee is appointed, CarePoint would lose control of the bankruptcy as a debtor-in-possession, including its business operation and control of this litigation. The United States Trustee further requested that, in the alternative, the bankruptcy case be converted from Chapter 11 to Chapter 7, under which a Chapter 7 trustee would be appointed to liquidate CarePoint's assets and CarePoint would cease to continue as a going concern. [*See id.* ¶¶ 32-39]. The Bankruptcy Court has scheduled a hearing on the US Trustee Motion for January 7, 2025, prior to which the motion is being briefed. [*See* Ex. 2 ¶ 4]. Thus, we expect that after the January 7 hearing there will be greater clarity regarding whether CarePoint will control this litigation and if it will move forward.

    In the meantime, the Former Shareholders remain caught in the middle of the parties' dispute, with one side uncertain about their ability to continue with the litigation and the other side prosecuting a separate case claiming "fraud" against the Former Shareholders and making unreasonable demands. [*See, e.g.*, D.I. 129, at 28]. CarePoint last stated that it could not make



Honorable Cathy L. Waldor
December 23, 2024
Page 2

decisions about whether it could "proceed or fund this antitrust litigation" but suggested that it would provide an update after a December 10 bankruptcy hearing. [*See* ECF 149]. On the date of that bankruptcy hearing, Barnabas told the Former Shareholders that discovery was back on and demanded that they produce documents within three days.[1] While the Former Shareholders have expended significant time and funds reviewing and preparing documents for this matter, as non-parties, they have not been standing at the ready to produce documents at the drop of a hat. Rather, the completion of document production will require the Former Shareholders to work with a third-party vendor in order to process the documents for production, which requires additional burden and expense. The burdens are not justified when it is uncertain whether the parties will even proceed with this litigation—and when there may be answers not long after the upcoming holidays.

In addition, Barnabas should not be permitted to use this action to continue to attack the non-party Former Shareholders while the litigation may not even move forward amongst the parties. The Former Shareholders purchased the would-be shuttered hospitals out of bankruptcy and restored them from losing tens of millions of dollars to generating significant profits, repairing their reputations and enabling them to provide high-quality care to countless patients without compromising on care for financially disadvantaged Medicare, Medicaid, and uninsured patients. The Former Shareholders took on significant risk, particularly since, at the time the hospitals were purchased, they were suffering steep financial losses and had no other viable bidders. As part of their significant financial investment, pursuant to agreements negotiated with third-party landlords and lenders, the Former Shareholders could receive returns through distributions of profits and management fees only if they were successful in turning the hospitals around and making them profitable. Ultimately, the Former Shareholders decided that the hospitals should belong to the community and donated their interests in the hospitals to Plaintiff CarePoint Health Systems, Inc., which donation included what would be their portion of real estate owned by Christ Hospital valued at over $135 million in the aggregate.

Unlike the Former Shareholders, who restored the hospitals, Barnabas, the Complaint in this action alleges, engaged in a years-long systematic effort to destroy them. [*See, e.g.*, ECF 27 ¶¶ 1-3]. The success of the CarePoint hospitals disrupted Barnabas' ambitions to monopolize acute care hospital facilities in Hudson County so, as alleged in the Complaint, Barnabas set out to eliminate the CarePoint hospitals. [*See, e.g.*, *id.* ¶¶ 1-3, 16, 18, 30, 59]. Barnabas' alleged scheme included exploiting its relationship with the state's largest health insurer, colluding with other players in the New Jersey healthcare industry, including to purchase the land under two of the hospitals to disrupt their operations, sowing false and damaging rumors about CarePoint to create uncertainty, and feigning interest in purchasing certain of the hospitals to scare off other potential suitors and misappropriate confidential CarePoint market information. [*See, e.g.*, *id.* ¶¶ 8-12, 15, 21-26]. When it became clear that the hospitals were not failing as the odds stacked against them suggested they might, but were succeeding in their turnaround, Barnabas appeared to increase its anticompetitive efforts.

---

[1] Counsel for each of the Former Shareholders reached out to counsel for Barnabas to request to stay the Former Shareholders' obligation to produce documents until January 15, 2025, but Barnabas refused.

Honorable Cathy L. Waldor
December 23, 2024
Page 3

Damaged by Barnabas' scheme, the hospitals ceased being profitable in 2019. As a result, the Former Shareholders no longer received profit distributions or management fees by then, as even Barnabas appears to recognize regarding management fees when it suits Barnabas' litigation position. [*See* ECF 129, at 31 (Barnabas' opposition to CarePoint's motion to disqualify, arguing Barnabas' counsel's legal advice to CarePoint did not overlap with its allegations against the Former Shareholders because "management fees allegedly ceased in June 2019")]. Rather, the Former Shareholders infused over $30 million of their own cash into to the hospitals after that time to help them through their difficulties. From around the same time CarePoint was no longer paying management fees or profit distributions to the Former Shareholders, Barnabas, by contrast, paid its top three executives, as measured each year, an aggregate of over $69 million from 2019-2023.[2] In the meantime, despite being a "non-profit," Barnabas in 2021 spent less than 2% of its revenue on charity care.[3] In other words, Barnabas has claimed negotiated incentive payments to investors in CarePoint for risking their capital and dedicating their time to turning the CarePoint hospitals around—payments which stopped when Barnabas' scheme to financially destroy the hospitals was coming to fruition and the hospitals ceased being profitable—was "fraud," while at the same time Barnabas as a "non-profit" was paying its top-compensated executives tens of millions of dollars.

Yet, since CarePoint sought to hold Barnabas to account for its anticompetitive actions, Barnabas has sought to deflect from its alleged misconduct by attacking the Former Shareholders who, as non-parties, are limited in their ability to defend themselves in the litigation. Barnabas' deflection gambit is particularly suspect since it has sought to point the finger at non-parties over issues that have nothing to do with the underlying antitrust claims of which Barnabas is accused.

In any event, Barnabas' accusations are baseless. Indeed, when they were brought directly against the Former Shareholders by Barnabas' alleged co-conspirator, Avery Eisenreich, a Delaware judge dismissed them. *See HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640, at *7-9, *10, *15 (dismissing claims alleging management fees were wrongfully paid, on laches grounds). Barnabas itself has cited that case as one in which "the [Former Shareholders'] alleged fraud featured prominently" [D.I. 129 at 11]—leaving out that the claims relating to that "alleged fraud" were dismissed with prejudice. *See HUMC Holdco*, 2022 WL 3010640, at *22. Barnabas thus seeks to leap to a conclusion that payments to prior shareholders of a for-profit hospital during the time it was making a profit must be fraudulent, when that leap makes no sense and claims based on the same allegations have been dismissed. The non-party Former Shareholders should not be subjected to continued demands for discovery fishing for a means to attack them while the parties might not even move forward with the litigation.

---

[2] *See RWJBH Corporate Services Inc.*, PROPUBLICA: NONPROFIT EXPLORER, https://projects.propublica.org/nonprofits/organizations/222405279/202333199349320683/full (last visited Dec. 22, 2024) (linking to Form 990s filed with the IRS reporting compensation). The $69 million number only includes reportable compensation from the filing organization, not reportable compensation from related organizations, which would increase the number by tens of millions of dollars if included. *See id.*

[3] *See* Beth Mole, *Nonprofit Hospitals Skimp on Charity While CEOs Reap Millions, Report Finds*, ARS TECHNICA, https://arstechnica.com/health/2023/10/nonprofit-hospitals-skimp-on-charity-while-ceos-reap-millions-report-finds/ (Oct. 19, 2023).

Honorable Cathy L. Waldor
December 23, 2024
Page 4

      The Former Shareholders understand that the Court recently ordered that discovery may proceed in the ordinary course. [ECF 155, at 2]. But since that order, there have been significant developments in the bankruptcy proceedings that appear to call into doubt CarePoint's ability to control this litigation. Accordingly, the Former Shareholders respectfully request that non-party discovery directed at them be stayed until at least January 15, 2025, or such later time as there is more certainty around Plaintiffs' ability to control this litigation. This limited stay will avoid burdens on non-parties until there is further clarity regarding whether this litigation will continue—which may arrive not long after the upcoming holidays.

      We thank the Court for its time in considering this matter and are available should Your Honor have any questions or concerns.

      Respectfully submitted,

      s/ Nicholas Pellitta_____
      Nicholas Pellitta, Esq.


cc: Alex Spiro, Esq. – Quinn Emanuel Urquhart & Sullivan, LLP (Counsel for Mr. Garipalli)