William T. Walsh
Proskauer Rose LLP
11 Times Square
New York, NY 10036
(212) 969-3908
wwalsh@proskauer.com

*Attorney for RWJ Barnabas Health, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **CAREPOINT HEALTH SYSTEMS INC.,** *et al*. | ) ) ) | 22-cv-05421-EP-CLW |
| | ) | |
| Plaintiffs, | ) | Hon. Evelyn Padin, USDJ |
| | ) | |
| v. | ) | Hon. Cathy L. Waldor, USMJ |
| | ) | |
| **RWJ BARNABAS HEALTH, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## BARNABAS'S OPPOSITION TO CAREPOINT'S MOTION TO SUBSTITUTE THE LITIGATION TRUST AS PLAINTIFF AND CROSS-MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.      INTRODUCTION. ....................................................................................1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY..................5

        A.      CarePoint Alleges a Conspiracy to Drive CarePoint into
                Bankruptcy....................................................................................5

        B.      HRH Pays CarePoint Millions to Settle Claims Against It..................7

        C.      HRH's Settlement Extinguished All or Part of CarePoint's
                Claims Against Barnabas Prior to Assignment to the Trust. .............9

        D.      HRH Obtains the Right to Recover Proceeds from CarePoint's
                Antitrust Suit Against Barnabas. .......................................................10

        E.      The Litigation Trust is a Special Purpose Trust that Does Not
                Operate in the Alleged Relevant Markets. .........................................13

III.    THE COURT SHOULD DENY THE SUBSTITUTION MOTION. ...........13

        A.      The Trust Cannot Be Substituted as a Party Because it is Not a
                Juridical Entity................................................................................13

        B.      Neither the Trust nor the Trustee Has Established that the
                Purported Transfer of Interest Survived the HRH Settlement. ..........15

IV.     THE COURT SHOULD GRANT THE CROSS-MOTION FOR
        SUMMARY JUDGMENT BECAUSE THE TRUSTEE CANNOT
        RECOVER ON BEHALF OF HRH.........................................................17

        A.      HRH Cannot Pursue Claims Against Barnabas as an Assignee
                of CarePoint's Claims.......................................................................17

        B.      HRH Cannot Pursue Claims Against Barnabas Indirectly Via
                the Litigation Trustee. ......................................................................22

V.      THE COURT SHOULD DISMISS THE TRUST'S INJUNCTIVE
        RELIEF CLAIM...................................................................................27

VI.     CONCLUSION......................................................................................29

# TABLE OF AUTHORITIES[1]

Page(s)

CASES

*Already, LLC v. Nike*, *Inc.*,
568 U.S. 85 (2013) ................................................................................27

*Americold Realty Tr. v. Conagra Foods, Inc.*,
577 U.S. 378 (2016) .............................................................................14

*Armstrong World Indus., Inc. v. Adams*,
961 F.2d 405 (3d Cir.1992) .................................................................27

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) .............................................................................20

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) .............................................................................19

*Carpa, Inc. v. Ward Foods, Inc.*,
536 F.2d 39 (5th Cir. 1976) ...........................................................16, 21

*Conklin v. St. Lawrence Valley Educ. Television Council, Inc.*,
1995 WL 118465 (N.D.N.Y. 1995) .....................................................18

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) .............................................................................22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .............................................................................22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .............................................................................28

---

[1] Unless otherwise noted, all emphasis added, all internal citations and quotation marks omitted, and capitalizations conformed without brackets. Citations to "SF" refer to Barnabas's Statement of Material Facts submitted herewith pursuant to L. Civ. R. P. 56.1.

*Gayle v. Monmouth Cty. Corr. Inst.*,
    838 F.3d 297 (3d Cir. 2016) ...............................................................27

*GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*,
    888 F.3d 29 (3d Cir. 2018) .................................................................14

*Holcomb v. Pilot Freight Carriers, Inc.*,
    120 B.R. 35 (M.D.N.C. 1990) ............................................................28

*In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    2021 WL 5002715 (D.N.J. 2021) .......................................................15

*Kohler v. Southland Foods, Inc.*,
    459 F. App'x 617 (9th Cir. 2011) ......................................................28

*Link v. Mercedes-Benz of N. Am., Inc.*,
    1984 WL 2959 (E.D. Pa. 1984) .........................................................18

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................................................28

*Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*,
    13 F.3d 69 (3d Cir. 1993) .......................................................3, 15, 16

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    677 F. Supp. 151 (S.D.N.Y. 1988) ....................................................18

*Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
    437 F.3d 1145 (11th Cir. 2006) ...................................................24, 25

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*,
    267 F.3d 340 (3d Cir. 2001) ..............................................................24

*Precision Instrument Mfg. Co. v. Automotive Co.*,
    324 U.S. 806 (1945) .......................................................................2, 19

*Presbytery of N.J. v. Florio*,
    40 F.3d 1454 (3d Cir.1994) ...............................................................27

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    69 F. Supp. 2d 678 (M.D. Pa. 1999)..................................................18

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994) ................................................................................19

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ...........................................................................1, 17, 18

*Veritext Corp. v. Bonin*,
   2021 WL 1313409 (E.D. La. 2021) ....................................................................18

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971) ....................................................................................16, 21

**STATUTES**

15 U.S.C. § 26 ..............................................................................................28

**RULES**

Fed. R. Civ. P. 17 ................................................................................13, 15, 29

Fed. R. Civ. P. 25 ....................................................................................*passim*

**OTHER AUTHORITIES**

*Restatement (Second) of Trusts* § 62 ........................................................25

## I.    INTRODUCTION.

A co-conspirator cannot settle claims against it and then turn around to pursue contribution from its alleged co-conspirators for the payments it made.   That is bedrock antitrust law.

Yet it is exactly what Hudson Regional Hospital ("HRH") is attempting to do through the Litigation Trust.   HRH allegedly conspired to drive CarePoint out of business, and then paid $130 million to acquire the hospitals out of bankruptcy and settle the conspiracy claims against it.   It now has the chutzpah to sue Barnabas to recoup HRH's own costs for carrying out this allegedly successful scheme. Recognizing it could not sue Barnabas directly, however, HRH came up with a more devious "grand plan."   It told CarePoint that if it wanted the $130 million, it also had to give HRH a priority interest in and effective control over, the Trust, which now seeks to assert claims against Barnabas.   That is impermissible.   It is barred by the rules against contribution, the doctrines of unclean hands and *in pari delicto*, and the requirements of antitrust standing.

**The Rules Against Contribution Bar the Trust's Claim**.   In *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), the Supreme Court held that there is no right of contribution under the antitrust laws.   For nearly 50 years, this principle has stood inviolate.   Because HRH is an alleged co-conspirator, it cannot recover from Barnabas any portion of the amounts it paid to settle CarePoint's claims

against it.  Its attempt to do so through the Trust is nothing more than a disguised action for contribution barred by *Radcliff*.

**The In Pari Dilecto *and Unclean Hands Doctrines Bars the Trust's Claim.***

The doctrine of *in pari delicto*, or unclean hands, also precludes HRH from participating, directly or indirectly, in the recovery of claims from Barnabas.  Under settled Supreme Court precedent, a co-conspirator cannot use legal process to directly or indirectly benefit from its own wrongdoing.  *Precision Instrument Mfg. Co. v. Automotive Co.*, 324 U.S. 806, 814 (1945).  Here, by acquiring an interest in the claims against Barnabas, HRH seeks not just to recover amounts it paid in settlement, it also seeks to recover the amounts it paid to purchase the CarePoint Hospitals.  Allowing the Trust to recover on behalf of HRH would put HRH in an even better position than had the wrong it allegedly caused to CarePoint never occurred.  This cannot be.

**Antitrust Standing Bars the Trust's Claim**.  Principles of antitrust standing also bar the Trust from suing Barnabas.  Joint and several liability allows antitrust plaintiffs to choose the party from whom they seek damages.  But once they recover funds from one alleged co-conspirator, it extinguishes the claims they have from the others, lest there be duplicative recovery.  Here, HRH paid ***over $130 million dollars*** in settlement for the claims at issue.  This either fully extinguished CarePoint's claims related to its alleged conspiracy between HRH and Barnabas or came close

to it. If extinguished, there is nothing left for the Trust to pursue. If HRH's payments did not fully compensate CarePoint for its alleged injuries, the Court would need to engage in a complex, speculative process of apportionment to prevent duplicative recovery and ensure that HRH neither receives contribution for its settlement payments nor benefits from its wrongdoing. Such a process is required because the Trust is tainted by HRH's settlement, depriving the Trust of antitrust stranding.

***The Substitution Motion Should Be Denied***. Under settled Third Circuit precedent, the Court can only grant a motion to substitute parties under Rule 25(c) if it first *finds* that there has been an effective transfer of a valid claim to the Litigation Trust. *Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc*., 13 F.3d 69, 72 (3d Cir. 1993). But on the current record – with no Amended Complaint and nothing but the Trust Agreement and the Bankruptcy as guides – it is impossible for the Court to determine how much, if any, of CarePoint's claim survives the over $130 million HRH paid to secure the Release. Because HRH's payments may have fully compensated CarePoint for its alleged injuries, CarePoint's claims may have been extinguished ***before*** they were ever assigned to the Litigation Trust. If so, there would be no "transfer of interest" to trigger a Rule 25(c) motion. CarePoint does not address this in its motion, and it cannot be merely assumed that its claim survives HRH's release. Indeed, it is more likely than not that the over $130 million extinguishes the claim.

### *Barnabas's Cross Motion for Summary Judgment Should Be Granted.*

Even if the Court grants the substitution motion, the Court should grant summary judgment in favor of Barnabas. The material facts are not, and cannot be, disputed. HRH paid tens of millions of dollars, and perhaps as much as $130 million, to settle the claims against it and obtain an interest in CarePoint's remaining claims against Barnabas. The rules against contribution, the unclean hands and *in pari dilecto* doctrines, and antitrust standing requirements preclude HRH, through the Trust, from pursuing this claim.

The Trust's only defense appears to be that the bankruptcy court approved the formation of the Trust and the assignment of claims. But the bankruptcy court did not purport to immunize the Trust from all challenge. Indeed, the Litigation Trust Agreement's severability clause recognizes that "another court of competent jurisdiction" could find that "application" of the Trust Agreement could be found to be "invalid or unenforceable" by "another court of competent jurisdiction. SF ¶ 51 (LTA § 12.8). That provision – which seems tailor-made to address the HRH's use of the Trust to recoup its investment in carrying-out the alleged scheme – would be wholly unnecessary if the Trust Agreement was immune from challenge.

Nor did the bankruptcy court purport to resolve these issues. The bankruptcy court did not – and could not – overrule *Radcliff*, address *in pari dilecto* or unclean hands, or find that the Trust had antitrust standing. That is for this Court to do. The

4

bankruptcy court's remit was far more limited. Its job was simply to approve a plan to resolve the debtors' liability. It did so. But it did not decide which claims were extinguished by HRH's release, which surviving claims transferred to the Trust, and whether the rule against contribution or the unclean hands and *in pari dilecto* doctrines bar the Trust's claims. Any such post-confirmation risks from, or defects in, the assignment of claims, was borne by HRH and the Trust's other beneficiaries. The bankruptcy court had no power to subject Barnabas, a third-party not subject to its jurisdiction, to the risks of duplicative recovery or impermissible claims of contribution.

Finally, even if the Trust is permitted to proceed, at a minimum, any claim for injunctive relief must be dismissed. The Trust does not own or operate the CarePoint hospitals—HRH does. Because the Trust has no business interest to protect, the Trust's request for injunctive relief is moot and it lacks Article III standing to pursue the claim.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    *CarePoint Alleges a Conspiracy to Drive CarePoint into Bankruptcy.*

In September 2022, CarePoint filed this antitrust action against Barnabas, asserting violations of Sections 1 and 2 of the Sherman Act. SF ¶ 1 (Ex. 1). The claims are premised on an alleged conspiracy with HRH and Avery Eisenreich to

block CarePoint's sale of Bayonne Medical Center.   SF ¶¶ 2-12; Ex. 2 (Third Amended Complaint ("TAC")).

According to the Complaint, "CarePoint began to explore strategic alternatives, including a sale of [its] Hospitals to new operators" beginning in 2018. SF ¶ 5 (TAC ¶ 80). "In January 2020, HRH, owned by [Yan] Moshe, approached CarePoint about a possible acquisition of all or part of … CarePoint," and eventually submitted an offer for Bayonne. SF ¶ 7 (TAC ¶ 104). "At the same time it was negotiating with HRH," however, CarePoint was also "negotiating with others, including BMC," a special-purpose entity "formed with the purpose of acquiring Bayonne." SF ¶ 8 (TAC ¶ 108). CarePoint ultimately selected BMC and signed a letter of intent in March 2020. SF ¶ 9 (TAC ¶ 110).

After losing the bid, HRH allegedly sought to "sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction." SF ¶ 10 (TAC ¶ 115). To do so, HRH acquired the real estate underneath the Bayonne facility from Avery Eisenreich and MPT (the prior owners of the land), giving it "'veto power' over any hospital operator it did not like." SF ¶ 11 (TAC ¶ 11). The acquisition blocked CarePoint from closing the BMC transaction, positioned HRH as Bayonne's landlord, and ultimately forced Bayonne (and the rest of the CarePoint system) into bankruptcy. SF ¶ 12 (TAC ¶ 11).

6

Lawsuits ensued.  In June 2020, CarePoint sued HRH in New Jersey Superior Court.  SF ¶ 13 (Ex. 3).  That case was later re-filed as a counterclaim in a lawsuit HRH filed against CarePoint in Delaware Chancery Court.  SF ¶¶ 14-18 (Exs. 4-8). As relevant here, CarePoint asserted damages claims for arising from HRH's alleged "conspiracy with Eisenreich … to dispossess Bayonne Medical as the tenant under the Lease."  SF ¶¶ 18-19 (Ex. 8, *Verified Counterclaim*, ¶¶ 4, 5, 9 12, 210, 236).

Two years later, CarePoint sought to bring Barnabas into the litigation fold. SF ¶ 20. Although Barnabas was not otherwise connected to the sale of Bayonne or the underlying real estate, CarePoint alleged that Barnabas had orchestrated the conspiracy between HRH and Eisenrich to "delay closing so that Bayonne Medical would become insolvent and forced to close."  SF ¶ 12 (TAC ¶ 11, 112, 116).

Because CarePoint had pending claims in a separate suit against HRH, it did not name HRH as a defendant in the suit against Barnabas.  SF ¶ 21.  But it did allege that "HRH and its principals, while not defendants in this litigation, were ***intimately involved*** with Eisenreich and [a Barnabas's executive] in efforts to advance [Barnabas's] goals including controlling the real estate under the Hospitals [and] decimating CarePoint financially."  SF ¶¶ 21-22 (TAC ¶ 19 n.2).

B.    ***HRH Pays CarePoint Millions to Settle Claims Against It.***

In November 2024, CarePoint filed for bankruptcy in the District of Delaware. SF ¶ 23 (Ex. 10).  As part of its confirmed Bankruptcy Plan ("BP"), CarePoint settled

all claims it had against HRH, and released HRH from all claims "whether known or unknown … arising from, in whole or in part, … the transactions or events giving rise to[] any Claim or Interest that is treated in the Plan [or] the business or contractual arrangements between any Debtor and any Released Party." SF ¶¶ 26-28; Ex. 11 (BP, Art. XIV.D., p. 121). This broad release covers HRH's role in the alleged conspiracy to derail the BMC transaction and drive CarePoint into bankruptcy. *Id.*

In exchange for this Release and other assets, HRH paid CarePoint ***over $130 million***. SF ¶ 29 (BP, Art. III.A.1., p. 33; BP, Art. IX.B., p. 88; Ex. 15). The precise amount HRH paid for the Release is incalculable because HRH did not separately account for it. SF ¶ 30 (Ex. 15 ¶ 2). Rather it provided funds to CarePoint for many purposes – including payment of others' pre-petition debt, post-petition Debtor-in-Possession financing, and "new money" – in exchange for the release and title to CarePoint's three money-losing hospitals. *Id.* Though the release was not separately valued, the Bankruptcy Court found that the Release was "essential to the Debtors' restructuring efforts" because "HRH would decline to support the Plan … without the inclusion of the … Releases." SF ¶ 33 (BP, Art. III.D.2, p. 53).

Though the precise amount paid for the Release was not separately fixed by the Bankruptcy Plan, testimony elicited during the bankruptcy proceedings confirmed that HRH paid at least tens of millions of dollars for it. For example,

8

CarePoint's independent board director, Kevin Greene, testified "that [HRH] had contributed a very significant amount of money to the CarePoint entities, *$39.5 million or so*" in "exchange for the release." SF ¶ 32 (Ex. 14 at 70). The Unsecured Creditors Committee (members of which are now beneficiaries of the Trust) confirmed this understanding:

> "Let me just get rid of the pink elephant [concerning] the releases. HRH is a DIP lender, injecting … 39 and a half million dollars to date, plus the commitment to keep the hospitals going forward [despite] the projections [showing] losses this year [and] next year…. Yes, HRH got a release … *That was part of that mediated grand bargain*."

SF ¶ 32 (Ex. 16 at 79-80). The Creditors' Committee further explained that "HRH is getting a release under this plan" in exchange for "contributing tens of millions of dollars of funding." SF ¶ 32 (Ex. 17 at 89).

## C. *HRH's Settlement Extinguished All or Part of CarePoint's Claims Against Barnabas Prior to Assignment to the Trust.*

Whatever the amount HRH paid in settlement – whether the full $130 million set forth in CarePoint's Bankruptcy Plan or some lesser amount – it extinguished CarePoint's claim to that extent *before* the claims were assigned to the Trust. Specifically, the Plan defines "Litigation Claims" assigned to the Trust as "all claims or Causes of action of any kind or nature arising under any federal and/or state antitrust laws" – including "for the avoidance of doubt, any "antitrust, unfair competition, or similar … claims or Causes of Action against RJW Barnabas" – but

*excludes* all "claims or causes of action personal to HRH or its subsidiaries or Affiliates."  SF ¶ 28 ((BP § 1.117, p. 24; Art. IX.P(ix), p. 100).

    D.    ***HRH Obtains the Right to Recover Proceeds from CarePoint's Antitrust Suit Against Barnabas.***

HRH not only secured a release but also acquired a ***direct interest*** in the proceeds of this lawsuit.  Under the Trust Agreement, the assigned claims were "a deemed transfer from the Debtors ***to the Beneficiaries***," including HRH, "followed by a deemed transfer by the Beneficiaries to the Litigation Trust."  SF ¶ 36; Ex. 13 (Litigation Trust Agreement ("LT"), p. 2; *see also id*. § 8.1 ("the parties hereto intend that the Beneficiaries of the Litigation Trust be treated as if they had received a distribution of the applicable assets transferred to the Litigation Trust and then contributed such assets to the Litigation Trust.")).[2]

As such, the claims *first* belonged to HRH before being passed to the Trust "for the purpose of monetizing" the claims.[3]  *Id*. § 1.1.  Importantly, the Trust is not a juridical entity.  It is not a corporation, an LLC, or any other recognized legal entity

---

[2] The Bankruptcy Plan similarly notes that the "Debtors shall transfer and assign to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets," and that "such assets shall automatically vest in the Litigation Trust free and clear of all … other interests … *subject only to the interests of the Litigation Trust Beneficiaries …, as set forth in the Plan and the Litigation Trust Agreement*."  SF ¶ 36 (BP, Art. X.C., p. 102).

[3] As noted, by defining "Litigation Claims" to exclude all "claims or causes of action personal to HRH" (*see* SF ¶ 28 (BP , Art. II.A. § 1.117, p. 24)), HRH's settlement payments must be deducted from the assigned claims prior to the assignment.  Were it otherwise, CarePoint could recover damages from HRH, while the Trust seeks recovery for the same injury from HRH's alleged co-conspirator.  That would give rise to double recovery and violate the principle that a Trustee stands in the grantors' shoes.

with separate personhood.  Nor is it a business trust, created for the purpose of carrying on business activities.  Rather, it is an ordinary trust or donative trust, in which the Trustee acts on behalf of the Beneficiaries.  All relevant actions are taken by the Trustee, not the Trust.  It is the Trustee, not the Trust, for example that is "authorized" to prosecute the claims.  SF ¶ 37 (LT § 3.1).  There is also no legal entity that "owns" the Trust Assets.  Rather, all Trust assets are held by the Trustee. SF ¶ 39 (LT § 1.3).  The Bankruptcy Plan merely establishes a Litigation Trust Account, in a federally insured bank, which the Trustee may use to deposit Trust Assets.  SF ¶ 38 (BP, Art. IX.L.1., p. 96).  The Litigation Trustee then "accept[s] all Litigation Trust Assets *on behalf of* the Litigation Trust Beneficiaries."  SF ¶ 39 (BP, Art. IX.G § ).  Thus, while the Trustee may take authorized actions to prosecute the claims, the beneficiaries are the owners of the claims.

Distributions from the Trustee to the beneficiaries are governed by the Bankruptcy Plan and the Trust Agreement.  SF ¶ 40 (BP, Art. IX.C., p. 89).  Under these governing documents, HRH is the primary beneficiary, receiving anywhere from 35% to 100% of the proceeds, depending on the ultimate recovery. Specifically, HRH receives the first $3.5 million (plus interest); the next $15 million goes to the remaining general unsecured creditors, HRH gets the next $5 million, and beyond that, HRH gets 35% of any proceeds until it receives back $110 million of the over $130 million it paid.  SF ¶ 41 (LT § 1.5).  In effect, under the maximum

payments allowed under the Trust Agreement, HRH will have paid only $20 million to acquire CarePoint's three operating hospitals.

As the primary beneficiary, HRH was granted unique supervisory control and exclusive consent rights over the Trust. SF ¶ 43. It selected the Trustee. SF ¶ 44 (BP , Art. II.A. § 1.128, p. 25). And the Trustee answers directly to HRH. Under the Trust Agreement, any ongoing "*decisions* regarding the prosecution … of any Cause of Action … that seeks recovery … of or is … reasonably valued" at one million dollars (such as ***this lawsuit***), "shall require HRH's consent." SF ¶ 45 (LT § 3.1(k)). Importantly, no conflict-of-interest or recusal provisions limit HRH's control or restrict any payments to HRH.[4] SF ¶ 46 (LT § 11.4).

HRH's control far exceeds that of the Oversight Committee, whose members lack ***any*** voting rights, decision-making authority, or consent rights concerning the prosecution of the assigned claims. SF ¶¶ 48-50. Rather, the Oversight Committee plays only an advisory role, in which it receives "communications" and "consult[s] with the Litigation Trust." SF ¶ 48 (LT §11.1). But consulting is not voting, consenting, or approving. Only HRH possesses such rights.

---

[4] The Trust Agreement's conflict recusal procedures only apply to the Oversight Committee. Because HRH's distribution and consent rights are separate from its role as an *ex officio* member of the Oversight Committee, such rights are not constrained by any conflict-of-interest rules.

E.      ***The Litigation Trust is a Special Purpose Trust that Does Not Operate in the Alleged Relevant Markets.***

Under the Litigation Trust Agreement, the sole purpose of the Trust is to monetize the litigation claim assigned to it.  It does "not have authority to engage in a trade or business, and no portions of the Trust Assets shall be used in the conduct of a trade or business."  SF ¶ 52 (LT § 1.1).  As such, unlike CarePoint (or HRH), the Litigation Trust does not compete in the alleged relevant market, and does not have any ongoing interest in that market.

III.    **THE COURT SHOULD DENY THE SUBSTITUTION MOTION.**

The Court should deny the Substitution Motion because neither the Trust nor the Trustee is a proper party.  This is for two reasons.  *First*, the Trust is not a juridical entity capable of suing or being sued.  That right, to the extent it exists, belongs only to the Trustee.  *Second*, neither the Trustee nor the Trust has established that the purported "transfer" of interest needed to support substitution under Rule 25(c) survived the HRH settlement.

A.      ***The Trust Cannot Be Substituted as a Party Because it is Not a Juridical Entity.***

The Substitution Motion seeks to name the "Litigation Trust" as the Plaintiff.  But Rule 17(a) does not permit this.  It only allows the "trustee of an express trust" to "sue in [his] own name[] without joining the person for whose benefit the action is brought."  Fed. R. Civ. P. 17(a)(1)(E).

Nor can the Trust be named as the "real party in interest" on whose behalf the Trustee is acting. The Trust is not a juridical entity. It is not a corporation, LLC, or partnership, or any other form of unincorporated entity recognized as a juridical entity. Nothing in the Bankruptcy Code displaces state law rules governing the creation of juridical entities or authorizes the bankruptcy court to create such entities out of whole cloth. But even if the bankruptcy court had the power to do so, it did not. It simply created an "express trust." A trust can be express, however, without being a juridical entity capable of suing or being sued in its own name.

Under settled law, a traditional unincorporated trust is "not considered a distinct legal entity, but a fiduciary relationship between multiple people…. Such a relationship [is] not a thing that could be haled into court; *legal proceedings involving a trust were brought by or against the trustees in their own name*." *See, e.g.*, *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016); *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 40-41 (3d Cir. 2018) (same). In determining whether an express trust is a juridical entity, courts distinguish between "business trusts," which are designed to carry on and operate a business, and a "donative" trust, which "facilitates a donative transfer." *Id*.

The Litigation Trust is a traditional unincorporated express donative trust. It is not a separately incorporated business entity, with a distinct legal existence. The Litigation Trust Agreement expressly bars the Trust from engaging in any business

14

activity.  SF ¶ 52 (LT § 1.1) (the Trust shall "not have authority to engage in a trade or business, and no portions of the Trust Assets shall be used in the conduct of a trade or business.").  In addition, all relevant activities – such as acceptance and distribution of the Litigation Trust Assets – are carried out by the Trustee.  In such circumstances, the real parties in interest, for purposes of Rule 17(a), are the Beneficiaries.  As such, if the trust did not want to proceed in the name of the Trustee under Rule 17(a)(1)(E), it would have to name the beneficiaries.  Simply naming the "Trust" will not do.

### B.    *Neither the Trust nor the Trustee Has Established that the Purported Transfer of Interest Survived the HRH Settlement.*

As the Third Circuit explained, "substitution under Rule 25(c) does not ordinarily alter the substantive rights of the parties but is merely a procedural device … to facilitate the conduct of the case." *Luxliner*, 13 F.3d at 71-72.  Accordingly, the Court can only grant the motion if the Trustee steps into the shoes of CarePoint.

But the Trustee is not CarePoint's successor.  The bankruptcy divided CarePoint's assets.  HRH purchased the vast bulk of those assets outright, including all operating assets.  SF ¶¶ 29-30.  As such, HRH – not the Trust – is the successor-in-interest to CarePoint.  While the Trustee argues that it is the successor with respect to CarePoint's claims, that argument ignores the effect of HRH's settlement.

As this Court explained in *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2021 WL 5002715, *12 (D.N.J. 2021), who "owns this lawsuit [is] an

15

important question for this Court to consider in the context of Fed. R. Civ. P. 25 as it relates to substitution." Because Rule 25(c) is only triggered "if an interest is transferred," the Court must first determine exactly what "litigation asset," if any was transferred. *Id*. And, if there are factual disputes bearing on this threshold issue, the Court must conduct an evidentiary hearing. *See Luxliner*, 13 F.3d at 71 (requiring an evidentiary hearing prior to substituting parties under Rule 25(c) where disputed factual issues exist regarding the sufficiency or effect of the transfer of interest).[5]

Here, HRH's settlement payments extinguished CarePoint's right to seek recovery from Barnabas dollar-for-dollar. *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 348 (1971) ("It is settled that, entirely apart from any release, a plaintiff who has recovered any item of damage from one coconspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment."); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 55 (5th Cir. 1976) ("An antitrust plaintiff who recovers damages for an injury from one co-conspirator via a release may not recover for the same item from another co-conspirator.").

So, to the extent of HRH's settlement, there was nothing to transfer to the Trustee, and there would be no "transfer of interest" to trigger substitution under

---

[5] For avoidance of doubt, Barnabas specifically requests an evidentiary hearing under Rule 25(c).

Rule 25(c). Put differently, you can't transfer something you don't have. While the Trustee may *argue* that HRH's settlement did not fully compensate CarePoint for its losses, it must prove that fact. It failed to introduce *any* evidence – or even any allegation – sufficient to establish it. That failure of proof precludes substitution.

## IV. THE COURT SHOULD GRANT THE CROSS-MOTION FOR SUMMARY JUDGMENT BECAUSE THE TRUSTEE CANNOT RECOVER ON BEHALF OF HRH.

The Trustee cannot maintain this action because the Trust's primary beneficiary, HRH, is an alleged co-conspirator. The antitrust laws leave alleged wrongdoers where they are; they may not recover amounts paid in settlement from other alleged co-conspirators. HRH, having chosen to pay millions in settlement to compensate CarePoint for its alleged injuries, cannot now sue Barnabas to offset any portion of that payment. Nor can HRH avoid this bedrock rule by acquiring an "assignment" of the claims from CarePoint and transferring them to the Trustee.

### A. *HRH Cannot Pursue Claims Against Barnabas as an Assignee of CarePoint's Claims.*

Can an alleged conspirator seek to recover amounts paid in settlement from its other alleged co-conspirators by acquiring the plaintiff's remaining interest in the claim? The answer is no. Three principles preclude it: the rule against contribution, the *in pari delicto* and unclean hands doctrine, and antitrust standing.

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 635 (1981), bars defendants from seeking contribution from co-conspirators for settlement payments.

As the Court explained, "traditional equitable standards have something to say about the septic state of the hands of such a suitor in the courts, and, in the context of one wrongdoer suing a co-conspirator, these standards similarly suggest that parties generally in *pari delicto* should be left where they are found." *Id*. For nearly half a century, this has been the rule.[6]

Here, HRH paid tens of millions of dollars (if not more) to settle the claims against it. *Radcliff* precludes it from recovering any portion of those payments from Barnabas. Nor can HRH sidestep this rule by also acquiring an interest in CarePoint's remaining claim against Barnabas. Antitrust wrongdoers cannot purchase their way into standing to sue other wrongdoers. Were it otherwise, settling defendants would always seek to acquire the right to sue alleged co-conspirators to offset their settlement payments, defeating the deterrent effects of the antitrust laws.

And even if HRH's claim were not deemed an implied claim for contribution, the doctrines of *in pari delicto* and unclean hands would nonetheless preclude the suit. As the Supreme Court explained,

> "The guiding [principle] is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than

---

[6] *See also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc*., 69 F. Supp. 2d 678, 681 (M.D. Pa. 1999) ("the Sherman Act does not permit a third-party claim for contribution."); *Link v. Mercedes-Benz of N. Am., Inc*., 1984 WL 2959, *4 n.7 (E.D. Pa. 1984) ("an antitrust defendant has no right to contribution from other participants in an antitrust conspiracy.); *Minpeco, S.A. v. Conticommodity Servs., Inc*., 677 F. Supp. 151, 152 (S.D.N.Y. 1988) (same); *Conklin v. St. Lawrence Valley Educ. Television Council, Inc*., 1995 WL 118465, *1 (N.D.N.Y. 1995) (there is "no right to contribution"); *Veritext Corp. v. Bonin*, 2021 WL 1313409, *2 (E.D. La. 2021) (dismissing "affirmative defenses of contribution").

a mere banality.  It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.  That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.  This presupposes a refusal on its part to be 'the abetter of iniquity.'"

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

Similarly, under the *in pari dilecto* doctrine, a plaintiff's "complete, voluntary, and substantially equal participation in an illegal practice under the antitrust precludes recovery for that antitrust violation."  *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994) (collecting cases).  As the Supreme Court explained, the doctrine bars suit when: (1) the plaintiff "bears at least substantially equal responsibility for the violations he seeks to redress," and (2) preclusion would not "significantly interfere with the effective enforcement" of the law.  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985).

Here, unclean hands and *in pari dilecto* apply.  HRH is no mere peripheral player in the alleged scheme; the plausibility of the conspiracy depends on its participation.  According to the Complaint, HRH orchestrated the purchase, and paid for, the land underneath Bayonne.  It then exercised its rights as landlord to scuttle the BMC deal and drive CarePoint into bankruptcy.  The *coup de grace* of the alleged scheme was HRH's purchase of the entire CarePoint system out of bankruptcy.  Having achieved its goal, it cannot now sue its alleged co-conspirators to recover the

amounts it spent – over $130 million – to bring about this result. Allowing a party who allegedly drove a plaintiff out of business and then picked up the assets out of bankruptcy for cents on the dollar to turn around and sue the other alleged co-conspirators to recover what it spent to do so would be contrary to the purposes of the antitrust laws.

Indeed, precluding assignment of claims to an alleged co-conspirator is consistent with antitrust enforcement policy. Joint and several liability gives CarePoint the freedom to decide from whom to seek recovery for its alleged injuries. CarePoint chose to accept millions of dollars from HRH in exchange for granting a release. Having made that choice, the enforcement purposes of the antitrust laws have been fully satisfied.

Even apart from *Radcliff, in pari dilecto*, and unclean hands, HRH (and by extension the Trustee) still lacks ***antitrust standing*** to pursue the claim as an assignee. To determine whether a plaintiff has standing, Courts consider factors such as directness of injury, risk of duplicative recovery, and the existence of more appropriate plaintiffs. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983). Here, HRH's injury, is at best, derivative of CarePoint's. Indeed, as noted, part of its alleged injury are the funds it expended to bring about CarePoint's alleged demise, including the millions it paid to acquire the assets out of bankruptcy. Another part of HRH's alleged injury

20

are the millions more it paid to settle CarePoint's claims against it. Neither are "antitrust injuries."

Moreover, allowing HRH to recover, either directly or through the Trustee, creates a grave risk of duplicative recovery and would embroil an impossible task of apportionment. A simple example illustrates the problem: If a plaintiff suffers an $100 million injury, and settles with one conspirator for the full amount in exchange for a release and an assignment, the claim is extinguished. *See Zenith Radio*, 401 U.S. at 348; *Carpa*, 536 F.2d at 55. As such, any suit by the settling defendant – as assignee of the claims or otherwise – would constitute duplicative recovery. The problem is no less acute where a settling conspirator settles for less than full *judgment* value. In that case, the alleged wrongdoer could take advantage of the fact that the claim was not fully extinguished to recover the amounts it paid in settlement – which is exactly what *Radcliff* prohibits.

Indeed, any settlement for the "fair market value" of the claim is mathematically equivalent to an improper claim for contribution. Suppose, for example, the plaintiff has a claim for $100 (in judgment value), but only a 50% chance for success. A settling defendant could pay $50 to acquire the claim, reflecting the claim's fair market value and making the plaintiff whole on a net present value basis. The settling defendant would then have a $50 claim (in judgment value) against his alleged co-conspirator, consisting of plaintiff's original

$100 claim minus an offset for the $50 the plaintiff received. Because the settling defendant also has a 50% chance of prevailing on the assigned claim against the second defendant, the second defendant would likely pay $25 in settlement. The result is that each defendant pays $25 to resolve a claim with a fair market value of $50. This is exactly what would happen if contribution were permitted. Because contribution is not permitted, a settlement-related assignment cannot be either. Indeed, as this example shows, even if an assignment were permitted, the Court would need to engage in a complex apportionment process to ensure that the claim does not result in duplicative recovery or a disguised claim for contribution. This is exactly the type of inquiry antitrust standing rules were designed to obviate.

B.     ***HRH Cannot Pursue Claims Against Barnabas Indirectly Via the Litigation Trustee.***

HRH cannot use the Trust to do indirectly what it cannot do directly. The antitrust laws do not exalt form over substance, but instead look to the commercial realities of the parties' conduct. As the Supreme Court has explained, "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992). For that reason, courts routinely look through corporate formalities when applying antitrust principles. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 760 (1984) (finding that affiliates can't conspire because the "statute is aimed at substance rather than form.").

22

Here, the commercial realities are clear. HRH allegedly purchased the land under Bayonne to drive CarePoint into bankruptcy, and then acquired the whole kit-and-kaboodle out of bankruptcy for over $130 million. SF ¶¶ 4-12, 29-39. That it structured the transaction as an "asset purchase" and housed part of the purchased assets in a Litigation Trust does not change the fundamental fact that HRH, as the alleged wrongdoer, is now seeking to recover the amounts it expended from its alleged co-conspirator.

Nor can HRH ignore this reality by claiming that the Trust stands in the shoes of the CarePoint debtors. That argument not only ignores commercial realities, it ignores how the Trust is *actually* structured. Under the Trust Agreement, "the Beneficiaries of the Litigation Trust [are] treated as if they had received a distribution of the applicable assets transferred to the Litigation Trust and *then* contributed such assets to the Litigation Trust." SF ¶ 36 (LT § 8.1). That is, ownership of the claims flow as follows:



Under this chain of ownership, the Trustee is the assignee of the beneficiaries, who in turn are the assignees of the CarePoint debtors. As third in line, the Trustee inherits both the legal disabilities of the beneficiaries and the CarePoint debtors.

This chain has significant implications for the viability of the Trust's claims. At the first level, the court must determine *what* was assigned to the beneficiaries. The Trust says that *entire* claim that CarePoint had asserted against Barnabas was assigned. But that ignores the fact that CarePoint had settled its claims against HRH when it accepted funds from it in exchange for a Release. Those payments extinguished at least part of CarePoint's claims prior to the assignment of the remainder to the beneficiaries. Indeed, given the magnitude of HRH's payments, it may very well be that CarePoint's conspiracy claims were completely extinguished, and nothing was left to assign to the beneficiaries.

But even if part of CarePoint's claim survived HRH's settlement, the Trustee cannot maintain suit because it inherits HRH's legal infirmities, including the bar on contribution, the *in pari delecto* and unclean hands doctrines, and antitrust standing requirements. *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir. 2006) ("We are not alone in concluding that the defense of *in pari delicto* may be asserted against a bankruptcy trustee."); *Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir. 2001) (joining other Circuit Courts that "have also applied the *in pari delicto* doctrine to bar claims of a bankruptcy trustee, standing in the shoes of a debtor, against third-parties, without regard to the trustee's status as an innocent successor.").

Indeed, HRH's attempt to use the Trust to achieve what it cannot lawfully achieve without it invalidates the provision assigning *this lawsuit* to the Trust. *See Restatement (Second) of Trusts* § 62 ("A trust or a provision in the terms of a trust is invalid if the enforcement of the trust or provision would be against public policy, even though its performance does not involve the commission of a … tortious act by the trustee.").

Nor can the Trustee scrub away these infirmities by pointing out that the Trust Assets commingle HRH's interests with those of the other unsecured creditors. The unsecured creditors chose to tie their fate to HRH, even though they knew that HRH was an alleged co-conspirator in the antitrust case against Barnabas. If they wanted to avoid being tainted by HRH's legal disabilities, they could have instead created a separate trust to house this piece of litigation and exclude HRH from it. They chose not to. That choice has consequences. The resulting Trust is tainted by HRH's own wrongdoing, and it cannot sue the other alleged members of the conspiracy. *Edwards*, 437 F.3d at 1151.

Nor does the bankruptcy court's confirmation of the Bankruptcy Plan cure the Trust's lack of standing. When a bankruptcy court approves a contract as part of a bankruptcy plan, the resulting contract is still governed by applicable state and federal laws. Contrary to the Trustee's argument, such approval does not forevermore immunize the Trust from challenge. As an initial matter, dismissing the

Trustee's claims is a ruling on the merits of the claim.  It does not invalidate or render unenforceable any provision of the Litigation Trust Agreement.

Moreover, by including a severability provision, the Litigation Trust Agreement specifically recognizes that it can be challenged outside of bankruptcy:

> "In the event that any provision of this Litigation Trust Agreement or the application thereof to any person or circumstance shall be determined by the Bankruptcy Court *or another court of competent jurisdiction* to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement … shall be valid and enforced to the fullest extent permitted by law."  SF ¶ 51 (LTA § 12.8).

This provision would be wholly unnecessary if the Trust could not be challenged by third parties outside of bankruptcy.

Here, the bankruptcy court did not – and could not – expressly or implicitly address whether the rule against contribution, the doctrine of unclean hands and *in parti dilecto*, or antitrust standing requirements bar the Trustee's claim.  The court simply approved the debtors' and creditors' agreement to create a trust.  That does not immunize the trust from challenge by third parties.  Indeed, while the bankruptcy court has many powers to modify the relationship between debtor and creditor, it lacks the power to modify rights of non-creditor third parties.  The bankruptcy court certainly does not have the power to subject Barnabas to a claim of contribution, or to allow HRH – as a wrongdoer – to recover from Barnabas expenses it incurred to drive CarePoint into bankruptcy so that it could buy the defunct assets.

## V.    THE COURT SHOULD DISMISS THE TRUST'S INJUNCTIVE RELIEF CLAIM.

Finally, CarePoint's injunctive relief claim, which the Trust now seeks to assert, must be dismissed as moot. Article III of the Constitution "limits federal jurisdiction to actual 'cases' and 'controversies.'" *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir.1992). This limitation "stands as a direct prohibition on the issuance of advisory opinions." *Id*. "The existence of a case or controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief," and must be satisfied at all stages throughout the life of the case. *Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1462 (3d Cir.1994).

"A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – when the issues presented are no longer 'live' ***or the parties lack a legally cognizable interest in the outcome***.'" *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013). "If developments occurring during the course of [a case] eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss the case as moot." *Gayle v. Monmouth Cty. Corr. Inst*., 838 F.3d 297, 303 (3d Cir. 2016).

Because a "plaintiff must demonstrate standing separately for each form of relief sought," courts routinely dismissed claims for injunctive after the plaintiff exits the market. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *Holcomb v. Pilot Freight Carriers, Inc.*, 120 B.R. 35, 37

(M.D.N.C. 1990) (holding "request for preliminary injunctive relief to be moot, because of the [plaintiff's] bankruptcy."); *Kohler v. Southland Foods, Inc.*, 459 F. App'x 617, 618 (9th Cir. 2011) ("claims for prospective injunctive relief became moot once the [plaintiff] ceased operation"); *see also, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (plaintiff had standing to pursue damages, but not for injunctive relief).

Here, CarePoint's injunctive relief claims were brought under Section 16 of the Clayton Act.  Under Section 16, the plaintiff can only "sue for and have injunctive relief … against threatened loss or damage."  15 U.S.C. § 26.  This requires a showing that the plaintiff would suffer irreparable injury but for the injunction.  The Trust cannot make that showing.

The Trust has a single purpose:  to monetize the claims assigned to it.  It does not operate in the market or carry on any business activities in the marketplace. Indeed, the Trust Agreement expressly precludes it from doing so.  SF ¶ 52 (LT § 1.1).  As such, it has no redressable right or interest in securing injunctive relief.  The injunctive relief claim must be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, CarePoint's Motion to Substitute the Litigation Trust as Plaintiff should be denied, and Barnabas's Cross-Motion for Summary Judgment should be granted.[7]

Dated: June 30, 2025

Respectfully submitted,

*/s/ William T. Walsh*

William T. Walsh
David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square New York,
NY 10036
(212) 969-3000
wwalsh@proskauer.com
dmunkittrick@proskauer.com

Colin R. Kass*
Erica T. Jones*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
ejones@proskauer.com

*Attorneys for Defendant*
*RWJ Barnabas Health, Inc.*

*\*Admitted Pro Hac Vice*

---

[7] Because CarePoint concedes it is no longer the "real party in interest," its claims should also be dismissed with prejudice under Rule 17(a).