PUBLIC REDACTED VERSION



Proskauer Rose LLP | 11 Times Square | New York, NY 10026

William T. Walsh
212-969-3908
WWalsh@proskauer.com

August 25, 2025

***Via Email***

Hon. Cathy L. Waldor, U.S.M.J.
U.S. District Court for New Jersey
Martin Luther King, Jr. Federal Building

> Re:    *CarePoint Litigation Trust v. Barnabas,* 22-cv-05421
> <u>Request to Enforce Order Compelling Complete Interrogatory Responses</u>

Dear Judge Waldor:

Last December, the Court granted Barnabas's motion to compel complete responses to three interrogatories requiring CarePoint to (i) identify all payments made to the Founders; (ii) describe all management services provided by the Founders; and (iii) detail any efforts to determine whether payments for those services reflected their "fair market value." *See* ECF 97, 167.  A central issue was whether CarePoint could evade providing substantive written responses by invoking Rule 33(d).  *See* ECF 97, 98, 113, 141, 161, 163, 165.  The Court rejected that argument, overruled CarePoint's objections, and ordered CarePoint to serve "written responses." *Id.*

On January 24th, CarePoint served its amended responses.  Ex. 1.  Instead of complying with the Court's order, it reasserted objections—most of which had already been overruled, and the rest waived.  As to the substance, it was largely a non-response, as detailed below.

Barnabas was unable to seek relief to enforce the Court's Order due to CarePoint's bankruptcy, and the associated Court-ordered discovery stays.[1]  But when the CarePoint Trust was substituted for the CarePoint debtors, Barnabas attempted to engage the Trust to remedy the deficiencies.  Exs. 2, 3.

For almost a month, the CarePoint Trust claimed insufficient knowledge or preparedness to address these issues.  When it finally responded last week, it ***ratified*** the CarePoint debtors' amended responses, refused to supplement them, and thus reaffirmed CarePoint's prior refusal to comply with the Court's order.[2]

---

[1] In connection with the dispute concerning the potential spoliation of evidence, Barnabas advised the Court at the April 11, 2025 Status Conference that CarePoint's amended interrogatory responses remained deficient.  Hrg. Tr. 7-8 ("We have interrogatories that are pending that this Court compelled answers to that have not been answered.").

[2] Ex. 4.  The Trust claims that there is no "violation" of the Court's prior order because the supplemental interrogatory responses were typed on paper, rather than delivered orally.  *Id.* (arguing that the responses are "indisputably 'written'").  That is not a good faith argument.  When the Court ordered written responses, it was resolving the dispute among the parties about CarePoint's prior "written" responses, which were littered with objections and sought to use

Proskauer»

Page 2

Barnabas now seeks the Court's intervention.  The time has come to solidify the record regarding the Founders' cash extractions and their phantom management services.  Because CarePoint was compelled to serve complete written responses, failed to do so, and then refused to remedy the deficiency, we seek a simple order precluding CarePoint from contradicting its interrogatory responses at trial, as set forth below.

*Interrogatory 1*.  Interrogatory No. 1 asks CarePoint to "identify all funds or payments … by CarePoint to, or to the benefit of, directly or indirectly, any of the Founders or any … Founder-affiliated entity."  In response, CarePoint first offers a litany of objections, but then concedes that the Founders were responsible for CarePoint's financial distress.  Citing its bankruptcy filings, CarePoint represents that "after acquiring the Hospitals …, the Prior Owners [*i.e.*, the Founders] allegedly engaged in various transactions involving affiliates and related entities," and that this admission "speaks to Barnabas' contention as to CarePoint Founders."  Ex. 1 at 8-9.  Indeed, CarePoint's bankruptcy filings went even further:

> "***Circumstances Giving Rise to the Chapter 11 Cases***…  After acquiring the Hospitals from prior bankruptcies, the Prior Owners proceeded to extract tens of millions of dollars from the Hospitals through numerous questionable transactions and transfers, including without limitation, sale-leaseback transactions, inflated management fees (for which little or no services were provided) paid to related entities, and diversion of corporate assets to personal use.  In 2019, the New Jersey Commission of Investigations released a detailed report explaining how the Prior Owners used a byzantine network of shell companies to extract over $157 million from the hospitals…
>
> The Prior Owners' systematic siphoning of Debtors' assets for over a decade, among other factors, rendered the Debtors insolvent, left them with insufficient capital, and weakened them to the point they became virtually unviable as going concerns."  Ex. 5 at 35-36.

Having made these admissions, CarePoint unilaterally decided – contrary to this Court's Order – that this was all Barnabas needed to prove its point.  Specifically, CarePoint says that because the "statement[s] in the [Bankruptcy] Disclosure Statement speaks to Barnabas' contention," any further disclosure "violate[s] Rule 26" because it would not be "proportional to the needs of the case." Ex. 1 at 9.  Based on this objection, CarePoint declined to set forth the specific payments that the Founders extracted from the system as required by the Interrogatory.

But CarePoint debtors were not then, and the Trust isn't now, at liberty to decide whether to comply with the Court's Order.  CarePoint's duty is and was plain:  comply.

---

Rule 33(d) to avoid putting in writing a specific **substantive** response to the questions posed.  The Court certainly was not ordering CarePoint to simply re-issue its prior written response as a new written response.

Proskauer»

Page 3

To enforce its Order, this Court should *preclude* CarePoint from contesting that *all* of the financial difficulties CarePoint experienced were due in large part, if not exclusively, to the Founders' extraction of money from the Hospitals. Put simply, Barnabas cannot be forced into a position where it cannot defend itself from claims that Barnabas is responsible for such financial difficulties, while CarePoint refuses to provide the evidence needed to support an alternative cause.

Apart from its direct refusal to answer the Interrogatory, CarePoint also says it "will provide" a "schedule of payments" under Rule 33(d) to several (but not all) Founder-Affiliated entities. Putting aside the omitted Founder-related entities, CarePoint did not provide the promised schedule. And so, Barnabas still does not know *what* payments were made, *when* they were made, or *why* they were made.

The only document CarePoint produced is a one-page spreadsheet, appended to its amended response, which *groups* together total payments (over some unspecified period of time) to various affiliated entities. The Trust relies heavily on this spreadsheet, going so far as to say that, because "the referenced schedule is specifically attached to CarePoint's amended interrogatory responses, … there is nothing missing from CarePoint's response to Interrogatory No. 1." Ex. 4.

But the spreadsheet is both facially incomplete and non-responsive. Ex. 1. It is incomplete because the total payments to all affiliated entities total just ▮▮▮▮▮▮▮▮▮▮ the *$157 million* in such payments identified by the SCI Report and referenced in CarePoint's own Interrogatory response. And far less than the *half-a-billion* dollars reflected in CarePoint's *own* financial statements. The spreadsheet is non-responsive because it does not identify any specific payments (as requested), when such payments were made, or what they were for. CarePoint itself represented in bankruptcy that these payments included "sale-leaseback transactions, inflated management fees …, and diversion of corporate assets to personal use." This interrogatory required CarePoint to identify each such payment. It did not.

Since CarePoint has now represented that the total extractions were no greater than ▮▮▮, and that there is "***nothing missing from [its] response***," CarePoint should be bound by that representation.[3]

---

[3] The Trust seeks to have its cake and eat it too, by first claiming that "nothing is missing" but then reserving the right "supplement this response" "if further responsive information is identified." Ex. 4. As an initial matter, the purpose of moving to compel was to ensure that, as of the date of the amended response, the interrogatory responses contained all the responsive information that was available to CarePoint. Indeed, if the Trust could serve a deficient response now, with the mere promise of an open-ended right to supplement, the motion to compel would be totally illusory, as would the duty to respond to Interrogatories fully and completely. Moreover, Barnabas specifically offered to allow the Trust to supplement its response, and offered to give the Trust until the end of August to "cure the deficiency." Ex. 2 ("Please confirm by August 1st that you will commit to responding to Barnabas's Interrogatories as written, in full within 30 days of this letter, or by August 25, 2025."). Rather than take Barnabas up on this offer, the Trust asserted that no immediate supplementation was necessary because "nothing is missing."

**Proskauer»**

Page 4

As Barnabas explained when it initially sought an Order of Compulsion, "following the money is no easy task," and because "there is a strong incentive (counteracted only by the threat of sanctions) to understate the true amount of the Founders' cash extractions," we "need CarePoint's representations – not Barnabas's experts' calculations – about such payments to confront witnesses … about such payments."  ECF 97, 165.

We are now exactly where Barbabas predicted:  a deficient disclosure that obscures, rather than illuminates, the Founders' cash extractions.  Accordingly, Barnabas should be entitled to show the jury that CarePoint has lied and continues, to this very day, to hide its payments to the Founders.  Accordingly, CarePoint should be precluded from (i) presenting at trial any evidence that the extractions exceeded ███████; and (ii) disputing that CarePoint **represented to this Court** that the cash extractions were limited to this amount.

That way, at trial, if Barnabas presents evidence of additional extractions, it can confront witnesses with this binding statement and establish that, *even in litigation*, CarePoint – both the debtors and the Trust – continue to conceal the Founder fraud.

*Interrogatory 2.*   In its Bankruptcy filings, CarePoint admitted that it paid "inflated management fees (for which *little or no services were provided*)" to Founder-related entities.  Ex. 5 at 35.  Interrogatory No. 2 seeks to look under the hood of that naked admission to foreclose any suggestion that the Management Services Agreements were not a complete and utter fraud because *some* services were legitimate.  To do that, the interrogatory asks CarePoint to "identify all services provided to any of the CarePoint Hospitals by Sequoia Healthcare Management, LLC ("Sequoia"); CarePoint Health Management Associates, LLC ("CHMA"), IJKG LLC …, or any other [Founder-related] entity…."  Ex. 1.

Following the Court's Order compelling disclosure, CarePoint again responded with a litany of objections.  It then claimed that it could not *identify* a *single* management service that was provided.  Specifically, CarePoint claimed that "there is no tracking that exists that details the specific services."  Ex. 1 at 12-13.  It goes on to say that the description of "services provided to CarePoint … in the applicable MSAs [Management Services Agreements]" – which Barnabas contends reflect a fraudulent description of phantom services – "do not pertain to specific service[s] rendered by specific personnel," were not "provided to any specific CarePoint [entity]," and cannot be "linked" to any specific person.  *Id*.  Finally, it says that it has no record of actually paying any employee or any person for such services.  *Id*.

This non-answer, answer confirms what CarePoint has already admitted:  that it paid the Founders for phantom services, and that *every dollar* transferred to the Founders was in exchange for "*no service*" whatsoever.[4]   CarePoint's inability – or refusal – to identify even a single legitimate service, recipient, provider, or payment substantiates the fraud.

_____

[4] For the payments made to Sequoia, the record is clear that **all** payments were for phantom services, especially since Sequoia had no employees.  For payments made to CPHMA, the cash extraction appears to have involved both

**Proskauer》**

Page 5

This Court should now enforce its prior Order by precluding CarePoint from introducing any evidence – whether documents, data, or witness testimony – that ***any*** fee paid to ***any*** Founder-related entity for ***any*** "service provided to any of the CarePoint Hospitals" reflected a bona fide payment for services rendered.[5]

***Interrogatory 3.***  Interrogatory No. 3 asks CarePoint to identify and describe any efforts it undertook to "evaluate whether any payments by CarePoint" to a Founder-related entity "reflected the fair market value of such services."  It is a straightforward factual question.  Either CarePoint conducted such an evaluation, or it did not.

Rather than respond to this interrogatory as ordered, the CarePoint debtors again rested on a litany of objections in the amended response.  The Trust was a little more forthcoming.  In its letter, it admitted that "no non-privileged responsive information has been identified to date."  Ex. 4.  However, CarePoint has not amended its Interrogatory responses to explicitly state this.  Nor has it provided a privilege log identifying any withheld information.

Even though the factual upshot is the same – that there is no evidence in the record that any payment reflected the fair market value of any service – the failure to comply with the Court's Order jeopardizes Barnabas's ability to make use of this fact at trial.  Indeed, that is why the Federal Rules require that interrogatory responses be affirmed under oath.  *See* Fed. R. Civ. P. 33(b).  As such, CarePoint should be precluded at trial from asserting that any payment to the Founders (or a Founder entity) was set with reference to the fair market value of such services.

\* \* \*

For the foregoing reasons, this Court should grant Barnabas's motion to enforce this Court's Order Compelling Interrogatory Responses, and enter the relief requested in the accompanying Proposed Order.

---

phantom services and inflated prices for the services.  The Interrogatory would have allowed Barnabas to distinguish between these two methods of cash extraction.  The Trust, however, has declined to supplement the response, presumably because any statement that it makes that a service was actually performed would prejudice the Trust's own investigation of claims against the Founders, for which the Trust has hired separate counsel.  That, of course, is a strategic litigation decision.  But that decision has consequences.  It means that the Trust cannot now claim that any payment was actually made in exchange for services rendered, let alone in exchange for their fair market value.

[5] CarePoint argues that it has no duty to "investigate" and that, if it later wants to show that the services the Founders provided were real, it can manufacture expert testimony for that purpose.  *See* Ex 4.  But Rule 33 imposes an obligation on parties to investigate and disclose the facts.  Indeed, without a ***factual investigation***, there is nothing for an expert to opine about.  Nor is it sufficient to state that CarePoint might, if it so chooses, include some of the responsive information in its "expert disclosures."  *Id*.  Nothing in the expert disclosure rules requires the Trust's experts to provide this information.  Rather, the expert disclosure rules are designed to identify the evidence that the Trust wishes to affirmatively present at trial through experts, ***not*** to protect facts adverse to its interest that it would rather hide from disclosure.



Page 6

Sincerely,

/s/ *William T. Walsh*