Proskauer Rose LLP | 11 Times Square | New York, NY 10026

William T. Walsh
212-969-3908
WWalsh@proskauer.com

September 29, 2025

*Via Email*

Hon. Cari Fais, U.S.M.J.
U.S. District Court for New Jersey
Martin Luther King, Jr. Federal Building

    Re:    *CarePoint Litigation Trust v. Barnabas,* 22-cv-05421
             *Request to Enforce Order Compelling Complete Interrogatory Responses*

Dear Judge Fais:

CarePoint spends five pages trying to side-step the Court's Order, but avoids one simple fact: both the CarePoint debtors and the Trust have failed to meaningfully respond to Barnabas's interrogatories despite the passage of *two years* and this Court's Order that they do just that. *See* ECF 97, 167, 295.

### A.    *CarePoint Has Not Complied with Judge Waldor's Order.*

CarePoint begins its letter brief by claiming that it has "complied with th[e Court's] order" mandating written discovery responses, and that Barnabas "mischaracterizes … the Order" in its opening brief. ECF 307 at 1-2. But CarePoint's argument rests on its assertion that Court merely ordered CarePoint to do nothing more than re-serve substantially the same deficient "written" responses to Barnabas's interrogatories, regardless of the substance of those responses. But this is not what the Court ordered. The Court overruled CarePoint's objections – it did not invite new ones – and ordered complete substantive responses to the Interrogatories as written. CarePoint's reading of the Court's Order ignores the reasons the Order was entered in the first place.

Indeed, if the Court only wanted CarePoint to reduce any old response into writing, there would be no need for the Order. At the time the Order was entered, CarePoint had already served two iterations of written responses to the interrogatories—though they were deficient, first lacking substance and then offering only unfounded objections in September 2023 and May 2024, respectively.[1] Thus, an order compelling only literal written responses would have ordered CarePoint to do what it had already done. That could not have been the Court's intent.[2]

Barnabas's initial letter brief moving to compel appropriate interrogatory responses – filed over fourteen months ago – informed the Court that "CarePoint ha[d] yet to provide a ***substantive***

---

[1] Barnabas served its First Interrogatory on August 4, 2023. CarePoint served written responses on September 5, 2023. Barnabas served its Second Set of Interrogatories, containing Interrogatories Two and Three, on April 3, 2024. CarePoint initially served written responses on May 3, 2024 and, following the Court Order at issue here, re-served virtually identical written responses on January 24, 2025.

[2] To be sure, the Order was issued after voluminous briefing. *See* ECF 97, 98, 113, 141, 161, 163, 165.

Proskauer

Page 2

response to any of" Barnabas's interrogatories. ECF 97 at 1. Barnabas wrote to the Court again to this effect in August 2024. ECF 113, 115. And when Barnabas wrote a third time in December, it asked that CarePoint be ordered to "respond to the Interrogatories, and [] ***be bound forevermore*** by their answer or non-answer." ECF 161 at 2. So, when CarePoint tells this Court that Barnabas "mischaracterizes" the record, or that its request for preclusion is "unfounded," it does so with eyes wide shut. Even a cursory review of the briefing underpinning the Court's Order makes clear that CarePoint's interpretation is disingenuous. Instead, CarePoint appears to have picked up the mantle of its predecessor-in-interest (*i.e.*, the CarePoint debtors), taking a position to prevent Barnabas from obtaining basic facts essential to its defense. The Court should not countenance it.

## B. Interrogatory 1

For Interrogatory 1, CarePoint leans heavily on a "schedule of payments [CarePoint] referenced in its amended response." ECF 307 at 2. It claims that this "schedule of payments" included information about payments made to "21 different individuals and/or entities." *Id.* But the so-called "schedule" offers the support of a wet napkin.

*First*, the table cited is no schedule at all. A schedule of payments typically includes some combination of payments made, as well as the specific dates on which they were made. Rather than providing this, CarePoint generated an eight-column table purporting to show a "summary of payments" made to various entities, collectively, from "2011 to current." ECF 295-1 at 21.

*Second*, contrary to CarePoint's claims, this "summary" does not show payment flows to "21 different individuals or entities." Although there are 21 rows, and each contains the name of an individual or entity, eleven of those rows contain no payment amount at all. This includes the rows for each of the Founders. *Id.* This fact alone renders the "summary" facially deficient where **CarePoint's own documents** confirm that the Founders received direct payments from the CarePoint Hospitals in the form of member distributions ███████████████████████████████████████████████.

But the shortcomings of the table are compounded by the numbers themselves. The "summary of payments" indicates that CarePoint transferred just over $63 million to Founder-related entities from 2011 onward, including approximately $12.9 million to Sequoia Healthcare Management ("Sequoia). However, the New Jersey SCI found that CarePoint had transferred <u>**over $157 million to Sequoia alone**</u> during the period of 2011 to 2019. CarePoint's financial records confirm the same—███████████████████████████████████████. To dismiss Barnabas's concerns about the "summary" by stating that Barnabas is "not satisfied" with its contents is a gross misrepresentation.

Barnabas has repeatedly explained that tracing the dollars exchanged between the various CarePoint- and Founder-related entities is no easy task. The endeavor is made harder still by CarePoint's routine use of inter-hospital transfers and the Founders' corporate shell games. Given the nature of its allegations, there is a strong incentive for CarePoint to understate the extent of the

Page 3

cash transfers it made to the Founders. CarePoint's representations on this point are critical to Barnabas's ability to cross-examine witnesses about the flow of funds out of the CarePoint system.

Barnabas's interrogatory, and this Court's order demanding it be answered, requested CarePoint "[i]dentify *all* funds or payments made or executed by CarePoint to … any of the Founders or any entity in which any Founder has any … equity or financial interest." ECF 295-1 at 7. CarePoint's initial response so utterly failed to provide this information that the Court ordered it to respond again. CarePoint's updated response fares no better. And as contradictory evidence in CarePoint's own production confirms, CarePoint's failure to adequately respond to Barnabas's interrogatories is not due to any "inability," but rather unwillingness. Thus, CarePoint has made its choice and should be precluded from introducing evidence contradicting the fact that millions upon millions of dollars were funneled out of the CarePoint system and into the Founders' pockets.

### C.      Interrogatory 2

CarePoint's defense of its insufficient response to Interrogatory 2 fares no better. Interrogatory 2 asks CarePoint to identify the services provided by CPHMA and Sequoia Healthcare Management, seeking itemized information about these services. CarePoint says that "the information Barnabas requested … does not exist in the itemized form or fashion requested." ECF 307 at 3. However, just because there is no existing document providing the information requested does not mean that it does not exist or that CarePoint cannot provide it. Indeed, in CarePoint's first response to this interrogatory in May 2024, it explained at least one manner in which it *could* respond if it chose to dedicate its resources accordingly. Ex. 1 ("CarePoint would need to locate invoices for a 13 year period and then re-direct at least one employee from job duties associated with running hospitals providing patient care to review each invoice for any services for the 13 year period related to the information sought…"). The fact that CarePoint chose not to expend its resources in this way does not excuse it from answering this interrogatory.

And any objection as to burden falls flat now just like it did then. There may not be a document that itemizes the management services Founder entities did or did not provide to CarePoint. But then CarePoint should say so in its interrogatory response, so the jury can draw the appropriate inference from it. Moreover, even if there is no such document, that does not mean CarePoint cannot identify and compile that information (or even some subset thereof). CarePoint demonstrates as much in its attempt – however flimsy and inaccurate – to provide *at least some* information its "summary of payments" created in connection with Interrogatory 1. CarePoint has not even made this minimal effort for Interrogatory 2. It is inconceivable that a sophisticated hospital system entered into multi-year, multi-million-dollar contracts with management service providers with nary a clue about the nature of the services it was getting, the amounts it was paying for those services, nor the dates on or frequency with which those services would be provided.[3]

---

[3] If this is true, it simply supports Barnabas's position that these were related party transactions in which CarePoint paid Founder-owned entities hundreds of millions of dollars for illusory services as a means of lining the pockets of the ultimate owners of both corporate beings, and CarePoint should be precluded from contradicting this at trial or in subsequent motion practice. If it is not true, then CarePoint has violated this Court's Order and should be precluded

Proskauer»

Page 4

CarePoint's failure to adequately respond to Barnabas's interrogatories is not due to any "inability," but rather unwillingness. Thus, it should be precluded from introducing evidence to identify any services it was provided by CPHMA or Sequoia for a bona fide payment of value.

### D.     Interrogatory 3

Barnabas's third interrogatory was perhaps the most straightforward. It asked CarePoint to identify and describe any efforts it undertook to "evaluate whether any payments by CarePoint" to a Founder-related entity "reflected the fair market value of such services." CarePoint initially refused to answer this interrogatory as well, asserting objections that have now been long overruled. In its amended response, it again asserted those overruled objections. CarePoint now argues its response was sufficient because it has "no non-privileged responsive information" responsive to the request. ECF 307 at 3. But the interrogatory was not a document request. It asked whether, and when, a fair market value analysis was undertaken. If the answer was "never," CarePoint should amend its response to say so.

There are, again, a litany of issues with this assertion. *First*, CarePoint has never amended its interrogatory responses to convey this message, which was presented informally through correspondence with counsel. As of now, CarePoint's formal response, served under oath, makes no assertion of privilege.

*Second*, and more troubling, is the fact that CarePoint's discovery deficiencies are compiling to create the prejudice Barnabas has long warned this Court about. Namely, CarePoint has not produced a privilege log in this case. The document it did produce is facially deficient to the point of being meaningless. Now, in lieu of providing the Court-ordered substantive response to Barnabas's interrogatory, CarePoint invokes privilege. But it is impossible for Barnabas to evaluate this privilege claim, as the "log" produced lacks information sufficient to analyze any privilege claims. This is particularly problematic given the dubious nature of the privilege asserted here, where the "determination of fair market value is a question of fact." *Prime Leasing, Inc. v. Aetna Life Ins. Co.*, 1994 WL 411726, *6 (N.D. Ill. 1994); *Mae v. Laruffa*, 2015 WL 12661937, *7 (D. Ariz. 2015) (fair market value is a question of fact).

*Third*, CarePoint's privilege assertion leaves the ultimate question unanswered: did CarePoint do *anything at all* to determine whether it was paying fair market value. The answer is yes or no—a simple fact that would not be subject to privilege, regardless of attorney involvement. *See Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("The privilege … does not protect disclosure of the underlying facts by those who communicated with the attorney."); *see also In re Processed Egg Prods. Antitrust Litig.*, 278 F.R.D. 112, 121 (E.D. Pa. 2011) ("Not every document containing facts later conveyed to counsel is automatically blanketed in privilege.").

---

from introducing any evidence that any fee paid to any Founder related entity for any "service provided to any of the CarePoint Hospitals" reflected a bona fide payment for services rendered.

Page 5

As to Interrogatory 3, the Court should prevent CarePoint from introducing any evidence that it attempted to determine the fair market value of services rendered by Founder-related entities. CarePoint has now had three bites at the apple to answer this basic question. Its inability or refusal (whichever the case may be) to identify a *single* measure it took to determine whether the Founders were fleecing CarePoint's coffers should bind it going forward.

### E.  An Order Precluding Contradictory Evidence Is Appropriate.

CarePoint argues that the relief Barnabas requests is unwarranted, primarily "because Barnabas's request for relief hinges on the premise that CarePoint has failed to comply with the Order." ECF 307 at 4. ***That premise is fact.*** The Court's Order mandated that CarePoint do more than just put words on paper with no regard for what those words are.

Additionally, the responses CarePoint provided were made under oath. *See* Fed. R. Civ. Proc. R. 33(b)(3) ("Each interrogatory must … be answered separately and fully ***in writing under oath***"). Courts routinely prevent parties from contradicting statements made under oath. *See Pinnacle Fitness and Recreation Mgmt., LLC v. Jerry & Vickie Moyes Family Trust*, 844 F.Supp.2d 1078, 1093 (S.D. Cal. 2012) (precluding Defendant from creating fact issue where its "assertion contradicts the Trust's own interrogatory answers"); *see also In re CitX Corp., Inc.*, 448 F.3d 672, 678-80 (3d Cir. 2006) (disregarding affidavit that contradicted sworn deposition testimony as a "sham"). As such, Barnabas's request that the Court hold CarePoint to its sworn testimony is not "inappropriate." Indeed, it merely enforces the purpose for requiring interrogatory answers be provided under oath—ensuring consequence for subsequent contradiction.

It is of no moment that "no depositions have occurred" or "no experts have been designated." ECF 307 at 4. Barnabas asked straightforward questions about what payments were made to Founder-related entities, what services were provided, and what measures CarePoint took to ensure its money was not wrongfully siphoned into the pockets of its billionaire owners.

Despite having over two years to answer one interrogatory and over 14 months to answer the other two, CarePoint (neither the debtors nor the Trust) has not mustered evidence or argument that satisfies these requests. The responses it has given confirm that CarePoint paid ***at least*** $63 million to Founder-related entities from 2011 on; that it cannot identify any single service it was provided in exchange for a bona fide payment of value; and provide no evidence that CarePoint took a single measure to ensure such bona fide payments were made at anything akin to fair market value. These answers, provided under oath over the course of two years, should be binding.

For these reasons, this Court should grant Barnabas's motion to enforce this Court's Order Compelling Interrogatory Responses, and enter the relief requested in Barnabas's Proposed Order.

Sincerely,

*/s/ William T. Walsh*