*Via ECF*
Hon. Cari Fais, U.S.M.J.
U.S. District Court for New Jersey

   Re: *CarePoint Litigation Trust v. Barnabas*, Case No. 22-cv-05421 (D.N.J.)
     *Barnabas's Request to Enforce Order Compelling Interrogatory Responses (ECF 312)*

Dear Judge Fais:

Pursuant to this Court's September 30, 2025 Order (ECF 312), the parties submit this joint letter concerning Barnabas's motion to Enforce Judge Waldor's Order Compelling Interrogatory Responses. The parties have met and conferred in a good-faith effort to resolve this dispute concerning CarePoint's Responses to Barnabas's Interrogatories.[1]

## I. BARNABAS'S POSITION.[2]

Between 2009 and 2011, Vivek Garipalli, James Lawler, and Jeffrey Mander (the "Founders") acquired Bayonne, Christ, and Hoboken hospitals out of bankruptcy. Over the next decade, they used the hospitals as their personal piggybank, extracting nearly a **billion dollars** from the system. After draining virtually every available cent, the Founders then made a hasty exit, leaving the system for bankrupt.

CarePoint has now admitted that, "after acquiring the Hospitals … the Prior Owners [*i.e.,* the Founders] allegedly engaged in various transactions involving affiliates and related entities" and that this scheme "speaks to Barnabas' contention as to the CarePoint Founders." ECF 295-1 at 8-9 (quoting CarePoint's Fourth Amended Disclosure Statement). In its full bankruptcy filings, CarePoint has been even more candid:

> "***Circumstances Giving Rise to the Chapter 11 Cases***… The Prior Owners proceeded to extract tens of millions of dollars from the Hospitals through numerous ***questionable transactions*** and transfers, including without limitation, ***sale-leaseback*** transactions, ***inflated*** management fees (***for which little or no services were provided***) paid to ***related entities***, and diversion of corporate assets to ***personal use***…. The Prior Owners' ***systematic siphoning*** of the Debtors' assets for over a decade, among other factors, rendered the Debtors insolvent, left them with insufficient capital, and weakened them ***to the point where they became virtually unviable as going concerns***." ECF 295-5 at 35-36.[3]

---

[1] The parties met and conferred on July 8, 2025 and August 21, 2025, and exchanged written correspondence on July 8, 2024, July 19, 2024, August 6, 2024, August 12, 2024, August 14, 2024, August 28, 2024, August 31, 2024, September 17, 2024, September 18, 2024, October 16, 2024, October 23, 2024, December 10, 2024, December 13, 2024, December 17, 2024, January 7, 2025, July 25, 2025, August 5, 2025, August 12, 2025, and August 19, 2025.

[2] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.

[3] CarePoint criticizes Barnabas' quotation from its First Amended Disclosure Statement, just because CarePoint prefers a later iteration. The later iteration watered down the admission – not because it was inaccurate – but because

**Proskauer**

Page 2

Nonetheless, CarePoint now tries to spin a different tale. It is not the Founders, CarePoint says, but Barnabas and HRH (the CarePoint Trust's principal beneficiary) who caused CarePoint's collapse. But Barnabas has a right to prove that the Founders' cash extractions were to blame. To that end, Barnabas served three interrogatories, seeking:

1. Information about funds paid to Founder-related entities;

2. Details about the (bogus) "management services" allegedly provided by these entities; and

3. Disclosure of any fair market value analysis for related-party transactions.

First, CarePoint refused to answer, relying solely on boilerplate objections. Then, Judge Waldor overruled those objections and ordered CarePoint to "provide written responses to Defendant's interrogatory nos. 1, 2, and 3..." ECF 167. Yet, when the deadline came, CarePoint again served objections, quotations from its bankruptcy disclosures, and just one largely non-responsive table. Barnabas moved to enforce the Order, and this letter renews that motion. On the same day that CarePoint provided its section of this joint letter, it served Second Amended Responses to Barnabas's Interrogatories. But these did little more than provide citations to underlying documents for the same, deficient responses.

**A.   Interrogatory 1.**

Barnabas asked CarePoint to identify all payments made – directly or indirectly – to Founder-related entities.[4] ECF 295-1. After being ordered to "provide written responses," CarePoint responded with a renewed litany of objections. In its view, the "statement[s] in the [Bankruptcy] Disclosure Statement" – quoted above – "speak[] to Barnabas' contention," and so, any further disclosure "violate[s] Rule 26" because it would not be "proportional to the needs of the case." ECF 295-1 at 9. But refusing to answer an interrogatory because it is supposedly "not proportional," *after being ordered to respond*, is contempt. *See* Fed. R. Civ. P. 37(b)(2).

If CarePoint continues to blame Barnabas for its financial difficulties, it cannot hide behind objections and refusals to provide information about the extent and purpose of the Founders' cash extractions. As such, CarePoint should now be *precluded* from introducing any evidence concerning the amounts, nature, or purpose of any payment that was not specifically disclosed in

---

the Founders objected, and CarePoint still hoped to get their support for the final plan. The watered-down version does not erase the earlier admission or prove that CarePoint didn't know what it was talking about in the First Amended Disclosure Statement. At most, it undermines CarePoint's credibility by showing it changes its story to suit its needs.

[4] Specifically, Interrogatory 1 required CarePoint to "Identify all funds or payments made or executed by CarePoint to, or to the benefit of, directly or indirectly, any of the Founders or any entity in which any Founder has any direct or indirect equity or financial interest (a Founder-affiliated entity), and for each such payment, identify (i) the *date* of the payment; (ii) the *form and amount* of the payment; (iii) the *reason* for the payment; and (iv) the *payor and payee*. To the extent any payment or fund passed through multiple Founder-affiliated entities, *each payment in the chain* should be identified in response to this Interrogatory." ECF 295-1 at 7.



Page 3

its Interrogatory response. Introducing any such evidence, after first refusing to produce it, would unfairly prejudice Barnabas.

CarePoint concedes that Judge Waldor's order required "written responses," not renewed "objections." It, nonetheless, argues that its "objections" remain valid and can be used to justify its failure to respond because the objections are, technically, "written." That argument is nonsense. Judge Waldor granted Barnabas's motion to compel, rejecting each of CarePoint's objections. She certainly did not enter a meaningless order allowing CarePoint to evade its discovery obligations through still more "written" objections.

CarePoint alternatively argues that it has "complied" with the Court's order because it included a summary table, consisting of a mere 21 rows, and asserts that there is "nothing missing." But the table is facially incomplete. For starters, more than half of the table is blank. Nor does it identify the intermediate shell corporations CarePoint and the Founders used to funnel the funds. Most importantly, the table is not consistent with CarePoint's own audited financial statements, the findings of the State Commission of Investigation (SCI), or CarePoint's own disclosures in the Bankruptcy Court (in which CarePoint noted that "questionable" management fees during a four year period alone exceeded $157 million, more than twice the $63 million CarePoint now represents – under oath – is the full extent of every cent CarePoint ever paid to a Founder-related entity). ECF 295-5 at 35. It does not include *any* payments the Bayonne hospital made to its Founder-owned management services company, IJKG, LLC. It does not include *any* of the payments Christ Hospital made to another Founder-owned management services company, Sequoia Healthcare Management. It does not include any of the hundreds of millions of dollars in member distributions paid to the Founders. All of these are stated in CarePoint's own financial statements.

CarePoint's Interrogatory response is simply not credible. It is contemptuous, if not perjurious. The chart is also severely misleading. Even though Vivek Garipalli – the 90% owner of the hospitals – directly or indirectly extracted almost a billion dollars from the system ***himself***, the chart shows that he got exactly *zero* dollars. That is a lie.

CarePoint's Second Amended Responses do nothing to remedy these deficiencies. Instead, they simply attach and refer to a limited set of vendor payment history exports that correspond to the CarePoint's summary table.

CarePoint must live with the consequences of its lies. It was given a chance to disclose the actual payments, it was ordered to disclose them, and if failed to do so. CarePoint's plea that it "will continue to review to see if any additional information exists or can be located, but to date, … has not identified any other payments" is not credible. This Interrogatory has been pending for more than *two years*, CarePoint has had plenty of time to provide the information. It should be precluded from introducing any evidence concerning the dates, reasons, or amounts of ***any payments*** – because no such information was provided. CarePoint should also be precluded from introducing any evidence concerning the *effects* on CarePoint's viability of any funds extracted beyond the $63 million reflected in its table. Put simply, if CarePoint wants to claim that only $63 million was extracted, it has to live with that lie.



Page 4

### B.  Interrogatory 2.

One of the primary vehicles the Founders used for extracting cash was through payments of "management fees" to two shell companies, Sequoia Health Management LLC and IJKG Opco, LLC. Hundreds of millions of dollars were extracted using this ploy. The SCI found these payments "questionable" because there was no evidence that any services were actually provided, yet the Founders still extracted up to 95% of the hospitals' profits under the guise of management services fees.

To rebut any claim that these payments were legitimate, Barnabas asked for specifics: service descriptions, dates, providers, payments, and employee identity and remuneration.[5] Barnabas further included a chart, identifying the information sought.

| Date Service Provided | Description of Service | Entity Receiving Service | Entity Providing Service | Employee Providing Service | CarePoint Payment to Service Provider | Service Provider Payment to Employee | CarePoint Payment to Employee |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

CarePoint responded with objections, which Judge Waldor overruled. ECF 167. Despite this, rather than provide any information, CarePoint *renewed* its objections. Specifically, CarePoint's objections included the "definition" of "Founders," "proportionality," a claim that the "transactions [have] already [been] determined to [] be[] appropriate by the Bankruptcy Court" (they were not), duplicative documents (some produced, some not), and that the information is not readily available in the form requested. ECF 295-1 at 11. But when a court overrules an objection, a party that continues its refusal to provide a substantive response based on those objections is in contempt.

In seeking to defend its conduct, CarePoint protests that its objections – whether proper or not – are irrelevant because the "information Barnabas requested … does not exist in the *itemized* form or fashion requested." ECF 307 at 3. As an initial matter, CarePoint's new position is inconsistent with its prior representations that the information does exist but would be too burdensome to gather.[6] It was for that reason that CarePoint did not identify a single person that provided a single service to CarePoint. Instead, CarePoint claimed that the self-serving statements

---

[5] Specifically, Interrogatory 2 requests that CarePoint "Identify all services provided to any of the CarePoint Hospitals by Sequoia Healthcare Management, LLC ("Sequoia"), CarePoint Health Management Associates, LLC ("CHMA"), IJKG LLC, Clover Health Investments, Corp., or other entity in which any Founder has an any interest ("Other Interested Entity") (collectively, the "CarePoint Insider Service Providers") who provided any service to CarePoint (the "CarePoint Services") between January 1, 2011 and the present." ECF 295-1 at 10.

[6] ECF 307-2 at 4 (objecting because "CarePoint would need to locate invoices for a 13 year period and then re-direct at least one employee from job duties associated with running hospitals providing patient care to review each invoice for any services for the 13 year period related to the information sought…."). The fact that CarePoint chose not to expend its resources in this way does not excuse it from answering Interrogatory 2 or from being bound by its non-answer.

in the Management Services Agreements ("MSAs") the Founders signed on behalf of themselves and CarePoint (both sides of the transaction) should be taken as gospel, and that Barnabas should just assume that any service mentioned in those agreements was in fact provided. CarePoint's Second Amended Responses add nothing but more bates-number references to MSAs produced by one of its management service providers. But the whole point of Barnabas's request is to show that the MSAs were a sham, so pointing back to the agreements is both non-responsive and contemptuous, and it says nothing of the Founder entities that did not sign MSAs.

If CarePoint wishes to contend it received services in exchange for the hundreds of millions of dollars it paid, it cannot refuse to produce any evidence to support that claim. It is inconceivable that a sophisticated multi-hospital system entered into multi-year, multi-million-dollar contracts with nary a clue about the nature of the services it was getting, the amounts it was paying for those services, the dates on or frequency with which those services were provided, or the identity of a single person who supposedly provided them.[7] The only way this could be is if the services were a sham.

Nor is CarePoint's objection that it has no obligation "to perform an analysis" of the factual record an answer. ECF 295-4 at 2. That is precisely the investigation Interrogatories require,[8] and the objection has been overruled. Only CarePoint can identify what services, if any, were provided. Its failure to investigate and respond is contempt. Barnabas, therefore, seeks an order precluding CarePoint from introducing any evidence that actual services were provided to CarePoint in exchange for any payment made to the Founders (or their entities).

C. **Interrogatory 3.**

Interrogatory 3 asks CarePoint to "identify and describe all activities [it] engaged in (and the dates thereof) to evaluate whether any payments by CarePoint to [a Founder-related entity] … reflected the fair market value of [the] service" allegedly provided. ECF 295-1 at 16. As with the other interrogatories, the Court compelled compliance. CarePoint responded with a litany of objections, and then asserting that "*CarePoint will not provide a response to this Interrogatory except for the [non-responsive] statements contained herein*." *Id* at 19. That is contempt.

---

[7] Indeed, barring an extreme breakdown in internal controls, any well-managed organization should have this information readily available—namely, invoices, payment confirmations, and other documentation to substantiate payments made to service providers (particularly in an arm's length transaction). No such records have been provided. For this reason, any argument that CarePoint will supplement its response to Interrogatory 2 "as responsive information is identified" rings hollow.

[8] CarePoint "must furnish the information available to" it. Fed. R. Civ. P. 33(b)(1)(B). This means using "reasonable efforts to gather responsive information," including "such information as is known by its subsidiaries or predecessors, and by its employees [including former employees], and by a related company having documents which are readily available…." *United States v. Kramer*, 1992 U.S. Dist. LEXIS 7651, *12 (D.N.J. 1992). The required efforts "enlarge when, as in the present case, the respondent's own activities, albeit years ago, are at issue." *Id.*, at *15. "Corporate knowledge … must be retrieved largely through the efforts of the respondent, as in any other civil case." *Id.*, at *16. Thus, "a responding party must not only perform a reasonable inquiry; it must also give a complete response." *Id.*



Page 6

CarePoint now claims in its Second Amended Responses that it "to date, has not identified privileged or non-privileged information responsive to this Interrogatory." But though it ostensibly maintains no fair market analysis was undertaken, CarePoint inexplicably resists an order precluding it from later asserting that it did perform such an analysis. CarePoint cannot have it both ways. If CarePoint performed a fair market analysis, it needed to disclose it. It did not, and so it must be precluded from surprising Barnabas with evidence of any undisclosed fair market value analysis. Again, it is no response to maintain that "its factual investigation is ongoing." CarePoint has had over 14 months to answer this Interrogatory. If CarePoint intends to claim that it conducted a fair market value analysis, then it must disclose it. If CarePoint has no such intention, it should have no objection to the order Barnabas now seeks.

### D. An Order of Preclusion For Any Responsive Information Not Disclosed in the Interrogatories is Appropriate.

Barnabas seeks preclusion orders under Rule 37(b). *See* Fed. R. Civ. P. 37(b)(iv) ("if a party … fails to obey an order to provide … discovery …, the court … may issue [an order] (i) directing that the matters … be taken as established," or (ii) "prohibiting the disobedient party from supporting or opposing designated claims or defenses."). As to Interrogatory 1, Barnabas seeks an order precluding CarePoint from introducing any evidence concerning (i) any payments to Founders, including the reasons or justifications for the payments, and (ii) the *effects* on CarePoint (or lack thereof) of any funds extracted from the system beyond the $63 million reflected in Table 1. For Interrogatory 2, Barnabas seeks an order precluding CarePoint from introducing any evidence that actual services were provided to CarePoint by any founder-related entity. For Interrogatory 3, Barnabas seeks an order precluding CarePoint from introducing any evidence that CarePoint had conducted a fair market value analysis of any service provided by a Founder-related entity.

## II.  THE CAREPOINT LITIGATION TRUST'S POSITION

As Barnabas' overheated rhetoric and unsubstantiated[9] makes clear, Barnabas is attempting to convert a simple discovery dispute into a mini-trial on its favored defenses. There is no trial date currently set in this case. Fact discovery concludes on March 13, 2026, and expert discovery concludes on July 17, 2026. ECF 297. Motions in limine and other pretrial motions concerning the evidence to be allowed at trial will be addressed sometime after that—nearly a year from now, once discovery is complete. And yet, Barnabas asks this Court to enter an order now "precluding CarePoint from introducing any evidence" at trial on issues related to the subject matter of its Interrogatory Nos. 1-3. Barnabas' request for a trial ruling on evidence admissibility issues is entirely premature as the discovery deadline is months away and not a single party-deposition has yet to occur. Moreover, as Judge Waldor noted in the last hearing, in connection with denying the

---

[9] Throughout its section of this joint discovery letter, Barnabas makes argumentative, self-serving statements (without citation) about its various defenses, such as alleging the Founders "used the hospitals as their personal piggybank" and that the Founders "caused CarePoint's collapse." None of those allegations excuse ***Barnabas'*** myriad antitrust violations, as set forth in the Complaint, and its legal responsibility for the damages it caused. Moreover, Barnabas' colorful language is no substitute for actual proof.

**Proskauer»**

Page 7

Trust's motion for reconsideration on a privilege issue, "evidentiary rulings" are "for the trial judge." Trans. at 26 (Aug. 26, 2025). Here, too, the evidentiary rulings the Trust seeks should be addressed to the trial judge, at the conclusion of discovery.

    **A.    *Barnabas Rests its Argument on a Misleading Discussion of the Bankruptcy Proceeding***

Barnabas sets up its request for discovery sanctions by suggesting that CarePoint took contradictory positions in the bankruptcy proceeding than is found in the Interrogatory answers provided. It quotes at length from an early version of the bankruptcy Disclosure Statement. Curiously, Barnabas ignores the final version of the Disclosure Statement and plan of reorganization—the one that was confirmed by the Bankruptcy Court. No doubt that is because the "Seventh Amended Combined Disclosure Statement and joint Chapter 11 Plan of Reorganization as Modified as of April 15, 2025" (the "Disclosure Statement") does not contain that same language. Instead, it states as follows:

    **B.  Circumstances Giving Rise to the Chapter 11 Cases**

*   *   *

    **1.  Activities of Prior Owners**

> The Plan Proponents assert that, after acquiring the Hospitals from prior bankruptcies, the Prior Owners allegedly engaged in various transactions involving affiliates and related entities, which may give rise to claims and Causes of Action under state and federal law. Certain of these transactions to be investigated include transactions (i.e., management fees, allocation and other related party payments) subject to a 2019 report of the New Jersey Commission of Investigations. In addition, certain transactions and conduct relating to the contemplated, but not consummated sale(s) or other disposition of certain of the Debtors' assets may give rise to claims or Causes of Action under state and federal law. In 2022, certain of the Prior Owners donated their interests in certain of the Debtors and were granted releases and indemnification rights in connection therewith. The Plan Proponents may investigate these actions, and claims and Causes of Action may be asserted under applicable state and federal law.

*In re CarePoint Health Systems Inc.*, No. 24-12534 (JKS), at ECF 1154, at 42 (emphasis added).

It is obvious that Barnabas hopes to turn this case into a trial of the prior owners' conduct, but the issue in this case is Barnabas' conduct. Those are the allegations that the district court determined stated valid claims of antitrust violations. Among other things, CarePoint has alleged that Barnabas sought to eliminate CarePoint as a competitor and monopolize the relevant market for general acute care services by (1) steering patients away from CarePoint to Barnabas' facilities (ECF 27 at 26-27, ¶¶ 65, 72); (2) poaching CarePoint physicians (*id.* at 8 n.2, ¶ 31); (3) colluding



Page 8

with Horizon to prevent CarePoint from being designated a Tier 1 Omnia provider (*id.* at ¶¶ 73-75); (4) colluding with entities that controlled the real estate under two CarePoint hospitals in Hudson County (*id.* at 29-34); (5) entering into an agreement to acquire CarePoint to obtain confidential information about its operations with no intent to actually go through with the transaction (*id*. at 10-12, ¶¶ 91-93, 97-98, 101, 104); and (6) seeking to sell CarePoint's hospitals without involving CarePoint in the negotiations (*id.* at 41-46, ¶¶ 29-30). Nothing the prior owners did or did not do can justify or immunize Barnabas from the consequences of its own wrongdoing. At best, the issues regarding the prior owners may be relevant to calculating the amount of damages attributable to Barnabas' antitrust violations under certain methodologies. Everything else is merely an attempt at distraction and misdirection from the actual allegations in this case.

### B. *Barnabas' Allegation of Contempt Is Unfounded*

Barnabas seeks discovery sanctions because it contends CarePoint failed to comply with the magistrate judge's Order requiring a "written response" to Barnabas' interrogatories. But the plain language of the Court's Order is clear and CarePoint unequivocally complied when it timely served amended interrogatory responses. Barnabas' real complaint is that it contests the sufficiency of the written responses provided, but the Magistrate has not had an occasion to review or opine on whether those answers are sufficient or not, so that cannot be a basis for contempt.

In its original responses, CarePoint objected to the interrogatories and offered to meet and confer. Following the Court's Order of "written responses," CarePoint did as instructed. It conducted a reasonable search and it identified in its responses any payments that it found that would be responsive. It also explained the contractual arrangement between CarePoint and the various entities at issue, to explain what information it had and what information did not exist or was within the knowledge of parties other than CarePoint. By providing the information within its knowledge on these issues, CarePoint complied with Rule 33, and the Magistrate did not purport to require anything more.

Unhappy with the answers it received in the Trust's amended responses, Barnabas attempts to read language into the Order that requires some sort of unidentified sufficiency component that has not been met. *IQVIA, Inc. v. Veeva Systems, Inc.*, 2020 WL 14024241, at *4 (D.N.J. Mar. 5, 2020) ("A responding party generally is not required to conduct extensive research to answer an interrogatory, but must make a reasonable effort to respond."). That attempt should be rejected. Barnabas also repeatedly states that this Court overruled the Trust's objections. That is false, and the Order includes no such requirement. All the Order requires is for the Trust to provide "written responses" to Barnabas' interrogatories Nos. 1–3 by January 24, 2025. ECF 167. It does not overrule (or even reference) any of the Trust's objections or privilege claims, which makes sense because Barnabas did not even actually ask the Court to make such rulings. ECF 97. Again, Barnabas' attempt to read language into the Order that does not exist as a basis for a contempt finding should be rejected.

Moreover, Barnabas' request for discovery sanctions pursuant to Fed. R. Civ. P. 37(b)(2) should be rejected because it is an end-run around the Trust's right to supplement and amend its interrogatory responses pursuant to Fed. R. Civ. P. 26(e), even though there are months to go in

**Proskauer**

Page 9

fact discovery and only two depositions have occurred. Rule 26(e) provides that the Trust can supplement its interrogatory responses in a timely manner. This is particularly relevant here, since the Trust has taken over the case. In fact, since the day the Trust appeared in this case (even before substitution was granted), it has sought to resolve outstanding disputes and propel this litigation forward. For example, the Trust withdrew its motion to disqualify Barnabas' counsel, provided a date for the production of a privilege log (which it endeavors to meet), prepared and participated in two non-party depositions noticed by Barnabas, and is in the process of preparing for (and also facilitated the scheduling of) two additional party-depositions. This is all in addition to processing, collecting, and reviewing the over 2.3 terabytes of data containing the documents produced in this case. Specifically, the 2.3 million CarePoint-produced documents, more than 700,000 Barnabas-produced documents, and 250,000 third party documents. Moreover, the Trust has spent countless hours responding to Barnabas' opposition to the Trust's substitution motion and utterly meritless cross-motion for summary judgment. As relevant to this particular dispute, the Trust specifically advised Barnabas in its August 19 correspondence that it would supplement its responses if it identified additional responsive information as it was getting up to speed and discovery continued, just as the Federal Rules contemplate. See ECF 295-4. Indeed, the Trust has held true to its word by providing second amended responses to Barnabas further addressing these issues. Those responses, as well as a supplemental document production, were provided on October 20, 2025.[10] In light of these amended responses, the Trust does not believe there is an impasse that needs to be resolved by this Court at this time.

      **C.    The Answers Provided Fully and Fairly Address the Interrogatories and there is No Basis for Sanctions**

For all the reasons outlined above, Barnabas' premature motions in limine disguised as discovery sanctions should be denied. Indeed, as described below, the Trust has provided substantive responses to each request consistent with Rule 33 and the Magistrate Judge's prior Order.

**Interrogatory No. 1**

CarePoint initially responded to Interrogatory No. 1 by stating (subject to its objections) it was available to meet and confer. ECF 307-1. After this Court's Order, CarePoint amended its response to Interrogatory 1 to provide information about payments made (to the extent any exist) to ***21 different individuals and/or entities***, as reflected in the chart appended to the Trust's first amended response. ECF 295-1 at 21. While Barnabas may claim not to be satisfied with the payment information CarePoint (and subsequently the Trust) provided, it is simply untrue that the Trust failed to comply fully with the Order to provide a "written response" to Interrogatory No. 1. *See Boselli v. Se. Pennsylvania Transp. Auth.*, 108 F.R.D. 723, 725 (E.D. Pa. 1985) ("Defendant's

---

[10] Barnabas claims that documents such as "invoices, payment confirmations, and other documentation to substantiate payments made to service providers" should be "readily available," but "[n]o such records have been produced." *See supra* n. 7. But the supplemental production the Trust made is exactly that type of information. They are documents from the CarePoint accounts payable system, consisting of "VENDOR HISTORY PAYMENT DETAIL (BY PAYMENT DATE)" and reflect individual payments made to the "Founders" or "Founder-affiliated entity."



Page 10

inability to provide more detailed answers to these interrogatories cannot be held to be a failure to obey the Order compelling full and complete answers.").

Moreover, in its second amended interrogatory responses, the Trust references and describes recently produced documents that provide the underlying support for the numbers in the payment chart that the Trust originally included in its first amended interrogatory responses. This is additional information that the Trust located as part of its effort to ensure fulsome responses were provided consistent with the requirements of Rule 33. Those documents, are in all facets, directly responsive to the call of Barnabas' interrogatory in that they provide the exact payment details that Barnabas seeks, such as the payor, payee, date, form, amount, and the reason for the payment from CarePoint's hospitals to specific entities. Barnabas' chief complaint now is that the payment schedule and documents do not include certain entities that it believes should have been included, and that the amount paid to this collection of entities does not match the amount Barnabas' believes was actually paid. As with all discovery requests, the Trust will continue to review to see if any additional information exists or can be located, but to date, based on a reasonable search, the Trust has not identified any other payments. But a trial preclusion order barring the Trust from introducing evidence concerning the amounts and nature of those payments at trial is entirely premature and unwarranted given that the discovery period is ongoing. If, after the close of discovery, Barnabas still believes the Trust's response to Interrogatory No. 1 is at issue, then it can file a motion in limine. But at this juncture, discovery sanctions are entirely unwarranted.

**Interrogatory No. 2**

Like Interrogatory No. 1, CarePoint initially stated (subject to its objections) that it was available to meet and confer. ECF 307-2. Interrogatory No. 2 requested CarePoint to identify all services provided to CarePoint by the entities in which any Founder has an interest, including, among other things, the date the service was provided, a description of the service provided, the entity receiving the service, and the payments made for such services. After this Court's Order, CarePoint amended its response to Interrogatory No. 2 to explain that Barnabas' Interrogatory reflects a misunderstanding of the contractual relationship between the Founders and CarePoint, such that the information Barnabas requested in the Interrogatory does not exist in the itemized form or fashion requested. CarePoint provided details about the contractual relationship and the payment structure that was in place to address this Interrogatory.

Barnabas takes issue with this reality and cites to a statement in the Trust's original response to Interrogatory No. 2. *See supra* n.6. This is nothing more than attempt to pull the wool over the Court's eyes. The statement Barnabas cites to is not from the Trust's operative response to Interrogatory No. 2, nor is it from the first amended response to Interrogatory No. 2, which is the response that has triggered Barnabas' premature evidentiary objection. Moreover, the statement Barnabas references was in objection to the interrogatory. That has absolutely no bearing on whether the Trust complied with the Court's Order to provide "written responses," which it did when it explained in its first amended response to Interrogatory No. 2 that CarePoint's healthcare management services agreements (which have been produced to Barnabas) encompass a suite of services that are not broken out separately and billed in the itemized fashion Barnabas requested.

**Proskauer»**

Page 11

This is not unusual, as Barnabas surely knows. Contractual billings for hospital management services are often structured such that charges are not on an individual service basis or broken down as suggested by Barnabas' interrogatory characterization, but rather are frequently charged on a percentage basis, as in the contracts produced by the Trust. The Trust cannot manufacture and generate responsive information that does not exist, and the Court certainly did not order it to do so. *Danieli Corporation v. SMS Group*, 2023 WL 12040520, at *2 (W.D. Pa. Jun 13, 2020) (holding that response to interrogatory was sufficient because a party "cannot be made to give what it does not have.").

Moreover, in its second amended response to Barnabas' Interrogatory No. 2, the Trust references the management services agreements specifically by bates number and explains exactly the types of services that are to be provided. That response, of course, is expressly endorsed by Rule 33(d). It is certainly not contempt of this Court's Order to provide "written responses." Barnabas' request to preclude the Trust from introducing evidence at trial of the actual services provided to CarePoint in exchange for any payment made to the Founders or their entities should be rejected.

**Interrogatory No. 3**

Last, with respect to the Trust's amended response to Interrogatory No. 3, Barnabas asserts that it is contemptuous for the Trust to assert privilege in response to the interrogatory. That is wrong. Nowhere in the Court's Order directing "written responses" was there a requirement, yet less an expectation that the Trust would have to divulge privileged information to comply with the Order. To be clear, however—and as expressly stated in the Trust's second amended response to Interrogatory No. 3—the Trust has not currently identified any responsive information, privileged or not-privileged, to date. As this Court recognized (by entering an amended scheduling order with a discovery cutoff months away), the Trust's factual investigation is ongoing. If responsive information is identified, then the Trust will supplement its response, just as parties do every day in all types of litigation. And if privileged responsive information is identified, then the Trust will provide the type of information on a privilege log. But Barnabas' suggestion that an assertion of privilege violates this Court's Order, when that Order did not address the Trust's objections or privilege at all, is entirely baseless. And Barnabas' request for a trial preclusion order based on that assertion is unwarranted for the reasons stated throughout. The Trust is not using privilege as a sword and shield. What the Trust is doing is its level-best to investigate the claims and defenses in this case and push this litigation forward to trial.

Respectfully submitted,

*/s/ Robert M. Hirsh*

Counsel for the CarePoint Litigation Trust

*/s/ William T. Walsh*

Counsel for RWJ Barnabas Health Inc.