William T. Walsh
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3908
wwalsh@proskauer.com

*Attorney for RWJ Barnabas Health, Inc*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THE CAREPOINT LITIGATION TRUST.** Plaintiff, v. **RWJ BARNABAS HEALTH, INC.,** Defendant. | Civil Action No. 22-cv-05421-EP-CF<br>Hon. Evelyn Padin, USDJ<br>Hon. Cari Fais, USMJ<br>***PUBLIC REDACTED VERSION*** |

**BARNABAS'S MOTION FOR LEAVE TO AMEND ITS ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................1

II. THE FACTS ...............................................................................................7

III. LEAVE TO AMEND THE PLEADINGS SHOULD BE GRANTED .........14

IV. BARNABAS'S CLAIMS ARE NOT FUTILE ............................................16

A. Barnabas States a Claim for Sham Litigation in Violation of the Sherman Act. ....................................................................................17

1. Barnabas Alleges a Section 1 Violation. ..................................17

2. Barnabas Alleges a Section 2 Violation. ..................................20

B. Barnabas States a Claim for Unjust Enrichment. ................................24

C. Barnabas's New Affirmative Defenses Are Not Futile. .......................27

1. In Pari Delicto Affirmative Defense. .......................................27

2. Unclean Hands Affirmative Defense. .......................................28

3. Contribution Bar Affirmative Defense.....................................29

4. Lack of Antitrust Standing and Antitrust Injury Affirmative Defense (Amended). .................................................................30

5. Mootness Affirmative Defense (Amended). .............................31

6. One-Satisfaction Rule Defense. ...............................................32

IV. CONCLUSION........................................................................................32

# TABLE OF AUTHORITIES[1]

**Page(s)**

**CASES**

*Advo, Inc. v. Phila. Newspapers, Inc.*,
51 F.3d 1191 (3d Cir. 1995) ....................22

*Alston v. Parker*,
363 F.3d 229 (3d Cir. 2004) ....................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................17

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)....................31

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)....................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................16, 17

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*,
49 F. Supp. 2d 750 (D.N.J. 1999)....................19, 20

*Boback v. Geisler*,
2024 WL 5340665 (W.D. Pa. 2024)....................26

*Brager & Co. v. Leumi Sec. Corp.*,
429 F. Supp. 1341 (S.D.N.Y. 1977) ....................21

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ....................21

[1] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and in all internal citations and quotation marks omitted. Citations to "CC" refer to Barnabas's Counterclaim attached to this motion. Citations to "AA" refer to Barnabas's Amended Answer.

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1977)....................................................................................30

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)......................................................................19, 20, 22

*Callano v. Oakwood Park Homes Corp.*,
91 N.J. Super. 105 (App. Div. 1966).........................................................24

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)....................................................................................20

*Fed. Trade Comm'n v. AbbVie Inc*,
976 F.3d 327 (3d Cir. 2020) ..................................................................19, 20

*Foman v. Davis*,
371 U.S. 178 (1962)....................................................................................14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................................................................................32

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
276 F.3d 160 (3d Cir. 2001) .......................................................................29

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
627 F.2d 919 (9th Cir. 1980) ......................................................................21

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .....................................................................16

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
2008 WL 4126264 (D.N.J. 2008) ...............................................................24

*In re K–Dur Antitrust Litig.*,
338 F.Supp.2d 517 (D.N.J.2004).........................................................24, 25

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
710 F. Supp. 152 (E.D. Pa. 1989)...............................................................26

*In re New Valley Corp.*,
181 F.3d 517 (3d Cir. 1999) .......................................................................28

*In re Oakwood Homes Corp.*,
356 F. App'x 622 (3d Cir. 2009) ....................27

*Inserra Supermarkets, Inc. v. Stop & Shop Supermarket Co., LLC*,
240 F. Supp. 3d 299 (D.N.J. 2017) ....................23

*LifeScan, Inc. v. Smith*,
2024 WL 1007845 (D.N.J. 2024) ....................27

*Lifewatch Servs. Inc. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018) ....................17

*McAdam v. Dean Witter Reynolds, Inc.*,
896 F.2d 750 (3d Cir. 1990) ....................28

*Miller Indus. Towing Equip. Inc. v. NRC Industries*,
659 F. Supp. 451 (D.N.J. 2023) ....................22, 23

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ....................17

*Nisselson v. Lernout*,
469 F.3d 143 (1st Cir. 2006) ....................28

*Premier Comp Sols. LLC v. UPMC*,
377 F. Supp. 3d 506 (W.D. Pa. 2019) ....................22

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PREI")*,
508 U.S. 49 (1993) ....................22, 23

*Quaratino v. Tiffany & Co.*,
71 F.3d 58 (2d Cir. 1995) ....................16

*Scherer Design Grp., LLC v. Ahead Eng'g LLC*,
764 F. App'x 147 (3d Cir. 2019) ....................28, 29

*Shammas v. Shammas*,
9 N.J. 321 (1952) ....................27

*Shields v. Consol. Rail Corp.*,
810 F.2d 397 (3d Cir. 1987) ....................30

*Sonos, Inc. v. D&M Holdings Inc.*,
2016 WL 4249493 (D. Del. 2016) .......... 29

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981) .......... 30

*United States v. Apple, Inc.*,
2025 WL 1829127 (D.N.J. 2025) .......... 21

*Williams v. Int'l Paper Co.*,
2024 WL 3858132 (D.N.J. 2024) .......... 15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 13 .......... 14, 15

Fed. R. Civ. P. 15 .......... 14

Fed. R. Civ. P. 20 .......... 16

Fed. R. Evid. 408 .......... 11

Rest. Restitution § 1, Comment a .......... 25

# I. INTRODUCTION

The substitution of the CarePoint Litigation Trust as Plaintiff fundamentally changed the nature of this case. No longer is it just CarePoint seeking to use the antitrust laws to find a scapegoat for its own mismanagement and misdeeds. Now it is HRH[2] – through its acquisition of CarePoint from bankruptcy and control over the Trust – seeking to prosecute claims that HRH knows for a fact are untrue: that HRH conspired with Barnabas. And it is the Trust – with no operations in the market and no interest other than monetizing claims primarily for the benefit of HRH – pursuing sham litigation to enjoin Barnabas from competing for emergency services in the City of Bayonne, where HRH now has monopoly power, and to obtain damages so *HRH* can recoup the hundreds of millions of dollars it spent to obtain its monopoly. This new landscape gives rise to Barnabas's new affirmative defenses and new affirmative claims against HRH and the Trust for unjust enrichment and Sherman Act violations.

As such, pursuant to this Court's Third Amended Pretrial Scheduling Order (ECF 297), Barnabas seeks leave to file an Amended Answer asserting new affirmative defenses and counterclaims against the CarePoint Litigation Trust (the "Trust"), and third-party claims against HRH.

---

[2] HRH is defined in the Counterclaim to include NJMHMC, LLC; NJBMCH, Inc.; 29 E 29 Street Holdings, LLC; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; and Hudson Regional Hospitals, LLC. CC ¶ 22.

This case has dramatically transformed. When CarePoint first filed suit against Barnabas in 2022, HRH was the supposed villain—a "co-conspirator," not with Barnabas, but with Avery Eisenreich, accused of driving CarePoint into bankruptcy. But by orchestrating a collusive settlement with CarePoint and the creation of the Trust, HRH has recast itself as the puppeteer of this very lawsuit. HRH now finances, directs, and controls the prosecution of claims that it knows are false. The Trust serves merely as HRH's proxy, an entity without operations, assets, or business purpose except to monetize litigation for HRH's benefit. What began as an antitrust case has devolved into the next chapter in HRH's efforts to orchestrate CarePoint's collapse, obtaining monopoly power over emergency services in the City of Bayonne, where Barnabas is the only remaining competitor, and recoup the $270 million HRH spent in doing so.

***The Origins of HRH's Scheme.*** HRH's scheme was born in the midst of the decade-long looting of CarePoint by its Founders – Vivek Garipalli, James Lawler, and Jeffrey Mandler – who siphoned over a billion dollars from the CarePoint hospitals through sham management contracts, "tax distributions," and sale-leaseback transactions. By 2019, CarePoint's hospitals – Bayonne, Hoboken, and Christ – were on the brink of insolvency. HRH saw an opportunity. Bayonne Medical Center, though financially distressed, dominated the emergency services

market in Bayonne. Control of Bayonne meant control of that market. It was a coveted prize, but not one that would come easily.

As HRH started testing the waters for an acquisition of Bayonne, it found itself in the middle of a bitter struggle between Avery Eisenreich, the landlord of Bayonne, and CarePoint over control of the hospital. Initially, HRH aligned with Eisenreich. In what CarePoint would later describe as a conspiracy with Eisenreich to drive CarePoint into bankruptcy, HRH scooped up the land beneath the hospital from Eisenreich, and then used its leverage as landlord to put CarePoint into default and ultimately into bankruptcy. In CarePoint's telling, HRH was a central conspirator, acting in concert with Eisenreich to "sabotage" transactions (including with Barnabas), "thwart" competing bids, and "drive CarePoint into insolvency." HRH ultimately prevailed in that contest—it acquired the Bayonne real estate and forced CarePoint into bankruptcy.

***From Adversaries to Co-Conspirators.*** Having driven CarePoint to the edge of bankruptcy, HRH then struck a bargain to take control of what remained. In late 2024, HRH and CarePoint entered into a sweeping settlement that transformed their disputes into collusion. HRH agreed to pay over $130 million (roughly half of the $270 million it spent from the outset of this scheme to the present) in exchange for (1) a complete release from all liability for its role in the alleged conspiracy to destroy CarePoint, (2) the right to manage and operate CarePoint's hospitals, and (3)

beneficial ownership and control of CarePoint's outstanding litigation claims against Barnabas.

The acquisition of the claims – under HRH's direction and control – is now being used as a weapon to complete HRH's scheme: to eliminate competition from Barnabas through sham litigation and to recoup HRH's costs in carrying out this scheme.

Under the governing Bankruptcy Plan and Trust Agreement, HRH is the Trust's principal and controlling beneficiary. It receives priority distributions from the Trust, estimated at near 100% of the Trust's likely recovery. And no decision concerning the prosecution, settlement, or dismissal of this action may be made without HRH's express consent. Thus, HRH – a released co-conspirator that once stood accused of colluding with Barnabas – now wields full control over CarePoint's claims against Barnabas, including *for allegedly colluding with HRH*, which HRH knows to be untrue. HRH has become both master and beneficiary of a litigation apparatus designed to recoup its own losses by falsely accusing Barnabas of the very misconduct for which HRH itself was blamed.

***HRH's and the Trust's Sham Litigation.*** When CarePoint first filed its complaint in September 2022, it was compelled to amend within weeks, publicly admitting that many of its central allegations were "baseless and without merit." Yet even then, CarePoint continued to assert one fantastical claim: that Barnabas had

"colluded with HRH and Eisenreich" to "close down Bayonne Medical." Those allegations – which formed the backbone of CarePoint's antitrust claims – were lies. HRH, of course, knows this with absolute certainty and beyond a shadow of a doubt. It never conspired with Barnabas. Despite that knowledge, HRH has used its post-bankruptcy control of the Litigation Trust to ensure that those same falsehoods remain at the core of this case. With HRH's funding and consent, the Trust continues to prosecute CarePoint's claims against Barnabas, repeating – verbatim – the same allegations HRH knows to be false.

These are not innocuous misstatements. They are deliberate fabrications advanced by an entity (the Trust) whose every major decision requires HRH's approval. HRH's continued consent to the prosecution of claims it knows to be false transforms this litigation into textbook sham litigation—objectively and subjectively baseless and prosecuted to achieve anticompetitive ends.

HRH already dominates emergency services in Bayonne, operating the only full-service emergency department in the city and capturing over 60 percent of the market. Barnabas's Satellite Emergency Department ("SED") – approved by the New Jersey Department of Health to expand access for Bayonne residents – represents HRH's only significant competitor. The Trust's ongoing demand for injunctive relief to restrict Barnabas's SED, and prevent Barnabas's ability to compete for physicians, nurses, and patients, serves no conceivable purpose; other

than to benefit HRH in its quest to eliminate competition, buttress its monopoly, and wield the power to charge supracompetitive prices. Through the continued prosecution of knowingly false allegations, HRH and the Trust are using this sham litigation to monopolize or attempt to monopolize the market for emergency services market in the City of Bayonne in violation of the Sherman Act.

***HRH's Unjust Enrichment.*** The prosecution of false claims against Barnabas for HRH's benefit – to recoup its costs in obtaining control over CarePoint and monopolize the Bayonne emergency services market – also constitutes unjust enrichment. Allowing HRH to pursue these claims through the Trust would allow it to profit directly from the very injuries it helped cause. Having settled CarePoint's claims against it, HRH seeks to recoup that payment through the Trust's pursuit of those same claims against Barnabas. The lion's share of any recovery will flow directly into HRH's coffers. And the injunctive relief the Trust is seeking – curtailing Barnabas's efforts to compete in Bayonne through its SED and for physicians, nurses, and patients – will benefit only HRH by restraining competition in the market for emergency services in Bayonne. That constitutes unjust enrichment. HRH cannot transform itself from a wrongdoer into a claimant by laundering its interests through the Trust. Either the conspiracy CarePoint alleged existed – in which case HRH is a culpable co-conspirator barred from recovery – or it did not, in which case HRH's continuation of those allegations is frivolous and a sham. In either event, the

result is the same: HRH and the Trust seek to unjustly enrich themselves at Barnabas's expense.

HRH's and Trust's conduct is unlawful. Therefore, the Court should grant Barnabas's motion pursuant to Rule 15 for leave to file an Amended Answer, asserting additional affirmative defenses, counterclaims, and third-party claims arising from the substitution of the Trust, as HRH's proxy, in this case.

## II. THE FACTS

In 2008, financial analyst Vivek Garipalli, together with James Lawler and Jeffrey Mandler, (the "Founders") "acquired Bayonne Medical Center out of bankruptcy." CC ¶ 41. A few years later, they "acquired Hoboken University Medical Center and Christ Hospital, consolidating the three facilities under the CarePoint banner." *Id.* Through those acquisitions, the Founders "secured control of most inpatient and emergency room services in Hudson County, and crucially, achieved a monopoly over emergency services in the City of Bayonne, where no other emergency facility operated at that time." *Id.*

From inception, "the Founders' goal was to divert hospital revenues for their own personal profit." CC ¶ 42. As CarePoint recently admitted, the Founders "extract[ed] … millions of dollars from the Hospitals through numerous questionable transactions and transfers … including sale-leaseback transactions, inflated management fees … and diversion of corporate assets to personal use." *Id.*

Their "systematic siphoning of Debtors' assets for over a decade … rendered the Debtors insolvent, left them with insufficient capital, and weakened them to the point they became virtually unviable as going concerns." *Id.*

[redacted] Where others saw a sinking ship, HRH saw an opening. In late 2019, "HRH saw an opportunity to seize control of Bayonne Medical Center, one of three distressed hospitals that made up the CarePoint Health System." *Id.* ¶ 2. Bayonne "dominated the market for emergency care in the City of Bayonne," and HRH recognized that "exploiting that position promised immense profit once freed from the shackles of Founder debt." *Id.* ¶ 3.

HRH soon discovered, however, that "CarePoint did not actually own the hospital." CC ¶ 4. "The land, buildings, and facilities belonged to the landlord, Avery Eisenreich, while CarePoint merely controlled the operating company." *Id.* "Almost immediately, the discussions [between HRH and CarePoint] broke down over the allocation of the purchase price between the OpCo," controlled by CarePoint, and the "PropCo," controlled by Eisenreich. *Id.* ¶ 90. "The Founders believed that they could use their political clout" and the threat of eminent domain to "force Eisenreich to sell the real estate for well below its fair market value." *Id.*

"Eisenreich, on the other hand, believed that the hospital operations were near insolvent," and that CarePoint would soon have no choice but to sell. *Id*.

By March 2020, "the dispute among the Founders and Eisenreich came to head, with HRH stuck in the middle." CC ¶ 91. [REDACTED] When HRH refused, the Founders entered into a Letter of Intent with a newly-created, special-purpose entity to acquire Bayonne, contingent on the government's decision to exercise eminent domain. *Id.* ¶ 92. HRH responded by acquiring the land from Eisenreich for its true fair market value, agreeing to pay over $220 million for the real estate beneath CarePoint's Bayonne and Hoboken Hospitals. *Id.* ¶ 96. Then, as landlord, HRH foreclosed on CarePoint. *Id.* ¶¶ 96-98.

CarePoint retaliated by suing HRH, "accusing it of 'conspiring with Avery Eisenreich' to 'thwart' the sale of the 'Hoboken and Christ Hospitals to RWJ Barnabas' and to sell Bayonne Medical to BMC LLC." CC ¶ 98. [REDACTED] In this telling of the story, CarePoint and Barnabas were the victims, and HRH and Eisenreich were the conspirators.

But CarePoint's story would shapeshift to serve its changing needs. As CarePoint was teetering on the brink, it scrambled to find other suitors to save it from liquidation. It trained its sights on Barnabas. Barnabas had previously expressed interest in acquiring the Hoboken and Christ hospitals from CarePoint, but that transaction had also been stymied by the in-fighting between CarePoint's Founders and Eisenreich. CC ¶ 8. CarePoint, nevertheless, believed Barnabas "could be brought back to the table" by asserting – then offering to settle – frivolous litigation against Barnabas. *Id.* ¶ 104.

On September 6, 2022, CarePoint filed suit against Barnabas. (ECF 1). This time, "CarePoint imagined a bigger conspiracy." *Id.* ¶ 8. "It was no longer HRH and Eisenreich who orchestrated CarePoint's descent into bankruptcy, as previously alleged; now, it was Barnabas who supposedly masterminded it." *Id.* "In its complaint against Barnabas, HRH and Eisenreich were recast as mere puppets, with HRH merely 'involved with Eisenreich in efforts to advance RWJ's goals, including controlling the real estate under the Hospitals [and] decimating CarePoint.'" *Id.*

CarePoint "knew this imaginary conspiracy was a sham." CC ¶ 9. "Within days of filing, it was forced by the Governor of New Jersey to retract many of its central allegations, ***publicly admitting they were 'baseless and without merit.'***" *Id.* But CarePoint's true purpose was not to prevail in its claims; it merely sought to use

the lawsuit as leverage "to force Barnabas to acquire the [CarePoint] hospitals." CC ¶ 104. As its counsel wrote just a few months after filing:

> "CarePoint… will shortly be soliciting the interest of other New Jersey nonprofit health systems in a merger with CarePoint… ***Because of the pending litigation*** …, RWJ Barnabas has a unique opportunity to enter into some arrangement or transaction with CarePoint. ***CarePoint is willing to end the litigation in connection with any business arrangement*** with RWJ." *Id.* ¶ 105.[3]

CarePoint's gamble failed, as "Barnabas refused to capitulate." *Id.* ¶ 10. But the gambit served its purpose: "it created the appearance of a stalking horse [that] drew HRH to the table." *Id.*

"In late 2024, HRH and CarePoint struck a new bargain." CC ¶ 12. "Through a series of transactions prior to, but culminating in, a pre-packaged bankruptcy," CarePoint agreed to settle its claims against HRH, and transfer control of the hospitals and this *litigation* to HRH. *Id.* ¶¶ 12-14. In exchange, HRH paid an additional $50 million in new money to CarePoint and converted an additional $80 million of debt into a loan. *Id.* ¶ 118. Nearly five years after its scheme began, HRH had finally succeeded in its goal of acquiring monopoly control over the emergency services market in the City of Bayonne. *Id.* ¶ 6. But it had spent over $270 million to do so—money it needed to recoup. *Id.* ¶ 99.

---

[3] This email is not covered by any settlement privilege. Fed. R. Evid. 408 does not apply because the email is not being used to prove or disprove the validity of any claim, and the parties specifically exempted any communications prior to February 9, 2024, including this email, from their March 1, 2024 mediation stipulation.

That was the beauty – or deviousness – of its conspiracy with CarePoint. HRH did not merely settle its own liability and acquire control of the hospitals, it acquired the means to control and benefit from the suit against Barnabas for the damages HRH *itself* inflicted on CarePoint, and to interfere with Barnabas's ability to compete against HRH in future. CC ¶¶ 138, 157. Under the agreement with CarePoint, as reflected in the Trust Agreement, HRH is the sole financer of the Trust, stands to receive between 35 and 100% of any recovery," and has full consent and ***sole*** veto rights over every decision concerning the prosecution of this case. *Id.* ¶ 125.

"On May 22, 2025, HRH deposited $3.5 million into a litigation fund" held by a Trust that it controlled and of which it was the principal beneficiary." CC ¶ 14. "With HRH's consent and [under its] complete control," the Trust stepped into CarePoint's shoes, and continued "to assert allegations HRH and the Trust knew – with absolute certainty and beyond a shadow of a doubt – were false." *Id.* These false allegations concerned HRH's own conduct, including the following:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe **[Owner of HRH]**."
- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."
- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling

the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in effort to close down Bayonne Medical."
- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."
- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."
- "The plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."
- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."
- "RWJ and its conspirators including … HRH, Moshe, Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."
- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh." *Id*.

"Each of these allegations cast HRH as a central participant in a supposed conspiracy with Barnabas—a conspiracy HRH and the Trust knew never existed." *Id.* ¶ 15. HRH had both the "authority … and the responsibility … to stop the Trust's assertion of these knowingly false allegations," but instead, it "compelled the Trust to

"abandon its duty of candor to the Court in effort to offset the 270 million HRH spent to secure control of the hospitals." *Id.* ¶ 16.

HRH now stands to unjustly benefit from its own wrongdoing – its conspiracy with Avery Eisenreich to drive CarePoint into bankruptcy, its conspiracy with CarePoint to acquire claims against Barnabas to recover for injuries HRH itself caused, and its conspiracy with the Trust to assert sham litigation against Barnabas – as part of a multifaceted overarching scheme to recoup its costs in taking control of the market for emergency services in the City of Bayonne. CC ¶ 110.

Barnabas's Counterclaim aims to stop that unlawful scheme.

## III. LEAVE TO AMEND THE PLEADINGS SHOULD BE GRANTED.

Barnabas's proposed amendment easily satisfies the liberal standard for amending pleadings under Rule 15. "The Court should freely give leave when justice so requires," especially where – as here – the amendment concerns a "transaction, occurrence, or event that happened after the date of the [original] pleading." *See* Fed. R. Civ. P. 15(a)(2), (d); *see also* Fed. Civ. P. 13(e). As this Court has recognized, "leave to amend pleadings under Rule 15(a) should be 'freely given' in absence of any apparent … undue delay, bad faith, … undue prejudice …, or futility of amendment." ECF 24, at 2 (citing *Foman v. Davis*, 371 U.S. 178 (1962); *Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004)); *see also* Fed. R. Civ. P. 13, 2009

Advisory Comm. Notes ("leave should be freely given" to "add a counterclaim" when "justice so requires.").

Here, there is no delay, bad faith, prejudice, or futility that could bar amendment. Barnabas's amendment asserts affirmative defenses, counterclaims, and third-party claims that accrued just a few months ago when the Trust was substituted as plaintiff. Prior to May 22, 2025, the Trust did not exist, and HRH had not yet directed, or consented to, the Trust's assertion of claims and allegations against Barnabas based on HRH's own alleged wrongdoing (all of which it knows to be false). As such, while HRH's scheme was years in the making, the *injury to Barnabas* from HRH's and the Trust's conduct only started once the Trust was substituted and HRH affirmatively decided not to wield its power to end to CarePoint's baseless litigation, but rather to use the litigation to cement its monopoly power over emergency services in the City of Bayonne and improperly recoup from Barnabas the costs of HRH's scheme to take over CarePoint. Rules 13(e) and 15(d) were made for such situations. Fed. R. Civ. P. 13(e) ("the court may permit a party to file a supplemental pleading [under Rule 15(d)] asserting a counterclaim that matured … after serving an earlier pleading.").

Additionally, as Barnabas is filing this motion by the deadline set by this Court (ECF 297), there can be no argument that Barnabas's claims or its amendment is untimely. *See Williams v. Int'l Paper Co.*, 2024 WL 3858132, *1 (D.N.J. 2024)

(finding no undue delay where amendment was filed within court deadlines and before the close of discovery).

Nor can there be any undue prejudice. The claims and facts alleged directly arise from the subject matter of CarePoint's original claims and the Trust's substitution as plaintiff a few months ago. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) ("leave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading."). Nor would permitting amendment cause any hardship. The fact that HRH and the Trust must defend themselves against Barnabas's claims is simply part of the litigation process.[4] And, Barnabas's claims are far from futile.

## IV. BARNABAS'S CLAIMS ARE NOT FUTILE.

Amendment is futile only if the proposed pleading "would fail to state a claim upon which relief can be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The familiar *Twombly* standard applies. To survive challenge at the pleading stage, a plaintiff's claims need only be "facially plausible, meaning that the well-pled facts 'allow the court to draw the reasonable inference

[4] Joinder of HRH as a third-party defendant is proper. Under Rule 20, "persons … may be joined in one action as defendants if … any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A)-(B). Here, the Counterclaim alleges that HRH conspired with CarePoint and the Trust to seek recovery from Barnabas for injuries that HRH caused. As such, HRH is jointly and severally liable with the Trust for the harms caused by its scheme, all of which involve common questions of fact and law.

that the defendant is liable for the misconduct alleged." *See* ECF 61 (denying motion to dismiss, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Here, Barnabas asserts claims for unjust enrichment and unfair competition under the Sherman Act. Each states plausible grounds that HRH and the Trust are liable.

### ***A. Barnabas States a Claim for Sham Litigation In Violation of the Sherman Act.***

#### ***1. Barnabas Alleges a Section 1 Violation.***

A plaintiff states a claim under Section 1 of the Sherman Act by alleging (1) concerted action by the defendants, (2) that produced anticompetitive effects within a relevant product and geographic market, (3) that the conduct pursuant to that concerted action was unlawful, and (4) that the plaintiff was injured as a result. *Lifewatch Servs. Inc. v. Highmark Inc.,* 902 F.3d 323, 331 (3d Cir. 2018). Put another way, a Section 1 conspiracy requires "a contract, combination or conspiracy," and a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Barnabas's Section 1 claim satisfies each of these elements.

***Concerted Action.*** The Counterclaim pleads concerted action among HRH, Eisenreich, CarePoint, and the Trust, who together have entered into continuing "contracts, combinations, and conspiracies to restrain trade and suppress competition" in the market for emergency medical services in the City of Bayonne.

CC ¶ 162. First, HRH agreed with Eisenreich to obtain control of the CarePoint real estate and use that control to drive CarePoint into bankruptcy. Then, through CarePoint's bankruptcy, HRH agreed with CarePoint to obtain the assets of Bayonne Hospital and control over CarePoint's other hospitals, while settling CarePoint's claims against HRH. And after bankruptcy, HRH agreed with the Trust, through its veto and consent authority, to pursue claims against Barnabas that HRH knew to be false but believed would help HRH solidify its monopoly over emergency services in the City of Bayonne and recoup the hundreds of millions it spent in its scheme to take over CarePoint. *Id.* ¶¶ 165-68.

***Anticompetitive Objective and Effects.*** The claim further alleges that the object and effect of this combination is to eliminate or cripple Barnabas's SED and preserve HRH's dominance over hospital-based emergency services in Bayonne. CC ¶¶ 165, 180. HRH currently controls roughly 60 percent of all emergency-service volume in the City of Bayonne, operating the only full-service emergency department within city limits, leaving Barnabas's SED as the only alternative available to Bayonne residents. *Id.* ¶ 164. The purpose and effect of the relief sought by HRH and the Trust are direct and anticompetitive: crippling Barnabas's SED and maintaining supracompetitive pricing and monopoly control over emergency services. *Id.* ¶¶ 165, 175.

These allegations describe classic exclusionary and collusive effects prohibited by Section 1 of the Sherman Act—conduct designed to suppress a rival and restrict consumer choice in a well-defined market. The fact that HRH and the Trust are using litigation as their weapon of choice does not deprive their conduct of its anticompetitive nature. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 371 (3d Cir. 2020) (affirming District Court's finding that a sham litigation constituted an attempt "to interfere directly with its business relationships" used as "an anticompetitive weapon."); *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,* 49 F. Supp. 2d 750, 770 (D.N.J. 1999) ("Threats of baseless litigation can constitute improper anticompetitive conduct for purposes of the antitrust laws.").

***Unlawful Means – Sham Litigation.*** The Counterclaim also pleads unlawful means: the maintenance and funding of objectively baseless litigation designed to exclude Barnabas from the City of Bayonne Emergency Services Market. CC ¶¶ 130-31, 154-55, 166, 171, 175-77. HRH and the Trust are together prosecuting a lawsuit asserting a supposed HRH–Barnabas conspiracy that HRH (and the Trust) knows to be false. *Id.*

Such sham litigation is not protected from the antitrust laws. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511–12 (1972) (holding that baseless joint petitioning to bar competitors from access to tribunals states a Sherman Act claim). "***Misrepresentations***, condoned in the political arena, ***are not***

***immunized when used in the adjudicatory process***." *Id.* at 513 ("there are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations").

HRH's and the Trust's knowing prosecution of false claims is no different and is not immune from antitrust liability. HRH surely knows it did not conspire with Barnabas. Its continued assertion of that alleged conspiracy, through its control of the Trust, is thus both objectively and subjectively baseless. This is not a case of mere error or a weak legal theory. This is a different species. HRH knows the truth and has directed the Trust to assert the opposite. Such conduct, when, as here, is employed for anticompetitive goals, is subject to the full weight of the antitrust laws.

Courts have long recognized that baseless litigation used as a competitive weapon is an unlawful means of restraining trade under the Sherman Act. *Id.* at 511-12; *AbbVie Inc,* 976 F.3d at 371*; Biovail Corp. Int'l,* 49 F. Supp. 2d at 770; *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144 (1961) (sham campaign to interfere with competitors' business relationships may fall outside First Amendment protection). That is the claim Barnabas brings. It is not futile.

### ***2. Barnabas Alleges a Section 2 Violation.***

A plaintiff states a Section 2 Sherman Act claim by alleging (1) possession of monopoly power in a relevant market, and (2) the willful acquisition or maintenance of that power through exclusionary or anticompetitive conduct rather than through

growth or superior efficiency. *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 317 (3d Cir. 2007); *United States v. Apple, Inc*., 2025 WL 1829127, at *5 (D.N.J. 2025). Similarly, a plaintiff pleads attempted monopolization by alleging (1) anticompetitive or exclusionary conduct, (2) specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power in the relevant market. *Broadcom Corp.,* 501 F.3d at 317. Barnabas's Counterclaim meets these elements.

***Monopoly Power in the Relevant Market.*** Barnabas alleges that HRH possesses – or is dangerously close to possessing – monopoly power in the City of Bayonne Emergency Services Market. CC ¶¶ 136, 175. HRH operates the only full-service emergency department in Bayonne, accounts for roughly 60 percent of all emergency-service volume, and controls key hospital infrastructure and referral networks, enabling it to raise prices and exclude rivals. *Id.* ¶¶ 164, 175. This sufficiently alleges monopoly power in a relevant market. *See, e.g.*, *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924-25 (9th Cir. 1980) (reversing ruling that an allegation of 65% market share was an insufficient pleading of monopoly power); *see also Brager & Co. v. Leumi Sec. Corp.*, 429 F. Supp. 1341, 1349 (S.D.N.Y. 1977) (denying motion to dismiss antitrust complaint alleging 60% market share).

***Exclusionary or Anticompetitive Conduct.*** A party engages in anticompetitive conduct "when it attempts to exclude rivals on some basis other than

efficiency or when it competes on some basis other than the merits." *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 525 (W.D. Pa. 2019). Here, HRH's direction of the Trust's baseless lawsuit – asserting claims HRH knows to be false and pursued for the improper purposes of recouping the costs of HRH's anticompetitive scheme and to solidify its monopoly power over emergency services in the City of Bayonne – constitutes exclusionary conduct. HRH and the Trust, through their lawsuit, directly attack Barnabas's opening of SED and seek injunctive relief, relief that would serve only to protect HRH's monopoly. Baseless litigation – like HRH's and the Trust's – can constitute exclusionary conduct under Section 2. *Cal. Motor Transp. Co.*, 404 U.S. 511–12; *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PREI")*, 508 U.S. 49, 60-61 (1993).

***Specific Intent to Monopolize.*** HRH's specific intent to monopolize is evident from its deliberate effort to use sham litigation to drive Barnabas from the Bayonne market and restore its monopoly over emergency services. CC ¶ 176. Courts infer specific intent from exclusionary conduct that lacks legitimate business justification. *Advo, Inc. v. Phila. Newspapers, Inc.,* 51 F.3d 1191, 1199 (3d Cir. 1995). The Trust's refusal to withdraw its injunctive relief claims – despite it having no operational or market function – further supports an inference of specific intent because the litigation serves no purpose other than protecting HRH's market dominance. *See Miller Indus. Towing Equip. Inc. v. NRC Industries*, 659 F. Supp.

451, 466-67 (D.N.J. 2023) (finding specific intent plausibly alleged where sham litigation was used to deter a rival from operating in the same niche market).

***Dangerous Probability of Achieving or Maintaining Monopoly Power***. HRH controls at least 60 percent of the Bayonne market and operates the only facility offering full-service emergency care within city limits. CC ¶ 164. Eliminating or crippling Barnabas's SED – the sole competitive alternative – would give HRH complete control over the market. This establishes a dangerous probability of success in monopolizing emergency medical services in Bayonne. *See Miller Indus*., 659 F. Supp. 3d at 467 (finding dangerous probability plausible where one firm controlled nearly all market share and sought to deter the only other competitor).

***Noerr–Pennington and Antitrust Injury.*** The Noerr–Pennington and injury analyses mirror those addressed under Section 1. Baseless litigation brought for anticompetitive purposes is not immune. *PREI*, 508 U.S. at 60–61; *Inserra Supermarkets, Inc. v. Stop & Shop Supermarket Co., LLC*, 240 F. Supp. 3d 299, 307 (D.N.J. 2017). Likewise, Barnabas pleads antitrust injury by alleging that the relief the Trust and HRH seek is designed to impair SED's ability to compete in the market for emergency services in Bayonne.

### ***B. Barnabas States a Claim for Unjust Enrichment.***

Barnabas alleges that HRH and the Trust will be unjustly enriched if they are allowed to recover for injuries that CarePoint claims it suffered due to HRH's alleged conduct as a co-conspirator with Barnabas. Specifically, Barnabas alleges that HRH first conspired with Avery Eisenreich to drive CarePoint into bankruptcy, which allowed HRH to settle, and obtain releases for, all CarePoint's claims against it. Then – having succeeded in doing so – HRH conspired with CarePoint to acquire an assignment of claims that gave it control over, and priority distribution of the proceeds from, this action. Finally, to fully effectuate the scheme, HRH conspired with the Trust to assert claims and allegations it knows with absolute certainty and beyond a shadow of a doubt to be false. CC ¶¶ 14, 109, 131, 152-53.

These alleged facts state a claim for unjust enrichment, which "rests on the equitable principle that a person shall not be allowed to enrichment himself unjustly at the expense of another." *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966). Because the claim is equitable in nature, it is broadly construed to do substantial justice. All a plaintiff must show is that (1) the defendant received (or stands to receive) a benefit, (2) at the plaintiff's expense, and (3) the defendant's retention of the benefit would be unjust. *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.,* 2008 WL 4126264, at *21 (D.N.J. 2008); *In re K–Dur*

*Antitrust Litig.*, 338 F.Supp.2d 517, 544 (D.N.J.2004). Barnabas meets these elements.

***HRH and the Trust Stand to Receive a Substantial Benefit Unless Enjoined***. By acquiring an interest in CarePoint's claims against Barnabas, HRH and the Trust stand to receive a substantial benefit from any judgment or settlement in this case. *See* Rest. Restitution § 1, cmt a, b (1937) ("The word 'benefit,' therefore, denotes any form of advantage."). Under its agreements with CarePoint, "HRH is the single largest beneficiary" of the Trust, receives priority distribution, and will get "anywhere from 35% to 100% of the proceeds" of CarePoint's claims against Barnabas. CC ¶ 125. Such funds would be a substantial benefit to HRH.

***Those Benefits Come at Barnabas's Expense***. The funds that HRH seeks to improperly recoup through this lawsuit do not come from nowhere, they come from Barnabas's pocket. It does not matter that HRH may not receive 100% of the proceeds of the lawsuit. The "critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct." *K–Dur*, 338 F.Supp.2d at 54.

***HRH's Receipt and Retention of Benefits for Harm it Caused Would Be Unjust***. According to CarePoint's allegations, now being pursued by HRH and the Trust, HRH was a principal actor in bringing about the harm that CarePoint has asserted. Even before CarePoint filed the instant suit, it alleged that HRH entered

into a conspiracy with Eisenreich "to thwart" the sale of the CarePoint hospitals through subterfuge and underhanded conduct that they could not obtain through legitimate, good faith negotiation. CC ¶ 98 (citing *IJKG Opco, LLC v. NJMHMC LLC, et al.,* HUD-C-000087-20 (Jun. 4, 2020 Super. Ct. N.J.), ¶¶ 6, 154). In this case, CarePoint then broadened its conspiracy theory to include Barnabas, now claiming that HRH *joined* a conspiracy with Barnabas to drive CarePoint into bankruptcy.[5] As CarePoint alleged, "HRH and its principals … were intimately involved with Eisenreich and [RWJ] in efforts to advance RWJ's goals [of] controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint's doctors." CC ¶ 107 (citing TAC, ECF 27, ¶ 19, n. 2). Since HRH was a material contributor to CarePoint's alleged injury, and an alleged co-conspirator, allowing it to recover from Barnabas is unjust.

Moreover, HRH and the Trust are also wrongdoers because they are alleging a conspiracy between HRH and Barnabas that HRH (and the Trust) knows with absolute certainty and beyond a shadow of doubt is false. It would be unjust to permit HRH or the Trust to recover based on such allegations. *See, e.g., Boback v.*

[5] Because HRH is an alleged conspirator, it is responsible for all the harm caused by the alleged conspiracy, including harm that predates its joinder. *In re Lower Lake Erie Iron Ore Antitrust Litig*., 710 F. Supp. 152, 153 (E.D. Pa. 1989) ("[O]ne who joins an existing conspiracy is equally liable with the other conspirators for all damages occasioned by the conspiracy, including damages caused before joinder."). Here, CarePoint fashioned its complaint as a single overarching conspiracy, in which numerous co-conspirators allegedly played a role. *See* CC ¶ 154.

*Geisler*, 2024 WL 5340665, *5 (W.D. Pa. 2024) (maintenance of frivolous appeals constitutes unjust enrichment). As the New Jersey Supreme Court explained, "we prefer to follow the equity of the matter and to take away an ***unjust judgment*** obtained by vital perjury when the injustice and inequity of allowing it to stand are made evident." *Shammas v. Shammas*, 9 N.J. 321, 330 (1952).

### *C. Barnabas's New Affirmative Defenses Are Not Futile.*[6]

#### *1. In Pari Delicto Affirmative Defense.*

Barnabas's proposed *in pari delicto* defense is proper and supported. The doctrine – literally meaning "equally at fault" – refers "to the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *In re Oakwood Homes Corp*., 356 F. App'x 622, 626 (3d Cir. 2009). The defense requires a showing that the plaintiff bears "at least substantially equal responsibility for his injury" as the defendant and that the plaintiff "engaged in the same wrongdoing that is the subject of the plaintiff's suit." *LifeScan, Inc. v. Smith*, 2024 WL 1007845, *4 (D.N.J. 2024) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307-08 (1985)). It applies when a plaintiff is "an active,

[6] In addition to these proposed amended affirmative defenses, Barnabas also seeks leave to amend certain of its specific answers to the allegations in CarePoint's Third Amended Complaint to reflect the post-bankruptcy realities of this case—including the substitution of the CarePoint Litigation Trust as plaintiff, HRH's assumption of control over the Trust and this litigation, and the resulting change in the economic and factual context underlying CarePoint's claims. *See* Ex. A. These limited amendments are necessary to ensure that Barnabas's responsive pleadings accurately reflect the current procedural and factual posture following confirmation of CarePoint's bankruptcy plan.

voluntary participant in the unlawful activity that is the subject of the suit." *McAdam v. Dean Witter Reynolds*, *Inc.*, 896 F.2d 750, 757 (3d Cir. 1990).

Here, HRH's participation in the alleged conspiracy with Eisenreich to drive CarePoint into bankruptcy renders it at least equally culpable, if not more so, than Barnabas. After obtaining a release for that same conduct, HRH acquired control of the Trust and now seeks to recover through that vehicle for injuries stemming from its own actions. AA ¶¶ 26. Allowing HRH – acting through the Trust – to recover damages for harm it helped cause would directly contravene the *in pari delicto* doctrine and the public policy underlying it. *See Nisselson v. Lernout*, 469 F.3d 143, 158 (1st Cir. 2006) (affirming dismissal where trustee's claims arose from debtor's own fraudulent conduct). Because comparative fault and HRH's role are fact issues, the defense cannot be resolved on the pleadings and is not futile.

***2. Unclean Hands Affirmative Defense.***

The unclean hands doctrine applies when (1) a party commits an unconscionable act, (2) that act affects the equitable relations between the parties, and (3) the act concerns an issue before the court. *In re New Valley Corp.*, 181 F.3d 517, 524 (3d Cir. 1999). It bars equitable relief where a litigant's conduct in the same controversy "shocks the moral sensibilities of the judge." *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 149–50 (3d Cir. 2019). The doctrine "applies when a party seeking relief has committed an unconscionable act

immediately related to the equity the party seeks." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001).

HRH's conduct satisfies these elements. It conspired with Eisenreich to destabilize CarePoint, later acquired and controlled the Trust, and now uses that Trust to pursue baseless claims for its own benefit—an unconscionable act that directly affects the parties' equitable relationship. AA ¶¶ 19-23. The same misconduct also concerns issues before the Court, as the Trust seeks injunctive and equitable relief arising from HRH's own wrongdoing. *See Scherer Design*, 764 F. App'x at 151 ("For the unclean hands doctrine to apply, there must be a relationship between the inequitable conduct and the claims brought before the court."); *Sonos, Inc. v. D&M Holdings Inc.*, 2016 WL 4249493, *5 (D. Del. 2016). Because HRH's inequitable conduct bears directly on the equitable relief sought, the doctrine bars HRH and the Trust from recovering in equity. The proposed defense is therefore grounded in law, factually supported, and not futile.

***3. Contribution Bar Affirmative Defense.***

Barnabas's proposed contribution bar defense reflects post-bankruptcy developments that fundamentally alter the equities. As part of the confirmed CarePoint Plan, HRH obtained a release of all claims against it – including those related to the alleged conspiracy – and in exchange paid more than $130 million.

AA ¶¶ 13-18. HRH is now the Trust's controlling and primary beneficiary, entitled to 35-100% of any litigation recovery. AA ¶ 17.

Allowing the Trust to recover damages from Barnabas would impermissibly allow HRH to recoup its settlement payment indirectly, in violation of the contribution bar governing joint tortfeasors and co-conspirators. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639-47 (1981) (no contribution or indemnity rights among antitrust co-conspirators); *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987) (equity bars parties "equally responsible for wrongdoing" from shifting liability). Because HRH is a released co-conspirator, its receipt of proceeds from the Trust's recovery would effectively constitute contribution from Barnabas, which the law forbids. The defense therefore is both factually and legally sufficient and not futile.

#### ***4. Lack of Antitrust Standing and Antitrust Injury Affirmative Defense (Amended).***

Barnabas's amended defense for lack of antitrust standing and injury reflects that the Trust – not CarePoint itself – is now the plaintiff, and that HRH, an alleged antitrust wrongdoer, controls and benefits from the Trust. AA ¶¶ 27-32. To establish standing under Section 4 of the Clayton Act, a plaintiff must show "antitrust injury"—an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). The Trust cannot satisfy this

requirement because: (i) it is not a market participant and therefore cannot have suffered competitive injury; (ii) HRH, the Trust's controlling beneficiary, is an alleged co-conspirator and cannot recover for injuries arising from its own conduct; and (iii) any injury claimed would duplicate the benefits HRH already received in the bankruptcy.

Entities that do not participate in the restrained market and suffer no competitive injury lack antitrust standing. *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540–45 (1983). Moreover, allowing HRH to recover through the Trust would contravene public policy by permitting an antitrust violator to "purchase standing" and obtain contribution from a co-conspirator. These facts foreclose antitrust injury as a matter of law. Because the standing inquiry turns on factual issues regarding HRH's control and benefit structure, the defense is properly pleaded and not futile.

***5. Mootness Affirmative Defense (Amended).***

Barnabas's amended defense for mootness also reflects the substitution of the CarePoint Litigation Trust and HRH's control over it. AA ¶¶ 10-12. The Trust seeks injunctive relief despite being a passive litigation vehicle with no operations, assets, or market activity. *Id.* ¶ 12. A plaintiff cannot obtain prospective relief where it has

no continuing or redressable injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Here, the Trust's only function is to monetize assigned litigation claims for HRH's benefit; it does not compete or participate in any market. Any injunction would therefore redound solely to HRH's competitive advantage, not to redress any injury to the Trust. The request for injunctive relief is thus moot as a matter of law. These facts plausibly support the defense and render the amendment non-futile.

***6. One-Satisfaction Rule Defense.***

HRH settled CarePoint's claims against it, including the claims it continues to assert through the Trust, for $130 million as part of its bankruptcy deal with CarePoint. [REDACTED]

Those amounts, and any other amounts for which CarePoint settled claims it continues to assert against Barnabas, must be offset against any recovery obtained against Barnabas. The prior, related settlements are alleged, and the defense is not futile.

## IV. CONCLUSION

For the foregoing reasons, Barnabas respectfully submits that its Motion for Leave to Amend its Answer, Counterclaims, and Third-Party Complaint should be granted.

Dated: November 14, 2025

Respectfully Submitted,

/s/ *William T. Walsh*

William T. Walsh
David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square New York, NY 10036
(212) 969-3000
wwalsh@proskauer.com
dmunkittrick@proskauer.com

Colin R. Kass*
Erica T. Jones*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202)416-6800
ckass@proskauer.com
ejones@proskauer.com

*Attorneys for Defendant RWJ Barnabas Health, Inc.*

**Admitted Pro Hac Vice*