# EXHIBIT A

William T. Walsh
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3908
wwalsh@proskauer.com

*Additional Counsel listed on Signature Page*
*Attorneys for RWJ Barnabas Health, Inc.*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| The CarePoint Litigation Trust,<br><br>    Plaintiffs / Counterclaim-Defendant,<br><br>    v.<br><br>RWJ Barnabas Health, Inc.,<br><br>    Defendant / Counterclaim-Plaintiff / Third-Party Plaintiff,<br><br>    v.<br><br>NJMHMC, LLC d/b/a Hudson Regional Hospital; 29 E 29th Street Holdings, LLC; NJBMCH, Inc.; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; Hudson Regional Hospitals, LLC,<br><br>    Third-Party Defendants | 22-cv-05421-EP-CF<br><br>Hon. Evelyn Padin, USDJ<br><br>Hon. Cari Fais, USMJ<br><br>**BARNABAS'S COUNTERCLAIM, THIRD-PARTY COMPLAINT, AMENDED ANSWER, AND AFFIRMATIVE DEFENSES**<br><br>***PUBLIC REDACTED VERSION*** |

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT[1]

1.      This Counterclaim challenges HRH's and the CarePoint Litigation Trust's coordinated scheme to convert CarePoint's collapse into unlawful gain. HRH conspired first with CarePoint's Landlord, then with CarePoint itself, and now with the Litigation Trust, to seize control of the CarePoint Hospitals, and to weaponize CarePoint's assigned claims so that it can unjustly enrich itself and entrench its monopoly power over emergency services in the City of Bayonne.

2.      In 2019, HRH saw an opportunity to seize control of Bayonne Medical Center, one of three distressed hospitals that made up the CarePoint Health System. CarePoint was collapsing under the weight of more than a decade of corporate looting by its prior owners – the "Founders" – who, as CarePoint later admitted, engaged in a "*systematic siphoning of [CarePoint's] assets for over a decade*," totaling over $1 billion, which "rendered the [hospitals] insolvent, left them with insufficient capital, and *weakened* them to the point they became virtually *unviable as going concerns.*"

3.      Where others saw dying embers, HRH saw a diamond in the rough— Bayonne dominated the market for emergency care in the City of Bayonne and

---

[1] Unless otherwise noted, all emphasis added, internal citations and quotation marks omitted, and capitalizations conformed without brackets.

exploiting that position promised immense profit once freed from the shackles of Founder debt.

4.     HRH soon discovered, however, that CarePoint did not actually own the hospital.  Bayonne was not a single, unified institution, but – like a jigsaw puzzle – was an interlocking web of corporate and real estate interests owned by competing factions.  The land, buildings, and facilities belonged to the landlord, Avery Eisenreich, while CarePoint merely controlled the operating company.

5.     Caught between these dueling owners, HRH sided with Eisenreich, Bayonne's landlord.  That alliance – forged amid the chaos of CarePoint's financial collapse – would later be branded by CarePoint as a "conspiracy" between HRH and Eisenreich to drive CarePoint into bankruptcy and acquire its operating assets debt free and on the cheap.

6.     HRH ultimately prevailed.  It acquired the Bayonne property from Eisenreich, enforced the lease terms to the letter, and forced CarePoint – not just Bayonne, but the *entire system* – into bankruptcy.  But that victory was neither immediate nor cheap.  It took more than five years and cost HRH over $270 million to achieve.

7.     During this period, HRH had CarePoint on the ropes, but CarePoint did not go down without a fight.  As its finances deteriorated under the weight of the Founders' billion-dollar cash extraction scheme and new legislation enacted

3

specifically to curb CarePoint's abusive billing practices, CarePoint turned to its favorite weapon of choice: litigation. It countersued HRH, accusing HRH and Eisenreich of conspiring to drive it into bankruptcy. That countersuit delayed HRH's takeover of the hospital for several years, but it was not enough to generate real competition for CarePoint's assets.

8.    CarePoint needed another bidder, so it turned to Barnabas. Barnabas had previously expressed interest, but – as with the HRH negotiations – CarePoint could not bring its landlord, Avery Eisenreich, to the table. To force Barnabas to re-engage, CarePoint resorted again to its favorite tactic: another lawsuit. This time, CarePoint imagined a bigger conspiracy. It was no longer HRH and Eisenreich who orchestrated CarePoint's descent into bankruptcy, as previously alleged; now, it was Barnabas who supposedly masterminded it. In its complaint against Barnabas, HRH and Eisenreich were recast as mere puppets, with HRH merely "*involved* with Eisenreich in efforts to advance ***RWJ's*** goals, including controlling the real estate under the Hospitals [and] decimating CarePoint."

9.    CarePoint knew this imaginary conspiracy was a sham. Within days of filing, it was forced by the Governor of New Jersey to retract many of its central allegations, ***publicly admitting they were "baseless and without merit."***

10.    Yet, CarePoint pressed ahead, demanding that Barnabas participate in mediation, framing the lawsuit as an opportunity to acquire its hospitals and thereby "resolve" the suit.  As CarePoint wrote only months after filing:

> "Because of the pending litigation …, RWJ Barnabas has a unique opportunity to enter into some arrangement or transaction with CarePoint.  CarePoint is willing to end the litigation in connection with any business arrangement with RWJ."

Barnabas refused to capitulate.  But the Court-ordered mediation had served its purpose—it created the appearance of a stalking horse and drew HRH to the table.

11.    CarePoint then succeeded in turning HRH from adversary to ally, joining forces in their own conspiracy against their common rival, Barnabas.

12.    In late 2024, HRH and CarePoint struck a new bargain.  After years trying to stave off bankruptcy, CarePoint made an abrupt U-turn, embracing the process to its own advantage.  Through a series of transactions prior to, but culminating in, a pre-packaged bankruptcy plan, CarePoint transferred control of its hospitals to HRH in exchange for the creation of massive new debt—obligations that HRH then used to settle CarePoint's conspiracy claims against it and to acquire CarePoint's remaining claims against Barnabas.

13.    This collusive conduct between HRH and CarePoint had a singular purpose:  to enable HRH to recoup from Barnabas the $270 million it had spent executing its takeover scheme.  The deal transformed HRH – the very party accused of conspiring with Barnabas – into both a settling defendant and the controlling

beneficiary of those same allegations, giving it consent powers over all future litigation decisions and entitling it to the lion's share of any recovery.

14.    HRH embraced its new role with a vengeance.  Upon the effective date of the CarePoint Litigation Trust on May 22, 2025, HRH deposited $3.5 million into a litigation fund and directed the Trust to continue prosecuting the claims against Barnabas.  With HRH's consent and complete control, the Trust pressed forward, continuing to assert allegations HRH and the Trust knew – with absolute certainty and beyond a shadow of a doubt – were false, including the following:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe **[HRH]**."

- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land

transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "The plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, [and] Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh."[2]

15.     Each of these allegations cast HRH as a central participant in a supposed conspiracy with Barnabas—a conspiracy HRH knows never existed.  What began as a figment of CarePoint's imagination has now been ratified by HRH and the Trust.  That is sham litigation.  HRH cannot hide behind "information and belief" pleading standards when the allegations concern *its own conduct*.

16.     Nor was HRH required to permit these fraudulent allegations to persist. The Bankruptcy Court gave HRH the right to do the right thing.  It was given **sole** authority – and the responsibility – to stop the Trust's assertion of these knowingly false allegations.  Instead, HRH compelled the Trust to do the opposite:  to abandon

---

[2] TAC ¶¶ 8, 19 & n. 2, 21, 115, 116, 149, 183, & p. 34

its duty of candor to the Court in an effort to offset the $270 million HRH spent to secure control of the hospitals.

17.     Even apart from the false allegations, HRH has perverted the legal process to its own ends, seeking to unjustly enrich itself at Barnabas's expense. Either the heart of the case – the conspiracy allegation – is false, in which case HRH and the Trust are perpetrating a fraud on the Court, *or* those allegations are true, in which case HRH would be capitalizing on its own wrongdoing.  It cannot have it both ways.  But in either event, HRH's direct or indirect recovery constitutes unjust enrichment.  As a wrongdoer, HRH cannot collect from its alleged co-conspirators the costs it incurred in carrying out the wrongful scheme.

18.     HRH's misconduct, however, extends even further.  It is using this lawsuit not just to extract money from Barbabas, but to eliminate competition in the City of Bayonne for emergency services.  Barnabas is the only meaningful constraint on HRH's exercise of monopoly power, through its satellite emergency department ("SED") operating in Bayonne.  But because HRH has no claim against Barnabas, it used its dominion over the Trust to force the Trust to do its bidding.  The Trust – a non-operating entity whose sole purpose is to monetize CarePoint's *past* damages claims – has no cognizable interest in the future competitive dynamics of the City of Bayonne Emergency Services Market.  Only HRH has that interest.  HRH's use of this lawsuit, in concert with the Trust, constitutes a conspiracy in restraint of trade,

unlawful monopolization, attempted monopolization, and conspiracy to monopolize in violation of the Sherman Act.

19.     Through its counterclaim and third-party complaint, Barnabas seeks to put a stop to HRH's misuse of the judicial process, prevent HRH from profiting from its own wrongdoing, and restore fair competition in the City of Bayonne Emergency Services Market.  HRH's conduct – its conspiracy with Eisenreich, its conspiracy with CarePoint, its acquisition and misuse of CarePoint's claims against Barnabas, and its conspiracy with (and control over) the Trust – violates the most basic principles of equity, the integrity of the courts, and the nation's antitrust laws.  Unless enjoined, HRH will continue to exploit the Trust to enrich itself at Barnabas's expense, suppress competition, and harm the patients and community who depend on lawful and accessible emergency medical care in Bayonne.

## THE PARTIES

20.     **Barnabas**.     Counterclaim/Third-Party Complaint Plaintiff and Defendant RWJ Barnabas Health, Inc. is a not-for-profit health system organized under New Jersey law with its principal place of business in West Orange, New Jersey.     Barnabas operates a state-approved Satellite Emergency Department ("SED") in the City of Bayonne.

21.     **The Trust**.     Counterclaim-Defendant and Substituted-Plaintiff the CarePoint Litigation Trust (the "Trust") is a trust created in connection with

CarePoint's Bankruptcy Plan. The CarePoint Litigation Trust became effective on May 22, 2025, and was substituted as plaintiff in this action by Court Order dated July 23, 2025. ECF 238 at 1; ECF 260. Nominally organized to hold and prosecute litigation claims for the benefit of CarePoint's creditors, the Trust is controlled by HRH. Its Trustee, Paul Navid, serves subject to HRH's exclusive consent and veto rights.

22.    **HRH.**    HRH refers collectively to the third-party defendant HRH entities: NJMHMC, LLC; NJBMCH, Inc.; 29 E 29 Street Holdings, LLC; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; and Hudson Regional Hospitals, LLC. Each of these individually named Defendant entities is part of a comprehensive corporate structure that controls and operates 80% of the hospitals located in Hudson County, New Jersey, including Bayonne Medical Center, which for a substantial portion of the relevant period was the sole provider of emergency medical services in Bayonne, New Jersey. HRH's component entities are all affiliates of one another, and coordinated and operated as a unified whole in pursuit of the anticompetitive conspiracy such that they can reasonably be referenced as a unified whole.

23.    **NJMHMC, LLC.**    Third-Party Defendant NJMHMC, LLC, doing business as Hudson Regional Hospital, is a New Jersey limited liability company with its principal place of business located at 55 Meadowlands Parkway, Secaucus,

New Jersey. NJMHMC, LLC is the licensee and operator of Hudson Regional Hospital and is the primary business entity through which the HRH organization transacts business in the marketplace.

24. **NJBMCH, Inc.** Third-Party Defendant NJBMCH, Inc. is an HRH-owned and -controlled New Jersey corporation with its principal place of business located in Secaucus, New Jersey. NJBMCH, Inc. is a holding company created by Mr. Yan Moshe, to receive the assets and perform the services identified in the January 2024 Term Sheet executed with CarePoint relating to HRH's acquisition of CarePoint's Bayonne Hospital and control over the entire CarePoint system.

25. **29 E 29 Street Holdings, LLC.** Third-Party Defendant 29 E 29 Street Holdings, LLC, is an HRH-owned and -controlled New Jersey limited liability company with its principal place of business located at 32 Farmstead Lane, Glen Head, New York 11545. 29 E 29 Street Holdings, LLC owns the real estate under the Bayonne Medical Center.

26. **Bayonne Medical Center Opco, LLC.** Third-Party Defendant Bayonne Medical Center Opco, LLC, is an HRH-owned and -controlled New Jersey limited liability company with its principal place of business located in Secaucus, New Jersey. Bayonne Medical Center Opco, LLC functions as the operating company for Bayonne Medical Center and is named as the Debtor-in-Possession Lender to CarePoint under CarePoint's Bankruptcy Plan.

27.    **Hudson Regional Management, LLC.**    Third-Party Defendant Hudson Regional Management, LLC is a partially HRH-owned and -controlled New Jersey limited liability company.  According to the bankruptcy management services agreement ("MSA"), Hudson Regional Management, LLC is the entity established to provide administrative oversight services to the CarePoint hospitals, and is owned 50%-50% by CarePoint and an entity designated by Yan Moshe.

28.    **Hudson Regional Hospitals, LLC.**  Third-Party Defendant Hudson Regional Hospitals, LLC, doing business as Bayonne Medical Center, is an HRH-owned and -controlled New Jersey limited liability company.  Hudson Regional Hospitals, LLC is an entity identified in CarePoint's bankruptcy as a party to a Binding Term Sheet with CarePoint Health Systems, Inc. and to the Collateral Surrender and Operations Transfer Agreement in connection with the transfer of Bayonne Medical Center.

29.    HRH is the Trust's primary beneficiary and holds exclusive consent rights over all litigation decisions undertaken by the Trust in this action.  HRH is a direct assignee, beneficial owner, and real party in interest with respect to the claims asserted by the Trust in this action.  HRH also controls, jointly with Dr. Achintya Moulick, the operations of Bayonne Medical Center ("Bayonne"), Hoboken University Medical Center ("Hoboken"), and Christ Hospital ("Christ," and together with Bayonne and Hoboken, the "CarePoint Hospitals") under a Management

Services Agreement.  By virtue of its entitlement to the profits of the CarePoint Hospitals and control over their operations, HRH is also a real party in interest with respect to claims relating to the anticompetitive conduct alleged herein.

**UNNAMED CO-CONSPIRATORS**

30.     To carry out their scheme, the Counterclaim/Third-Party Complaint Defendants conspired with several other persons and entities, each an unnamed co-conspirator.

31.     **Counterclaim/Third-Party Complaint Defendants' Affiliates, Employees, and Consultants**.  Each Counterclaim-Defendant and Third-Party Defendant conspired with its affiliates, employees, and consultants to bring about the actions alleged herein.  While all such affiliates, employees, and consultants are not separately named as Counterclaim/Third-Party Complaint Defendants, they participated in unlawful acts in furtherance of the alleged conspiracy.

32.     **CarePoint**.  CarePoint, also referred to as the CarePoint debtors, consists (or consisted at relevant times) of numerous affiliated entities, including CarePoint Health Systems, Inc.; IJKG, LLC; IJKG OPCO, LLC; Hudson Hospital Opco LLC; and HUMC Opco LLC; as well as their parents, subsidiaries, affiliates, employees, advisors, and consultants.  Such entities and persons participated in the conspiracy alleged herein.

33.     **Avery Eisenreich**.  Avery Eisenreich, including through the entities he directly or indirectly controls, and employees or consultants of such entities, participated in the conspiracy alleged herein.  Such entities and persons controlled directly or indirectly by Mr. Eisenreich include Alaris Health; WTFK Bayonne Propco LLC; SB Holdings, LLC; SB Hoboken Propco, LLC; and David Sussman.

34.     **Individual Co-Conspirators**.  Individual co-conspirators, acting either in their personal capacity or as employees, officers, or directors of Counterclaim/Third-Party Defendants or unnamed co-conspirators include HRH's Owner and Chairman Yan Moshe, CarePoint's Founders Vivek Garipalli, James Lawler, and Jeffrey Mandler (together, the "Founders"); CarePoint's consultant Lou Modugno; and former CarePoint President and Chief Executive Officer Dr. Achintya Moulick.  Such persons participated in the conspiracy alleged herein.

## JURISDICTION AND VENUE

35.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Barnabas asserts claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

36.     The Court has supplemental jurisdiction over Barnabas's state law claims against the Trust under 28 U.S.C. § 1367(a), and Federal Rule of Civil Procedure 13(a), because this claim arises out of the same nucleus of operative facts

and form part of the same controversy as (i) Barnabas's federal claims against the Trust; and (ii) the Trust's affirmative claims against Barnabas.

37.    The Court has supplemental jurisdiction over Barnabas's state law claim against HRH under 28 U.S.C. § 1367(a), and Federal Rule of Civil Procedure 14(a), because this claim arises out of the same nucleus of operative facts and form the same controversy as Barnabas's federal claims against HRH, and because HRH is or may be liable to Barnabas for all or part of the Trust's affirmative claims against Barnabas.

38.    The Court has personal jurisdiction over the Trust because it has pursued this litigation in this Court and, therefore, has consented to personal jurisdiction or waived any objection thereto.  The Court has personal jurisdiction over the Trust pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, based on the Trust's nationwide contacts.  The Court can also assert general personal jurisdiction over the Trust based on the citizenship of its beneficiaries, including HRH, which has its principal place of business in New Jersey.  The Court has specific personal jurisdiction over the Trust because the claims arise in whole or in part out of transactions and tortious conduct in which the Trust engaged in this District and that were expressly aimed at, and caused injury in, New Jersey.

39.    The Court has personal jurisdiction over HRH pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, based on HRH's nationwide contacts.  The Court

can also assert general personal jurisdiction over HRH because it has its principal place of business in New Jersey. The Court has specific personal jurisdiction over HRH because the claims arise in whole or in part out of transactions and tortious conduct in which HRH engaged in this District and that were expressly aimed at, and caused injury in, New Jersey.

40.    Venue is proper under 28 U.S.C. § 1391, 15 U.S.C. § 22, and Federal Rules of Civil Procedure 13 and 14 because a substantial part of the events or omissions giving rise to these claims occurred in this District, and both HRH and the Trust are subject to personal jurisdiction here. Both HRH and the Trust reside in, transact business in, and can be found in this District, and a substantial portion of their unlawful conduct has been carried out in this District.

## FACTUAL ALLEGATIONS

### A.    *The Birth of CarePoint.*

41.    In 2008, a financial analyst, Vivek Garipalli, together with James Lawler and Jeffrey Mandler acquired Bayonne Medical Center out of bankruptcy. A few years later, they acquired Hoboken University Medical Center and Christ Hospital, consolidating the three facilities under the CarePoint banner. Through these acquisitions, the Founders secured control of most inpatient and emergency room services in Hudson County, and crucially, achieved a monopoly over

emergency services in the City of Bayonne, where no other emergency facility operated at that time.

42.    From inception, the Founders' goal was to divert hospital revenues for their own personal profit.  To accomplish this, the Founders developed what CarePoint itself describes as a "byzantine network of shell companies," which they used to extract **over a billion dollars** from the system through self-dealing transactions.[3]  As CarePoint admitted to a federal Bankruptcy Court:

> "After acquiring the Hospitals from prior bankruptcies, the [Founders] proceeded to extract … millions of dollars from the Hospitals through numerous *questionable transactions* and transfers, including without limitation, **sale-leaseback transactions**, **inflated management fees** (for which little or **no services** were provided) paid to related entities, and *diversion of corporate assets to personal use*….

> The [Founders] *systematic siphoning* **of Debtors' assets for over a decade**, among other factors, rendered the Debtors insolvent, left them with insufficient capital, and **weakened** them to the point they became virtually *unviable as going concerns.*"[4]

### 1.    The Founders Extract Cash Through Sale-and-Leaseback Transactions.

43.    When most people think of a hospital, they picture a building with hospital beds, medical equipment, and staff working seamlessly to treat patients.  But the Founders saw something else:  an opportunity to extract exorbitant sums of cash.

---

[3] *In re CarePoint Health Systems, Inc., et al.*, Case No. 24-bk-12534 (JKS), Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization, Bk. ECF 522 at 35-36, (Jan. 21, 2025 Bankr. D. Del.).

[4] *Id*.

They realized they could separate the CarePoint Hospitals' most valuable assets – the underlying real estate – from their operations and use that division to generate immediate personal profit.

44.    To execute this plan, the Founders divided each of the CarePoint Hospitals into an operating company ("OpCo") and a property-holding company ("PropCo"), all of which rolled up to holding companies initially under the Founders' common control.    The OpCos managed the CarePoint Hospitals' day-to-day operations, while the PropCos owned the underlying real estate, buildings, and facilities.  Once this bifurcated structure was in place, the Founders sold off interests in the hospital real estate to outside investors, extracting ***over $100 million*** in sale-and-leaseback transactions.  Specifically:

- In February 2011, CarePoint sold 100% of its interest in the Bayonne real estate for $58 million to Medical Properties Trust ("MPT"), a national publicly traded REIT.

- That same year, the Founders sold a 70% interest in the Hoboken real estate to MPT for $50 million.

- In 2012, CarePoint sold 25% of its interest in the Christ real estate to Avery Eisenreich for $10 million.

Through the proceeds from the real estate sales and the receipt of subsequent inflated rental payments under leases for Christ and Hoboken, hundreds of millions of dollars were funneled to Founder-controlled entities for personal or non-hospital purposes.

45.     But these sale-and-leaseback transactions were shortsighted.  Yes, they generated short-term liquidity.  But they permanently stripped the CarePoint Hospitals of their core assets.  As CarePoint would later regrettably acknowledge, these deals gave the new landlords – Avery Eisenreich and MPT – "veto" rights over any subsequent sale of the CarePoint Hospitals, ensuring the CarePoint Hospitals could never be sold or financed free and clear by CarePoint or the Founders.

### 2.     The Founders Extract Cash Through Fictitious "Tax Distributions."

46.     The Founders also funneled millions of dollars out of the CarePoint Hospitals through so-called "tax distributions."  These distributions were labeled as payments to cover tax liabilities supposedly incurred by the Founders as members of the various hospital entities.  In reality, the label "tax distributions" was a pretext to disguise outright withdrawals of hospital cash for personal use.

47.     By mischaracterizing such transfers, the Founders withdrew *over $200 million dollars* that should have, and otherwise would have, been reinvested in patient care and hospital operations.  As early as 2015, CarePoint's creditors began challenging these transactions, alleging that the Founders had extracted tens of millions of dollars beyond any legitimate tax exposure, that such distributions "bore no relationship whatsoever to taxes imposed on [the Founders], and served no

purpose other than to knowingly and fraudulently deprive" creditors of their rights to hospital-generated revenues.[5]

### 3.    The Founders Extract Cash Through Fraudulent or Inflated Related-Party Transactions.

48.    The Founders also engaged in scores of related-party transactions, including sham transactions, to funnel *additional* funds to Founder-related entities and to shield assets from creditors.  To this end, the Founders created a parallel network of affiliated service and management entities, also owned by the Founders, that entered into no-bid contracts with the CarePoint Hospitals for non-existent or inflated "management" or administrative services.

49.    Chief among these entities were two "management companies," Sequoia Health Management, LLC and IJKG, LLC.  Tellingly, neither entity had any employees, business premises, operating infrastructure, or notable business expenses.  Nor did these companies provide any actual services to the CarePoint Hospitals.  Nevertheless, the Founders caused the CarePoint Hospitals to enter into contracts – in which CarePoint Founder Vivek Garipalli signed on behalf of both parties – obligating Bayonne to transfer 95% of its net profits to IJKG, while Hoboken and Christ would transfer 4% of their gross revenues (before expenses such as band-aids, medicines, salaries, and equipment) to Sequoia.  These arrangements

---

[5] *California Capital Equity, LLC v. IJKG, LLC*, Case No. 652373/2015 (July 2, 2025 N.Y. Sup. Ct.), Complaint ¶ 5.

alone siphoned ***more than $300 million*** from the CarePoint Hospitals to the Founders for fictitious or duplicative services.

50.    To accelerate their burgeoning personal enrichment, the Founders also monetized the *future* revenue streams created through their fraudulent management services contracts.  In 2014, the Founders directed Sequoia to obtain a ***$60 million*** loan from Credit Suisse backed by future management fees and guarantees from the hospital OpCos, effectively transforming projected bogus income into a very real, very immediate lump-sum cash payout.  These funds were used for the Founders' personal benefit and/or to finance the Founders' other personal business ventures. The Founders also caused the CarePoint Hospitals to incur more than ***$100 million*** in other Founder-related debt, through shell companies, such as Maple Healthcare LLC.

51.    The Founders knew that these transactions were fraudulent. ▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



Though this particular transaction did not materialize, the Founders used similar tactics to extract all available funds from the CarePoint Hospitals.

52.



The concealment of the flow of funds was an integral part of the Founders' cash extraction scheme.

53.    Beyond these fictious management services contracts, the Founders also directed the CarePoint Hospitals to enter into a patchwork of inflated, related-party transactions – covering everything from billing to housekeeping – with



---

[7] The "Nurses' Union" refers to Health Professionals and Allied Employees (HPAE).

affiliates they secretly owned or controlled.  None of these contracts were subject to competitive bidding or fair market value review.  Collectively, these arrangements diverted an additional **$400 million** in hospital funds to the Founders or Founder-related entities.

      **B.**     ***CarePoint Gouges Patients and Payors to Funnel Funds to the Founders.***

     54.    For many years, CarePoint funded the extraordinary and exorbitant payments to the Founders by gouging patients and payors.  According to data collected by the Centers for Medicare and Medicaid Services (CMS), CarePoint had some of the highest prices of any hospital in New Jersey and throughout the nation.



Source: Medicare Provider Inpatient Charge Data for FY2011



Cost of treating chronic obstructive pulmonary disease in 2011 at local hospitals.  Bayonne's prices shown in red.

55.    To charge such exorbitant rates, CarePoint terminated insurer contracts that capped reimbursement rates.  CarePoint recognized that it possessed monopoly power over General Acute Care (GAC) services in Hudson County and, especially, over emergency services in the City of Bayonne as the city's only emergency department prior to Barnabas's entry in 2017.  By terminating its insurer contracts and going out of network, CarePoint was able to unilaterally dictate out-of-pocket prices to patients and payors.

56.    Under the Founders' control, reimbursement rates drastically increased, and the CarePoint Hospitals became some of the most expensive hospitals in the nation, more than premier institutions like the Mayo Clinic.

### C.    *The Founders' Scheme Begins to Collapse.*

57.    Monopolies are not everlasting.  Nor are fraudulent schemes.  As the Founders' scheme grew, cracks in the foundation began to appear.

### 1.    *The Founders Starve the Hospitals of Necessary Investment and Resources, Reducing Patient Demand.*

58.    As the Founders extracted unprecedented sums, they starved the hospitals of essential resources.  Expenditures on medical equipment, patient care, and maintenance were slashed.  CarePoint fired or laid off many employees, reduced wages below the prevailing market rates, and cut back on all non-essential expenses.

59.    In several instances, CarePoint stopped paying vendors, including essential chemical and pharmaceutical providers, and even exterminators.  The Founders also closed down specific service lines at the CarePoint Hospitals, including the pediatric unit at Christ.  These reductions maintained the flow of funds to the Founders in the short run, but severely degraded the quality of the CarePoint Hospitals, ultimately driving patients away and irreversibly affecting the long-term viability of the CarePoint system.

### 2.    *The Founders' Extraction of Monopoly Profits Sparks Barnabas's Entry into Bayonne.*

60.    The backlash against CarePoint was severe, particularly from insurers who were legally obligated to pay CarePoint's increasingly unreasonable rates.  As CarePoint explained, its efforts to increase rates "caused a great deal of tension

between Horizon and CarePoint, … [since] Bayonne Medical did not participate in Horizon's network at the time."[8]

61.    At the same time, Barnabas – New Jersey's largest non-profit, charitable hospital system – was looking for ways to reach more patients in need throughout the state.  In 2017, with the support of community leaders, 450 citizen petitioners, insurers, and others, the Department of Health approved Barnabas's application to open a Satellite Emergency Department ("SED") in the City of Bayonne.  As the New Jersey Department of Health stated,

> "The Department has conducted its own analysis … and found that the data … supported [Barnabas's] position that the proposed SED in Bayonne would eliminate or substantially mitigate problems of access to appropriate emergency care in Bayonne….
>
> The data showed … that there is, indeed, a problem of access to appropriate emergency care in Bayonne.
>
> The data also showed [that there were thousands of patients] who had healthcare insurance in which Bayonne Medical Center is currently out-of-Network.  [Barnabas] on the other hand … remains in-network for the majority of health insurances plans in the region."

62.    Once the Department of Health approved Barnabas's SED application, patients and payors had a viable choice for emergency care for the first time since the Founders took control of Bayonne in 2008. ████████████████

████████████████████████████████████████

---

[8] TAC ¶ 60.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

### 3. The Legislature Passes the Out of Network Act to Limit CarePoint's Price Gouging.

63.    CarePoint's relentless price gouging also drew the attention of the New Jersey Legislature, culminating in the passage of 2018 Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act (the "Out of Network Act"), N.J. Stat. Ann. §§ 26:2SS-1.  By imposing mandatory arbitration, the Act prevented out-of-network healthcare providers, such as CarePoint, from charging excessive rates for emergency care.  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

64.    The Out of Network Act obliterated the Founders' cash extraction scheme because it relied so heavily on this source of income.  ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████  After the Out of Network Act, Christ had to close many departments, ████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

#### 4.    The SCI Investigates CarePoint's Fraudulent Misuse of Corporate Assets for Personal Gain.

65.    Around the same time, the New Jersey State Commission of Investigation (SCI) opened a fraud investigation targeting CarePoint and the Founders specifically.

66.    The SCI is a government investigative agency tasked with rooting out organized crime.  Ultimately, the SCI found that the Founders had siphoned off at least $157 million in questionable payments in just four years.  As the SCI found, Christ paid management fees to Sequoia that were nearly 460% greater than its net operating income.  The Founders also extracted over $98 million from Bayonne.  These amounts dwarfed the hospitals' own operating margins and brought "into question [the hospitals'] long-term financial viability."

67.    To resolve the SCI investigation, the Founders agreed to terminate their sham management contracts.  But this was for appearances' sake only.  The Founders had come to rely on the money they siphoned from the CarePoint Hospitals and needed that revenue stream to continue to fund their debt obligations, other business ventures, and lavish personal lifestyles.  To replace the bogus management fees, the Founders increased their bogus "tax distributions." ████████████████████

████████

68.    The other Founders agreed. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Despite the SCI's findings, the Founders

continued to extract over ████████████████████████████████████████

████, even as CarePoint laid off employees and informed the Department of Health

that closure of Christ Hospital was imminent.

D.    **The Founders Initiate a Sales Process to Extract the Last Pennies from the CarePoint System Before Off-Loading Its Distressed Assets.**

1.    **The Founders' Attempt to Conceal the CarePoint Hospitals' Distress.**

69.    By late 2018, the CarePoint Hospitals were hemorrhaging cash.  The

Founders' cash-extraction schemes had left the institutions overleveraged,

undercapitalized, and unable to attract outside investment.  Each facility was ████

████████████████████████████████████████████████

████████████████████████████████

70.     In response, the Founders mobilized a crisis task force of executives, investment bankers, lawyers, and consultants to orchestrate the Founders' hasty exit. This task force publicly presented the Founders' exit plan as an effort to "preserve access to care." ████████████████████████████████████

████████████████████████████████████████████

71.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

72.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

73.     The marketing materials prepared by CarePoint's investment bankers also contained numerous material misstatements and omissions. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

74.    At the same time, lenders were ███████████████████████████████

██████████████████████████████████████ forcing CarePoint

to seek additional loans to fund payroll, send layoff notices, close patient care departments, and prepare to put one or more of the hospitals into bankruptcy.

### 2.    The Proposed Sale of Hoboken and Bayonne to Atlantic Falls Through Over a Dispute with MPT of Land Valuation.

75.    Despite casting a wide net for potential buyers, there was limited interest.  Only two serious bidders emerged—Barnabas and Atlantic Health.  Barnabas submitted its draft non-binding Letter of Intent on July 3, 2019, and Atlantic followed in early August 2019.

76.    Neither Barnabas nor Atlantic, however, was interested in buying the entire CarePoint system.  Barnabas wanted to acquire Hoboken and Christ, viewing them as potential complements to its existing facility in Jersey City.  Conversely, Atlantic was interested in Hoboken and Bayonne, but believed Christ was too far gone to be salvaged.

77.    Initially, the Founders celebrated having two competitive bids, believing that the exclusivity of each (both wanted Hoboken) might drive up the price.  But in reality, it meant that any sale would entail closing at least one hospital,

a prospect that would have dissipated the value (if any) of the closing hospital, invited public and regulatory backlash, and caused any remaining value of the system to evaporate. The Founders initially chose to focus on the Atlantic bid, reasoning that Bayonne's monopoly power over emergency services made it more valuable than Christ.

78.     By late August 2019, the Founders had rejected Barnabas's offer to acquire Hoboken and Christ. But in late September, the Atlantic bid ran into trouble. CarePoint could not sell the entirety of Bayonne and Hoboken; it could only sell its interest in the operating companies. Because CarePoint sold the real estate under those two hospitals to MPT through prior sale-and-leaseback transactions, it could not deliver the hospitals free and clear. This created a divergence of interest – and ultimate stalemate – between CarePoint and the Founders on one hand, and MPT on the other, as each sought to maximize their own share of the proceeds at the others' expense. By mid-October 2019, the would-be deal with Atlantic collapsed.

### 3.     *The Proposed Sale of Hoboken and Christ to Barnabas Falls Through Due to Founder Greed, Founder Disputes with Eisenreich, and Continued Deterioration of Assets.*

79.     As CarePoint was pursuing the Atlantic negotiations, Eisenreich, as a partial owner of Christ, became increasingly concerned that he would be left out in the cold. Because the Founders also had an interest in trying to find a buyer for Christ, ███████████████████████████████████████████████ On

September 23, 2019, Barnabas submitted a Letter of Intent to acquire the Christ OpCo, contingent on negotiating an acceptable lease.

80.    Eisenreich, however, was concerned that a Christ-only proposal would not be acceptable, and so he developed a plan that would keep all three hospitals open.    On September 22, 2019, Eisenreich texted CarePoint's consultant and confidant, Lou Modugno.  Eisenreich explained to Modugno that he may "have a plan that can work for EVERYONE." ██████████████████████

████████████████████████████████████████████

██████████████████

81.    ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████    But the more Garipalli learned more about the plan, the more enamored with it he became.

82.    Under  the  plan, ███████████████████████████

████████████████████████████████████████████

████████████████████████████  ███████████████

██████████████████████████████████████████

83.    Because the Founders wanted ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



─────────────────────────

█ ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████    ██    Despite being aware of these conversations, at no time did CarePoint tell MPT or Barnabas that they were precluded from discussing a potential transaction with Eisenreich. Nor could they, as any such instructions would constitute unlawful tortious interference with Eisenreich's prospective business relationships.

84.    By the end of October and into early November, Eisenreich and the Founders had completed step one of their plan: ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

85.    ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

─────────────────────

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████

████████████████

86.    Angry at Eisenreich, the Founders attempted to obstruct further negotiations with Barnabas over the lease.  Eisenreich then countered with exorbitant rent demands that made the deal economically infeasible for Barnabas.  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████  ███████████████████████

███████████████████████████████████████████████

███████████████████████

87.    Rather than reduce their demands, however, the Founders ratcheted them up.  In March 2020, Barnabas submitted a revised offer of $185 million for the Hoboken and Christ OpCos and the related real estate.  This was *higher* than the amount it had previously offered in the LOI both parties signed in October 2019. Garipalli, however, rejected this offer.  Garipalli now demanded that Barnabas "get the total purchase price up to $230 million ([up] from the initially offered $185

---

█ ████████████████████████████████████████████████
███████████████████████████████████████████

million)," an increase of nearly 25% over Barnabas's already-improved offer. Barnabas rejected CarePoint's demands.

    **E.**    ***HRH Enters into Several Conspiracies to Drive CarePoint into Bankruptcy and Recoup its Costs.***

        **1.**    ***HRH Conspires with Avery Eisenreich to Drive CarePoint into Bankruptcy.***

88.    In November 2019, HRH became interested in acquiring Bayonne Medical Center. ████████████████████████████████████████ ████████████████████████████████ Then, in January 2020, HRH "approached CarePoint about a possible acquisition of all or part of … CarePoint."

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

89.    CarePoint viewed HRH as an ideal partner for a quick deal given HRH's CEO, Nizar Kifaieh, was a CarePoint insider and former CarePoint executive. ████████████████████████████████████████

████████████████████████████████████████████████████

90.    Almost immediately, however, the discussions broke down over the allocation of the purchase price between the OpCo and the PropCo. The Founders believed they could use their political clout – and their threat of imminent closure of

the hospital – to force Eisenreich to sell the real estate for well below its fair market value.  Eisenreich, on the other hand, believed that the hospital operations were near insolvent, and that the hospital's only truly valuable asset was the building and associated real estate.  His demands reflected his estimation of value.

91.    By March 2020, the dispute among the Founders and Eisenreich came to a head, with HRH stuck in the middle.  On March 11, 2020, the Founders rejected any transaction that would not personally benefit them to the tune of tens of millions of dollars. ███████████████████████████████

███████████████████████████████████████████

███████  Because paying the Founders for the fraudulent debt Bayonne had incurred over the years would have reduced the amount of money available to acquire the real estate, a three-party transaction between HRH, the Founders, and Eisenreich did not work.

92.    Two weeks later, on March 23, 2020, the Founders took the next step in their plan to force Eisenreich to sell the Bayonne real estate for below market value.  They entered into a Letter of Intent with a newly-created entity, BMC Hospital, LLC, to acquire the Bayonne OpCo.  The Founders knew that this was not a bona fide offer because it was contingent on a hypothetical world in which the government strips Eisenreich of his property interest without fair compensation.

███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ █

93.     With the BMC LOI in hand, the Founders engaged in an intense lobbying effort to secure support for their plan, in which they threatened closure of Bayonne if it were not accepted.  On May 14, 2020, the Hudson County Board adopted three resolutions authorizing the Hudson County Improvement Authority to condemn the Christ, Bayonne, and Hoboken Properties "in accordance with and in the manner provided by the Eminent Domain Act."

94.     HRH and Eisenreich did not take the Founders' plan sitting down.  They responded with a deal of their own.  On the same day as the Condemnation Resolutions, █████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

95.     Meanwhile, BMC LLC and CarePoint executed an Asset Purchase Agreement on June 1, 2020, and submitted the sale the next day to the NJDOH for approval.

_____

█ ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████

96.     Immediately after the BMC agreement was announced, HRH announced it had agreed to acquire both the Bayonne and Hoboken real estate from Eisenreich for $220 million, $76 million of which was allocated to Bayonne, ████ ████████████████████████████████████████ Eisenreich and HRH then acted in concert to issue notices of default and institute eviction proceedings against CarePoint.

97.     On August 10, 2020, HRH, through its controlled affiliate, 29 E 29 Street Holdings, LLC, acquired the real property under BMC from Eisenreich, and became the successor in interest to Eisenreich's rights under the lease.

98.     In response to these eviction proceedings, CarePoint countersued.  On June 4, 2020, CarePoint filed suit in the Superior Court of New Jersey against HRH.[13]  CarePoint accused HRH of "conspiring with Avery Eisenreich" to "thwart" the sale of the "Hoboken and Christ Hospitals to RWJ Barnabas" and to sell Bayonne Medical to BMC Hospital LLC." ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████

---

[13] *IJKG Opco, LLC v. NJMHMC LLC, et al.,* HUD-C-000087-20 (Jun. 4, 2020 Super. Ct. N.J.), ¶¶ 6, 154.

99.    Ultimately, HRH spent over $270 million to force CarePoint into bankruptcy in its effort to take control of the Bayonne hospital.

**F.    CarePoint Uses Litigation to Try to Force Potential Bidders to Acquire CarePoint.**

100.    By mid-2022, CarePoint was still hemorrhaging cash, and remained unable to find a willing buyer for any of the three hospitals.  At that point, the Founders decided to wash their hands of CarePoint.  They recognized that the operating companies were no longer able to pay their debts, let alone funnel money to them for their personal use.  Because the CarePoint Hospitals were insolvent, the Founders decided to "donate" their interests in the CarePoint operating companies by converting them to a new non-profit entity, CarePoint Health Systems, Inc.

101.    The Founders believed that they would personally benefit from the conversion to a non-profit in two ways.  *First*, they intended to take a tax deduction based on an inflated value of the CarePoint entities.  Since the hospitals were insolvent, the Founders' equity had no value (as the subsequent bankruptcy would prove).  Thus, any tax deduction for the donation was, or would have been, fraudulent.[14]  *Second*, prior to the bankruptcy, the Founders had loaded the operating companies with over $100 million in founder-related debt.  The Founders maintained

---

[14] The Founders, despite being compelled to do so (ECF 221), refused to produce their tax returns in this litigation, so the amount, if any, of the actual tax deduction is unknown at this point.

their claims to recover such funds, despite the new non-profit status of the operating companies.

102. The conversion to a non-profit would benefit the CarePoint Hospitals because the state would step in to provide tens of millions of dollars in stop-gap funding to prevent their closing. Nonetheless, such funds were a temporary band-aid at best. CarePoint's new leadership, helmed by CEO Achintya Moulick, decided that the best way to sell the hospitals was to use the courts as leverage.

103. Pursuant to this plan, CarePoint, under the direct leadership of Moulick, sued *Barnabas* and used the suit against it to extract a settlement in which HRH would become the *de facto* successor-in-interest to CarePoint.

### 1. *The Barnabas Litigation.*

104. By late 2022, any hope of a transaction with a third-party purchaser for the CarePoint Hospitals had vanished. The only party CarePoint believed could be brought back to the table was Barnabas, but it needed a way to force Barnabas to acquire the defunct hospitals notwithstanding Eisenreich's and HRH's property interests. Its solution was to assert frivolous litigation against Barnabas, accusing it of conspiring with Eisenreich and HRH.

105. CarePoint hoped that the lawsuit would ultimately force Barnabas to acquire the CarePoint Hospitals. As its counsel wrote on February 8, 2024,

> "CarePoint… will shortly be soliciting the interest of other New Jersey nonprofit health systems in a merger with CarePoint to strengthen

CarePoint's presence as the leading provider of acute hospital care in Hudson County.

**Because of the pending litigation** ..., RWJ Barnabas has a unique opportunity to enter into some arrangement or transaction with CarePoint. **CarePoint is willing to end the litigation in connection with any business arrangement** with RWJ which results in the continuation of patient care at the CarePoint hospitals."[15]

106. The lawsuit CarePoint asserted against Barnabas contained knowingly false allegations. Within days of filing the lawsuit, CarePoint was forced to retract significant portions of its claims. As CarePoint's CEO Dr. Moulick explained at the time, such allegations were "baseless and without merit."[16]

107. Even aside from the withdrawn allegations, the Complaint *still* contained materially false allegations. In particular, CarePoint alleged – for the first time – that Barnabas masterminded the conspiracy between Eisenreich and HRH to interfere with the Founders' sales process and drive CarePoint into bankruptcy. Specifically, as it relates to HRH, CarePoint alleged that:

- "RWJ's conspirators have included real estate players Avery Eisenreich ... and Yan Moshe."

- "RWJ and its conspirators including ... HRH, ..., Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and

---

[15] The email referenced in this paragraph is not covered by any settlement privilege. Fed. R. Evid. 408 does not apply because the email is not being used to prove or disprove the validity of any claim, and the parties specifically exempted any communications prior to February 9, 2024, including this email, from their March 1, 2024 mediation stipulation.

[16] David Wildstein, *Hospital boss apologizes to Murphy, staff for 'baseless' statements*, New Jersey Globe, June 14, 2023 (accessed Nov. 2, 2025).

underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "[T]he plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, and Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh."[17]

---

[17] TAC ¶¶ 8, 19 & n.2, 21, 115-16, 149, 182-83, & at 34.

108.    CarePoint knew that these allegations were baseless and without merit. The complaint alleged no facts concerning Barnabas's alleged role in any conspiracy between Eisenreich and HRH.  Moreover, in CarePoint's previous telling of its conspiracy theory involving Eisenreich, MPT, and HRH, CarePoint alleged that Barnabas was the *victim* of the alleged conspiracy—not a *perpetrator* of it.  Indeed, the basis for its prior suits was that Barnabas had acted in good faith, but that Eisenreich and MPT had tried to interfere with the Barnabas transaction for Christ and Hoboken.

109.    HRH and the Trust it controls know with absolute certainty and beyond a shadow of a doubt that each of the allegations set forth in the operative complaint concerning a purported conspiracy between HRH and Barnabas is false.

### 2.    HRH Conspires with CarePoint to Settle CarePoint's Claims Against HRH and Prosecute CarePoint's Claims Against Barnabas.

110.    As for the instant litigation, HRH has conspired with CarePoint to take advantage of CarePoint's allegations against Barnabas in an effort to recoup the costs associated with (i) HRH's years-long scheme to drive CarePoint into bankruptcy; (ii) the settlement of CarePoint's claims against HRH; and (iii) HRH's successful bid for control of the CarePoint Hospitals and their underlying real estate.

111.    The various lawsuits that began in mid-2020 between CarePoint and HRH continued for several years.  As part of Dr. Moulick's plan to use litigation to

force a third party into a strategic alliance, CarePoint decided to use its claims against HRH to effectuate a *de facto* sale of the CarePoint Hospitals to HRH.

112.    Between November 2023 and January 2024, the respective principals of CarePoint and HRH – including Dr. Moulick and Yan Moshe – engaged in multiple negotiations regarding a "global resolution and combination of their health care resources."[18]    CarePoint and HRH then entered into one or more contracts, combinations, or conspiracies to settle the claims between them, including CarePoint's conspiracy claims against HRH.

113.    Following extensive negotiations, HRH and CarePoint entered into a "Binding Term Sheet" on January 11, 2024.

114.    HRH and CarePoint agreed to resolve the claims each had against the other and to create a four-hospital health network comprised of Hudson Regional Hospital, Bayonne Medical Center, Christ Hospital, and Hoboken University Medical Center.

115.    HRH and CarePoint also agreed to form a new, jointly-owned and operated management company that would "coordinate patient services and [serve] management functions" for the four-hospital health system.

---

[18] *HRH v. CarePoint Health Sys., Inc.*, HUD-L-001995-24 (May 28, 2024 N.J. Sup. Ct.), Verified Complaint ¶ 39.

46

116.   Under the Term Sheet, CarePoint would control Christ Hospital and Hoboken University Medical Center, and HRH would control Hudson Regional Hospital and Bayonne Medical Center.  As HRH put it in a subsequent lawsuit against CarePoint, it would gain "complete ownership and control" of BMC.  HRH also had the exclusive option to purchase Christ and HUMC.

117.   On January 12, 2024, HRH and CarePoint issued a joint press release announcing the creation of the Hudson Health System.

118.   Under the agreed-upon plan, CarePoint and HRH entered into a management agreement that gave HRH and CarePoint's current CEO joint control over the CarePoint Hospitals, with all economic value going to HRH.  CarePoint also agreed to release HRH from liability for its conspiracy with Eisenreich, and to give HRH control of – and priority interest in – CarePoint's lawsuit against Barnabas, which was premised on an allegation that HRH itself conspired with Barnabas to drive CarePoint into bankruptcy.  For its part, HRH would pay CarePoint an additional $50 million.  The parties agreed that the plan would be documented in several agreements and ultimately form the basis of a pre-packaged Bankruptcy Plan.

119.   As CarePoint put it, before filing for bankruptcy, CarePoint had "spent many months negotiating a comprehensive solution" with HRH, and "the purpose of the[] bankruptcy cases is to implement this solution…."  This included "three

comprehensive agreements with certain affiliates of Hudson Regional Hospital….”
One of these, entered into on October 9, 2024, was to “immediately implement [a]
Collateral Surrender Agreement allowing [HRH] to operate” Bayonne Hospital.  The
agreement for HRH to take over Bayonne was now all but *fait accompli*.

120.   CarePoint’s final Chapter 11 Plan Disclosure noted that, once
confirmed, “the assets of Bayonne … shall be transferred to HRH…,” “and HRH
shall be granted the right to operate and manage Christ Hospital and HUMC as set
forth in and pursuant to the Hospital Facilities MSA.”

121.   As part of the confirmed Bankruptcy Plan, CarePoint settled its claims
against HRH, releasing it from all claims “whether known or unknown … arising
from, in whole or in part, ... the transactions or events giving rise to[] any Claim or
Interest that is treated in the Plan [or] the business or contractual arrangements
between [CarePoint] and [HRH].”  This broad release covered HRH’s role in the
alleged conspiracy with Eisenreich to drive CarePoint into bankruptcy, as well as its
role in the baseless alleged conspiracy with Barnabas.

122.   In exchange for this release and other assets, HRH paid CarePoint over
$130 million.  Though the release was not separately valued, the Bankruptcy Court
found that the Release was “essential to [CarePoint’s] restructuring efforts” because

"HRH would decline to support the Plan … without the inclusion of the …. Releases."[19]

123.   HRH not only secured a release of its own liability, it also acquired a direct interest in the proceeds of CarePoint's lawsuit against Barnabas.  Because the CarePoint Hospitals were insolvent, HRH paid tens of millions of dollars, if not more, for the release and assignment.

124.   Under the Litigation Trust Agreement, which was incorporated into the Bankruptcy Plan, the assigned claims were "a deemed transfer from the Debtors *to the Beneficiaries,*" including HRH, "followed by a deemed transfer by the Beneficiaries to the Litigation Trust."[20]  As such, the claims first belonged to HRH before being passed on to the Trust "for the purpose of monetizing" the claims.[21] Even if HRH were not the direct assignee of CarePoint's claims, it is certainly the beneficial owner of such claims.

125.   Distributions from the Trust to the beneficiaries, including HRH, are governed by the Bankruptcy Plan and the Trust Agreement.  Under these governing

---

[19] *In re CarePoint Health Systems, Inc.*, 24-BK-12534 (Nov. 3, 2024 Bankr. D. Del.), ECF 1154 at 53.

[20] SF ¶ 31 & ECF 247-17 (Litigation Trust Agreement ("LT")), at 2; *see also id*. § 8.1 ("the parties hereto intend that the Beneficiaries of the Litigation Trust be treated as if they had received a distribution of the applicable assets transferred to the Litigation Trust and then contributed such assets to the Litigation Trust.").

[21] *Id*. § 1.1.

documents, HRH is the primary beneficiary, receiving anywhere from 35% to 100% of the proceeds, depending on the ultimate recovery. Specifically, HRH receives the first $3.5 million (plus interest); the next $15 million is distributed to the remaining general unsecured creditors; HRH receives the next $5 million; and beyond that, HRH receives 35% of any proceeds until it has recouped $110 million of the over $130 million it paid.

126. As the primary beneficiary, HRH was granted unique supervisory control and exclusive consent rights over the Trust. Under the Trust Agreement, any ongoing "*decisions* regarding the prosecution … of any Cause of Action … that seeks recovery of or is reasonably valued" at one million dollars (such as **this lawsuit**), "shall require HRH's consent." Importantly, no conflict-of-interest or recusal provisions limit HRH's control or restrict any payments to HRH.[22]

127. HRH's control exceeds that of the Oversight Committee, whose members lack *any* voting rights, decision-making authority, or consent rights concerning the prosecution of the assigned claims.[23] Rather, the Oversight Committee plays only an advisory role, in which it receives "communications" and

---

[22] SF ¶ 46. The Trust Agreement's conflict recusal procedures only apply to the Oversight Committee. Because HRH's distribution and consent rights are separate from its role as an *ex officio* member of the Oversight Committee, such rights are not constrained by any conflict-of-interest rules.

[23] SF ¶¶ 48-50.

consults "with the Litigation Trust." *Id*. But consulting is not voting, consenting, or approving. Only HRH possesses those rights.

128.    Under the Trust Agreement, the sole purpose of the Trust is to monetize the litigation claims assigned to it. It does "not have authority to engage in a trade or business and no portions of the Trust Assets shall be used in the conduct of a trade or business." As such, unlike CarePoint or HRH, the Trust does not compete in the alleged relevant market, and does not have any ongoing interest in that market.

### 3.    *HRH Conspires with the Trust to Commit Further Overt Acts In Support of its Scheme to Assert False Claims Against Barnabas.*

129.    On May 22, 2025, the Litigation Trust became effective. Upon the effective date of the Litigation Trust, the Trust and its Trustee, Paul Navid, joined the conspiracy between CarePoint and HRH to use this lawsuit to recoup HRH's costs in driving CarePoint into bankruptcy, taking over the CarePoint Hospitals, and settling CarePoint's claims against it.

130.    On June 11, 2025, with HRH's consent, CarePoint and the Trust moved to substitute the Trust as plaintiff in this case. On July 23, 2025, the Court granted the substitution motion. Since that date, the Trust, with HRH's consent, has continued to assert knowingly false and baseless allegations against Barnabas. The Trust expressly refused to amend the operative complaint upon its substitution, and thus, has continued to assert that "HRH and its principals . . . were intimately

involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."[24]

131.   HRH and the Trust know with 100 percent certainty and beyond a shadow of doubt that HRH did not conspire with Barnabas for any reason at any point in time.  As such, the Trust's continued assertion of this conspiracy claim – with HRH's consent and at its direction – is both subjectively and objectively baseless.

### 4.    HRH and the Trust Have Conspired to Use this Litigation to Monopolize or Attempt to Monopolize Emergency Care in the City of Bayonne.

132.   In addition to seeking to recoup the costs of its scheme to drive CarePoint into bankruptcy and acquire control of the hospitals, HRH and its co-conspirators seek to use this lawsuit to eliminate or reduce competition for emergency services in Bayonne.

133.   HRH and its co-conspirators possess monopoly power, or have a dangerous probability of obtaining monopoly power, over emergency services provided in the City of Bayonne.

134.   The City of Bayonne Emergency Services Market is a well-defined antitrust market because there are no reasonable economic substitutes for these

---

[24] TAC ¶ 19 n.2.

services, and a hypothetical monopolist of such services could impose at least a small but significant and non-transitory increase price. Emergency care generally must be provided in close proximity to the scene of the accident or medical emergency. Because the City of Bayonne is located on a peninsula, transportation to other emergency rooms outside of Bayonne is often not feasible. Nor are non-emergency services substitutes for emergency services.

135. During the relevant period, CarePoint and HRH possessed significant monopoly power over Emergency Services in Bayonne. Prior to the Barnabas SED's entry into the market, Bayonne was the only provider of emergency services in the city, and possessed 100% market share. Even after the SED's entrance, Bayonne continued to have over 60% of the emergency services market. CarePoint and HRH's monopoly power is further demonstrated by CarePoint's successful ability to extract exorbitant rates for services when it went out of network with Horizon and other insurers prior to the enactment of the Out of Network Act. Nor did the Out of Network Act eliminate CarePoint's and HRH's monopoly power.

136. An alternative market exists for emergency services provided to residents of Bayonne City. This market includes Bayonne City residents that obtain emergency services at Bayonne Medical Center, SED, and Jersey City Medical Center. CarePoint/HRH either possesses monopoly power in this market or has a dangerous probability of obtaining monopoly power.

137.    When CarePoint filed suit against Barnabas, it sought injunctive relief. CarePoint has the purpose and specific intent of using the litigation to reduce competition between Barnabas and CarePoint.   When CarePoint's claims against Barnabas were assigned to the Litigation Trust, the Trust continued to press the injunctive relief claims against Barnabas.  The Trust did so even though the Trust does not itself compete in any healthcare market.  Rather, under the Bankruptcy Plan and Trust Agreement, the Trust's only legitimate purpose is to monetize the assigned claims for the benefit of the Trust's beneficiaries.

138.    But only one of the Trust's beneficiaries competes with Barnabas in either the market for inpatient general acute care in Hudson County, or the market for emergency services in the City of Bayonne: HRH.  HRH, which controls the Trust, has required the Trust to continue asserting the injunctive relief claims with the specific intent and sole purpose of limiting or reducing Barnabas's ability to compete in the City of Bayonne Emergency Services Market.

## COUNT I
## UNJUST ENRICHMENT

139.    Barnabas incorporates each and every paragraph of this Counterclaim and Third-Party Complaint as if fully set forth herein.

140.    From at least January 2020 through the confirmation of CarePoint's bankruptcy plan in May 2025, HRH engaged in a deliberate scheme to acquire

control over the CarePoint Hospitals and their associated claims for its own enrichment.

141.   As part of that scheme, HRH conspired with Eisenreich to acquire the Bayonne Medical Center real estate, exploit its leverage as landlord to drive CarePoint into bankruptcy, and block any alternative purchasers from acquiring the Bayonne operating company.  HRH's objective was to ensure that it, and not a third-party buyer, would ultimately control CarePoint's hospital assets and operations.

142.   Among the claims CarePoint asserted before bankruptcy were allegations that HRH's conduct – including its collaboration with Eisenreich – tortiously interfered with CarePoint's contractual rights and prospective business opportunities.   CarePoint also alleged that HRH acted in concert with others, including Barnabas, to obstruct the Founders' efforts to sell the hospitals to third parties.

143.   In resolving those allegations, HRH entered into a settlement and release agreement with CarePoint as part of the pre-packaged bankruptcy plan. Under that settlement, HRH:

a.     Obtained a release of all claims CarePoint had asserted against it;

b.     Acquired, by assignment, CarePoint's remaining claims against Barnabas and other alleged conspirators; and

      c.     Secured priority rights and *de facto* control over those claims through the CarePoint Litigation Trust created under the plan.

By virtue of that settlement, HRH transformed itself from a named defendant in one lawsuit by CarePoint and an unnamed conspirator in this case (both of which arise out of the same nucleus of operative fact) into a plaintiff and/or real party in interest in this case.

144.   The assignment of claims constitutes a concrete and valuable benefit to HRH. It made HRH both a direct assignee of the claims and the principal beneficiary of the Trust established to pursue them. HRH funded the Trust, exercises substantial control over the Trust, and stands to receive priority distributions from any proceeds recovered in this action.

145.   The direct or indirect receipt or retention of any such proceeds would be inequitable and unjust.

      a.     *First*, HRH's conspiracy with Eisenreich and the further overt acts it engaged in were a material cause of CarePoint's bankruptcy and the injury CarePoint claims to have suffered. HRH's recovery via its status as a Trust beneficiary is derivative of CarePoint's injury. It would be unjust to permit HRH to recover for damages of which it was a substantial and material cause.

b. *Second*, to the extent the conspiracy with Eisenreich was unlawful, recovering for the consequences of such wrongful conduct would be unjust.

c. *Third*, CarePoint itself alleged that HRH conspired with Barnabas to injure CarePoint. Under settled principles of equity, an alleged co-conspirator cannot obtain damages from its supposed co-conspirators for the fruits of the alleged scheme.

d. *Fourth*, HRH extinguished its own liability for its conduct through the release it negotiated. Permitting HRH to recover damages on the very claims for which it was released would yield a double benefit—freedom from liability *and* profit from the same events.

e. *Fifth*, HRH is being unjustly enriched through its control over the Trust to the extent the Trust is seeking injunctive relief. The Trust does not participate in any relevant healthcare market, and has no interest of its own in obtaining any injunctive relief. HRH is the only Trust beneficiary with any interest in obtaining injunctive relief. It is wrong and unjust to permit HRH to receive the benefits of injunctive relief based on an assignment of CarePoint's claims to the Trust.

146. HRH's and the Trust's unjust enrichment comes at Barnabas's direct expense. Any funds Barnabas pays by judgment, settlement, or otherwise to resolve

CarePoint/the Trust's claims would constitute a direct and foreseeable transfer of value from Barnabas to HRH, rewarding HRH for conduct that equity forbids it to exploit.

147.   HRH's unjust enrichment is independent of the merits of CarePoint's claims against Barnabas, and stems from HRH's own participation in the alleged wrongful conduct, its conspiracy with Eisenreich, CarePoint, the Trust (and the Trustee), and its role in controlling and benefiting from the Trust.

148.   Even absent actual recovery to date, HRH's possession and assertion of the assigned claims (through the Trust) poses a clear and imminent threat of unjust enrichment.  Moreover, HRH's and the Trust's assertion of the assigned claims is itself an inequitable act, and imposes immediate harm by forcing Barnabas to expend litigation resources defending against claims advanced for an improper and unjust purpose.

149.   The Barnabas litigation was initiated by CarePoint for an improper purpose—to create leverage over Barnabas to force it into a transaction to acquire one or more of the CarePoint hospitals.

150.   Irrespective of CarePoint's original motive, CarePoint knowingly asserted false allegations against Barnabas, including allegations it later admitted were "baseless and without merit."   The Third Amended Complaint, filed on February 8, 2023, continues to assert knowingly false allegations of material fact.

HRH and the Trust have ratified the statements in the Third Amended Complaint either expressly or through conduct, including by continuing to prosecute claims against Barnabas, by refusing to amend the operative complaint, and by referencing the alleged conspiracy in court filings.

151. HRH entered into a contract, combination, or conspiracy with CarePoint to step into CarePoint's shoes as the plaintiff in CarePoint's suit against Barnabas. A principal purpose of the agreement between HRH and CarePoint was to give HRH effective control over CarePoint's claim. HRH entered into this agreement with full knowledge that the operative complaint contained false statements.

152. HRH and the Trust know with absolute certainty and beyond a shadow of a doubt that HRH did not enter into any conspiracy with Barnabas relating to the sale of the CarePoint hospitals or real estate (or anything else). Even if HRH and/or the Trust does not possess this level of certainty, they either knew or should have known that any allegation relating to a conspiracy between HRH and Barnabas was untrue.

153. HRH and the Trust also know with absolute certainty and beyond a shadow of a doubt that the following allegations in the Third Amended Complaint are false:

- "RWJ's conspirators have included real estate players Avery Eisenreich … and Yan Moshe."

59

- "RWJ and its conspirators including ... HRH, …, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County Community."

- "HRH and its principals … were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors."

- "RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical."

- "Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint."

- "HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County."

- "The plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close."

- "Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical…."

- "RWJ and its conspirators including … HRH, Moshe, Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public."

- "RWJ's conspirators in this effort [to monopolize, attempt to monopolize, or conspire to monopolize the market for GAC services in Hudson County] include … HRH, Moshe, and Kifaieh."[25]

Even if HRH and/or the Trust does not possess this level of certainty, they either knew or should have known that such allegations were untrue.

154.    The claims and allegations against Barnabas are both objectively and subjectively baseless.  The Third Amended Complaint alleges a single overarching conspiracy or claim to monopolize the GAC market in Hudson County.  A principal component of this overarching conspiracy is the false allegations of conspiracy with HRH to interfere with the sale of CarePoint to third parties.  The inclusion of these false allegations renders CarePoint's claims and/or allegations objectively and subjectively baseless.

155.    HRH knowingly, or with reckless disregard, conspired with the Trust to cause the Trust to continue to assert baseless claims and allegations against Barnabas.  The Trust entered into a contract, combination, or conspiracy with HRH in which the Trust took overt acts in furtherance of the agreement to assert baseless claims and allegations against Barnabas.  At all relevant times, HRH possessed both the power and the duty to prevent the Trust from asserting these baseless claims and allegations against Barnabas, but did not in fact prevent the Trust from asserting them.  With HRH's consent, the Trust refused to amend the operative complaint to

---

[25] TAC ¶¶ 8, 19 & n. 2, 21, 115, 116, 149, 183, & p. 34.

remove the baseless and knowingly false allegations and/or to strike the improper request for injunctive relief.

156.    With HRH's consent and at its direction, the Trust is pursuing claims against Barnabas, not to maximize recovery for the benefit of unsecured creditor beneficiaries, but to benefit HRH's competitive position in the market.   The Trust does not have any legitimate basis for seeking injunctive relief and is continuing to seek such relief solely to eliminate competition from Barnabas to the benefit of HRH.

157.    The continued assertion of false claims and allegations against Barnabas has caused and continues to cause substantial harm to Barnabas, including the threat of an unjust monetary recovery against it, the diversion of resources to defend against a sham case, and the impairment of its ability to compete freely in the marketplace.   As a result of Counterclaim-Defendants' conduct, Barnabas has suffered and will continue to suffer both monetary injury and irreparable harm unless the Court intervenes to prevent HRH and the Trust from continuing this sham litigation.

158.    The confirmation of the Bankruptcy Plan does not vitiate or immunize HRH's unjust enrichment.   The enrichment arises from conduct and agreements that were never before, and could not have been adjudicated by, the Bankruptcy Court— including HRH's conspiracy with Eisenreich to drive CarePoint into bankruptcy, its

pre-petition agreements with CarePoint to settle litigation, its post-confirmation agreements with the Trust, and its decision to continue asserting objectively and subjectively baseless allegations of a conspiracy between HRH and Barnabas. The Bankruptcy Court did not address – or have occasion to address – the equitable question presented here: whether HRH may, consistent with equity and due process, retain or profit from the assignment of claims arising from its own conduct. Because Barnabas was not a party to the bankruptcy proceedings, no confirmation order could confer on HRH a right to enrich itself at Barnabas's expense.

159.    Equity and good conscience require that HRH be barred from directly or indirectly receiving or retaining any proceeds or benefits from this action or the direct or indirect assignment of CarePoint's claims.

## COUNT II
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

160.    Barnabas incorporates each and every paragraph of this Counterclaim and Third-Party Complaint as if fully set forth herein.

161.    HRH's and the Trust's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

162.    HRH, the CarePoint Litigation Trust, and the CarePoint debtors have entered into one or more contracts, combinations, and conspiracies to restrain trade and suppress competition in the market for emergency medical services in Bayonne, New Jersey. The contracts, combinations, or conspiracies include: (i) a contract,

combination, or conspiracy between HRH and CarePoint; (ii) a contract, combination, or conspiracy between HRH, CarePoint, and the Trust (or Trustee); and (iii) a contract, combination or conspiracy between HRH and CarePoint, which the Trust joined upon its formation.

163.  These contracts, combinations, or conspiracies are *per se* unlawful, constitute naked restraints under the quick look analysis, and violate the rule of reason.

164.  No allegation of market power is required.  But to the extent such allegations are required, HRH possesses market power in (i) the market for emergency services provided in the City of Bayonne; and (ii) the market for emergency services provided to residents of the City of Bayonne.  HRH has over a 60 percent market share in each of these alleged relevant markets.  Barnabas's SED is the sole competitive alternative in each of these markets.  In addition to market share, there is direct evidence that HRH possesses market power because prior to the passage of the Out of Network Act it was able to extract pricing far in excess of competitive rates.

165.  The objective of HRH's contracts, combinations, or conspiracies is to restrain trade by eliminating, crippling, limiting, or foreclosing competition from Barnabas's SED; Barnabas's efforts to compete for doctors, nurses, and patients; and to preserve HRH's market power over emergency services in Bayonne.

166.    In furtherance of their conspiracy, HRH and the Trust have engaged in the subjectively and objectively baseless litigation against Barnabas – asserting a "conspiracy" that HRH and the Trust know to be false – solely to burden and deter Barnabas's lawful competition.

167.    HRH and the Trust have also conspired to use the Trust's assignment of CarePoint's damages claim to seek injunctive relief for the sole and exclusive benefit of HRH.  Since the Trust does not participate in any healthcare market – but exists solely to monetize CarePoint's past damages claims – any attempt to seek injunctive relief constitutes sham litigation pursued solely for HRH's benefit.  The corruption of the Trust's purpose is to the detriment of Barnabas and competition in the relevant market.

168.    There is no procompetitive justification for HRH's or the Trust's conduct.  The anticompetitive effects of the conduct outweigh any procompetitive justifications for such conduct, and/or there are less restrictive means for achieving any legitimate benefits of the Trust's or HRH's actions.

169.    HRH's and the Trust's conduct threatens to cause harm to competition, patients, payors, and Barnabas in the alleged relevant market.

170.    HRH's and the Trust's conduct occurred in and affected interstate commerce.

171.   HRH's and the Trust's conduct is not entitled to immunity.  It falls squarely within the "sham litigation" exception because it is both objectively and subjectively baseless – founded on allegations HRH knows to be false – and subjectively intended to interfere with a rival's business rather than to obtain a legitimate judicial outcome.

172.   Barnabas is threatened with substantial, direct, and foreseeable antitrust injury to its business or property caused by HRH's and the Trust's unlawful conduct.

## COUNT III
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

173.   Barnabas incorporates each and every paragraph of this Counterclaim and Third-Party Complaint as if fully set forth herein.

174.   HRH's and the Trust's conduct constitutes unlawful monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2.

175.   HRH possesses monopoly power in (i) the market for emergency services provided in the City of Bayonne; and (ii) the market for emergency services provided to residents of the City of Bayonne.  HRH has over a 60 percent market share in each of these alleged relevant markets.  Barnabas's SED is the sole competitive alternative in each of these markets.  In addition to market share, there is direct evidence that HRH possesses monopoly power, since prior to the passage

of the Out of Network Act, Bayonne was able to extract prices far in excess of competitive rates.

176.  To the extent HRH does not already possess monopoly power, it possesses a dangerous probability of obtaining monopoly power, and has acted with specific intent to obtain monopoly power through exclusionary conduct, including through sham litigation, the assertion of false and baseless allegations, and using its control over the Trust to compel it to wrongfully seek injunctive relief for HRH's sole and exclusive benefit and to the detriment of competition.

177.  HRH, the CarePoint Litigation Trust, and the CarePoint debtors have conspired to monopolize the market for emergency medical services in Bayonne, New Jersey.  The conspiracy includes:  (i) a conspiracy between HRH and CarePoint; (ii) a conspiracy between HRH, CarePoint, and the Trust (or Trustee); and (iii) a conspiracy between HRH and CarePoint, which the Trust joined upon its formation.

178.  In furtherance of their scheme, HRH and the Trust have engaged in this subjectively and objectively baseless litigation against Barnabas – asserting a "conspiracy" that HRH and the Trust know to be false – solely to burden and deter Barnabas's lawful competition.

179.  HRH and the Trust have also conspired to use the Trust's assignment of CarePoint's damages claim to seek injunctive relief for the sole and exclusive benefit of HRH.  Since the Trust does not participate in any healthcare market – but exists

solely to monetize CarePoint's past damages claims – any attempt to seek injunctive relief constitutes sham litigation pursued solely for HRH's benefit.  The corruption of the Trust's purpose is to the detriment of Barnabas and competition in the relevant market.

180.   The objective of HRH's and the Trust's conduct is to exclude, cripple, foreclose, or limit competition from Barnabas's SED; Barnabas's efforts to compete for doctors, nurses, and patients; and to preserve HRH's market power over emergency services in Bayonne.  HRH's conduct and monopoly power is not the result of historic accident, superior business acumen, or chance, but constitutes willful acquisition, maintenance, or enhancement of monopoly power.

181.   There is no procompetitive justification for HRH's or the Trust's conduct.  The anticompetitive effects of the conduct outweigh any procompetitive justifications for such conduct, and/or there are less restrictive means for achieving any legitimate benefits of the Trust's or HRH's actions.

182.   HRH's and the Trust's conduct threaten to cause harm to competition, patients, payors, and Barnabas in the alleged relevant market.

183.   HRH's and the Trust's conduct occurred in and affected interstate commerce.

184.   HRH's and the Trust's conduct is not entitled to immunity.  It falls squarely within the "sham litigation" exception because it is both objectively and

subjectively baseless – founded on allegations HRH knows to be false – and subjectively intended to interfere with a rival's business rather than to obtain a legitimate judicial outcome.

185.   Barnabas is threatened with substantial, direct, and foreseeable antitrust injury to its business or property caused by HRH's and the Trust's unlawful conduct.

## JURY DEMAND

Barnabas requests, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury for all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Barnabas prays that the Court award the following relief:

- Declare and adjudge HRH's and the Trust's conduct unlawful as set forth in each of the above Counts;

- Enjoin HRH and the Trust from continuing to engage in the unlawful conduct set forth in each of the above Counts;

- Award damages, treble damages, and punitive damages to the extent permitted by each of the above Counts;

- Require HRH and the Trust to disgorge and/or provide restitution for the conduct set forth in, and to the extent permitted by, each of the above Counts;

- Award reasonable attorneys' fees and costs of suit to the extent permitted by each of the above Counts; and

- Award such other relief as the Court deems just and proper.

# AMENDED ANSWER

Pursuant to Fed. R. Civ. P. 8(b)(3), RWJ Barnabas Health, Inc. ("Barnabas") "generally denies" all allegations of the Third Amended Complaint (ECF No. 27) ("Complaint"), including in its footnotes, headings, and sub-headings, "except those specifically admitted," as set forth below.*

For their Third Amended Complaint against Defendant RWJ Barnabas Health, Inc. ("RWJ"), Plaintiffs CarePoint Health Systems Inc. (the "CarePoint NonProfit"); Hudson Hospital OPCO, LLC d/b/a CarePoint Health – Christ Hospital ("Christ Hospital"); IJKG, LLC, IJKG PROPCO, LLC and IJKG OPCO, LLC d/b/a CarePoint Health – Bayonne Medical Center ("Bayonne Medical") and HUMC OPCO, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC") (together "Plaintiffs" or "CarePoint"), by and through their attorneys, Dilworth Paxson LLP hereby allege as follows:

**Answer:** This paragraph does not contain any factual allegations, and as such, no response is required. To the extent a response is required, RWJ Barnabas Health, Inc. ("Barnabas") denies that it engaged in any wrongdoing. Barnabas also denies that CarePoint, the Trust, or HRH is entitled to any relief. Barnabas further notes that, by Court Order dated July 23, 2025, the CarePoint Litigation Trust ("the Trust") was substituted as plaintiff in this action. The Trust is a non-operating entity formed in CarePoint's bankruptcy for the sole purpose of monetizing assigned litigation claims. It is controlled by Hudson Regional Hospitals ("HRH"), which holds

---

* For any response in which Barnabas asserts that it does not know or is not aware of a particular alleged fact, Barnabas specifically means that it "lacks knowledge or information sufficient to form a belief about the truth of the allegation," and so denies the allegation under Fed. R. Civ. P. 8(b)(5).

exclusive consent rights over litigation decisions and stands to receive priority distributions from any recovery.[26]  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

## PRELIMINARY STATEMENT

1.     This case involves a years-long systematic effort by RWJ, in conspiracy with others, to destroy competition and to monopolize the provision of general acute care hospital services and related health care services in northern New Jersey.  This effort particularly targeted Hudson County, New Jersey, to the detriment of the CarePoint NonProfit, its individual hospitals, and the public by aiming to destroy the three hospitals operated by CarePoint as independent competitors.

**Answer:**    Denied.    The alleged "years-long systematic effort" and "conspiracy" are contrary to the record and to CarePoint's own allegations in prior litigation.  CarePoint and HRH repeatedly accused *each other* – not Barnabas – of conspiring to manipulate real estate, leases, and operations surrounding the CarePoint Hospitals.    When CarePoint later recast its narrative to claim that Barnabas "masterminded" a broader conspiracy, CarePoint promptly retracted central allegations as "baseless and without merit."  The Trust, now substituted as plaintiff and controlled by HRH, has nonetheless chosen to press forward with the same knowingly false narrative—even though HRH and the Trust know, beyond any doubt, that HRH did not conspire with Barnabas.    Far from "destroying

---

[26] As noted in the Counterclaim and Third-Party Complaint, HRH refers collectively to the third-party defendant HRH entities: NJMHMC, LLC; NJBMCH, Inc.; 29 E 29 Street Holdings, LLC; Bayonne Medical Center Opco, LLC; Hudson Regional Management, LLC; and Hudson Regional Hospitals, LLC.

competition," Barnabas's actions increased competition and improved access to emergency care, including through the Department of Health-approved Satellite Emergency Department ("SED") in Bayonne, which was established to mitigate longstanding access barriers created by CarePoint's out-of-network strategy.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

      2.    RWJ's goal was to force CarePoint into financial collapse by systematically targeting each of the CarePoint hospitals, with the ultimate result of destroying the entire CarePoint network.  RWJ pursued a strategy that would lead to (i) a shutdown of Christ Hospital – the preeminent hospital in Hudson County, (ii) a shutdown of Bayonne Medical and (iii) the possible acquisition of HUMC by RWJ, as HUMC has the most profitable payor mix of any of the CarePoint Hospitals.  RWJ is engaged in a protracted campaign to control virtually all hospital care in Hudson County, primarily through the elimination of the CarePoint hospitals as viable, independent competitors.  RWJ's goal explicitly disregarded the needs of the poor, underinsured and charity care patients which CarePoint serves in its role as the safety net hospital system in Jersey City and surrounding areas.

**Answer:**  Denied.  The allegation that Barnabas sought to "force CarePoint into financial collapse" is an attempt to shift responsibility away from CarePoint's Founders, who extracted enormous value from the hospitals over more than a decade, starved them of investment, and left them insolvent.  Moreover, the allegation that Barnabas pursued a strategy to shutter Christ or Bayonne and "acquire HUMC" is contradicted by CarePoint's own contemporaneous conduct and filings.  Barnabas engaged in arm's-length negotiations under non-binding letters of intent that CarePoint attested were driven by the Hospitals' "dire financial circumstances."

Those negotiations faltered because CarePoint could not deliver workable real estate arrangements—problems of CarePoint's own making. As to the emergency-care market in Bayonne, Barnabas's SED entry – approved by the New Jersey Department of Health – expanded in-network access and lowered costs for patients CarePoint had previously overcharged. The accusation that Barnabas "explicitly disregarded" poor and underinsured patients turns the truth on its head. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

3.      The facts of this case reveal an intertwined web of schemes by RWJ and its conspirators to stifle marketplace competition that would otherwise benefit the consuming public by destroying the CarePoint system, which has been creating centers of medical excellence which benefit the Hudson County community.

**Answer:** Denied. The only "intertwined web of schemes" was CarePoint's: a long-running extraction of cash from the Hospitals, sale-and-leaseback transactions that fractured ownership and control of critical real estate, and serial litigation deployed as leverage against counterparties and competitors. Barnabas's conduct was pro-competitive and lawful, and its Department of Health-approved SED mitigated barriers to emergency care in the City of Bayonne that CarePoint's business model created. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

4.      Specifically CarePoint has taken significant strides in partnering with Columbia University Hospital, New York Presbyterian and the Rothman Institute to bring world class specialty care to the Hudson County community – and with Saint Peter's Children's Hospital to improve pediatric care in Hoboken and Hudson County. Further, CarePoint has operated and continues to operate neighborhood

health clinics to further help uninsured and underinsured members of the community.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

5.    While certain of RWJ's conspirators have individual motivations separate from the goals of RWJ, they are consistent with and symbiotic with RWJ's goal to dominate acute care in Hudson County through the destruction of CarePoint.

**Answer:**  Barnabas admits that it acted unilaterally pursuant to its own self-interest.  Barnabas denies any goal to dominate acute care in Hudson County or to destroy CarePoint.  Barnabas's conduct was unilateral, lawful, and pro-competitive, including its Department of Health-approved SED in Bayonne, which mitigated barriers created by CarePoint's out-of-network pricing.  Barnabas further notes that the allegations in this paragraph presume the existence of "RWJ's conspirators," a premise the substituted plaintiff – the CarePoint Litigation Trust controlled by HRH – knows to be false.  Indeed, CarePoint previously cast Barnabas as a victim of HRH's and Avery Eisenreich's scheme to drive CarePoint into bankruptcy and take it over.  To the extent not specifically admitted, Barnabas denies all other allegations of this paragraph.

6.    RWJ's recent conduct is only part of the long history of RWJ's monopolistic conduct to tighten its control on general acute care hospital services and related health care services in northern New Jersey generally, and specifically in Hudson County.

**Answer:**  Denied.

74

7.    The relevant inquiry is the anticompetitive effect of RWJ's exclusionary practices considered together as a whole rather than considering each aspect in isolation. RWJ's series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws. This pattern is characterized by efforts to improperly steer patients from CarePoint facilities to RWJ facilities and to weaken the CarePoint facilities by creating uncertainty among their professional staff and employees, as well as referral sources, all to cripple the economic viability of each of the CarePoint facilities, as further described below.

**Answer:**  The allegations in this paragraph do not require a response because they are nothing more than CarePoint/the Trust's legal characterization or argument. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

8.    RWJ's conspirators have included real estate players Avery Eisenreich ("Eisenreich") and Yan Moshe ("Moshe") whose interests are unrelated to those of safety net hospitals and providing accessible healthcare to the community. These conspirators have faced numerous legal challenges including insurance fraud allegations against Moshe's facilities, and RICO complaints against Moshe and Nizar Kifaieh ("Kifaieh") and a recent weapons-related federal investigation within Moshe-controlled and Kifaieh-run Hudson Regional Hospital ("HRH").

**Answer:**  Barnabas denies the existence of any conspiracy. Barnabas lacks knowledge about the "legal challenges" faced by the third parties referenced in this paragraph, and therefore denies such allegations. Barnabas notes that CarePoint recycles accusations it has previously made about third parties – Eisenreich and HRH's principals – while omitting the dispositive fact: HRH controls the Trust and is the real party in interest to any recovery in this litigation. The Trust therefore knows the allegation of any conspiracy between Barnabas and HRH is false. Indeed, HRH and CarePoint litigated against each other for years over leases, evictions, and

real estate sales, with Barnabas either absent or an alleged victim in CarePoint's own pleadings.    To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

9.    Moshe and RWJ's President and CEO, Mark Manigan ("Manigan"), have worked together through Manigan's former role as a healthcare attorney. Manigan has represented Moshe and his surgery centers in connection with state investigations finding the centers' "using poor drug storage methods, an outdated infection control plan and unacceptable sterilization practices… may have exposed nearly 3,800 former patients to hepatitis B, hepatitis C and HIV."[1]  Other of Moshe's surgery centers have been and are the subject of ongoing litigation for insurance fraud and other illegal or unethical conduct.

**Answer:**  Barnabas admits that Mr. Manigan was a qualified and licensed attorney who worked for many healthcare clients prior to taking on a business role at Barnabas.  Barnabas denies that any prior attorney-client relationship between Mr. Manigan and any third-party is relevant to this action, or that Barnabas (as opposed to Mr. Manigan) possesses information concerning such representations.  Barnabas notes that the Trust is controlled by HRH.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

10.    Eisenreich, who has also maintained a close relationship with Manigan, was the subject of longstanding litigation brought by CarePoint in the Delaware Chancery Court for tortious interference with CarePoint's business dealings and had been involved in several actions adverse to CarePoint over the past few years.  Each of these matters has now been resolved through settlement.

---

[1]  Two employees fired at NJ surgery center that exposed patients to HIV (https://www.northjersey.com/story/news/health/2018/12/28/two-employees-fired-nj-surgery-center-exposed-patients-hiv/2431140002/)

**Answer:**  Barnabas admits that CarePoint sued its own business partners in Delaware Chancery Court—a fact that underscores CarePoint's previous narrative that any "scheme" involved Eisenreich and HRH, not Barnabas.  Barnabas is unaware of the outcome of such suits, but notes that the Trust's acknowledgment that such matters were resolved by settlement highlights the gulf between CarePoint's prior allegations and its current complaint against Barnabas.  Barnabas admits that Mr. Manigan and Mr. Eisenreich knew each other, but denies that the lawsuit referenced in this paragraph had anything to do with Mr. Manigan or Barnabas.  Barnabas denies any relationship or conduct with Mr. Eisenreich that would support a "close relationship."  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

11.   Eisenreich has transacted in the real property under the hospitals in Hoboken and Bayonne with RWJ's conspirators including Medical Properties Trust ("MPT") and HRH.  Through controlling the land under the hospitals, the property owner was able, at times, to have "veto power" over any hospital operator it did not like – thereby controlling not only the real estate, but also the hospitals themselves. Eisenreich has at all pertinent times maintained this close relationship with Manigan and others in RWJ management and engaged in detailed conversations about RWJ's plan to destroy CarePoint.  A key part of this plan was Manigan's and Eisenreich leveraging Eisenreich's control of the real estate under the Hospitals to frustrate potential transactions involving CarePoint and other parties.

**Answer:**  CarePoint, Mr. Eisenreich, and MPT engaged in transactions in the real property under the CarePoint Hospitals after CarePoint's Founders sold the underlying real estate as a part of a plan to extract cash from the CarePoint Hospitals and to enrich themselves.  Barnabas, however, is unaware of the specific terms that

govern the relationship between CarePoint, Mr. Eisenreich, MPT, or their respective business partners concerning the hospital real estate, or whether CarePoint gave its business partners "veto" power over prospective hospital operators. In any event, the allegations in this paragraph omit the dispositive point that the substituted plaintiff – the CarePoint Litigation Trust – is controlled by HRH and knows that any alleged Barnabas-HRH conspiracy, or "plan," never existed. Barnabas denies any "plan to destroy CarePoint." The suggestion that Mr. Manigan or anyone at Barnabas "leveraged" Eisenreich's property rights to "destroy CarePoint" is contradicted by the contemporaneous record, including CarePoint's own filings accusing Eisenreich and HRH – without Barnabas – of interfering with CarePoint's transactions. Barnabas engaged in arm's-length negotiations under non-binding letters of intent conditioned on workable real estate solutions. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

12.    Manigan has been the lead strategist for RWJ working to drive CarePoint to financial ruin. In addition to the close relationships he maintains with Moshe and Eisenreich from his background as a healthcare attorney, Manigan also has close relationships with people who influence healthcare funding to hospitals in New Jersey, which he has used along with RWJ's vast political, administrative and real estate lobby to undermine competition – with a specific goal of eliminating CarePoint as a competitor of RWJ.

**Answer:**  Denied.

13.    RWJ's pattern of serial acquisitions of competing hospitals and health care providers, as well as of the real estate necessary to operate competing hospitals, has been tailored to destroy competition. Indeed, the recent attempted acquisition by RWJ of St. Peter's Hospital in New Brunswick was blocked by antitrust

78

enforcement action taken by the Federal Trade Commission, despite being approved by New Jersey regulators.

**Answer:** Barnabas denies the first sentence of this paragraph. Barnabas admits that in June 2022, after considerable deliberation concerning an action filed by the Federal Trade Commission to block Barnabas's proposal to combine with St. Peter's Healthcare System, Barnabas mutually agreed with the leadership of St. Peter's to end the proposed transaction. Barnabas further admits that the planned integration of the two healthcare systems had received full approval from New Jersey's Attorney General and was supported by grassroots community groups, employer groups, unions, managed care organizations, and elected officials within the State of New Jersey. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

14. Similarly, RWJ has utilized its clout with people who influence healthcare funding to hospitals in the state to disadvantage CarePoint and to frustrate CarePoint's ability to access federal Covid relief funds.

**Answer:** Denied.

15. In pursuing its plan to achieve and extend its dominance in Hudson County, RWJ also leveraged its preferred relationship with the state's largest health insurer, Horizon Blue Cross-Blue Shield ("Horizon"), to CarePoint's detriment.

**Answer:** Denied.

16. Not only did RWJ use the Horizon relationship to explicitly attract patients who were Horizon subscribers, but RWJ recognized the significance of emergency room traffic as a significant driver of inpatient volume, particularly among the uninsured and those covered by government programs, such as Medicare, Medicaid and TriCare. To this end, RWJ – with the financial support and political backing of Horizon – established a Satellite Emergency Department ("SED") in

Bayonne (in an area adjoining Jersey City), specifically targeting the CarePoint Hospitals to steer patients away from Bayonne Medical to RWJ's Jersey City Medical Center ("JCMC") facility.

**Answer:** Barnabas admits that CarePoint was overcharging insurers and patients and that Barnabas opened a SED in Bayonne to provide a better, lower-cost alternative to CarePoint's monopoly. Barnabas also admits it competed for patients and physicians. Barnabas further admits its SED was in-network with Horizon and other insurers. Indeed, the fact that its SED would be "in-network for the majority of health insurance plans in this region," while Bayonne Medical Center was "currently out-of-network," was one of the many reasons the New Jersey Department of Health concluded – based on its "own analysis of [the] data" – that the establishment of the SED would "mitigate problems of access to appropriate emergency care in Bayonne…." ECF No. 28-3 at 4. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

17. RWJ's SED was the only such facility of its kind in New Jersey. An SED presents risks for emergency patients who are admitted in need of immediate, intensive therapies available only in an acute care hospital. Rather than having patients who, upon information and belief are primarily walk-ins, go to the Emergency Department at Bayonne Medical (a fully-resourced acute care hospital mere blocks away), RWJ's SED provides only first-level triage to such patients – whereas patients requiring more specialized or next-level care would have to be sent miles away to RWJ's Jersey City Medical Center to continue treatment – losing valuable time and creating a serious risk of adverse outcomes. RWJ's SED did not meet the regulatory criteria that would satisfy a narrow exception to a clear ban on such facilities under state health regulations and therefore provided RWJ with an unfair advantage over other providers who properly complied with such regulations.

**Answer:**  Barnabas admits that its SED offers treatment for patients with emergency care needs in New Jersey and is staffed with board-certified emergency room physicians, specially-trained nurses, technicians, and healthcare professionals. The SED is a fully-licensed emergency department with the same capabilities as a traditional emergency room and provides emergency care for patients needing immediate and specialized medical attention for most illnesses or conditions.  The facility is equipped with treatment rooms and advanced technology.  Should acute care hospitalization be required, the SED's emergency physicians begin treatment with the goal of stabilizing the patient, and the staff then arrange transport and admission to an inpatient bed at an acute care hospital of the patient or their family's choosing.  Barnabas denies that the SED did not meet any regulatory criteria. Instead, the application for the SED was approved by the New Jersey Department of Health (over CarePoint's objection).  The Department of Health found that "locating a SED in Bayonne [would], in fact, mitigate problems of access to appropriate emergency care in Greenville and Bayonne."  ECF No. 28-3 at 5.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

18.    In connection with the SED, Horizon offered RWJ "enhanced rates" to support RWJ's effort to eliminate CarePoint as a competitor.  Facially, Horizon's initial motivation to provide these higher rates to RWJ was to provide Horizon subscribers with an in-network option in Hudson County.  However, even now, with CarePoint being in network with Horizon for numerous years and despite CarePoint's superior outcomes, regional partnerships and national accolades, Horizon will not place CarePoint alongside RWJ in its "Omnia" tier of preferred

providers.  It is believed that RWJ has influenced this decision because of its intimate relationship with Horizon.

**Answer:**  Denied.

19.    RWJ and its conspirators including, without limitation, HRH,[2] Horizon, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County community.

**Answer:**  Denied.

20.    RWJ, through its collusion with others, has set out to destabilize and destroy competition with the goal that patients and revenue flow only to RWJ facilities.  RWJ's efforts, both public and surreptitious, have sown uneasiness among CarePoint employees and doctors and have caused direct economic harm to the CarePoint Hospitals in the form of decreased revenue and increased costs.

**Answer:**  Denied.

21.    By way of example, and as discussed in greater detail herein, RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical to boost HRH's same-day surgery practice, expand Eisenreich's skilled nursing facility empire, and clear the field for RWJ's SED to operate without competition in Bayonne.  A significant part of RWJ's effort to push CarePoint toward bankruptcy was the signing of a 2019 LOI for the acquisition of Christ Hospital and HUMC – neither of which RWJ intended to actually acquire and operate.  RWJ's true intent was to use the LOI to discourage other potential suitors

---

[2] As explained later herein, HRH and its principals, while not defendants in this litigation, were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors.

**Answer to Footnote 2:**  Denied.  This litigation is being improperly used by HRH to recoup its costs in settling CarePoint's claims against it, and to advance its own market position.  Both HRH and the Trust – which is controlled by HRH with its consent rights over litigation decisions and priority distribution from any recovery – knows beyond a shadow of a doubt that no Barnabas-HRH conspiracy took place.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

from entering into discussions with CarePoint and, by accessing a data room set up by CarePoint, to gain market knowledge and competitive intelligence.

**Answer:**  Denied.  The allegation of collusion with HRH, Mr. Moshe, or Mr. Eisenreich to "close down Bayonne Medical" is knowingly false.  Indeed, in prior litigation, CarePoint alleged a conspiracy between HRH and Eisenreich *without Barnabas* and in which Barnabas was a *victim*.  The substituted plaintiff – the HRH-controlled Trust – knows there was no unlawful agreement or coordination with Barnabas.    The Bayonne SED was a Department of Health-approved, pro-competitive entry that expanded in-network emergency access and lowered costs for consumers who had been disadvantaged by CarePoint's out-of-network pricing model; it did not "clear the field," but instead mitigated longstanding access barriers CarePoint created.   Barnabas admits that CarePoint executed a "***non-binding***" Letter of Intent dated October 18, 2019 to sell Hoboken and Christ to Barnabas (the "LOI"), which Barnabas pursued in good faith amid CarePoint's acknowledged "dire financial circumstances."  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

22.    As a natural and intended consequence of the LOI, CarePoint froze efforts at business development, including new programs and onboarding of new physicians, as well as planned for reductions in workforce.  RWJ was directly aware of these actions (which it intended) because of discussions with CarePoint management regarding the planned integration of the CarePoint facilities into the RWJ system.

**Answer:**  Barnabas does not know what efforts CarePoint did or did not take with respect to business development or staff reductions, but notes that if CarePoint did suspend any business development activities, it did so unilaterally and in violation of its obligations under the LOI.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

23.     Notably, the LOI included a provision whereby RWJ would fund operational losses at Christ Hospital after a certain date in 2021.  Based on this provision, RWJ was intimately aware of that facility's cash burn rate, and knew that Christ Hospital and CarePoint would experience drastic consequences without additional funding – especially during the period of the LOI's pendency when other entities were discouraged from discussing a possible acquisition of one of more of the CarePoint Hospitals.  Based on this fact, RWJ knew it could push the CarePoint Hospitals closer to the brink of closure without having to buy them.

**Answer:**  Denied.

24.     At the same time that CarePoint welcomed this original proposal from RWJ, reasonably expecting that it was brought forward in good faith, RWJ and Eisenreich were engaging in backroom negotiations concealed from CarePoint – driven by Eisenreich's control of the Hospitals through the real estate.  RWJ's interest in acquiring any of the CarePoint Hospitals was contingent upon controlling the real estate under them.  Eisenreich endeavored to preclude direct contact between RWJ and CarePoint with respect to any potential transactions involving the real estate so as to hand-pick the suitor that best served Eisenreich and RWJ.

**Answer:**  To the extent the allegations in this paragraph relate to communications between CarePoint and its business partners, including Mr. Eisenreich, Barnabas lacks knowledge and therefore denies them.  Barnabas admits that Mr. Eisenreich and CarePoint collectively controlled land underneath the hospitals, and that Mr. Eisenreich was duly appointed and responsible for

negotiating leases relating to such property.  Barnabas admits that the LOI contained a contingency involving the hospital real estate.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

25.    Over the course of time, as the LOI remained pending, RWJ circulated rumors of closing of Christ Hospital or reducing it to a small Emergency Department.  These statements related to the consolidation and/or closure of Christ Hospital had a material adverse effect on the hospital's operations, leading to attrition of physicians, employees and patients.

**Answer:**  Denied.

26.    This type of rumor-mongering forms part of the strategy of RWJ to depress the economics and professional staffing of the CarePoint Hospitals which negatively affected employee retention at HUMC and the other CarePoint Hospitals and resulted in the departure of a significant number of nurses.

**Answer:**  Denied.

27.    The Hospitals were forced to cover the departures with a large number agency nurses paid at a premium rate about three times the rate of a typically-employed nurse.  Specifically, HUMC incurred expenses averaging nearly $120,000 per pay period during 2022, or $3.1 million annually.  Moreover, the CarePoint Hospitals, together, incurred an average of nearly 6,200 contract nursing hours per pay period during 2022 which totals approximately $20.1 million in additional cost to these Hospitals.

**Answer:**  Barnabas lacks knowledge of these allegations and therefore denies them.  Barnabas notes, however, that the allegations in this paragraph do not appear to relate to the "rumor-mongering" alleged in the prior paragraph to have taken place *in Hoboken two years prior*.  CarePoint's need to pay nurses competitive wages in 2022 cannot be attributed to unspecified and stale "rumor-mongering," especially given the unprecedented nationwide nurse shortage that occurred in the wake of the

pandemic.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

28.    RWJ withdrew from the 2019 LOI ostensibly because of its inability to gain control of the real estate underlying the facilities.  However, upon information and belief, RWJ never intended to pursue to closing the possible transactions outlined in that LOI.  The LOI was a sham intended as a tool to achieve the negative impacts on CarePoint described above.  Indeed, during the pendency of the LOI, the CarePoint facilities experienced a significant decrease (roughly 20%) in inpatient volumes, even as CarePoint was re-establishing itself as an in-network provider with leading insurers, including Horizon.

**Answer:**  Barnabas admits that it terminated the 2019 LOI in accordance with its terms for a variety of reasons, including that the contingencies in the LOI were not met and CarePoint's representations concerning its operations and assets were not substantiated through due diligence.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

29.    When RWJ's strategy did not succeed in pushing HUMC into bankruptcy, RWJ pursued another collusive strategy.  In 2021, RWJ engaged with HMHA to have Raymond James send out a Request for Indications ("RFI") to garner interest, without CarePoint's consent, for the sale of HUMC.  Ahead of this distribution, RWJ, through its leadership, John Doll and Manigan, engaged with HMHA and Raymond James.  This interaction with HMHA and Raymond James was calculated to devalue HUMC, and RWJ used confidential and proprietary information it procured during the 2019 LOI discussions to assist HMHA and Raymond James on a plan of attack.

**Answer:**  Denied.

30.    RWJ continued to spread false information and undermine confidence in the CarePoint system, with no intention to actually acquire CarePoint, but rather inflict upon it a "death by a thousand cuts," striking strategic blows and inflicting damage until it was eliminated such that RWJ could operate without significant competition in Hudson County.

**Answer:**  Denied.

31.    Further, RWJ tried to steer referrals away from CarePoint, sending letters to certain physicians who regularly referred patients to CarePoint specialists and facilities to induce these physicians to instead refer patients to RWJ specialists and facilities.  These letters included discussion of financial incentives (such as enhanced rates and patient management fees) paid to these physicians in exchange for referrals of patients to RWJ instead of CarePoint.  Furthermore, RWJ poached one of the CarePoint's leading practitioners by encouraging him to intentionally violate a restrictive covenant.

**Answer:**  Barnabas admits that it competed for patients and physicians.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

32.    RWJ states its vision as to "[c]reate and sustain healthy communities, together," noting that it is "committed to the ongoing improvement of the health, quality of life, and vitality of our communities."[3]  The idea that RWJ would use its influence to jeopardize the health of that community and the care providers of a competing hospital not only directly contradicts its own vision, but clearly demonstrates that RWJ is far more interested in anti-competitive and predatory business activities than serving the New Jersey community.

**Answer:**  Barnabas admits the first sentence of this paragraph.  Barnabas further admits that CarePoint was overcharging insurers and patients and that Barnabas sought to provide a better, lower-cost alternative to CarePoint's monopoly.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

33.    The efforts of RWJ and its conspirators have created a stalemate in the progress of health care in Hudson County, mired in litigation in two states with a

---

[3] RWJBarnabas Health – (https://www.rwjbh.org/)

very real risk of eliminating any Hudson County based provider from having a meaningful role in the delivery of acute hospital care.

**Answer:**  Denied.

34.     Plaintiffs seek relief from this Court under the Federal Antitrust Laws.

**Answer:**  This paragraph does not contain any factual allegations, and as such, no response is required.  To the extent a response is required, Barnabas denies that it is liable and denies that CarePoint, the Trust, or HRH is entitled to any relief.

## PARTIES

35.     Plaintiff CarePoint Nonprofit is a New Jersey non-profit corporation organized under the laws of the State of New Jersey, having a principal place of business located at 308 Willow Avenue, Hoboken, New Jersey 07030.

**Answer:**  Barnabas does not know the details of CarePoint's organizational structure, but understands that CarePoint filed a Chapter 11 petition in United States Bankruptcy Court for the District of Delaware on November 3, 2024.  As part of CarePoint's confirmed Bankruptcy Plan, HRH obtained the assets of Bayonne Hospital and operational control of CarePoint's other two hospitals.  The Bankruptcy Plan also created the CarePoint Litigation Trust, which was substituted as plaintiff in this action by Court Order dated July 23, 2025.  (ECF 238 at 1, ECF 260).  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

36.     Plaintiff Christ Hospital is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 176 Palisade Avenue, Jersey City, NJ 07306.

**Answer:**    Barnabas does not know the details of Christ Hospital's organizational structure, but understands that HRH took control of Christ Hospital in connection with CarePoint's Bankruptcy Plan.  HRH's takeover of Christ Hospital was part and parcel of HRH's scheme to drive CarePoint into bankruptcy and take control of its hospitals.  As described in the Counterclaim, HRH, through the Trust, now seeks to recoup the costs of that scheme – and the settlement of CarePoint's claims against it – by pursuing allegations against Barnabas that it knows to be false. The CarePoint Litigation Trust, which is controlled by HRH and was created to monetize assigned claims, was substituted as plaintiff in this action by Court Order dated July 23, 2025.  ECF 238 at 1; ECF 260.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

37.    Christ Hospital operates a 349-bed fully accredited acute care hospital. With a highly-qualified team – including more than 500 doctors with specialties ranging from allergies to vascular surgery – Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, respiratory, and newborn care.  As a state-certified Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions with outcomes that rank among the best of New Jersey.  In 2021, Christ Hospital was ranked the most "Socially Responsible" hospital in the United States by the prestigious Lown Institute, for equitable care.[4]

**Answer:**  Barnabas does not know the details of Christ Hospital's services, facilities, operations, or rankings.  But Barnabas denies that Christ Hospital suffered

---

[4] Christ Hospital ranked #1 on Lown Institute's Most Socially Responsible Hospitals in America list – (https://carepointhealth.org/2021/09/21/christ-hospital-ranked-1-on-lown-institutes-most-socially-responsible-hospitals-in-america-list/)

injury as a result of any of Barnabas's actions.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

38.    Plaintiff Bayonne Medical is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey.

**Answer:**  Barnabas does not know the details of Bayonne's organizational structure, but understands that HRH took control of Bayonne in connection with CarePoint's Bankruptcy Plan.  HRH's takeover of Bayonne was part and parcel of HRH's scheme to drive CarePoint into bankruptcy and take control of its hospitals, including its monopoly over emergency services in Bayonne.  Prior to the passage of the OON Act, Bayonne was able to extract prices far in excess of competitive rates, which is direct evidence of its monopoly power.   Barnabas is the only meaningful constraint on HRH's exercise of this monopoly power, through its SED operating in Bayonne.  The CarePoint Litigation Trust, which is controlled by HRH and was created to monetize assigned claims, was substituted as plaintiff in this action by Court Order dated July 23, 2025.  ECF 238 at 1; ECF 260.  As described in the Counterclaim, HRH, through the Trust, now seeks to recoup the costs of its anticompetitive scheme – and the settlement of CarePoint's claims against it – by pursuing allegations against Barnabas that it knows to be false.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

39.    Bayonne Medical operates a 244-bed, fully accredited acute care hospital that provides quality, comprehensive, community-based health care

services to more than 70,000 people annually. Its facilities include 19 full-service emergency room bays, 205 medical/surgical beds, 10 obstetrical beds, 14 adult ICU/CCU beds, and 15 adult, acute psychiatric beds. The service complement consists of six inpatient operating rooms, two cystoscopy rooms, one full-service cardiac catheterization lab, 12 chronic hemodialysis stations, one MRI unit, emergency angioplasty services, elective angioplasty, two hyperbaric chamber units, and a PET-CT diagnostic imaging unit.

**Answer:** Barnabas does not know the details of Bayonne's services, facilities, or operations. But Barnabas denies that Bayonne suffered injury as a result of any of Barnabas's actions. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

40.    Plaintiff HUMC is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 308 Willow Avenue, Hoboken, NJ 07030.

**Answer:** Barnabas does not know the details of Hoboken's organizational structure, but understands that HRH took control of Hoboken in connection with CarePoint's Bankruptcy Plan. HRH's takeover of Hoboken was part and parcel of HRH's scheme to drive CarePoint into bankruptcy and take control of its hospitals. As described in the Counterclaim, HRH, through the Trust, now seeks to recoup the costs of that scheme – and the settlement of CarePoint's claims against it – by pursuing allegations against Barnabas that it knows to be false. The CarePoint Litigation Trust, which is controlled by HRH and was created to monetize assigned claims, was substituted as plaintiff in this action by Court Order dated July 23, 2025.

ECF 238 at 1; ECF 260.  To the extent not expressly admitted, Barnabas denies all

other allegations of this paragraph.

41.    HUMC operates a 348-bed fully accredited general acute care hospital. HUMC provides advanced medical technologies in support of its medical staff, nursing team, and other caregivers, to enable state-of-the-art care to citizens of Hoboken and the surrounding communities.  HUMC offers excellence in emergency medicine in the 34-bay emergency room and the dedicated OB/GYN ED; inpatient rehabilitation; transitional care; child and adult behavioral health; women's care; wound care; and numerous surgical subspecialties.  The American Heart and Stroke Association awarded the Silver Award to HUMC for its dedication to improving quality of care for stroke patients.  Overall, HUMC was ranked in the top ten hospitals in New Jersey for care quality among all hospitals in the state with 350 beds or fewer.

**Answer:**    Barnabas does not know the details of Hoboken's services,

facilities, operations, or rankings.  But Barnabas denies that Hoboken suffered injury

as a result of any of Barnabas's actions.   To the extent not expressly admitted,

Barnabas denies all other allegations of this paragraph.

42.    Defendant RWJ is a New Jersey corporation with its principal place of business at 95 Old Short Hills Rd, West Orange, NJ 07052.  RWJ is one of the largest health care systems in New Jersey.  As described further below RWJ owns and operates Jersey City Medical Center, a full service, acute care hospital in Hudson County, the SED – a few blocks away from Bayonne Medical, and many other healthcare facilities.

**Answer:**    Barnabas admits that it is a New Jersey corporation with its

principal place of business at 95 Old Short Hills Rd, West Orange, NJ 07052.

Barnabas further admits that it owns and operates Jersey City Medical Center and

SED.  To the extent not expressly admitted, Barnabas denies all other allegations of

this paragraph.

## VENUE AND JURISDICTION

43.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and over the state law claims asserted herein under 28 U.S.C. § 1367.

**Answer:**  Barnabas does not contest this Court's subject matter jurisdiction over this action at this time.  Barnabas denies that CarePoint or the Trust has pled a valid claim under the statutes cited.

44.    This Court has personal jurisdiction over the defendant RWJ as it resides, does business in, and has a principal place of business in New Jersey.  Venue in this district is proper because the parties are located in and/or a substantial part of the events took place in this district.

**Answer:**  Barnabas does not contest personal jurisdiction.

## FACTUAL BACKGROUND

### A.    The CarePoint Hospitals

45.    Between 2008 and 2012, Vivek Garipalli, James Lawler and Jeffrey Mandler (together, the "Founders"), by and through various entities, purchased out of bankruptcy the assets of HUMC, Christ Hospital, and Bayonne Medical (the "CarePoint Hospitals" or the "Hospitals").

**Answer:**  Barnabas understands that in 2008, Vivek Garipalli, James Lawler, and Jeffrey Mandler acquired Bayonne Medical Center out of bankruptcy and that a few years later they acquired Hoboken University Medical Center and Christ Hospital, consolidating the three facilities under the CarePoint banner.  Barnabas notes that, through those acquisitions, the Founders secured control of most inpatient and emergency room services in Hudson County and achieved a monopoly over emergency services in the City of Bayonne, where no other emergency facility

operated at that time.  To the extent not expressly admitted, Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

46.    Post-bankruptcy, the CarePoint Hospitals were controlled by the Founders through ownership of entities and trusts affiliated with the Founders.  The holding companies with a controlling interest in the CarePoint Hospitals were ultimately owned eighty percent (80%) by Vivek Garipalli via the Freehold Trust, ten percent (10%) by James Lawler individually, and ten percent (10%) by Jeffrey Mandler via the Mandler Family Trust.

**Answer:**  Barnabas admits that the CarePoint Hospitals were controlled by the Founders and certain Founder-controlled "entities," and that hundreds of millions of dollars were funneled to the Founders and their controlled entities for personal or non-hospital purposes.  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

47.    After buying the Hospitals' assets, the Founders invested time, labor, and capital to improve the Hospitals' physical plants, equipment, and finances, as well as the overall quality of healthcare services provided by the Hospitals.  Under the Founders' leadership and with the incredible support of all the physicians, nurses and staff, the Hospitals became leading acute health care service facilities in Hudson County and the State of New Jersey.

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph – including that the Founders made any "investment… to improve" the CarePoint Hospitals or offered any "leadership" whatsoever – and therefore denies them.

94

48.    In addition to demonstrably improving health care for New Jersey residents, the Founders' efforts to rescue the Hospitals from bankruptcy have saved thousands of jobs and generated substantial economic benefits to Hudson County and, more generally, to the State of New Jersey.  The Founders' efforts to revitalize the economic health of the Hospitals generated huge economic benefits to Hudson County and the State.  CarePoint Hospitals create a significant positive economic impact for New Jersey in terms of both in-state operating expenditures of hundreds of millions of dollars annually (e.g. $384 million in 2014) and significant capital expenditures (e.g. $177.8 million for the years 2014-2017).

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph – including that the Founders "demonstrably improv[ed] health care for New Jersey residents" or "generated huge economic benefits to Hudson County and the State" – and therefore denies them.

49.    To illustrate, the economic impacts for New Jersey of the above-referenced CarePoint expenditures include:

a.    8,167 direct and indirect jobs or job-years[5];

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

b.    $815.2 million in gross domestic product;

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

c.    $653.9 million in compensation to employees;

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

---

[5] Job year is defined as one job lasting more than one year.

      d.     $23.5 million in state government revenues; and

**<u>Answer:</u>**  Barnabas lacks sufficient knowledge or information to form a belief

about the truth of the allegations in this paragraph and therefore denies them.

      e.     $8.7 million in local government (county, municipal, school district) revenues outside Hudson County.

**<u>Answer:</u>**  Barnabas lacks sufficient knowledge or information to form a belief

about the truth of the allegations in this paragraph and therefore denies them.

50.    Most recently CarePoint's leadership team transitioned the CarePoint Hospitals' ownership to a new non-profit entity, CarePoint Health Systems Inc. Operating under physician leadership, this transition was a move lauded by the communities which the Hospitals serve.  Currently, the CarePoint Nonprofit is the ultimate owner of ninety percent (90%) of the interests in the holding companies that control the CarePoint Hospitals.  Unless they are destroyed by the unlawful and predatory conduct of RWJ and others (which is the subject of this and other litigation), CarePoint's three hospitals will continue to operate in their current form and will be controlled by the CarePoint Nonprofit.  CarePoint's top priority is to work collaboratively with the Hudson County community to maintain critical health care for those who need it most and bring world class specialty care to the Hudson County community through partnerships with top-flight medical systems in the region.

**<u>Answer:</u>**  Barnabas admits that CarePoint converted to a non-profit after the

CarePoint Founders had stripped the hospitals of sufficient operating funds.

Barnabas denies the CarePoint Nonprofit currently controls the CarePoint Hospitals

or that they "continue to operate in their current form" as of the filing of the Third

Amended Complaint.  The CarePoint Hospitals are now controlled by HRH—as a

result of HRH's years-long scheme to drive CarePoint into bankruptcy and gain

control of the CarePoint Hospitals and their underlying real estate.  Barnabas denies

engaging in any "unlawful [or] predatory conduct."   Barnabas lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

51.    The announcement of CarePoint's ownership by a non-profit corporation was praised by Jersey City Mayor Steve Fulop, who stated that "Christ Hospital and CarePoint have been critical partners with the city and the community before and during the pandemic, ensuring residents throughout the area have access to the top-quality health care they deserve, and, so, if transitioning to a nonprofit organization is the best way to further the life-saving services they offer, then we will, of course, support that," noting that the move "only strengthens the importance of Christ Hospital for the entire community."[6]

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

52.    Further, Bayonne Mayor Jimmy Davis stated that "CarePoint's conversion into a nonprofit will allow the residents of Bayonne to continue having the broadest range of quality health care services made available to them." *Id.*

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**B.    RWJ Barnabas Health**

53.    RWJ is the largest and most comprehensive healthcare system in the state of New Jersey, providing treatment and services to more than three million patients each year.[7]  In 2021, RWJ reported approximately $6.6 billion in revenue.

---

[6] Tom Bergeron - *CarePoint Health beginning process of becoming a nonprofit (here's why — and what happens next),* ROI-NJ.com (https://www.roi-nj.com/2021/10/06/healthcare/carepoint-health-beginning-process-of-becoming-a-nonprofit-heres-why-and-what-happens-next/)

[7] RWJ Barnabas - https://www.rwjbh.org/why-rwjbarnabas-health-/

**Answer:**  Barnabas admits that it is New Jersey's largest integrated healthcare delivery system, providing treatment and services to more than three million patients each year.  Barnabas further admits that it reported operating revenue of $6,626,523 for the year ended December 31, 2021.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

54.    RWJ has become the largest healthcare system in New Jersey through a series of acquisitions.  In 2016, Barnabas Health and Robert Wood Johnson Health System merged to create RWJ, which then controlled eleven general acute care hospitals across New Jersey.

**Answer:**  Barnabas admits that it operates a large healthcare delivery system. Barnabas further admits that in 2016 the system included eleven acute care hospitals: Clara Maass Medical Center in Belleville; Community Medical Center in Toms River; Jersey City Medical Center in Jersey City; Monmouth Medical Center in Long Branch; Monmouth Medical Center Southern Campus in Lakewood; Newark Beth Israel Medical Center in Newark; RWJUH in New Brunswick and Somerville; RWJUH-Hamilton; RWJUH-Rahway; and Saint Barnabas Medical Center in Livingston.   To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

55.    On January 1, 2022, RWJ closed on its acquisition of Trinitas Regional Medical Center in Union County.  RWJ now operates 12 hospitals, several ambulatory surgical centers, a pediatric rehabilitation hospital, and a freestanding behavioral health center.  RWJ also operates many other health care facilities and medical practices, especially in Hudson County, which generate significant patient revenue and provide increased patient flow to its inpatient acute care hospitals.

**Answer:**  Barnabas admits that Trinitas Regional Medical Center became a member of RWJ Barnabas Health in January 2022, and that the system came to include twelve acute care hospitals in addition to ambulatory care centers, the Children's Specialized Hospital, and a behavioral health center.  At that time, Barnabas also operated other healthcare facilities and medical practices.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

56.    Starting in 2019, RWJ began discussions to acquire St. Peter's Healthcare, based in New Brunswick, Middlesex County, which operates an independent hospital.  In addition to the hospital, Saint Peter's Healthcare employs physicians, and has other healthcare-related subsidiaries and joint ventures.  In 2021, Saint Peter's Healthcare reported approximately $579 million in revenue.

**Answer:**  Barnabas admits that in 2019 it signed a non-binding Letter of Intent with St. Peter's Healthcare System to explore a potential partnership.  A Definitive Agreement was signed in 2020, which outlined the intention to integrate the two healthcare systems.  St. Peter's Healthcare is headquartered in New Brunswick, NJ. It operates a hospital and employs physicians.  In the year ending December 31, 2021, St. Peter's University Hospital reported $579,253 in total revenue, gains, and other support.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

57.    New Jersey State officials and the NJDOH approved the merger in May 2022.  However, the FTC unanimously moved to block it, stating the RWJ-Saint Peter's merger would create an entity with control of 50% of the acute care market in Middlesex County.  FTC Bureau of Competition Director Holly Vedova

concluded that "There is overwhelming evidence that this acquisition would be bad for patients[.]"[8]

**Answer:**   Barnabas admits that the planned integration with St. Peter's Healthcare had support from New Jersey State officials, the New Jersey Attorney General's Office, the New Jersey Department of Health, consumers, and other community organizations.   Barnabas further admits that the Federal Trade Commission authorized an administrative complaint and suit in federal court to block the proposed transaction.   Barnabas does not know what Ms. Vedova "concluded" about the proposed transaction.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

58.   After the Federal Trade Commission commenced its proceeding to block the St. Peters acquisition, RWJ abandoned the proposed transaction, stating that it was "disappointed" that the FTC had acted to block the transaction after it had "received full approval from New Jersey's Attorney General" and received support from "managed care organizations and elected officials at all levels within the State of New Jersey."[9]

**Answer:**   Barnabas admits that it mutually agreed with the leadership of St. Peter's to end the proposed transaction.   Barnabas also admits that it was disappointed about the Federal Trade Commission's decision to disregard the informed and considered views of the New Jersey Attorney General, the New Jersey

---

[8] Spencer Kent - *Two N.J. health systems want to merge.  But the feds say it's bad for patients.* NJ.com, June 3, 2022 (https://www.nj.com/healthfit/2022/06/two-nj-health-systems-want-to-merge-but-the-feds-say-its-bad-for-patients.html).

[9] Jeffrey Kanige - FTC moves to block RWJBarnabas-Saint Peter's deal, NJBIZ June 3, 2022 (https://njbiz.com/ftc-moves-to-block-rwjbarnabas-saint-peters-deal/)

Department of Health, other state officials, managed care organizations, patients, and other community organizations.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

### C.    RWJ's Decade-Long Mission To Monopolize New Jersey Healthcare Markets

59.    In its first foray directly into Hudson County, RWJ purchased Jersey City Medical Center in 2013.  At that time, high-level executives at RWJ conducted a series of transition meetings.  In particular, it is believed that these meetings included specific discussions concerning how to eliminate competition for emergency medical service, including in Bayonne, and ultimately to wrest control of Bayonne Medical from CarePoint.

**Answer:**  Barnabas admits that prior to 2013, it did not own or operate any acute care hospital facilities in Hudson County.  Barnabas also admits that JCMC became a part of the Barnabas system in 2013.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

60.    The CarePoint Hospitals, including Bayonne Medical did not participate in Horizon's network at that time, which caused a great deal of tension between Horizon and CarePoint.

**Answer:**  Barnabas admits that CarePoint refused to participate in some or all insurers' provider networks, including, at certain times, Horizon, thereby overcharging insurers' in-network patients for acute care and emergency services, and resulting in litigation between CarePoint and various insurers, including Horizon.  Barnabas notes that CarePoint's ability to extract exorbitant rates for services when it went out of network with Horizon and other insurers prior to the enactment of the Out of Network Act demonstrates CarePoint/HRH's monopoly

101

power.   Barnabas further admits that there was backlash against CarePoint in connection with this price gouging, particularly from insurers who were forced to pay CarePoint's increasingly unreasonable rates.   Barnabas does not know how much tension, if any, existed between Horizon (which was being overcharged by CarePoint) and CarePoint (which was receiving monopoly profits at the expense of Horizon and its subscriber-patients).  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

61.     RWJ plotted to intentionally steer patients away from Bayonne Medical and toward RWJ facilities.  Upon information and belief, an early step in this plan was the development of a satellite emergency department ("SED") in Bayonne, blocks away from Bayonne Medical, located five miles away from JCMC.  Not only is access to emergency care essential to the welfare of the community, it is also a major driver of inpatient admissions for hospitals.  CarePoint's role as an Emergency Department provider in the City of Bayonne was an important element in not only keeping Bayonne's residents healthy, but also keeping Bayonne Medical healthy as a community hospital.

**Answer:**  Barnabas admits that CarePoint was overcharging insurers and patients and that Barnabas's SED would provide a better, lower-cost alternative to CarePoint's monopoly.   Barnabas denies participating in any "plot."   Barnabas admits that it opened its SED in Bayonne, approximately half a mile away from Bayonne Medical Center and approximately 5 miles away from JCMC.  Barnabas further admits that access to emergency care is a factor in the welfare of a community and can, in certain circumstances, contribute to inpatient admissions for hospitals. Barnabas denies that CarePoint's role as an Emergency Department provider in the

City of Bayonne was an "important" element in keeping Bayonne's residents healthy, or in keeping Bayonne Medical Center "healthy as a community hospital." Rather, CarePoint's excessive charges reduced the availability of, demand for, and provision of emergency services in Bayonne, thereby *injuring* the health of Bayonne residents and the community. As opposed to "keeping Bayonne Medical healthy as a community hospital," Bayonne Medical Center's monopoly position as the sole provider of emergency services in Bayonne, with 100% market share, merely enriched the CarePoint Founders, who inappropriately extracted cash or value from CarePoint's hospitals. HRH is using this lawsuit, through its control of the Trust, to reprise Bayonne Medical Center's position as the sole provider of emergency services in the Bayonne, as evidenced by the HRH-directed Trust's refusal to dispense with claims it knows for a fact are untrue, as well as its claims for injunctive relief, even though the Trust does not itself compete in any healthcare market. To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

62.    Upon information and belief, during the transition to RWJ's control of JCMC, Dr. Garay, JCMC's Chief Medical Officer, communicated with representatives at Horizon about "enhanced rates" – that is, rates substantially higher than what RWJ understood to be Horizon's prevailing in-network rates, if RWJ were to take over Bayonne Medical's market share in Bayonne.

**Answer:**    Barnabas admits that it negotiated reimbursement rates with Horizon and other insurers, as all hospital providers do. On information and belief,

the rates that Horizon paid to Barnabas for emergency services in Bayonne were below those charged by CarePoint. Barnabas, however, does not know what rates other providers were paid by Horizon. To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

63.    Upon information and belief, at that time, Jay Picerno, RWJ's Chief Financial Officer communicated with a Horizon representative about RWJ taking over the Bayonne market, leveraging Horizon's offer to provide enhanced rates, by starting a free-standing emergency department – which was not connected to a full-service facility.

**Answer:**    To the extent the allegations in this paragraph relate to communications between Horizon and Mr. Picerno, Barnabas lacks knowledge and therefore denies them. Barnabas admits that it wanted to start a free-standing emergency department to better serve the community and provide a better, lower-cost alternative to CarePoint's monopoly. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

64.    Indeed, beginning in at least the fall of 2015, RWJ "touted a 24/7 emergency department as a main feature of its medical facility planned for Broadway and 24th Street" in Bayonne.[10]  Picerno had several conversations with Horizon's leadership who actively supported RWJ creating the proposed SED at the Bayonne location. Indeed, Horizon would prefer to deal with an in-network RWJ facility than an out of network competitor in CarePoint – even if RWJ monopolized GAC services in the market.

---

[10] Jonathan Lin - *Battle looms between CarePoint and Barnabas Health over proposed Bayonne ER,*    The    Jersey    Journal,    November    2,    2016 (http://www.nj.com/hudson/index.ssf/2016/11/battle_looms_between_carepoint_and_barnabas_health.html)

**Answer:**    Barnabas denies that the quoted language is attributable to Barnabas.  Nonetheless, Barnabas admits that SED is open 24 hours a day, 7 days a week, and 365 days a year.  To the extent the allegations in this paragraph relate to communications between Horizon and Mr. Picerno, Barnabas lacks knowledge and therefore denies them.  Barnabas does not know what Horizon's preferences were or are.  But Barnabas admits that CarePoint was overcharging insurers and patients and that Barnabas's proposed SED would provide a better, lower-cost alternative to CarePoint's monopoly.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

65.    Horizon offered to pay RWJ enhanced rates at its Bayonne SED in order to ensure that the SED endeavor would be profitable and, thus, could serve its purpose to permit RWJ to so adversely impact the economics of Bayonne Medical as to force its closure.  Integral to the purpose of the Horizon-RWJ cooperation was the steering of patients away from CarePoint Hospitals, specifically Bayonne Medical, mere blocks away from the SED.

**Answer:**    Barnabas admits that CarePoint was overcharging insurers and patients and that Barnabas's proposed SED would provide a better, lower-cost alternative to CarePoint's monopoly.  Barnabas denies that the purpose of its SED was "to permit RWJ to so adversely impact the economics of Bayonne Medical as to force its closure."  Barnabas admits that it competed for patients and physicians. To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

66.    While not in-network for Horizon members at the time, CarePoint is now in network with Horizon and all major insurers.  Even while out of network, the CarePoint Hospitals treated a large percentage of government insured and uninsured patients.  CarePoint has, at all times, provided a significant amount of charitable care to the uninsured.

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

67.    Notably, it was reported that "[t]he [RWJ] application was backed by a trio of health insurance companies, a variety of elected officials, and hundreds of people who signed a petition to support the Bayonne SED, according to state documents."[11]

**Answer:**    Barnabas admits that its certificate of need application was supported by a number of insurers and other members of the community.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

68.    In that same article, it was reported that RWJ CEO Barry Ostrowsky told NJ Spotlight that Horizon "had encouraged his organization to construct a free-standing emergency facility as a way to connect more Horizon patients in the area with providers that are part of its network."[12]

**Answer:**    Barnabas admits that CarePoint was overcharging insurers and patients and that Barnabas's proposed SED would provide a better, lower-cost alternative to CarePoint's monopoly.  Barnabas also admits that CarePoint was

---

[11] Lilo H. Stainton - *The Battle of Bayonne: Turf Wars Over Satellite Emergency Departments,* NJ Spotlight News, August 2, 2017 (https://www.njspotlightnews.org/2017/08/17- 08-01-the-battle-of-bayonne-turf-wars-over-satellite-emergency-departments/)

[12] Notably, NJ Spotlight news lists "Major funding" provided by both "Horizon Blue Cross Blue Shield of New Jersey" and "RWJ Barnabas Health."

refusing to serve Horizon's subscribers as in-network patients, thereby increasing

cost and reducing the availability of care. To ensure that all patients had access to

sufficient care, Barnabas constructed a free-standing emergency facility, which

would – among other things – connect patients in the area with providers that were

part of insurers' networks. To the extent not expressly admitted, Barnabas denies

all other allegations in this paragraph.

69.    Since its opening in 2017, the SED has caused the disruption RWJ
intended. There has been a substantial decrease in emergency patients to Bayonne
Medical, which in turn led to a substantial decrease in inpatient admissions. This is
the case notwithstanding the fact that after the CarePoint Hospitals became in-
network with all major insurers, publicly available data shows that the percentage of
commercial payers remained flat rather than increased, as would have been
expected. This means that despite being in-network, RWJ's anticompetitive actions
continued to suppress competition in the market.

**Answer:** Barnabas's actions have continued to enhance competition in the

market. To the extent not expressly admitted, Barnabas denies all other allegations

in this paragraph.

70.    Specifically, many of the predominantly walk-in inpatient admissions
lost by Bayonne Medical to RWJ's SED are now being transported miles away to
JCMC. The annual financial losses to Bayonne Medical as a result of the SED are
approximately $20 million, and the total loss for the period from 2019 through 2022
is approximately $80 million. Moreover, the SED results in a risk of patient
morbidity stemming from the need for patients to be moved from the limited-purpose
SED to RWJ's JCMC, a full-service hospital.

**Answer:** Denied.

71.    As noted above, RWJ has been engaged for many years in a continuing
pattern of conduct, including agreements with others such as Horizon, to drive the

CarePoint Hospitals out of business as independent competitors such that RWJ can operate, with no meaningful competition, in the Hudson County acute care market.

**Answer:**  Denied.

### 1.    RWJ's Attempt to Induce CarePoint-Referring Doctors to Steer Patients to RWJ Facilities

72.    RWJ's march towards monopoly continued to not only decimate the CarePoint facilities through steering paying emergency room patients to its own facilities, but also by seeking to incentivize doctors to stop referring patients to CarePoint facilities and start referring them only to RWJ facilities.

**Answer:**  Denied.

73.    Beginning in mid-February 2016, RWJ in conjunction with Horizon, launched a campaign of sending letters (the "RWJ Letter") to physicians who have, over the years, consistently referred patients to CarePoint Hospitals for treatment (hereinafter the "CarePoint Referring Physicians").  The RWJ Letter was intended to induce physicians to refer patients to RWJ and away from the CarePoint Hospitals.  The letter confirmed the collaboration between RWJ and Horizon, and touted incentives to physicians to refer patients to RWJ.

**Answer:**  Barnabas admits that it competed for patients and physicians.  On or about February 16, 2016, Barnabas sent a letter to certain physicians noting that Barnabas facilities had been "designated as Tier 1 for all Horizon products," and thus, qualifying patients "will have lower out of pocket expense[s] when receiving care from Tier 1 physician and facilities."  Barnabas noted that any physicians who have "privileges at a Barnabas Health Facility" would be "eligible to join Barnabas Health Care network," which might provide better "fee-for-service fees" and other benefits by "creat[ing] action steps to help [physicians]" improve their performance to become "eligible for … shared savings when attained."  Nothing in this letter

referenced CarePoint, or required CarePoint physicians to rescind their privileges or employment at CarePoint. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

74.     For example, the RWJ Letter stated that "If you have privileges at a Barnabas Health facility, you are eligible to join Barnabas Health Care Network (ACO). Through this network, you may receive **enhanced fee-for-service fees**, be eligible for **patient management fees** and have the ability to **participate in shared savings** for most Horizon patients."

**Answer:**  Barnabas admits that it competed for patients and physicians, and that it communicated the benefits of working with Barnabas. On or about February 16, 2016, Barnabas sent a letter to certain physicians noting that Barnabas facilities had been "designated as Tier 1 for all Horizon products," and thus, qualifying patients "will have lower out of pocket expense[s] when receiving care from Tier 1 physician and facilities." Barnabas noted that any physicians who have "privileges at a Barnabas Health Facility" would be "eligible to join Barnabas Health Care network," which might provide better "fee-for-service fees" and other benefits by "creat[ing] action steps to help [physicians]" improve their performance to become "eligible for … shared savings when attained." Nothing in this letter referenced CarePoint, or required CarePoint physicians to rescind their privileges or employment at CarePoint. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

75.    In effect, Horizon, in conjunction with RWJ, sought to lure CarePoint Referring Physicians with financial incentives to steer paying, insured patients to Horizon's "Tier 1" hospitals at the expense of the CarePoint Hospitals.

**Answer:**    Barnabas admits that it competed for patients and physicians. Barnabas denies that it sought to "lure" CarePoint physicians into "steering" patients to Barnabas facilities.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

76.    These decreases in revenue, which were directly caused by RWJ, contributed to the CarePoint Hospitals experiencing difficult economic times late in the prior decade.  Unlike a competitive situation where a customer may be attracted to a better product or lower price, here RWJ financially incentivized doctors to steer the ultimate customer (the patient) to RWJ, without regard to the fact the doctors were paid to do so.  This is far from a marketplace where customer choice is paramount, but rather a marketplace where someone other than the customer can create a monopoly that hurts the customer by removing options.

**Answer:**    CarePoint's decreases in revenue, if any, were caused by CarePoint's own decision to overcharge patients and insurers.    Similarly, CarePoint's "difficult economic times," if any, were the result of efforts by CarePoint's Founders to enrich themselves at CarePoint's expense by extracting cash or value from CarePoint's hospitals.  Barnabas denies that competing for physicians or patients "hurts the customer by removing options."  Rather, such competition *increases* customer choice.  Barnabas notes that this is exactly what HRH and the Trust attempt to do through the claim for injunctive relief in this case: remove SED as a competitor so that HRH can operate Bayonne Medical Center as

the sole provider of emergency services in Bayonne once again.  To the extent not

expressly admitted, Barnabas denies all other allegations of this paragraph.

### 2.    CarePoint Explores Selling Hospitals

77.    Between 2011 and early 2018, CarePoint stabilized the operations of
the Hospitals, employing thousands of people, serving hundreds of thousands of
patients, and investing significant funds in the real estate on which each Hospital
operated and in the community served by each Hospital.  CarePoint further began
the transition to be an in-network provider for all major health plans, including
Horizon.  However, the latter portion of the prior decade presented significant
financial challenges to the CarePoint Hospitals as a result of RWJ's monopolization
efforts.

**Answer:**  Barnabas denies that CarePoint stabilized its operations, but does

not know the details of CarePoint's financial performance between 2011 and 2018,

or the latter portion of the prior decade.  Barnabas admits that CarePoint (or its

Founders) profited substantially from overcharging patients and insurers and

refusing to participate in insurers' provider networks.  Barnabas admits that

CarePoint, at various times during portions of the period referenced, pursued steps

to go out of network with major payor networks in order to jack up prices, then rejoin

payer networks after engaging in litigation against many of the insurers, only to

again go out of network, jack up prices, and sue insurers, again.  Barnabas denies

that CarePoint's "significant financial challenges" were "a result of RWJ's

monopolization efforts."  Rather, CarePoint's collapse was self-inflicted:  its

Founders extracted enormous cash pay-outs through sale-leasebacks, related-party

fees, and tax distributions; the hospitals were starved of capital, service lines were

111

cut, and CarePoint's out-of-network pricing strategy alienated consumers until the Out of Network Act curtailed the model. HRH also engaged in a sustained scheme to drive CarePoint into bankruptcy and afterwards join with CarePoint to monopolize the market for emergency services in Bayonne. Barnabas's conduct was lawful and pro-competitive, including expanding in-network emergency access in Bayonne through a Department of Health-approved SED that mitigated access barriers created by CarePoint's business model. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

78. In addition, efforts to navigate the economic shoals and develop a strategy for success, indeed survival, were complicated by the fact that the CarePoint Hospitals were not in full control of the real estate on which the Hospitals were located. By way of example, MPT of Hoboken TRS, MPT of Hoboken Hospital, MPT of Hoboken Real Estate, and MPT of Bayonne (together "MPT") are limited liability companies that, at pertinent times, own(ed) portions of the real estate under the CarePoint Hospitals. MPT is a national medical REIT.

**Answer:** Barnabas admits that, as part of the CarePoint Founders' strategy to extract cash and value from CarePoint's hospitals for their own self-enrichment, CarePoint chose to transfer partial control of the hospital real estate to others, including Mr. Eisenreich and MPT. Barnabas denies that such transfer "complicated" CarePoint's "strategy for success," but rather such transfer was purposefully designed to enrich CarePoint's Founders. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

79. The property on which Christ Hospital operated was owned by Hudson Propco, LLC (owned 75% by the Founders and 25% by JC Opco, LLC, an entity

owned by Eisenreich), and the property on which HUMC operated was owned 70% by an MPT entity and 30% by the Founders. The Bayonne property was wholly owned by an MPT entity and was subleased to IJKG, the CarePoint affiliate that operated Bayonne Medical Center.

**Answer:** Barnabas admits that the Founders divided each of the CarePoint Hospitals into an operating company ("OpCo") and a property-holding company ("PropCo"), all of which rolled up into holding companies initially under the Founders' common control. The OpCos managed the CarePoint Hospitals' day-to-day operations, while the PropCos owned the underlying real estate, buildings, and facilities. Once this structure was in place, the Founders sold off interests in the hospital real estate to outside investors, extracting *over $100 million* in sale-and-leaseback transactions. Barnabas further admits that, at certain times, the Founders and Eisenreich owned the property under Christ Hospital through various entities; MPT and the Founders owned the property under HUMC through various entities; and MPT owned the property under Bayonne. Barnabas otherwise lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

80.    Beginning in 2018, CarePoint began to explore strategic alternatives, including a sale of the Hospitals to new operators. As one of his companies was the minority owner of Christ Hospital, Eisenreich was included in all of CarePoint's discussions involving strategic alternatives.

**Answer:** Barnabas does not know when CarePoint or its Founders first began to explore strategic alternatives, but admits that by 2018 CarePoint did seek to obtain

expressions of interest relating to the sale of one or more of its hospitals.  Barnabas

admits that Mr. Eisenreich had a minority ownership interest in Christ Hospital.

Barnabas does not know all of the discussions in which Mr. Eisenreich was involved

or what they involved, but notes that ████████████████████████████████

████████████████████████████████  To the extent not

expressly admitted, Barnabas denies all other allegations of this paragraph.

81.    The primary goal for each of CarePoint's strategic alternatives was to
ensure that all potential suitors agree that the Hospitals would continue operating as
acute care facilities for the benefit of the communities that they serve.  This crucial
baseline requirement was communicated by CarePoint to all who expressed interest
in acquiring or otherwise becoming involved in the operation of any of the CarePoint
Hospitals.  In selecting an acquirer or other strategic partner, CarePoint's primary
focus has been to avoid any interruption in providing quality healthcare to the
residents of Hudson County; therefore, CarePoint rejected any proposal that did not
guarantee a seamless transition of employees, physicians, nurses, operations, and
health care services.

**Answer:**  Denied.  CarePoint's "primary goal" was to enrich its Founders

through a transaction that could be approved by state regulators.  Barnabas does not

know what, if any, proposals CarePoint rejected or the reasons for such rejections.

Indeed, the Complaint is inconsistent.  In paragraphs 86 and 89, CarePoint/the Trust

argues that any offer for the "assets" of a CarePoint hospital implies or "hint[s]" at

a desire by the acquiror to "sell off the ... assets" and "eliminate" the hospital as a

competitor, but in paragraph 93, CarePoint/the Trust alleges that it "accepted"

an offer.  CarePoint/the Trust's argument regarding the inferences that can be drawn

from an asset offer and its allegations about its "primary goal" cannot both be true,

meaning that one or both are false.  To the extent not expressly admitted, Barnabas

denies all other allegations of this paragraph.

82.    In April 2019, RWJ expressed interest in all three CarePoint Hospitals. In July, 2019, RWJ tendered an LOI for CarePoint's HUMC and Christ Hospital facilities, but not for Bayonne Medical.  CarePoint also engaged in discussions with another potential purchaser, Atlantic Health, which does not have acute care operations in Hudson County or in communities bordering Hudson County.

**Answer:**    In April 2019, Barnabas responded to CarePoint's request to

provide a preliminary "non-binding indication of interest" with a proposed valuation

for a transaction that included "100% of [CarePoint]."    Following further

discussions, Barnabas submitted a *draft* of a non-binding letter of intent on July 3,

2019, which contemplated an acquisition of certain assets relating to Hoboken and

Christ Hospitals.  For its part, Atlantic expressed interest in Hoboken and Bayonne.

Barnabas lacks sufficient knowledge or information to form a belief about the truth

of the remaining allegations in this paragraph and therefore denies them.

### 3.    Eisenreich and His Affiliates Conspired with RWJ to Utilize the Ownership of Hospital Realty to Squeeze CarePoint

83.    Potential acquirers, including RWJ and Atlantic, were aware of the importance of controlling the real estate on which the Hospitals were built, for predictability of cost and planning.

**Answer:**    Barnabas admits that CarePoint had transferred partial control of

the real estate on which its hospitals were built to others, including Mr. Eisenreich

and MPT.  Barnabas does not know the full terms of such transferred control,

including the ways in which such transfer would impede potential acquirers' ability

to operate or improve the hospitals or facilities. But Barnabas admits that its Letter of Intent contained a contingency involving the hospital real estate. Barnabas does not know what Atlantic or others were aware of. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

84.    Eisenreich also recognized the critical relationship between hospital operations and control of the hospital real estate, and the opportunity for him to personally benefit from and control the sale of the CarePoint Hospitals. Eisenreich devised a scheme to do exactly that, in part by conspiring with RWJ.

**Answer:** Barnabas denies it participated in any "scheme" or conspiracy with Mr. Eisenreich or anyone else. To the extent that the allegations in this paragraph relate to Mr. Eisenreich's state of mind, Barnabas lacks knowledge and therefore denies them. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

85.    In late August, 2019, RWJ advised CarePoint that it was not interested in purchasing HUMC at the offered price, but that it might still be interested in acquiring Christ Hospital's operations.

**Answer:** Barnabas admits that *CarePoint* rejected Barnabas's July 2019 Letter of Intent, and demanded a higher price than Barnabas had offered for Hoboken. Barnabas further admits that it was not interested in paying the exorbitant amount that CarePoint was demanding for Hoboken, and informed CarePoint of this in August 2019. Barnabas did not say it was still interested in acquiring Christ by itself, at that time. To the contrary, it asked CarePoint whether it had set "independent offer prices" for Christ, expressly stating that it "would prefer to spend

[its] time elsewhere" if CarePoint's expectations with respect to valuation remained at their current level.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

86.    On September 10, Eisenreich (through his counsel) told CarePoint's counsel that RWJ was interested in bidding for only the assets of Christ Hospital – thereby hinting that RWJ did not intend to operate, but rather sell off the hospital's assets and eliminate Christ as a competitor to RWJ.

**Answer:**  Barnabas notes that the complaint is internally inconsistent to the extent it asserts, in paragraph 85, that Barnabas expressed interest in acquiring Christ Hospital in August 2019, but then alleges in paragraph 86 that CarePoint learned of Barnabas's supposed interested in September 2019.  Regardless, Barnabas is not aware of what CarePoint's business partner, Mr. Eisenreich, told CarePoint, either directly or through their respective lawyers.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

87.    On September 17, MPT offered to sell the Hoboken and Bayonne real estate to CarePoint.  CarePoint accepted this offer, but such a transaction never closed.

**Answer:**  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

88.    Eisenreich separately communicated to RWJ and to CarePoint that he had a "plan" that could work for everyone.  He warned CarePoint that RWJ contemplated closing Bayonne Medical as an acute care hospital.

**Answer:**  Denied. ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Barnabas never offered to acquire Bayonne, let alone contemplate closing it. ████

███████████████████████████████████████████████████

███████████████████████████████████████████    Barnabas

denies being a part of any unlawful "plan" with Mr. Eisenreich or anyone else.  To

the extent not expressly admitted, Barnabas denies all other allegations of this

paragraph.

89.    On September 23, RWJ emailed to CarePoint an offer for the Christ
Hospital assets only – further reinforcing the notion that RWJ's goal was to remove
Christ Hospital from the equation, leaving RWJ to serve Jersey City through JCMC,
unchecked by competition.

**Answer:**  Barnabas did not email an offer for Christ Hospital on September

23, 2019.  It indicated that it would be interested in submitting a bid for Christ

Hospital, and outlined a few of the material terms that such a bid might contain.

Barnabas denies any goal to "remove Christ Hospital from the equation, leaving

RWJ to serve Jersey City through JCMC, unchecked by competition."  To the

contrary, the email suggested any offer or agreement would be conditioned on

material "improvement[s]" to enable Barnabas to continue operating the hospital,

and would exclude "medical practices and related infrastructure" related to Hoboken

and Bayonne, which would be available to continue serving the relevant market.  To

the extent not expressly admitted, Barnabas denies all other allegations of this

paragraph.

90.    From mid-September into November, Eisenreich orchestrated
communications regarding the implementation of his "plan" to which RWJ had
agreed.    Eisenreich endeavored to preclude direct contact between RWJ and
CarePoint with respect to any potential transactions so as to further obfuscate RWJ's
true motivation and plan.

**Answer:**  Denied.

91.    RWJ's interest in any acquisition was expressly contingent upon its
ability to negotiate new leases.  On September 28, 2019, RWJ tendered a revised
LOI for the assets of HUMC and Christ Hospital, with that contingency.

**Answer:**  Barnabas admits that, on September 28, 2019, it submitted a Letter

of Intent for the assets of Hoboken and Christ Hospitals, with a contingency

involving the hospital real estate.  CarePoint did not accept this LOI.  To the extent

not expressly admitted, Barnabas denies all other allegations of this paragraph.

92.    Eisenreich, through his affiliate, Alaris Health ("Alaris"), executed an
LOI with MPT for the sale of the HUMC and Bayonne Medical real estate and for
the acquisition of MPT's minority equity interest in HUMC, on October 18, 2019.
He promptly reported this to RWJ, but not to CarePoint.

**Answer:**  By the end of October or early November 2019, ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

119

████████████████████████████████ Barnabas

further understands that CarePoint subsequently filed suit against MPT and Eisenreich, seeking, among other things, a temporary restraining order seeking to enforce its right of first refusal over sale of MPT's interest in the Hoboken operating company.  Barnabas lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

93.    On October 21, RWJ submitted another LOI to CarePoint for the acquisition of Christ Hospital's assets and HUMC (expressly contingent on new leases for the HUMC and Christ Hospital real estate), which CarePoint accepted the next day.

**Answer:**  Barnabas admits that, on October 18, 2019, it submitted a revised non-binding LOI for certain assets of Christ Hospital and Hoboken, and that the LOI contained a contingency relating to the hospital real estate.  CarePoint executed this non-binding LOI on or about October 21, 2019.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

94.    Eisenreich continued to meet secretly with Manigan regarding lease terms.  He and Manigan agreed that it would not respond to CarePoint's inquiry about lease terms.

**Answer:**  Barnabas admits that it continued to try to negotiate terms for the hospital real estate, as contemplated in the LOI.  Barnabas denies any "secret" meetings.  Barnabas does not have sufficient information to know what CarePoint/the Trust refers to by "it" or "CarePoint's inquiry" in the second sentence,

and therefore denies the allegation.  To the extent not expressly admitted, Barnabas

denies all other allegations of this paragraph.

95.    On October 27, without notice to CarePoint, Eisenreich (through Alaris) executed definitive agreements with MPT for the sale of the HUMC and Bayonne Medical real estate and MPT's minority equity interest in the operator of HUMC.  These transactions closed on November 5, 2019 and RWJ was aware of the transaction prior to closing, yet CarePoint did not learn of it until two days later.  Alaris subsequently assigned its interests to other Eisenreich affiliates – WTFK Bayonne and SB Hoboken.

**Answer:** ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████  Barnabas lacks sufficient

knowledge or information to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

96.    Simultaneously and unbeknownst to CarePoint, during 2019, Eisenreich engaged in ongoing dialogue with Manigan at RWJ.  Much of this dialogue was conducted secretly, and not disclosed to CarePoint.

**Answer:**  Denied.  Mr. Eisenreich and the Founders collectively controlled

land underneath Christ Hospital, and MPT controlled the land under HUMC and

Bayonne. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████    As such, Barnabas denies any "secret"

dialogues.   To the extent not expressly admitted, Barnabas denies all other

allegations in this paragraph.

97.    A focus of this collusion between Manigan and Eisenreich involved the calculated and strategically presented 2019 LOI from RWJ for Christ Hospital and HUMC – which RWJ never intended to see through to completion.  Rather, Manigan intended to use the LOI to gain valuable proprietary and/or confidential intelligence and use it to prevent any other potential operators or acquirers from engaging with CarePoint.

**Answer:**  Denied.

98.    After the LOI was submitted, RWJ and CarePoint were in close contact and, as is expected prior to an acquisition, CarePoint ceased business development expenditures and planned for potential staffing reduction in force in consolidation with its purported acquirer, RWJ.  In fact, RWJ was aware of CarePoint's precise financial situation and leveraged this knowledge to push the CarePoint Hospitals to insolvency.

**Answer:**  Barnabas admits that it was in contact with CarePoint as part of the

due diligence process that is associated with any transaction.  Barnabas does not

know what efforts CarePoint did or did not take with respect to business

development or staff reductions, but notes that if CarePoint did suspend any business

development activities, it did so unilaterally and in violation of its obligations under

the LOI.  Barnabas denies that it took actions to "push the CarePoint Hospitals to

insolvency."  HRH did push the CarePoint Hospitals to insolvency, which allowed

HRH to ultimately acquire control of them.  Now HRH seeks to recover its costs in

so doing by pursuing – through the Trust that it controls – claims against Barnabas

that it knows are false.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

99.    Behind the scenes, Manigan and Eisenreich were discussing each step in the plan and while RWJ represented to CarePoint that its interest in CarePoint was contingent upon a favorable proposal from Eisenreich with regard to the hospital real estate Eisenreich controlled, Manigan and Eisenreich never had any intention of brokering any agreement as to such real estate.  This is made clearer by Eisenreich going to great lengths to preclude RWJ and CarePoint discussing any aspect of the real estate.

**Answer:**  Denied.

100.  On November 1, 2019, RWJ filed an application with the NJDOH for expedited consideration of its request for a certificate of need to proceed with its proposed transactions concerning Christ Hospital and HUMC.

**Answer:**  Barnabas admits that it filed an application for a certificate of need, which CarePoint attested to as "true and correct," "to assur[e] the continuation of essential health care services," and "to continue the clinical services currently offered by Christ Hospital and HUMC."  As attested to by CarePoint, expedited review was appropriate "as a result of dire financial circumstances" associated with CarePoint's mismanagement of the hospitals, and the impact of recent regulations that would limit CarePoint's ability to gouge insurers as an out-of-network provider.  Specifically, CarePoint attested that passage of the Out of Network Consumer Protection, Transparency, Cost Containment, and Accountability Act – which was designed to "provide[] protection for consumers" and to reduce "reimbursement pressures" on insurers – █████████████████████████████████

123

██████████████████████    In response, CarePoint fired numerous employees throughout its system.  The reimbursement changes also reduced the CarePoint Founders' ability to continue extracting cash from the system through bogus management fees, resulting in a ████████████████████████

████████████████████████████████████████████

███████    To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

101.  Using the pretense of uncertainty over the real estate, but in truth knowing that the whole intention of the LOI was the damage it would cause to CarePoint, RWJ – in collusion with Eisenreich – intentionally backed out of the proposed transaction to acquire the Christ Hospital assets and HUMC.

**Answer:**  Denied, except to the extent that Barnabas admits that the non-binding LOI was terminated.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

102.  The sale of the real estate on which HUMC and Bayonne Medical operate and the assignment of the affected leases was subject to claims brought by, among others, HUMC and IJKG (the CarePoint affiliate that owns and operates Bayonne Medical) in the Chancery Court in Delaware in the matter entitled *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, C.A. No. 2019-0972-KSJM.

**Answer:**  Barnabas is aware that CarePoint sued its landlords MPT and Avery Eisenreich.  In that case, CarePoint claimed that Barnabas was the *victim* of the alleged conspiracy—not a *perpetrator* of it.  Indeed, the premise of CarePoint's suit was that Barnabas had acted in good faith, but that MPT and Eisenreich had tried to

interfere with the Barnabas transaction for Christ and Hoboken.  Barnabas lacks

knowledge of the remaining allegations in this paragraph and therefore denies them.

103.   In that litigation, the Court has issued a number of interlocutory rulings in favor of the CarePoint entities, including (i) a finding that MPT violated a right of first refusal when it purported to sell the HUMC equity interest to an Eisenreich affiliate, (ii) the Court has denied the Eisenreich parties efforts to obtain summary judgment on CarePoint's tortious interference claims against Eisenreich and (iii) struck all of Eisenreich's counterclaims against CarePoint.  The matter is now settled.

**Answer:**  Barnabas is aware that CarePoint sued its landlords MPT and Avery

Eisenreich.  In that case, CarePoint claimed Barnabas was the *victim* of the alleged

conspiracy—not a *perpetrator* of it.  Indeed, the premise of CarePoint's suit was that

Barnabas had acted in good faith, but that MPT and Eisenreich had tried to interfere

with the Barnabas transaction for Christ and Hoboken.  Barnabas lacks knowledge

of the remaining allegations in this paragraph and therefore denies them.

### 4.   Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint

104.   In January 2020, shortly after RWJ "backed out" of its LOI to purchase the Christ Hospital assets and HUMC – a transaction Manigan orchestrated that RWJ never intended to close – HRH, owned by Moshe, approached CarePoint about a possible acquisition of all or part of, or investment in, the group of entities comprising CarePoint – by way of a merger, asset sale, or other transaction.

**Answer:**  Barnabas denies that it "never intended to close" on the deal

contemplated by the non-binding LOI.  In November 2019, HRH became interested

in acquiring Bayonne Medical Center.  ███████████████████████████

████████████████████████████████████████████████  Then, in

January 2020, HRH "approached CarePoint about a possible acquisition of all or part of … CarePoint." To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

105. In connection with this potential transaction, HRH requested an extensive list of confidential information about CarePoint and each of its Hospitals. Accordingly, CarePoint granted HRH access to a "data room" where confidential data, including financial data, regarding Bayonne Medical and the other CarePoint Hospitals was stored.

**Answer:** Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

106. As a condition to receiving information about the Company, HRH entered into a confidentiality agreement with CarePoint, dated January 9, 2020. Under the confidentiality agreement, HRH agreed to treat any "Evaluation Material" in "accordance with the provisions" of the confidentiality agreement.

**Answer:** Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

107. After having access to, reviewing, and downloading copies of most of the Evaluation Material in the data room for not only Bayonne Medical – but all the CarePoint Hospitals – on March 16, 2020, HRH submitted an offer to IJKG, which included a provision that the offer was "[c]ontingent upon the ability to acquire the Land and Property for $30 million or less." Despite HRH revising its bid several times, no version of HRH's modified offer for the assets of Bayonne Medical included all of the requirements requested by IJKG.

**Answer:** The Founders rejected any transaction that would not personally benefit them to the tune of tens of millions of dollars. ████████████

████████████████████████████████████████████

████████████████████████████████████████ Barnabas otherwise

lacks knowledge of the allegations in this paragraph and therefore denies them.

108.   At the same time it was negotiating with HRH, IJKG was negotiating with others, including BMC which was a newly formed entity, formed with the purpose of acquiring Bayonne Medical and continuing to operate it as an acute care hospital.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

109.   Given the offers before it, IJKG determined that BMC presented the best bid for Bayonne Medical's assets, considering the potential for successful operation of the hospital, and financial stability.

**Answer:**  The Founders wanted to force Eisenreich to sell the Bayonne real estate for below market value, and they thought the BMC transaction was the way to do it—namely, because it was contingent on a hypothetical world in which the government strips Eisenreich of his property interest without fair compensation. Barnabas lacks knowledge of the remaining allegations in this paragraph and therefore denies them.

110.   On March 23, 2020, BMC signed a letter of intent (the "BMC LOI") to purchase the assets of Bayonne Medical – keeping substantially all of Bayonne Medical's employees and staff, and providing the same services as an acute care hospital.

**Answer:**  On March 23, 2020, in an effort to force Eisenreich to sell the Bayonne real estate for below market value, the Founders entered into a Letter of Intent with a newly-created entity, BMC Hospital, LLC, to acquire the Bayonne OpCo. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████    With the BMC LOI in hand, the Founders engaged in

an intense lobbying effort to secure support for the transaction – which was

contingent on a hypothetical world in which the government strips Eisenreich of his

property interest without fair compensation – and threatened closure of Bayonne if

it the transaction did not come to pass.  Barnabas otherwise lacks knowledge of the

allegations in this paragraph and therefore denies them.

111.    Given the execution of the BMC LOI, IJKG informed the other bidders, including HRH, that it had an exclusive letter of intent with another bidder for the assets of Bayonne Medical, and could not entertain any further proposals or discussions about Bayonne Medical.

**Answer:**  The Founders rejected any transaction, including the one with HRH,

that would not personally benefit them to the tune of tens of millions of dollars.

Instead, the Founders wanted to pursue the BMC transaction in an effort to force

Eisenreich to sell the Bayonne real estate for below market value.  Barnabas lacks

knowledge of the remaining allegations in this paragraph and therefore denies them.

112.    In May 2020, notwithstanding the existence of the BMC LOI between IJKG and BMC, Eisenreich, through WTFK Bayonne agreed to sell the Bayonne Medical real estate to HRH – and HRH promptly and publicly announced its ownership and control of the Bayonne Medical real estate.

**Answer:**  HRH agreed to acquire both the Bayonne and Hoboken real estate

from Eisenreich for $220 million, $76 million of which was allocated to Bayonne,

███████████████████████████████████████████████  Shortly after

entering into this transaction, Eisenreich and HRH acted in concert to issue notices

of default and institute eviction proceedings against CarePoint.  Barnabas lacks

knowledge of the remaining allegations in this paragraph and therefore denies them.

113.  In an op-ed for The Jersey Journal, Hudson County Executive Tom
DeGise noted that the "supply of hospital beds cannot be simply be viewed as a
source of private profit, but as a critical community resource."[13]

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and

therefore denies them.

114.  Despite Moshe's HRH facility being licensed as a general acute care
hospital, its main focus had been, and continues to be, on same day surgery, and it
had no real incentive to expend significant resources to acquire Bayonne Medical.

**Answer:**  Barnabas notes that HRH now controls Bayonne Medical and all of

the CarePoint Hospitals, giving it monopoly power over emergency services in

Bayonne.  HRH expended significant resources as part of its scheme to force

CarePoint into Bankruptcy and acquire control of its hospitals:  more than five years

and over $270 million.  Barnabas lacks knowledge of the remaining allegations in

this paragraph and therefore denies them.

115.  HRH's real motivation in making hollow offers to CarePoint that
knowingly did not meet CarePoint's requirements, and then to sabotage BMC's
acquisition of Bayonne Medical through an 11th hour land transaction with

---

[13] Terri West, *DeGise says he's ready to use eminent domain on 3 CarePoint Health hospitals,* The
Jersey Journal, May 12, 2020 (https://www.nj.com/hudson/2020/05/degise-says- hes-ready-to-
use-eminent-domain-on-3-carepoint-health-hospitals.html)

Eisenreich, was pure greed to own the market for same day surgery in Hudson County, preferably at its existing Secaucus facility.

**Answer:**    HRH, in concert with Eisenreich, then CarePoint, and now the Trust, embarked on a multi-year scheme to force CarePoint into bankruptcy, acquire control of its hospitals, and solidify its monopoly over emergency services in Bayonne.  Barnabas lacks knowledge of the remaining allegations in this paragraph and therefore denies them.

116.   Upon information and belief, the plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close.  Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical, as the specter of bankruptcy causes staff and doctor defection, a freeze on programmatic growth and expansion of other services and offerings.  Further, patients are reluctant to seek care at a facility they believe is "going out of business."

**Answer:**    HRH, in concert with Eisenreich, then CarePoint, and now the Trust, wanted CarePoint to become insolvent so that it could take over operation of its hospitals, including its monopoly over emergency services in the City of Bayonne.  Barnabas denies colluding or being part of any unlawful "plan" involving Mr. Eisenreich, HRH, or anyone else.  Both HRH and the Trust – which is controlled by HRH with its consent rights over litigation decisions and priority distribution from any recovery – know beyond a shadow of a doubt that the allegation of a Barnabas-HRH "conspiracy" is false.  For the avoidance of doubt, Barnabas also denies that it "feigned interest" in any transaction with CarePoint or that its intention

has ever been to cause "financial distress to Bayonne Medical." To the extent not

expressly admitted, Barnabas denies all other allegations in this paragraph.

117. Eisenreich and Moshe planned that, once the hospital closed, they would repurpose the building as Eisenreich's next skilled nursing facility ("SNF") and HRH would hire the surgeons then doing cases at Bayonne Medical to further expand HRH's same day surgery programs at HRH's Secaucus facility.

**Answer:** Barnabas lacks knowledge of the allegations in this paragraph and

therefore denies them.

118. Such a plan served to benefit Eisenreich, Moshe, HRH and RWJ. Eisenreich could expand his SNF empire with Moshe, HRH would eliminate surgery center competition, and RWJ would eliminate Bayonne Medical as a competitor, as a SNF does not provide inpatient GAC services.

**Answer:** Denied. Both HRH and the Trust – which is controlled by HRH

with its consent rights over litigation decisions and priority distribution from any

recovery – know beyond a shadow of a doubt that the allegation of any conspiracy

between Barnabas and HRH is false.

119. As a result, essentially all ER traffic from Bayonne would be routed through the SED and this would drive inpatient admissions to RWJ's JCMC facility. Notably, and by way of example, publically [*sic*] available data on hospital admissions in 2021 shows that RWJ and CarePoint account for 91.5% of ER admissions in Bayonne (07002). Eliminating Bayonne Medical would leave RWJ with nearly all ER admissions for such patients.

**Answer:** Barnabas denies the first and last sentences of this paragraph.

Barnabas lacks knowledge of the allegations in the second sentence of this paragraph

and therefore denies them.

120. The transaction through which HRH acquired the Bayonne Medical real estate from Eisenreich not only occurred the same day that CarePoint and BMC

announced their asset purchase for Bayonne Medical, but was 100% seller-financed. That is to say that HRH did not put up one cent to acquire the Bayonne Medical real estate. The financing, also unsurprisingly, was through one of Eisenreich's entities.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

### 5.    Eisenreich's Collaborators at HRH

121.    To further demonstrate HRH's penchant for greed and subterfuge, its Board of Directors is headed by Manigan's former client, Moshe, who has been sued in at least half a dozen federal lawsuits, which have accused Moshe of RICO and insurance fraud over the last decade.[14]

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the Trust and is the real party in interest to any recovery in this litigation.  Barnabas otherwise lacks knowledge of the allegations in this paragraph and therefore denies them.

122.    Moshe has such an extensive history of alleged fraud and wrongdoing that another Federal Court based its granting of a preliminary injunction on the then-seven prior lawsuits filed against Moshe alleging his engagement in fraudulent billing activities.  *See* In *Gov't Employees Ins. Co. v. Moshe*, 2020 WL 3503176, at *1 (E.D.N.Y. June 29, 2020).

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the Trust and is the real party in interest to any recovery in this litigation.  Barnabas otherwise lacks knowledge of the allegations in this paragraph and therefore denies them.

---

[14] Peter D'Auria, *This man wants to create a new for-profit hospital chain in Hudson County. Can he do it?*, The Jersey Journal October 26, 2020 (https://www.nj.com/hudson/2020/10/this-man-wants-to-create-a-new-for-profit-hospital-chain-in-hudson-county-can-he-do-it.html)

123.    In fact, a putative class action was filed in this very Court, alleging that Moshe colluded with his sister, a New York-based physician, to refer New York-resident patients to HealthPlus – a Hackensack, NJ-based surgery center owned by Moshe, despite the existence of less expensive facilities closer to the patients.  The class alleges that poor sterilization and other deficiencies may have exposed these wrongly referred patients to HIV and hepatitis.  *C.S. v. HealthPlus Surgery Center, LLC*, 2020 WL 6074457, at *1 (D.N.J. Oct. 14, 2020).

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the Trust and is the real party in interest to any recovery in this litigation.  Barnabas otherwise lacks knowledge of the allegations in this paragraph and therefore denies them.

124.    Further, in a complaint filed late last year, State Farm alleged numerous claims, including fraud, based on Moshe's alleged orchestration of a fraudulent scheme to bill and profit from a series of medical facilities, a billing company, and a series of ambulatory surgical centers which he "secretly owns and controls."  *State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C.*, 21-cv-5523, Complaint ¶ 2 (E.D.N.Y. Oct. 5, 2021).

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the Trust and is the real party in interest to any recovery in this litigation.  Barnabas otherwise lacks knowledge of the allegations in this paragraph and therefore denies them.

125.    About the same time as the State Farm suit, Allstate Insurance Company separately sued Moshe for having "engineered" a fraud scheme in which he, through affiliated entities, "aggressively" sought to collect payments from Allstate even though the entities were not eligible for reimbursement.  *Allstate Ins. Co. v. Metro Pain Specialists P.C.*, 21-cv-5586, Complaint (E.D.N.Y. Oct. 7, 2021).

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the Trust and is the real party in interest to any recovery in this litigation.  Barnabas

otherwise lacks knowledge of the allegations in this paragraph and therefore denies

them.

126.   Perhaps most relevant to the instant action is that Allstate also alleged that Moshe sought to evade prohibitions against his ownership of certain types of medical facilities and fraudulent billing of medical services from the same by installing "sham owner" physicians, but retaining operations, control, and profit for himself and the medical facilities he owns.  *Id.*

**Answer:**  Mr. Moshe is the Owner and Chairman of HRH, which controls the

Trust and is the real party in interest to any recovery in this litigation.  Barnabas

otherwise lacks knowledge of the allegations in this paragraph and therefore denies

them.

127.   Moshe's colleague, HRH's President and Chief Executive Officer, Dr. Nizar Kifaieh, is the subject of an active litigation in Hudson County brought by CarePoint based on Kifaieh's legally binding separation agreement.

**Answer:**  Mr. Kifaieh is the President and CEO of HRH, which controls the

Trust and is the real party in interest to any recovery in this litigation.  Barnabas is

aware that CarePoint sued Kifaieh on non-disparagement/defamation theories.

Barnabas otherwise lacks knowledge of the allegations in this paragraph and

therefore denies them.

128.   As part of that separation agreement, and in return for over $2,600,000 in cash as well as other valuable consideration, Kifaieh agreed not to disparage CarePoint, yet after obtaining the CEO job with HRH, Kifaieh published and made a number of disparaging, false and defamatory statements in violation of his separation agreement.

**Answer:**  Mr. Kifaieh is the President and CEO of HRH, which controls the

Trust and is the real party in interest to any recovery in this litigation.  Barnabas is

aware that CarePoint sued Kifaieh on non-disparagement/defamation theories. Barnabas otherwise lacks knowledge of the allegations in this paragraph and therefore denies them.

129.   Also, most recently, Reuven Alonalayoff, Director of Marketing for HRH, was arrested after police found a "large cache of firearms and ammunition inside an office closet" at HRH.  Secaucus police "recovered 11 handguns, 27 rifles or shotguns, and a semi-automatic rifle with a high-capacity magazine, which is an assault rifle, inside [a] hospital closet," as well as "another high-capacity handgun magazine with 14 rounds."[15]

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

130.   Notably, Alonalayoff "who is also known as Reuven Alon and Rob Alon," has been named alongside Moshe as a co-owner of certain shell corporations in numerous lawsuits, including federal lawsuits brought by GEICO and State Farm in which he, with Moshe were accused of "submitting fraudulent claims for medical services related to car accidents."[16]

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

**D.    Raymond James Issues RFI and Colludes with RWJ To Interfere with CarePoint Hospitals**

131.   In another effort to use its political strength, RWJ commandeered the previously dormant bureaucratic machinery of the Hudson Municipal Hospital

---

[15] Emily Mae Czachor, *Hospital employee arrested after 39 guns, ammo found in office closet* August 9, 2022 CBS News (https://www.msn.com/en-us/news/crime/hospital-employee-arrested-after-39-guns-ammo-found-in-office-closet/ar-AA10u5IV)

[16] Ed Shanahan - *Employee Kept Arsenal, Including Assault Rifle, at Hospital, Police Say* – NY Times, August 9, 2022 (https://www.nytimes.com/2022/08/09/nyregion/guns-hospital- employee-threat-new-jersey.html)

Authority ("HMHA") to operate outside of its statutory authority to crush HUMC, such that RWJ could purchase it out of bankruptcy.

**Answer:**  Denied.

132.  On or about December 18, 2020, the Hudson Municipal Hospital Authority (HMHA) was reconstituted, allegedly pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15, *et. seq.* which "authorizes municipalities to create, by ordinance, an instrumentality for the **sole purpose** of carrying out an acquisition and to operate and maintain a hospital." (emphasis added).  However, HMHA neither obtained funding from the City of Hoboken that would permit it to acquire HUMC, nor otherwise raised funds to support an acquisition of HUMC.  In fact, HMHA took no steps to acquire and operate a hospital.

**Answer:**  CarePoint/the Trust's legal interpretation of Local Hospital Authority Law is wrong.  As to the facts, Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

133.  The applicable Ordinance B-312 reconstituting HMHA stated that HMHA was created because "CarePoint Health has notified the City that it no longer desires to continue its operation of the Hospital [HUMC]."  This assertion was false, as CarePoint never notified the City or any of its government officials that it intended to cease operating HUMC.

**Answer:**  Barnabas admits that CarePoint's Founders no longer desired to operate Hoboken as a for-profit hospital because, as CarePoint attested, the CarePoint Founders' ability to extract bogus management fees had been hampered by recent changes in the law that prevented CarePoint from gouging insurers as an out-of-network provider.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

134.  Instead of pursuing any of its statutorily permitted purposes under New Jersey Law, HMHA retained Raymond James and sought to broker a sale of

136

CarePoint – a private hospital system – to another private hospital system.  This is not a permitted purpose under the Local Hospital Authority Law.

**Answer:**    CarePoint/the Trusts's legal interpretation of Local Hospital Authority Law is wrong.    As to the facts, Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

135.  RWJ had previous extensive professional dealings with Raymond James and colluded with Raymond James in order to further its goals of devaluing HUMC to the point it would be forced into bankruptcy so RWJ could pursue an anticompetitive sale of HUMC to RWJ.

**Answer:**    Barnabas denies colluding with Raymond James or anyone else.  Barnabas denies having "goals of devaluing HUMC to the point it would be forced into bankruptcy so [Barnabas] could pursue an anticompetitive sale of HUMC to [Barnabas]."  Nor does that allegation make any sense, as any sale of Hoboken would avert bankruptcy (not force it into bankruptcy), especially if such sale occurred at a lower price.    More generally, Barnabas denies taking or contemplating anticompetitive action at all.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

136.  In June 2021, RWJ was provided with advance notice that Raymond James was tasked with identifying a new operator of HUMC, and that an RFI would be circulated seeking potential buyers.

**Answer:**    Barnabas admits that, in June 2021, Raymond James informed Barnabas that it would be issuing an RFI to solicit indications of interest for HUMC.  Barnabas assumes that Raymond James reached out to other potential bidders as

well, but does not know to whom it reached out.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

137.  Specifically, Vinton Rollins of Raymond James reached out to Mark Manigan of RWJ, noting their "prior introduction and past Zoom call," that Rollins was "[l]ooking forward to [his] next zoom" with Manigan on June 14, and to give Manigan "a Heads-up that Raymond James is now representing the City of Hoboken/Mayor in working to find a replacement operator/owner for CarePoint's Hoboken University Medical Center[.]"

**Answer:**  Barnabas admits that Vinton Rollins informed Barnabas that Raymond James was retained by the HMHA, the Mayor, and/or the City of Hoboken in connection with an RFI.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

138.  Even before this June 2021 advance notice, in February 2021 RWJ and Raymond James exchanged updates concerning CarePoint, including regarding Vivek Garipalli, the then-current majority owner of CarePoint– in an attempt to identify weaknesses that RWJ could leverage to devalue HUMC and to further its anticompetitive conduct.

**Answer:**  Barnabas denies that it sought to "to identify weaknesses . . . [it] could leverage to devalue Hoboken and to further its anticompetitive conduct." Barnabas denies engaging in any anticompetitive conduct at all.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

139.  To set this plan in motion, Raymond James issued a RFI, which sought potential buyers for not only HUMC, the only hospital under HMHA's City of Hoboken jurisdiction, but, incredibly, CarePoint's other hospitals in Hudson County, over which HMHA (a municipal authority of *Hoboken*) possessed no authority.

**Answer:**  Barnabas does not know what "plan" is being referred to and denies being a part of any unlawful plan with Raymond James or anyone else.  Barnabas

notes that Raymond James was retained merely to facilitate the "introduction of [interested parties] to CarePoint" because HMHA "believe[d] that a consensual, negotiated transaction with CarePoint can best ensure a seamless and successful transfer of operating control that benefits CarePoint, the new operator, and the community at large."  The RFI only sought indications of interest with respect to Hoboken.  But, in doing so, the RFI also suggested that recipients might consider indicating "whether they would be interested in proposing a transaction involving the other operations and/or assets of CarePoint in Hudson County … as CarePoint has indicated its interest in maintaining a coordinated system of facilities in its service area."  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

140.  On or about October 8, 2021, CarePoint publicly announced its intention to convert HUMC to non-profit ownership.  Despite this announcement, on or about December 20, 2021, without CarePoint's knowledge or consent, Raymond James circulated the RFI to RWJ (who was informed it was coming nearly six months earlier) and other entities (who did not get the same "heads up" as RWJ), soliciting potential buyers or operators for the Hospital.

**Answer:**  Barnabas admits that CarePoint announced its intention to convert Hoboken to a non-profit after the CarePoint Founders had stripped the hospital of sufficient operating funds.  To the extent the allegations relate to CarePoint's knowledge, consent, or involvement with Raymond James or the RFI, Barnabas lacks knowledge and therefore denies them.  Barnabas admits that it, presumably

139

along with others, received an RFI.  To the extent not expressly admitted, Barnabas

denies all other allegations in this paragraph.

141.  In an attempt to exclusively control the means and method of communication with RFI respondents and remove CarePoint from the negotiation of the sale of its own hospital(s), Raymond James warned in its RFI that "[i]n no event should any RFI Respondent directly contact any officer, member, agent or employee of . . . CarePoint without the prior consent of Raymond James."  The RFI directed recipients to direct all questions to Raymond James, and not the supposed seller, CarePoint.

**Answer:**    To the extent the allegations relate to CarePoint's knowledge,

consent, or involvement with Raymond James or the RFI, Barnabas lacks knowledge

and therefore denies them.  Barnabas admits that, following common practice, the

RFI instructed recipients not to "directly contact any officer, member, agent or

employee of the City of Hoboken, the HMHA or CarePoint without the prior consent

of [Raymond James]."  To the extent not expressly admitted, Barnabas denies all

other allegations in this paragraph.

142.   Boldly and without authority to do so, the RFI encouraged recipients to "consider expressing in their response whether they would be interested in proposing a transaction involving the other operations and/or assets of CarePoint in Hudson County, such as Bayonne Medical Center and Christ Hospital, as CarePoint has indicated its interest in maintaining a coordinated system of facilities in its service area."

**Answer:**    To the extent the allegations relate to CarePoint's knowledge,

consent, or involvement with Raymond James or the RFI, Barnabas lacks knowledge

and therefore denies them.  Barnabas admits that the RFI suggested that recipients

might  consider  indicating  "whether  they  would  be  interested  in  proposing  a

transaction involving the other operations and/or assets of CarePoint in Hudson

County … as CarePoint has indicated its interest in maintaining a coordinated system

of facilities in its service area."  To the extent not expressly admitted, Barnabas

denies all other allegations in this paragraph.

143.    Raymond James then continued the conversation it started more than six months earlier with RWJ to discuss how to take over the CarePoint Hospitals, which led to RWJ, despite backing out of a previous potential acquisition of one or more of the CarePoint facilities, to express interest in operating and owning HUMC, and potentially other CarePoint Hospitals.

**Answer:**  Barnabas admits that it responded to Raymond James's RFI.  To

the extent not expressly admitted, Barnabas denies all other allegations in this

paragraph.

144.    Furthermore, the RFI enclosed confidential information concerning CarePoint and HUMC that Raymond James obtained without authorization, from self-described "private sources" and a "proprietary database."  It is believed that this data, at least in part, came from the information provided to RWJ during the 2019 LOI and/or from Eisenreich through his dealings with CarePoint.

**Answer:**    Barnabas denies that it disclosed to Raymond James any

confidential information provided by CarePoint during the 2019 LOI discussions.

Barnabas lacks knowledge of the remaining allegations in this paragraph and

therefore denies them.

145.    Inclusion of this confidential information in the RFI intentionally and misleadingly represented to third parties that HUMC and CarePoint authorized such data to be contained in the RFI.

**Answer:**  Denied.

141

146.   As a result of the RFI's circulation, and RWJ's interest, certain RFI recipients halted ongoing negotiations and reconsidered prospective business relationships with CarePoint.  More broadly, the RFI (which states that the current operator will be displaced) and RWJ's interest therein put CarePoint at a disadvantage to enter into any new agreements and retain staff.

**Answer:**  Denied.

147.   Upon information and belief, RWJ understood how CarePoint and, specifically HUMC, would be affected by the circulation of the RFI—and likely intended these effects.  Also, circulating the RFI improperly interfered with HUMC's operations and management—including HUMC's development of relationships with strategic partners.

**Answer:**  Denied.

148.   CarePoint successfully brought an action against HMHA and others in Superior Court in Hudson County, NJ captioned Carepoint Health Management Associates, LLC d/b/a Carepoint Health And Humc Opco, LLC d/b/a Carepoint Health – Hoboken University Medical Center v. Hoboken Municipal Hospital Authority, Raymond, James & Associates, Inc. (Case No. HUD-C-000019-22) to enjoin distribution of the RFI.  The matter is now settled.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

149.   Through all the above actions RWJ and its conspirators including, without limitation, HRH, Moshe, and Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public.

**Answer:**  Denied.  Both HRH and the Trust – which is controlled by HRH with its consent rights over litigation decisions and priority distribution from any recovery – know beyond a shadow of a doubt that the allegation of any conspiracy between Barnabas and HRH (or its agents) is false.

142

150.    RWJ has carried out these actions without intervention from, and sometimes with the explicit support and authority of state and local government and New Jersey healthcare providers such as Horizon.

**Answer:**  Barnabas admits that it has, at all times, acted in accordance with all applicable laws and regulations.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

151.    RWJ's conduct, as alleged herein, has caused significant financial injury to CarePoint and, unless enjoined, will risk significant competitive harm to CarePoint and to the public through RWJ's elimination of all competition for general acute care in Hudson County.

**Answer:**  Denied.

## COUNT I – VIOLATION OF THE SHERMAN ACT SECTION TWO (15 U.S.C. § 2)

152.    Plaintiffs incorporate by reference paragraphs 1 through 151 above.

**Answer:**  Barnabas incorporates by reference its answers to paragraphs 1 through 151 above.

### A.    Relevant Markets

153.    Inpatient general acute care ("GAC") services provided in Hudson County is a relevant market in which to assess RWJ's monopolistic effect on competition and consumers of GAC services.

**Answer:**  Denied.

#### 1.    Relevant Product Market

154.    Inpatient GAC services is the relevant product market.  Inpatient GAC services include a broad cluster of hospital services— medical, surgical, and diagnostic services requiring an overnight hospital stay—for which competitive conditions are substantially similar.  Here, inpatient GAC services cover all such overlapping services that both RWJ and CarePoint provide.  GAC services implicate

interstate trade and commerce in that supplies used in providing care, as well as funding for the services, travel in interstate commerce.

**Answer:**  Denied.

155.  Outpatient services (i.e., services that do not require an overnight hospital stay) are not included in the inpatient GAC services market because patients cannot substitute outpatient services for inpatient services in response to a price increase on inpatient GAC services.  This is because the decision to administer services on an inpatient or outpatient basis is a medical determination based on each patient's specific clinical need.

**Answer:**  Denied.

156.  A hypothetical monopolist of all inpatient GAC services could profitably impose a small but significant and non-transitory increase in the price of those services.

**Answer:**  Denied.

### 2.    Relevant Geographic Market

157.   Hudson County, New Jersey, is a relevant geographic market in which to evaluate RWJ's monopolistic effect on competition.  Hudson County is the focal area of competition between RWJ and CarePoint.

**Answer:**  Denied.

158.   Hudson County is the fourth-most populous, most dense, and fastest-growing, county in New Jersey, with a population of more than 700,000 residents.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

159.  Hudson County is an area that is economically significant to commercial insurers.  Patients typically prefer to have access to inpatient GAC services close to where they live.  For this reason, a commercial insurer would be unable to sell a health plan successfully in Hudson County that did not include in its network any Hudson County GAC hospitals.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

160.    Commercial insurers must meet regulatory requirements that mandate a certain level of geographic access.  Insurers could not meet geographic access requirements for marketing commercial plans in Hudson County if those insurers did not include any Hudson County hospitals as in-network hospitals in their commercial insurance plans.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

161.  Hudson County's population includes a disproportionately high number of patients who receive health care from government funded programs, or the uninsured.  Hudson County has the most diverse population of any county in the eastern United States.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

162.    Hudson County also has a large number of patients for whom travel outside of Hudson County to receive GAC services would constitute a substantial hardship.

**Answer:**  Barnabas lacks knowledge of the allegations in this paragraph and therefore denies them.

163.    A hypothetical monopolist of all inpatient GAC services in Hudson County could profitably impose a small but significant and non-transitory increase in price of those services.

**Answer:**  Denied.

**B.    Market Effects**

164.    There is direct evidence that the conduct of RWJ, injuring and threatening the elimination of the CarePoint facilities as independent competitors, is

145

likely to further lessen competition in the relevant market. As it stands today, there is robust competition for general acute care services in Hudson County. That competition benefits commercial insurers and patients. However, if RWJ's various anticompetitive practices directed toward CarePoint are allowed to continue unfettered, RWJ will succeed in exerting nearly complete control over general acute care services in Hudson County. If CarePoint – an important competitor in the Hudson County GAC market – is eliminated, anticompetitive effects will follow.

**Answer:** Barnabas denies the first sentence of this paragraph. Barnabas *increased* competition in the relevant market. Barnabas admits that "[*a*]*s it stands today*, there is **robust competition** for general acute care services in Hudson County," which "benefits commercial insurers and patients." Barnabas denies the fourth sentence of this paragraph, and denies that it engaged in any wrongdoing or anticompetitive behavior. To the extent not specifically admitted, Barnabas denies all other allegations of this paragraph.

### C.    Competition Among Hospitals Benefits Consumers

165. Under a model of hospital competition that has been developed in merger enforcement cases brought by the Federal Trade Commission, competition among hospitals is viewed as a "two-stage" market, in which the first stage is centered on the formation of networks of providers, including hospitals, by commercial insurers. At this stage, both insurers and hospitals are viewed as competitors in the process of network formation. In theory, this process allows insurers to negotiate for lower prices and other favorable terms which, in turn, benefit consumers by lowering the insurers' costs that must be passed on to their subscribers.

**Answer:** The allegations in this paragraph do not require a response because they are nothing more than CarePoint/the Trust's legal characterization or argument. To the extent not specifically admitted, Barnabas denies all other allegations of this paragraph.

146

166.  Under this model, in the first stage of hospital competition, hospitals compete to be included in commercial insurers' health plan networks.  To become an in-network provider in a health plan, a hospital negotiates with an insurer and enters into a contract if it can agree with the insurer on terms.  The hospital's reimbursement terms for services rendered to a health plan's members are a central component of those negotiations.  This is true regardless of whether reimbursements are tied to fee-for-service contracts, value-based contracts, or other types of contracts.

**Answer:**  The allegations in this paragraph do not require a response because they are nothing more than CarePoint/the Trust's legal characterization or argument. To the extent not specifically admitted, Barnabas denies all other allegations of this paragraph.

167.  Insurers attempt to contract with local hospitals (and other healthcare providers) that offer services that current or prospective members of the health plan want.  In-network hospitals are typically significantly less expensive for health plan members to seek care from than a hospital that is not included in the health plan's network (an "out-of-network provider").  A hospital likely will attract more of a health plan's members when it is in-network.  Hospitals, therefore, have an incentive to offer competitive terms and reimbursement rates to induce the insurer to include the hospital in its health plan network.

**Answer:**  Barnabas admits that insurers sometimes attempt to contract with healthcare providers to provide services that the insurer's subscribers may want. Barnabas also admits that reimbursement rates for in-network hospitals are often lower than out-of-network reimbursement rates, but lacks sufficient information about whether this is always true or the magnitude, if any, of the difference in reimbursement rates.  Barnabas also lacks knowledge concerning the extent to which being in-network affects the share of a health plan's members.  Barnabas denies that

147

the incentive to increase patient volume overcame CarePoint's desire to overcharge patients and insurers for emergency and GAC services. Indeed, such incentives did not induce CarePoint to offer competitive terms and reimbursement rates. To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

168. From the insurer's perspective, having hospitals in-network is beneficial because it enables the insurer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically employers and their employees.

**Answer:** The allegations in this paragraph do not require a response because they are nothing more than CarePoint/the Trust's legal characterization or argument. Barnabas lacks information about what "insurers" perceive, or the relative benefits and costs of adding a particular provider to an insurer's provider network. To the extent not specifically admitted, Barnabas denies all other allegations of this paragraph.

169. A hospital has significant bargaining leverage if its absence would make the insurer's health plan network substantially less attractive (and therefore less marketable) to its current and prospective members. This relative attractiveness to the insurer depends largely on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of the plan's members. The presence of alternative, conveniently located, high-quality hospitals is important competition that constrains the ability of hospitals to raise prices and seek other terms adverse to consumers in negotiations with insurers. Where there are fewer meaningful alternatives (i.e., less competition), a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more onerous contract terms.

**Answer:**  Barnabas admits that, prior to the opening of its SED, CarePoint possessed a monopoly for emergency services in Bayonne, and thus, had significant bargaining leverage with insurers that enabled it to charge monopoly reimbursement rates.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

170.   In the second stage of competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services.  Once patients select a health plan, they generally do not face different out-of-pocket costs to access hospitals included in their commercial health plan network.  As a result, in-network hospitals often compete on non-price features, such as location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, conveniences, and patient satisfaction.

**Answer:**  The allegations in this paragraph do not require a response because they are nothing more than CarePoint/the Trust's legal characterization or argument.  Barnabas admits that it competes on price and non-price grounds.  To the extent not otherwise expressly admitted, Barnabas denies all other allegations of this paragraph.

171.   Non-price competition to attract patients benefits all patients at the competing hospitals, regardless of whether those patients are covered by commercial insurance, government funded programs, such as Medicare, Medicaid and Tri-Care, or are uninsured.  From the perspective of consumer welfare, the most important elements of competition among health care providers, including acute care hospitals, is access to care and quality of care.  CarePoint is endeavoring to maintain optimal access to acute care for the population of Hudson County, and to continue to enhance the quality of that care.  RWJ's efforts to control the provision of acute care in Hudson County will only reduce that access and reduce the incentive to upgrade the care available to the consuming public.

**Answer:**  CarePoint did not endeavor to "maintain optimal access to acute care for the population of Hudson County" or to "enhance the quality of that care." Instead, CarePoint and its Founders sought to enrich themselves at the expense of access to low-cost, quality care by extracting cash and value from CarePoint's hospitals and overcharging insurers for services.  Barnabas, in contrast, sought to increase choice, improve quality, and offer lower cost care than CarePoint did.  To the extent not expressly admitted, Barnabas denies all other allegations of this paragraph.

172.  In Hudson County, RWJ and CarePoint are close competitors to each other because they sell many of the same services in essentially the same place.

**Answer:**  Barnabas admits that it competes with other providers in the provision of healthcare services.  To the extent not otherwise expressly admitted, Barnabas denies all other allegations of this paragraph.

173.  RWJ and CarePoint currently serve as important alternatives to one another for insurers constructing networks that include Hudson County.  RWJ and CarePoint's Christ Hospital are two of the three largest hospitals in Hudson County, and they are the only hospitals in Jersey City, the largest city within Hudson County. Elimination of Christ Hospital as an independent acute care hospital would severely limit competition to the disadvantage of the public.

**Answer:**  Barnabas denies the first and last sentences of this paragraph. Barnabas admits that it competes with other healthcare providers.  Barnabas admits that it operates hospitals in Hudson County and in Jersey City, the largest city within

Hudson County.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

174.  Upon information and belief, quantitative analysis will provide direct evidence of the closeness of the competition between RWJ and CarePoint. Diversion analysis, an economic tool that measures substitution using data on where patients receive hospital services, will show that if CarePoint's hospitals were to become unavailable to patients for inpatient GAC services, a significant number of CarePoint's patients would seek care at an RWJ hospital.  Likewise, if RWJ were to become unavailable to patients for inpatient GAC services, a significant number of RWJ's patients would seek care at one of CarePoint's hospitals.

**Answer:**  Denied.

175.  RWJ and CarePoint compete with one another to attract patients to utilize their inpatient GAC services, regardless of a patient's insurer.  This competition incentivizes RWJ and CarePoint to improve quality, technology, amenities, equipment, access to care, and service offerings.

**Answer:**  Barnabas admits that it competes for patients.  Barnabas does not know what incentivizes CarePoint.  Barnabas notes, however, that CarePoint chose to enrich its Founders by at least $157 million rather than invest in improving the quality of CarePoint's facilities.  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

176.  RWJ is attempting to prevent CarePoint's hospitals from competing against RWJ, either as independent competitors or as competitors partnered with a different healthcare system.

**Answer:**  Denied.

177.  The provision of acute care hospital services, as well as subsets of those services, implicate interstate commerce, *inter alia*, in that they involve the use of medicines and supplies that travel in interstate commerce, involve reimbursement by insurance companies and federal and state funds that move in interstate commerce.

**Answer:**  Barnabas admits that the provision of acute care hospital services can implicate interstate commerce.

178.   RWJ has a dominant share of the acute care hospital services market in Hudson County, and enjoys power over the setting of prices to be charged to commercial insurers, as well as uninsured patients.

**Answer:**  Denied.

179.   If RWJ should succeed in eliminating the CarePoint Hospitals as independent competitors in Hudson County, RWJ's already significant market power would be greatly enhanced.

**Answer:**  Denied.

180.   As alleged above, RWJ and its conspirators have adopted a many-faceted strategy to pursue the goal of eliminating the CarePoint Hospitals as independent competitors.  While some of those activities, including seeking the aid of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme, they nonetheless provide evidence of RWJ's monopolistic intent and purpose.

**Answer:**  Barnabas admits that CarePoint/the Trust does not allege actionable or unlawful conduct.   Barnabas denies having any "monopolistic intent [or] purpose," denies engaging in any conspiracy, and denies that its goal or strategy was to "eliminat[e] the CarePoint Hospitals as independent competitors."  To the extent not expressly admitted, Barnabas denies all other allegations in this paragraph.

181.   RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for GAC services in Hudson County.

**Answer:**  Denied.

182.   RWJ's conspirators in this effort include, without limitation, HRH, Moshe, and Kifaieh.

**Answer:** Denied.

183.   CarePoint has suffered damage to its business or property in the form of lost revenues and resulting profits, as well as being forced to incur significant expenses to mitigate the anticompetitive effects of the conduct of RWJ and its conspirators.

**Answer:** Denied.

184.   Accordingly, RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for acute care hospital services in Hudson County, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**Answer:** Denied.

185.   The actions of RWJ and its conspirators have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

**Answer:** Denied.

186.   Unless the continued unlawful conduct of RWJ and its conspirators is enjoined pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**Answer:** Denied.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

**Answer:** This paragraph does not contain any factual allegations, and as such, no response is required.  To the extent a response is required, Barnabas denies that it is liable and denies that CarePoint, the Trust, or HRH is entitled to any relief.

## COUNT II – VIOLATION OF THE SHERMAN ACT
## SECTION ONE (15 U.S.C. § 1)

187.   Plaintiffs incorporate by reference paragraphs 1 through 186 above.

**Answer:**  Barnabas incorporates by reference its answers to paragraphs 1 through 186 above.

188.   The facts set forth above show that RWJ and its conspirators have engaged in a series of agreements in unreasonable restraint of interstate trade and commerce, affecting the markets for acute care hospital services in Hudson County, including but not limited to agreements intended to cripple and/or destroy the CarePoint Hospitals as independent competitors, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:**  Denied.

189.   The actions of RWJ have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

**Answer:**  Denied.

190.   Unless the continued unlawful conduct of RWJ is enjoined pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**Answer:**  Denied.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

**Answer:**  This paragraph does not contain any factual allegations, and as such, no response is required.  To the extent a response is required, Barnabas denies that it is liable and denies that CarePoint, the Trust, or HRH is entitled to any relief.

## AFFIRMATIVE DEFENSES

Barnabas asserts the following affirmative defenses.  In doing so, Barnabas does not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon Plaintiffs.

### *First Affirmative Defense*
### *(Statute of Limitations)*

1.     Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

2.     CarePoint/the Trust's claims are barred, in whole or in part, by the applicable statute of limitations.  CarePoint/the Trust's claims are barred, in whole or in part, because they are based, in whole or in part, on conduct that predates September 6, 2018.  In addition, regardless of whether CarePoint/the Trust has a claim based in whole or in part on conduct occurring prior to September 6, 2018, CarePoint/the Trust cannot recover for any *damages* incurred prior to September 6, 2018.

3.     The Complaint alleges conduct dating back to 2013.  For example, CarePoint/the Trust alleges that Barnabas acquired JCMC in 2013.  It asserts that, "beginning in at least the fall of 2015," Barnabas engaged in discussions with Horizon.  It asserts that Barnabas engaged in a campaign of soliciting physicians to

its physician network "[b]eginning in mid-February 2016." It alleges that Barnabas opened SED in 2017. And, it alleges various purported regulatory violations prior to September 6, 2018.

4. CarePoint/the Trust knew or, in the exercise of reasonable diligence, should have known of the alleged conduct giving rise to its claims. Indeed, CarePoint/the Trust cites public sources for many of its allegations. Barnabas did not actively, affirmatively, or fraudulently conceal the conduct alleged in the Complaint.

### *Second Affirmative Defense*
### *(Laches)*

5. Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

6. CarePoint/the Trust's equitable claims are barred by the doctrine of laches.

7. CarePoint/the Trust failed to exercise reasonable diligence in pursuing their alleged claims, resulting in prejudice to Barnabas. CarePoint/the Trust has delayed in bringing any claim against Barnabas.

8. The Complaint alleges conduct dating back to 2013. For example, CarePoint/the Trust alleges that Barnabas acquired JCMC in 2013. It asserts that,

"beginning in at least the fall of 2015," Barnabas engaged in discussions with Horizon.  It asserts that Barnabas engaged in a campaign of soliciting physicians to its physician network "[b]eginning in mid-February 2016."  It alleges that Barnabas opened SED in 2017.  And, it alleges various purported regulatory violations for which CarePoint/the Trust failed to bring any timely action.

9.    CarePoint/the Trust's delay in bringing its claims has caused undue prejudice to Barnabas, and CarePoint/the Trust should therefore be barred from seeking equitable relief.

### Third Affirmative Defense
### (Mootness)

10.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

11.    The Trust's request for injunctive relief must be dismissed as moot because CarePoint does not allege any ongoing anticompetitive conduct.

12.    The Trust does not operate in the market or carry on any business activities in the marketplace.  Instead, the Trust was nominally organized to hold and prosecute litigation claims for the benefit of CarePoint's creditors.  As such, the CarePoint Trust has no redressable right or interest in securing injunctive relief, and any claim for injunctive relief is moot.

### *Fourth Affirmative Defense*
### *(Contribution Bar)*

13.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

14.    The Trust's claims are barred by the Contribution Bar.

15.    In November 2024, CarePoint Debtors filed for bankruptcy in the District of Delaware.   In connection with CarePoint's Bankruptcy Plan, the CarePoint Litigation Trust became effective on May 22, 2025, and was substituted as plaintiff in this action by Court Order dated July 23, 2025.

16.    As part of its confirmed Bankruptcy Plan, CarePoint Debtors settled all claims between CarePoint and HRH.  This broad release covered HRH's role in its alleged conspiracy with Eisenreich to drive CarePoint into bankruptcy, and the baseless alleged conspiracy with Barnabas.  In exchange for this release, which was essential to CarePoint's restructuring efforts, and other assets, HRH paid CarePoint over $130 million.

17.    In addition to securing a release, HRH became the direct assignee, beneficial owner, and real party in interest with respect to the claims asserted by the Trust in this action.  Under the Bankruptcy Plan and the Trust Agreement, HRH is the primary beneficiary of the Litigation Trust, receiving anywhere from 35% to

100% of the proceeds, depending on the ultimate recovery.  Specifically, HRH receives the first $3.5 million (plus interest); the next $15 million goes to the remaining general unsecured creditors; HRH gets the next $5 million; and beyond that, HRH gets 35% of any proceeds until it receives back $110 million of the over $130 million it paid.  Even if HRH were not the direct assignee of CarePoint's claims, it is the beneficial owner of such claims.

18.     HRH, and the CarePoint Trust acting on its behalf, is now precluded from recovering any portion of its settlement with CarePoint Debtors from Barnabas by the Contribution Bar.

### Fifth Affirmative Defense
### (Unclean Hands)

19.     Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

20.     The Trust's claims are barred by the doctrine of unclean hands.

21.     HRH conspired with Eisenreich to gain control of the land underneath Bayonne and HUMC, and saddle CarePoint with default and eviction proceedings. It also exercised its powers as landlord to block the BMC deal for Bayonne and drive CarePoint into bankruptcy, allowing HRH to, in concert with CarePoint, purchase

Bayonne and gain control of the entire CarePoint hospital system. This scheme gave HRH monopoly power in at least the market for emergency services in Bayonne.

22.    HRH, through its control of, and in concert with, the Trust, is now asserting claims against Barnabas it knows for a fact to be false—namely, CarePoint/the Trust's allegations that HRH conspired with Barnabas. HRH is pursuing these knowingly false claims for the improper purpose of reimbursing itself, as primary beneficiary of the Trust, for its own wrongdoing, and solidifying its monopoly over emergency services in Bayonne.

23.    The Trust, acting for HRH, is precluded from recovery by the doctrines of unclean hands.

## Sixth Affirmative Defense
### (In Pari Delicto)

24.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

25.    The Trust's claims are barred by the doctrine of *In Pari Delicto*.

26.    The Trust is pursuing claims that HRH participated in a conspiracy with Barnabas, making it at least equally culpable as Barnabas under the Trust's allegations. As an alleged co-conspirator, HRH, and the CarePoint Trust acting on its behalf, is precluded from recovery by the doctrines of *In Pari Delicto*.

### Seventh Affirmative Defense
### (Lack of Antitrust Standing or Antitrust Injury)

27.     Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

28.     CarePoint/the Trust lacks antitrust standing to seek redress for the injury alleged in the Complaint.  CarePoint/the Trust has not suffered an injury-in-fact arising from the alleged conduct, and any injury it did suffer was not antitrust injury.  Moreover, the Trust does not operate in the market or carry on any business activities in the marketplace.

29.     CarePoint/the Trust alleges that "[t]he actions of RWJ have caused injury to CarePoint in its business or property, resulting in economic damages."  But CarePoint/the Trust does not identify what these damages are.  To the extent that CarePoint/the Trust has suffered financial losses, CarePoint/the Trust's purported losses are attributable to CarePoint's mismanagement of CarePoint; the CarePoint Founders' extraction of funds from CarePoint in the form of unjustified management fees, interest or other obligations on loans, and other interested-party transactions; CarePoint's refusal to contract with insurers with respect to network status or reimbursement rates; the effects of law relating to insurer reimbursement; CarePoint's business decisions with respect to competing (or not competing) for

patients, doctors, employees, or staff; CarePoint's disposition of, or contracts relating to, hospital real estate; CarePoint's dealings with its own business partners; and/or the acts of third parties, including HRH. Any such losses do not constitute injury-in-fact attributable to any conduct by Barnabas, and/or is too remote to confer standing.

30.    To the extent CarePoint/the Trust's injury can be attributed to Barnabas's conduct, any such injury flows from an increase in competition or effects other than that which makes the alleged conduct anticompetitive. Without limiting the foregoing, any injury flowing from the following does not constitute antitrust injury: acquiring JCMC in 2017; establishing SED; offering insurers and patients in-network care options; reducing reimbursement rates relative to CarePoint's rates; improving quality of care; offering employment opportunities, privileges, or other benefits to doctors, nurses, staff, and other employees; and investing millions of dollars in improvements. Each of these actions individually and collectively increased competition, lowered prices, and improved healthcare for patients and the community.

31.    To the extent CarePoint/the Trust's injury flows from conduct involving governmental actors, or any alleged violation of law (other than the Sherman Act itself) or regulation, such conduct does not flow from that which makes the conduct unlawful under the Sherman Act, and does not constitute antitrust injury.

32.    To the extent CarePoint/the Trust's injury flows from any alleged breach of any contractual obligation among the parties (or their respective affiliates), such conduct does not flow from that which makes the conduct unlawful under the Sherman Act, and does not constitute antitrust injury. Without limitation, any injury flowing from any alleged breach of any agreements relating to the transport of patients does not constitute antitrust injury.

### Eighth Affirmative Defense
### (Lack of Causation)

33.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

34.    CarePoint/the Trust's claims must be dismissed because any injury is not attributable to Barnabas's actions.

35.    None of the alleged losses were due to any conduct by Barnabas, or any anticompetitive conduct by Barnabas.

36.    To the extent CarePoint/the Trust has suffered injury, CarePoint/the Trust's purported losses are attributable to CarePoint's mismanagement of CarePoint; the CarePoint Founders' extraction of funds from CarePoint in the form of unjustified management fees, interest or other obligations on loans, and other interested-party transactions; CarePoint's refusal to contract with insurers with

respect to network status or reimbursement rates; the effects of law relating to insurer reimbursement; CarePoint's business decisions with respect to competing (or not competing) for patients, doctors, employees, or staff; CarePoint's disposition of, or contracts relating to, hospital real estate; CarePoint's dealings with its own business partners; and/or the acts of third parties, including HRH. Such losses do not constitute injury-in-fact attributable to any conduct by Barnabas.

### Ninth Affirmative Defense
### (Unenforceability of Non-Compete Agreements)

37.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

38.    CarePoint/the Trust's allegations are barred to the extent they rely on unenforceable non-compete agreements.

39.    Under New Jersey law, for non-competes to be enforceable, they must be reasonable under the circumstances. In its Complaint, CarePoint/the Trust alleges that Barnabas "poached one of CarePoint's leading practitioners by encouraging him to intentionally violate a restrictive covenant." Such a claim is barred because the restrictive covenant in CarePoint's contract is unenforceable.

### *Tenth Affirmative Defense*
### *(Pro-Competitive Justifications)*

40.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

41.    Barnabas's alleged conduct was pro-competitive or otherwise justified by legitimate business reasons, and the pro-competitive effect of its actions outweigh any anticompetitive harm.

42.    CarePoint/the Trust's purported losses are attributable to CarePoint's mismanagement of its hospitals; the CarePoint Founders' extraction of funds from CarePoint in the form of unjustified management fees, interest or other obligations on loans, and other interested-party transactions; CarePoint's refusal to contract with insurers with respect to network status or reimbursement rates; the effects of law relating to insurer reimbursement; CarePoint's business decisions with respect to competing (or not competing) for patients, doctors, employees, or staff; CarePoint's disposition of, or contracts relating to, hospital real estate; CarePoint's dealings with its own business partners; and/or the acts of third parties, including HRH.

43.    Barnabas's pro-competitive actions include acquiring JCMC in 2017; establishing SED; offering insurers and patients in-network care options; reducing reimbursement rates relative to CarePoint's rates; improving quality of care; offering

165

employment opportunities, privileges, or other benefits to doctors, nurses, staff, and other employees; and investing millions of dollars in improvements.  Each of these actions individually and collectively increased competition, lowered prices, and improved healthcare for patients and the community.

44.    The pro-competitive effects of Barnabas's conduct outweigh any alleged anticompetitive effects.

### Eleventh Affirmative Defense
### (Failure to Mitigate Damages)

45.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

46.    CarePoint/the Trust has failed to mitigate its damages, if any, and therefore, any recovery should be reduced or denied accordingly.

47.    CarePoint failed to mitigate damages by failing to offer adequate incentives to its patients, doctors, nurses, staff, employees, or insurers.  CarePoint's failure to offer competitive financial terms to such refusal to compete exacerbated CarePoint's alleged damages.   Had CarePoint reasonably offered competitive financial terms to patients, doctors, nurses, staff, employees, and insurers, any damages attributable to Barnabas's conduct would have been avoided or reduced.

48.    CarePoint also failed to mitigate damages by failing to invest sufficient funds in the improvement of its facilities or the provision of healthcare services. Without limiting the foregoing, CarePoint chose to unreasonably funnel funds to its Founders rather than make necessary investments and improvements in its operations and facilities.  Had CarePoint acted reasonably, any alleged damages attributable to Barnabas's conduct would have been avoided or reduced.

### Twelfth Affirmative Defense
### (Acts of Government and/or State Action Doctrine)

49.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

50.    CarePoint/the Trust's claims are barred, in whole or in part, to the extent they are caused by acts of government or involve acts of government.  Such conduct is immune under the State Action doctrine, the First Amendment, or limitations on the scope of Sections 1 and 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

51.    Barnabas operates in a heavily regulated market overseen by the New Jersey Department of Health.  Conduct that is subject to the review, approval, or oversight by the Department of Health is immune from antitrust liability because the regulatory process reflects a clearly articulated and affirmatively expressed state

policy to displace competition with regulation and involves active supervision of regulated parties by the State through the Department of Health.  The conduct alleged is all subject to the review, approval, or oversight by the Department of Health.

52.    Conduct involving, arising out of, or relating to government activities is also barred.  For example, claims relating to the Hudson Municipal Hospital Authority and the Raymond James sales process must be dismissed because the Hudson Municipal Hospital Authority was reconstituted pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15, *et. seq*.  Similarly, the actions of the Board of Chosen Freeholders of the County of Hudson, the Hudson County Improvement Authority, or the City of Jersey City constitute state action beyond the reach of the Sherman and Clayton Acts.

53.    To the extent that CarePoint/the Trust alleges that any conduct exceeded the scope of any governmental actor's authority, or that Barnabas engaged in conduct that violated any applicable government rule or regulation, such conduct does not constitute antitrust jury.

### *Thirteenth Affirmative Defense*
### *(Noerr Pennington and First Amendment Immunity)*

54.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party

Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

55.    CarePoint/the Trust's claims are barred, in whole or part, by the *Noerr-Pennington* doctrine and the First Amendment to the extent such claims rely, in whole or in part, on lobbying activities, petitioning activities, or communications with governmental actors.    As CarePoint/the Trust concedes, such activities, "including seeking the aid of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme."

## *Fourteenth Affirmative Defense*
### *(Accord and Satisfaction)*

56.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

57.    CarePoint/the Trust's claims are barred by the doctrines of accord and satisfaction, res judicata, and collateral estoppel to the extent they are covered by a settlement agreement entered into by CarePoint and/or its affiliates and Barnabas and/or its affiliates.

58.    On July 1, 2016, CarePoint, McCabe (a CarePoint affiliate), JCMC, and the City of Jersey City, New Jersey entered into a Settlement Agreement to resolve claims asserted by McCabe that the City of Hoboken improperly awarded an

ambulance contract to JCMC. The Settlement Agreement outlined procedures for providing ambulance transport pursuant to a grid-based protocol. To the extent CarePoint/the Trust seeks to assert any claims based on the transport of patients, such claims are covered by the operative Settlement Agreement, and are therefore barred under the doctrines of accord and satisfaction, res judicata, and collateral estoppel. To the extent CarePoint/the Trust seeks to assert claims based on the breach of any Settlement Agreement, such claims do not involve any antitrust injury.

### *Fifteenth Affirmative Defense*
### *(One-Satisfaction Rule)*

59.    Barnabas incorporates by reference each and every response, denial, and allegation set forth in its Amended Answer and Counterclaim and Third-Party Complaint, as well as all other affirmative defenses stated herein, as though fully set forth in this section.

60.    CarePoint/the Trust's recovery should be reduced, set off or otherwise credited with, the consideration already paid in settlement by alleged co-conspirators, including Horizon, HRH, and others that CarePoint has previously sued and settled with for the same or related conduct as alleged against Barnabas. Any additional recovery for the same or related allegations would be double recovery barred by the one-satisfaction rule and the New Jersey Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1, et seq.

61.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

62.    Since 2020, HRH and CarePoint engaged in several litigations, most

notably *HRH v. CarePoint Health Systems Inc.*, HUD-L-001995-24 (Super. Ct.

NJ).  As part of the confirmed Bankruptcy Plan, CarePoint Debtors settled all claims

between CarePoint and HRH for what equated to at least $130 million in

consideration in exchange for HRH's release of liability.

63.    To the extent CarePoint/the Trust is awarded any damages, any such

recovery should be reduced by the full amount of all prior settlements

171

Dated: November 14, 2025

Respectfully submitted,

*/s/ William T. Walsh*

William T. Walsh
David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
wwalsh@proskauer.com
dmunkittrick@proskauer.com

Colin R. Kass*
Erica T. Jones*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
ejones@proskauer.com

*Attorneys for Defendant
RWJ Barnabas Health, Inc.*

*\* Admitted Pro Hac Vice*