# EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| CarePoint Health Management Assoc. LLC, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:22-cv-05421-EP-CLW |
| RWJ Barnabas Health, Inc. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                     Louis Modugno
89 Headquarters Plaza, North Tower, Suite 1201, Morristown, New Jersey 07960

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: Proskauer Rose LLP <br> Eleven Times Square <br> New York, New York 10036 | Date and Time: <br><br> 14 Days After Service |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    04/18/2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ William T. Walsh |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendant
RWJ Barnabas Health, Inc.                            , who issues or requests this subpoena, are:

William T. Walsh, Eleven Times Square, New York, NY, 10036, WWalsh@proskauer.com, 212-969-3908

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:22-cv-05421-EP-CLW

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Attachment A**

**Definitions**

1.      The term "Complaint" refers to CarePoint's Third Amended Complaint filed in the United States District Court for the District of New Jersey on February 8, 2023, bearing Case No. 2:22-cv-05421-EP-CLW, and any future amendments thereto.

2.      The term "this Litigation" refers *CarePoint Health Sys. Inc. v. RWJ Barnabas Health, Inc.*, 2:22-cv-05421-EP-CLW (D.N.J.).

3.      The terms "you" or "your" means Louis Modugno and LJM Strategies, LLC.

4.      The terms "plaintiff" and "CarePoint" refer to Plaintiffs CarePoint Health Systems Inc., Hudson Hospital OPCO, LLC, d/b/a CarePoint Health—Christ Hospital; IJKG, LLC, IJKG PROPCO, LLC and IJKG OPCO, LLC, d/b/a CarePoint Health—Bayonne Medical Center; and HUMC OPCO, LLC, d/b/a CarePoint Health—Hoboken University Medical Center, as well as their present or former affiliates, officers, directors, or employees; their Founders; their representatives, agents, and attorneys when acting in that capacity; and all persons or entities acting or purporting to act on CarePoint's behalf.

5.      The terms "Barnabas" or "defendant" refer to RWJ Barnabas Health, Inc.; its present or former affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

6.      The term "Founders" refers to Vivek Garipalli, James Lawler, and Jeffrey Mandler; any related entities in which they hold an economic or financial interest, including Mandler Family Trust, the Freehold Trust, as well as their officers, directors, or employees; their representatives,

agents, and attorneys when acting in that capacity; and all persons or entities acting or purporting to act on the CarePoint Founders' behalf.

7.      The term "MPT" refers to the Medical Properties Trust, Inc; MPT of Hoboken TRS, LLC; MPT of Hoboken Hospital, LLC; MPT of Hoboken Real Estate, LLC; MPT of Bayonne, LLC; their present or former affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

8.      The term "Horizon" refers to Horizon Blue Cross-Blue Shield, as well as its affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

9.      The term "HRH" refers to the Hudson Regional Hospital, as well as its affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

10.     The term "BMC" refers to BMC Hospital, LLC, as well as its affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

11.      The term "Raymond James" means Raymond James & Associates, Inc., as well as its affiliates, officers, directors, or employees; and its agents, representatives, and attorneys when acting in that capacity; and all other persons acting or purporting to act on its behalf.

12.     The term "Relevant Government Officials" means any government official referred to in the Complaint or the Original Complaint by name or description, including the following (as well as their aides, assistants, members, delegees, employees, or subordinates): (i) the Governor of New Jersey; (ii) any employee of the New Jersey Department of Health; (iii) the Mayor Office

of Bayonne; (iv) Jimmy Davis; (v) the Mayor's Office of Jersey City; (vi) Steve Fulop; (vii) the Mayor's Office of Hoboken, (viii) the Mayor's Office of Jersey City; and (ix) the Hudson Municipal Hospital Authority and its Board.

13.    The term "person" means any natural person or any business, legal, or governmental entity, including but not limited to any corporations, proprietorships, partnerships, joint ventures, consortiums, clubs, associations, foundations, governmental agencies or instrumentalities, societies, and orders.

14.    The term "Relevant Hospitals" refers to the business, operations, or assets of Hoboken University Medical Center ("HUMC") and operating under HUMC Opco, LLC; Bayonne Medical Center ("Bayonne"), and operating under IJKG Opco, LLC; and Christ Hospital, operating under Hudson Hospital Opco, LLC.

15.    The term "Hospital Real Estate" refers to the real estate underlying or adjoining the Relevant Hospitals.

16.    The term "SED" refers to Barnabas's Satellite Emergency Department located at 519 Broadway at 24th Street in Bayonne, New Jersey 07002.

17.    The term "Strategic Alternatives" mean any actual or potential transaction or initiative (including the consideration of any transaction or initiative) involving: (i) the sale or merger of CarePoint, any Relevant Hospital, or any of their affiliates; (ii) the sale of significant assets owned by CarePoint, any Relevant Hospital, or any of their affiliates; (iii) any re-organization or restructuring of CarePoint, any Relevant Hospital, or any its affiliates, whether or not pursuant to the United States Bankruptcy Code; (iv) any new partnership with any third-party relating to CarePoint, any Relevant Hospital, or any their affiliates, in which such third-party would obtain or possess following the transaction 10% or more of the equity, or voting interests,

in CarePoint, any Relevant Hospital, or any their affiliates; (v) any conversion of CarePoint, any Relevant Hospital, or any of its affiliates into a not-for-profit entity; or (vi) to the extent not encompassed by the foregoing, any "strategic alternative" as that term is used in paragraph 80 of the Complaint.

18.    The term "Sales Process" means any process for identifying, negotiating with, or reaching agreements with, or transitioning CarePoint, any Relevant Hospital, any of their affiliates, or any of their assets to, any other person or entity relating to any Strategic Alternative.

## **Instructions**

For the purposes of these Specifications, unless otherwise agreed, the following instructions will apply.

1.     Unless otherwise specified, each Specification calls for documents created, modified, sent, or received on or after January 1, 2011, through the present (the "Relevant Period").

2.     In responding to this Subpoena, you shall produce all responsive documents that are in your possession, custody, or control.

3.     All objections must state with particularity whether and in what manner the objection is being relied upon as a basis for limiting the scope of any search for, review of, response to, or production of any document or document Specification.  If you are withholding responsive information pursuant to any general objection, you must so expressly indicate.  If, in answering any Specification, you claim any ambiguity in interpreting either the Specification or a definition or instruction applicable thereto such claim shall not be used by you as a basis for refusing to respond.  Instead, you must set forth as part of your response the language deemed to be ambiguous and the interpretation you used or intend to use in responding to this Specification.

4.     When a Specification seeks production of "all documents" of a particular type, you must produce each and every responsive document, including any drafts or copies of documents that may exist.

5.     If there are no documents responsive to a request, you must expressly state that fact.

6.     You must search for and produce all responsive non-electronically-stored information ("hard-copy documents") and electronically-stored information ("ESI").

7.     Absent further agreement, ESI should be produced in accordance with the Court's September 28, 2023 ESI Order, ECF 56.

8.      Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

a.      Construing the terms "and" and "or" in the disjunctive or conjunctive, as necessary, to make the Request more inclusive;

b.      Construing the singular form of any word to include the plural and the plural form to include the singular;

c.      Construing the past tense of any verb to include the present tense and the present tense to include the past tense;

d.      Construing the term "date" to mean the exact day, month and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters;

e.      Construing the masculine form to include the feminine form;

f.      Construing negative terms to include the positive and vice versa; and

g.       The terms "concerning," "regarding," "relating to," and "reflecting" shall all have the same meaning, each shall be construed broadly, and none shall be construed as being more limited than any of the others.

9.      All words not defined in the Definitions shall be construed using their plain and ordinary meaning.  In answering any Request, if you claim any ambiguity in interpreting either the Request or a definition or instruction applicable thereto, such claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the Request.  Unless otherwise agreed, if more than one meaning can be ascribed to a word, the meaning that would make a document be covered by the request should be used, unless you provide written notice of the specific ambiguity and state the definition of the word you are using to exclude any document from the scope of the Request.

10.      If you redact any portion of a document, stamp the word "redacted" on each page or portion of the document that has been redacted.  Privilege redactions must be included in a

privilege log; non-privilege redactions must also be included in a log describing the basis for the redaction.

11.     If you seek to withhold production of any document (or portion thereof) based on privilege, you must comply with the logging and disclosure requirements of Rule 26(b)(5) separately for each such document.  The log should also include (i) the specific grounds for the claim of privilege; (ii) the date of the privileged communication or information; (iii) the parties participating in the privileged communication or privy to the privileged information (denoting all attorneys with an asterisk "*"); and (iii) the nature of the communication or information with sufficient detail to assess the claim of privilege.  Additionally, for any information withheld under a claim of attorney work product protection, identify with particularity the specific litigation or regulatory proceeding that was anticipated or pending to which such information relates.

## **Specifications**

1.      All documents and communications relating to your relationship with CarePoint during the relevant period.

2.      All communications with CarePoint or its Founders relating to any sale or potential sale of CarePoint or any Relevant Hospital, any Strategic Alternative, the Sales Process, or the Hospital Real Estate.

3.      All communications with any other person (including Barnabas, MPT, Vinton Rollins, Raymond James, HRH, BMC, Yan Moshe, Nizar Kifaieh, Atlantic Health, any other bidder, or any Relevant Government Official) relating to any sale or potential sale of CarePoint or any Relevant Hospital, any Strategic Alternative, the Sales Process, or the Hospital Real Estate.

4.      To the extent not produced in response to Requests 2-3, all documents relating to any sale or potential sale of CarePoint or any Relevant Hospital, any Strategic Alternative, the Sales Process, or the Hospital Real Estate.

5.      All documents relating to any transaction or potential transaction concerning CarePoint, the Relevant Hospitals, the Hospital Real Estate, or MPT, including, but not limited to, the October 2019 LOI and agreements for the sale of HUMC and Bayonne Medical real estate and MPT's minority equity interest in the operator of HUMC.

6.      All documents relating to payments made to you, by CarePoint, its Founders, or the Relevant Hospitals.

7.      All agreements or contracts between you or LJM Strategies, LLC and CarePoint, its Founders, or the Relevant Hospitals.

8.      All documents concerning the financial performance of CarePoint, the Relevant Hospitals, or the Hospital Real Estate, including all documents relating to any potential bankruptcy or restructuring of CarePoint or the Relevant Hospitals.

9.      All documents relating to Barnabas.

10.      All documents, if any, produced by you in *HUMC Holdco LLC et. al. v. MPT of Hoboken TRS, LLC et al.*, 2010-cv-0972 (Del. Ch.).

11.      All communications with CarePoint or its counsel concerning this Litigation.

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CAREPOINT HEALTH SYSTEMS**, *et al.* ) | Civil Action No: 2:22-cv-05421-EP-CLW |
| Plaintiffs, ) | Hon. Evelyn Padin, USDJ |
| v. ) | Hon. Cathy L. Waldor, USMJ |
| **RWJ BARNABAS HEALTH, INC.**, ) | |
| Defendant. ) | |

## DISCOVERY CONFIDENTIALITY ORDER

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1. ***Confidential Material.*** Any party to this litigation and any third-party shall have the right to designate as "Confidential" and subject to this Order any information, document, or thing, or portion of any document or thing: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential personal information, or (c) that contains information received in confidence from third parties, or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure and Local Civil Rule 5.3. Any party to this litigation or

1

any third party covered by this Order, who produces or discloses any Confidential Material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "CONFIDENTIAL".

2.    ***AEO Material.***  Any party to this litigation and any third-party shall have the right to designate as "Attorneys' Eyes Only" ("AEO") and subject to this Order any information, document, or thing, or portion of any document or thing that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the designating party. Any party to this litigation or any third party who is covered by this Order, who produces or discloses any Attorneys' Eyes Only material, including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony, shall mark the same with the foregoing or similar legend: "ATTORNEYS' EYES ONLY."

3.    ***Use of Discovery Material***.  All material produced in this action ("Discovery Material") shall be used by the receiving party solely for purposes of the prosecution or defense of this action, shall not be used by the receiving party for any business, commercial, competitive, personal or other purpose, and shall not be disclosed by the receiving party to anyone other than those set forth below in

Paragraphs 7 and 8, unless and until the restrictions herein are removed either by written agreement of counsel for the parties, or by Order of the Court.

4.     *Initial Designations.*

All Discovery Material produced in this action may initially be designated "ATTORNEYS' EYES ONLY," in accordance with procedures set forth below:

a.     A Party that has received Discovery Material and that would like to use, and in the absence of the restrictive confidentiality designation would use, a specific document or testimony in a manner not permitted by the designation may request that the designating party review the document's initial confidentiality designation to determine whether it should remain or be given some other designation.

b.     Once a party has made a request that a document's initial confidentiality designation be reviewed, the designating party shall have fourteen (14) days, unless otherwise agreed upon, to make a final confidentiality designation.

c.     Mass, indiscriminate, or routinized final designation requests are prohibited.

5.      *Designation of Deposition Testimony*.

All deposition testimony, transcripts and recordings will initially be automatically designated "ATTORNEYS' EYES ONLY," subject to the procedure for final designations set forth above in Paragraph 4.

6.      *Designation Disputes*.  If counsel for a party receiving documents or information objects to a final designation under Paragraph 4 as Confidential or Attorneys' Eyes Only, the following procedure shall apply:

a.      Counsel for the objecting party shall serve on the designating party or third party a written objection to such designation, which shall describe with particularity the documents or information in question and shall state the grounds for objection.

b.      Counsel for the designating party or third party shall respond in writing to such objection within 14 days, and shall state with particularity the grounds for asserting that the document or information is Confidential or Attorneys' Eyes Only.  If no timely written response is made to the objection, the challenged designation will be deemed to be void.

c.      If the designating party or nonparty makes a timely response to such objection asserting the propriety of the designation,

4

counsel shall then confer in good faith in an effort to resolve the dispute.

d.   If a dispute as to a Confidential or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the proponent of the designation being challenged shall present the dispute to the Court initially by telephone or letter, in accordance with Local Civil Rule 37.1(a)(1), before filing a formal motion for an order regarding the challenged designation.

e.   The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

7.   ***Use of Confidential Material***.  Confidential Material and the contents of Confidential Material may be disclosed only to the following individuals under the following conditions:

a.   The Parties and their current directors, officers, and employees, and other persons, with written approval of both Parties, who are bound by this Protective Order by executing the agreement attached as Exhibit A and who are assisting with or making

decisions concerning this action, to the extent necessary for the purpose of prosecuting or defending this action;

b. Outside counsel (herein defined as any attorney at the parties' outside law firms) and relevant in-house counsel for the parties;

c. Outside experts or consultants retained by or for the parties for purposes of this action, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A;

d. Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

e. The Court and court personnel;

f. Any deponent may be shown or examined on any information, document or thing designated Confidential provided the deponent has signed a non-disclosure agreement in the form attached hereto as Exhibit A and does not retain any Confidential Material;

g. Any person indicated on the face of a document or accompanying cover letter, email, or other communication to be the author, addressee, or an actual or intended recipient of the document (or indicated as a blind copy recipient in such document/communication's metadata), or, in the case of

meeting minutes and presentations, an attendee of the meeting or presentation, provided the person has signed a non-disclosure agreement in the form attached hereto as Exhibit A;

h.      Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative, and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials.

8.      ***Use of AEO Material.***   Attorneys' Eyes Only Material and the contents of Attorneys' Eyes Only Material may be disclosed only to the following individuals under the following conditions:

a.      Outside counsel (herein defined as any attorney at the parties' outside law firms);

b.      Outside experts or consultants retained by or for the parties for purposes of this action, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A;

c.      Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

d.      The Court and court personnel;

e.      Any deponent may be shown or examined on any information, document or thing designated Attorneys' Eyes Only provided the deponent has signed a non-disclosure agreement in the form attached hereto as Exhibit A and does not retain any AEO Material;

f.      Any person indicated on the face of a document or accompanying cover letter, email, or other communication to be the author, addressee, or an actual or intended recipient of the document (or indicated as a blind copy recipient in such document/communication's metadata), or, in the case of meeting minutes and presentations, an attendee of the meeting or presentation, provided the person has signed a non-disclosure agreement in the form attached hereto as Exhibit A;

g.      Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative, and

audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials.

9.      ***Advice of Counsel.***  It is understood that counsel for a party may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of AEO Material, provided that such advice and opinions shall not reveal the content of such AEO Material except by prior written agreement of counsel for the parties, or by Order of the Court.

10.      ***Filing Under Seal***.  Any document designated "Confidential" or "Attorneys' Eyes Only" by a party or non-party and which document is filed with the Court shall be filed under seal, in accordance with Local Civil Rule 5.3.

11.      ***Use at Trial.***  If the need arises during trial or at any Hearing before the Court for any party to disclose Confidential or Attorneys' Eyes Only information, it may do so only after giving notice to the producing party and as directed by the Court.

12.      ***Inadvertent Failure to Designate***.  To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential or AEO Material that should have been designated as such, regardless of whether the information, document or thing was so designated at the time of disclosure, shall

not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed or as to any other material or information concerning the same or related subject matter. Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated Confidential or AEO within a reasonable time after disclosure. Such notice shall constitute a designation of the information, document or thing as Confidential or AEO under this Discovery Confidentiality Order.

13.    ***Inadvertent Disclosure of Privileged Material.***  The inadvertent or unintentional disclosure by a producing party of information subject to a claim of privilege, including, but not limited to, the attorney-client privilege, or the work product doctrine, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of the party's claim of privilege. As an example, but without limiting the foregoing, the disclosure of privileged information shall be deemed inadvertent if the disclosure was the result of the failure of search terms to capture such documents, so long as the producing party believed in good faith, at the time of production, that the search terms were adequate to guard against such production. In all cases, should the receiving party reasonably believe that a document produced to it was inadvertently produced or contains privileged information or attorney-work

product, that party shall notify the producing party and, upon the producing party's request, shall immediately sequester such documents. Further, should the producing party notify the receiving party of the inadvertent production of documents containing privileged information or attorney-work product, the receiving party shall immediately sequester such documents. The producing party shall then provide the basis for the privilege claim within fourteen (14) days of the producing party's discovery or notification of the inadvertent production, and produce to the party possessing the inadvertent production a privilege log identifying the inadvertently disclosed information and setting forth the basis for its withholding. If the receiving party intends to challenge the basis for withholding, the resolution of any dispute that may arise concerning whether a document is privileged or entitled to protection as trial-preparation material shall be governed by Rule 26(b)(5)(B). If the receiving party does not intend to challenge the basis for withholding, it shall return or destroy the inadvertently produced information within fourteen (14) days of receipt of a privilege log.

14. ***Public Domain Information.*** No information that is in the public domain or which is already known by the receiving party through proper means or which is or becomes available to a party from a source other than the party asserting confidentiality, rightfully in possession of such information on a non-confidential

basis, shall be deemed or considered to be Confidential or AEO Material under this Discovery Confidentiality Order.

15. ***Discovery Objections.*** This Discovery Confidentiality Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Discovery Confidentiality Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

16. ***Survival.*** This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court or by the written stipulation of the parties filed with the Court.

17. ***Final Disposition.*** Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law. Within 60 days after the final disposition of this action, each receiving party must return all Discovery Material to the producing party or destroy such material. As used in this subdivision, "all Discovery Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of

the Discovery Material. Whether the Discovery Material is returned or destroyed, the receiving party must submit a written certification to the producing party (and, if not the same person or entity, to the designating party) by the 60-day deadline that affirms that the receiving party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the discovery material.  Notwithstanding this provision, Counsel are entitled to retain archival copies of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Confidential or AEO Material.  Any such archival copies that contain or constitute such material remain subject to this Discovery Confidentiality Order.

 s/ Cathy L. Waldor
 Hon. Cathy L. Waldor, USMJ

 Date:  January 8, 2024

## EXHIBIT A

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **CAREPOINT HEALTH MANAGEMENT ASSOC. LLC**, *et al*. | ) ) ) ) | <u>Civil Action No:</u><br>2:22-cv-05421-EP-CLW |
| Plaintiffs, | ) ) | Hon. Evelyn Padin, USDJ |
| v. | ) ) | Hon. Cathy L. Waldor, USMJ |
| **RWJ BARNABAS HEALTH, INC.**, | ) ) | |
| Defendant. | ) ) | |

### AGREEMENT TO BE BOUND BY CONFIDENTIALITY ORDER

I, _____, state that:

1.    My address is:


2.    My present employer is _____ and the address of my present employment is:


3.    I have carefully read and understood the provisions of the Confidentiality Order in this case signed by the Court, and I will comply with all provisions of the Confidentiality Order.

4.    I will hold in confidence and not disclose to anyone not qualified under the Confidentiality Order any Confidential or Attorneys' Eyes Only material or any words, summaries, abstracts, or indices of Confidential

or Attorneys' Eyes Only material disclosed to me.

5.     I will limit use of Confidential or Attorneys' Eyes Only material disclosed to me solely for purpose of this action.

6.     No later than the final conclusion of the case, I will return all Confidential or Attorneys' Eyes Only material and summaries, abstracts, and indices thereof which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party for whom I was employed or retained.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____

_____
[Name]

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CAREPOINT HEALTH MANAGEMENT ASSOC. LLC**, *et al.* | Civil Action No: 2:22-cv-05421-EP-CLW |
| Plaintiffs, | Hon. Evelyn Padin, USDJ |
| v. | Hon. Cathy L. Waldor, USMJ |
| **RWJ BARNABAS HEALTH, INC.,** |  |
| Defendant. |  |

## ORDER REGARDING THE PROTOCOL FOR THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION

The parties to the above-captioned case (the "Parties," each a "Party") jointly submit this Stipulation and Order Regarding the Protocol for the Production of Electronically Stored Information (hereinafter the "Production Protocol") and respectfully request that the Court order that the Production Protocol govern the production of electronically stored information in this case (the "Litigation").

## I.    GENERAL PROVISIONS

A.    <u>Scope</u>:

1.    This Production Protocol governs the discovery of electronically stored information ("ESI"), which shall be produced electronically in the Litigation (collectively referred to as the "Document(s)").

1

2.      Nothing herein shall alter the Parties' respective responsibilities to comply with the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of New Jersey, and all other applicable rules of the Court (collectively, the "Local Rules").

3.      Nothing herein establishes any agreement regarding the responsiveness of any Document, the protected status of any Document or information, or the relevance or admissibility of any Document.

B.      Cooperation:  The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter consistent with this Production Protocol and the Local Rules.

C.      Preservation:  The Parties will discuss their preservation and will continue to meet and confer to ensure that preservation of potentially relevant ESI will be reasonable and proportionate.

D.      Documents Protected from Discovery:  The inadvertent production of protected Documents, including, but not limited to, those protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or protection, whether inadvertent or otherwise, shall not waive any claim of attorney-client privilege, work product protection or any other applicable privilege or protection from discovery in this case or any other federal or state proceeding.  Any Documents subject to attorney-client privilege, work-product protection or any other applicable

privilege or protection that are inadvertently produced shall, on request of the producing Party, be returned or destroyed in accordance with the Discovery Confidentiality Order entered in this Litigation.

  E. <u>Privilege Logs</u>:  Nothing in this Production Protocol shall be interpreted as a waiver of any Party's right to seek appropriate relief from the Court relating to the obligation by any party or third party to produce itemized privilege logs.  The Parties reserve all rights to seek judicial relief relating to privilege logs, including any appropriate request to seek the production of categorical privilege logs.

  F. <u>Format for Production</u>:

    1. When producing Documents, the producing Party must produce the Documents consistent with Part II (Processing of Electronically Stored Information) and Part III (Production of Native Files) of this Production Protocol. If particular Documents warrant a different production format, the Parties will cooperate to arrange for the mutually acceptable production of such Documents. The Parties agree not to degrade the searchability of Documents as part of the document production process.

    2. Native Files: A producing Party shall produce certain ESI as outlined in Section III(A) and (B) in its native format in accordance with the specifications contained herein ("Native Files," each a "Native File").

    3. Production of Additional Documents in Native Format:  Each

Party reserves the right to request production of ESI in Native Format for any ESI that it believes is not adequately represented in the TIFF format specified in Exhibit A, and, upon a showing of reasonable need, such requests will not be unreasonably denied. If the Parties are unable to agree as to the production of the requested Documents in Native Format, the Parties may submit the matter to the Court.

4.      TIFF: Subject to the provisions above, and excluding certain Native File types as outlined in Paragraph III(A) below, a producing Party shall convert ESI to TIFF for production in accordance with the specifications contained herein. Single-page 300 DPI, 1-bit Group IV TIFF images shall be provided for each page of each Document, with each image file named after the production number of that page with the extension ".tif". TIFF images will be in color for color documents.

5.      Text: For electronic Documents, the text of the corresponding Native File should be extracted directly from the Native File without using Optical Character Recognition ("OCR"), except in the case of (i) redacted Documents, (ii) any hard copy Documents that are scanned into TIFF image files, or (iii) Documents that are maintained as static images in the ordinary course of business. OCR text should instead be provided for those specified document types. OCR text files shall indicate page breaks where possible.

6.      Foreign Language Text: The Parties shall make reasonable efforts to ensure that all technologies and processes used to collect, process and produce the

text of any Document — including all TIFF conversion and OCR processes, and the extraction of text from Native Files — preserves all foreign language text, punctuation and other characteristics as they exist in the source Native File.

6. Parent-Child Relationships: When producing TIFF files, or converting Native Files with embedded Documents to TIFF images for production — e.g., for email with attachments — the parent-child relationship must be preserved by assigning sequential Bates numbers to all items within the parent-child group, and identifying those Bates numbers in the responsive Document metadata and coding fields specified in Appendix 1. For example, if a Native File email with embedded attachments is converted to a TIFF image, all non-privileged responsive attachments must be processed and assigned Bates numbers in sequential order, following consecutively behind the TIFF image of the parent email. The parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments will be produced, except any attachments that must be withheld or redacted on the basis of privilege, immunity or privacy laws.

G. <u>Bates Numbering</u>:

1. All Documents produced under this Production Protocol shall be assigned a Bates number that must always be unique across the entire document production.

2. The producing Party shall brand each TIFF image in the lower

right-hand corner with the image's corresponding Bates number, using a consistent font type and size. The producing Party shall take reasonable care to ensure that the Bates number does not obscure any part of the underlying image. If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number shall be placed as near to that position as possible while preserving the underlying image.

H.      Native Files: As per Section III(A) below, certain Native Files (e.g., spreadsheet-type and audio/visual files) will be produced with a placeholder TIFF image which shall contain language that the Document is produced as a Native File and shall contain the Bates number corresponding to the file.

I.      Load Files: All productions shall be provided with data load files and image load files as detailed in Appendix 1. The load file shall be in Concordance Delimited .DAT, ANSI or UNICODE format for use with Summation, Relativity, or any other COTS document management product reasonably requested.

J.      Confidentiality Designations: Any and all confidentiality designations of the Documents shall conform to the terms of the Discovery Confidentiality Order entered in this Litigation.

K.      Media Used for Production and Mode of Delivery: Documents shall be exchanged via portable hard drives or through secure file transfer protocol ("FTP") or similar secure electronic transmission. All Parties reserve the right to request that a

production be made on a mutually acceptable alternative form of media should the form of media selected by the producing Party be inoperable or incompatible with the receiving Party's systems.

## II. PROCESSING OF ELECTRONICALLY STORED INFORMATION

A. <u>System Files</u>: Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.

B. <u>Metadata Fields and Processing</u>:

1. ESI shall be processed in a manner that preserves the source Native File and all metadata, without modification (excepting the processing to UTC and time zone normalization to EST), including their existing time, date and time-zone metadata consistent with the requirements provided in this Production Protocol.

2. Auto date/time stamps: ESI shall be collected and processed to preserve and display the date/time shown in the Document as it was last saved by the custodian or end user, not the date of collection or processing. If this is not technically possible, the producing Party shall use its reasonable best efforts to display the field code in the Document's metadata.

3. Hidden text: ESI shall be processed and produced in a manner that clearly discloses and makes available all hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes and comments.

4. ESI items shall be produced with all the metadata and coding

fields set forth in Appendix 1.  Notwithstanding any language to the contrary, this Production Protocol does not give rise to an obligation to create or manually code fields that are not automatically generated by the processing of the ESI, or do not exist as part of the original metadata, provided, however, that the producing Party shall populate the following fields for all Documents produced:  (a) BegBates; (b) EndBates; (c) BegAttach; (d) EndAttach; (e) All Custodians; (f) Native File Link (if applicable); (g) Has Redactions (if applicable); (h) Text Link; and (i) Confidentiality (if applicable).

      C.    De-duplication:

      1.    In order to reduce the unnecessary costs of reviewing and producing duplicate documents, each Party may perform a global de-duplication during ESI processing using a recognized industry application for this purpose. Each Party may only remove exact duplicate Documents (i.e., identical copies of the same Document), including but not limited to Email.  If a Party chooses to remove exact duplicate documents, the Party will only remove exact duplicate ESI using the MD5/SHA-1 hashing method and shall identify the custodians of de-duplicated Documents.  Moreover, (a) de-duplication shall be performed only at the Document family level so that attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa, although each family member shall be hashed separately for purposes of populating the "HashValue" field in Appendix 1;

(b) attachments to Emails, Instant Messages or other Documents shall not be disassociated from the parent Email, Instant Message or Document even if they are exact duplicates of another Document in the production, and (c) paper Documents shall not be eliminated as duplicates of responsive ESI. If a Party uses de-duplication the Party will provide the names of all custodians who had a copy of a document that was removed through the de-duplication process.

D.     Email Threading: The Parties will meet and confer in good faith regarding any email threading to be used.

E.     <u>Search Terms</u>: A party who uses search terms to limit the collection or production of documents shall disclose such terms to the other party.

## III.    PRODUCTION OF NATIVE FILES

A.     The Parties agree that certain file types shall be produced as Native Files, including spreadsheet-application files (e.g., MS Excel), presentation-application files (e.g., MS PowerPoint), and audio/visual files. These Native Files shall be produced together with a placeholder TIFF image. Pursuant to Section I, above, each TIFF placeholder will contain language indicating that the Document is produced as a Native File and shall contain the Bates number. The corresponding load file shall include Native File Link information for each Native File that is produced.

B.     If a response to a discovery request requires production of files in a non-standard format or unusually large (regarding amount of data) files, the Parties

shall meet and confer to determine the optimal production format and mode of production.

C.     When TIFF images of certain Documents are not readable due to processing constraints, the producing Party may produce the Document as a Native File or in some other format.

D.     <u>Redaction</u>:

1.     The Parties agree that Documents may be redacted to shield information protected from discovery, including, but not limited to, information protected by the attorney-client privilege, the work product doctrine, the General Data Protection Regulation (EU) 2016/679, the Health Insurance Portability and Accountability Act ("HIPAA") or any other applicable privilege or protection from discovery.

2.     The words "Redacted" shall appear over the redacted portion or portions on each page of the Document.

3.     If the items redacted or partially withheld from production are PowerPoint-type presentation decks or Excel-type spreadsheets, the Native File shall not be produced, and instead the entire Document must be produced in TIFF format, including all non-privileged pages, hidden fields and other information that does not print when opened as last saved by the custodian or end-user. For PowerPoint-type presentation decks, this shall include, but is not limited to, any comments or speaker

notes. For Excel-type spreadsheets, this shall include, but is not limited to, all hidden rows and columns, cell values, annotations and notes. The producing Party shall also make reasonable efforts to ensure that any spreadsheets produced only as TIFF images are formatted to be legible. To the extent that any spreadsheet will not properly format so as be legible when converted to TIFF for redaction of privileged content, the Parties shall, upon request of the requesting Party, meet and confer to determine the most reasonable form of production.

## IV. PRODUCTION OF PAPER DOCUMENTS

A. In scanning paper Documents, each page of paper should be output to a single page TIFF file at least 300 dpi and 8 ½ x 11-inch page size, except for documents requiring higher resolution or different page size. Color documents should be scanned in color. Distinct, logical document breaks should be defined as such in a standard load file and OCR text shall be provided. The parties will make their best efforts to unitize documents correctly. Therefore, when scanning paper documents for production, the parties will use their best efforts to avoid distinct documents being merged into a single record and to avoid single documents being split into multiple records. Where the documents were organized into groups, such as folders, clipped bundles, and binders, the parties will use their best efforts to maintain this structure and provide it in the load file. The parties will use their best efforts to reflect the relationship among the documents in a folder or other grouping in proper coding of

the beginning and ending document and attachment fields to the extent reasonably practicable. Where a document, or a document group, such as folder, clipped bundle, or binder, has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

## V. RESOLUTION OF DISPUTES

A.    The Parties agree to meet and confer in good faith regarding matters (i) related to the production of Documents not specifically set forth in this Production Protocol; (ii) related to the interpretation of this Production Protocol; or (iii) related to the Parties' obligations hereunder.  The Parties shall make their best efforts to comply with and resolve any differences concerning compliance with this Production Protocol. If a producing Party determines that it cannot comply with any material aspect of this Production Protocol, such Party shall promptly inform the requesting Party as to why compliance with the Production Protocol is unreasonable or not possible.

## VI. MISCELLANEOUS PROVISIONS

A.    <u>Objections Preserved</u>:  Nothing in this Production Protocol shall be interpreted to require disclosure of information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or protection. Except as provided expressly herein, entry into this stipulation shall not constitute a waiver of any objections as to the production, discoverability, relevance, authenticity, use, admissibility, or confidentiality of Documents.

B.     Modifications:  This Production Stipulation may be modified by written stipulation of the Parties or by the Court for good cause shown.

C.     No Relief from Obligations:  Nothing in this Production Protocol shall relieve a Party of its obligations under the Local Rules or any Case Management Orders entered in this Litigation, or under any future stipulations or orders, regarding the production of Documents or the making of timely responses to discovery requests.

123455760-1

Dated: September 27, 2023

Respectfully submitted,

/s/ Patrick M. Harrington

/s/ Patrick M. Harrington
Patrick M. Harrington (098422014)
Lisa Rodriguez (034201983)
DILWORTH PAXSON LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
(856) 675-1900
Pharrington@dilworthlaw.com
Lrodriguez@dilworthlaw.com

Matthew T. Gardella (421842023)
David Smith, Esq.*
Ira N. Richards, Esq.*
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
(215) 575-7000
Mgardella@dilworthlaw.com
Dsmith@dilworthlaw.com
Irichards@dilworthlaw.com

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

/s/ David Munkittrick

Ryan P. Blaney (Bar No. 00618-2006)
Colin R. Kass*
Erica T. Jones*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6800
rblaney@proskauer.com
ckass@proskauer.com
ejones@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant*
*RWJ Barnabas Health, Inc.*

* Admitted Pro Hac Vice

**SO ORDERED:**

 s/ Cathy L. Waldor
Hon. Cathy L. Waldor, USMJ

14

123455760-1

# Appendix 1:  Production Delivery Requirements, Metadata, and Coding Fields

To the extent not otherwise stipulated by the parties, all ESI (with the exception of those file types produced in Native File format in accordance with this stipulation) should be produced in single page .tiff image format, with the below metadata fields provided and full text extracted to a linked electronic file.  The extracted text should be produced on the document level.  The metadata fields should include the following:

a.  BegBates
b.  EndBates
c.  BegAttach
d.  EndAttach
e.  File Name
f.  Native File Link
g.  Hash Value
h.  From
i.  To
j.  CC
k.  BCC
l.  Subject
m.  Message Sent Date/Time
n.  Message Received Date/Time
o.  Message-ID
p.  Reference Chain or Discussion Thread
q.  File Extension
r.  File Size
s.  Created Date/Time
t.  Last Modified Date/Time
s  Family Date/Time
t.  Title
u.  Author
v.  Custodian
w.  Duplicate or All Custodians
x.  Text Link
y.  Confidentiality designation field
z.  Has Redactions (yes or leave blank)

15

**DILWORTH PAXSON LLP**
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
Telephone: (856) 675-1900
Facsimile: (856) 663-8855
*Attorneys for Plaintiffs*
*CarePoint Health Systems Inc., Hudson Hospital OPCO, LLC, d/b/a CarePoint*
*Health—Christ Hospital; IJKG, LLC, IJKG PROPCO, LLC and IJKG OPCO,*
*LLC, d/b/a CarePoint Health—Bayonne Medical Center; and HUMC OPCO,*
*LLC, d/b/a CarePoint Health—Hoboken University Medical Center*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAREPOINT HEALTH SYSTEMS INC., HUDSON HOSPITAL OPCO LLC d/b/a CAREPOINT HEALTH – CHRIST HOSPITAL, IJKG, LLC, IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CAREPOINT HEALTH – BAYONNE MEDICAL CENTER, and HUMC OPCO LLC d/b/a CAREPOINT HEALTH – HOBOKEN UNIVERSITY MEDICAL CENTER | Hon. Evelyn Padin, U.S.D.J<br><br>Hon. Cathy L. Waldor, U.S.M.J.<br><br>Civil Action No.<br>2:22-cv-05421-EP-CLW |
| Plaintiffs,<br><br>v.<br><br>RWJ BARNABAS HEALTH, INC.<br><br>Defendant. | **THIRD AMENDED COMPLAINT AND**<br>**JURY DEMAND** |

For their Third Amended Complaint against Defendant RWJ Barnabas

Health, Inc. ("RWJ"), Plaintiffs CarePoint Health Systems Inc. (the "CarePoint

NonProfit"); Hudson Hospital OPCO, LLC d/b/a CarePoint Health – Christ Hospital

("Christ Hospital"); IJKG, LLC, IJKG PROPCO, LLC and IJKG OPCO, LLC d/b/a

CarePoint Health – Bayonne Medical Center ("Bayonne Medical") and HUMC OPCO, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC") (together "Plaintiffs" or "CarePoint"), by and through their attorneys, Dilworth Paxson LLP hereby allege as follows:

## PRELIMINARY STATEMENT

1.    This case involves a years-long systematic effort by RWJ, in conspiracy with others, to destroy competition and to monopolize the provision of general acute care hospital services and related health care services in northern New Jersey. This effort particularly targeted Hudson County, New Jersey, to the detriment of the CarePoint NonProfit, its individual hospitals, and the public by aiming to destroy the three hospitals operated by CarePoint as independent competitors.

2.    RWJ's goal was to force CarePoint into financial collapse by systematically targeting each of the CarePoint hospitals, with the ultimate result of destroying the entire CarePoint network. RWJ pursued a strategy that would lead to (i) a shutdown of Christ Hospital – the preeminent hospital in Hudson County, (ii) a shutdown of Bayonne Medical and (iii) the possible acquisition of HUMC by RWJ, as HUMC has the most profitable payor mix of any of the CarePoint Hospitals. RWJ is engaged in a protracted campaign to control virtually all hospital care in Hudson County, primarily through the elimination of the CarePoint hospitals as viable, independent competitors. RWJ's goal explicitly disregarded the needs of the poor,

2

underinsured and charity care patients which CarePoint serves in its role as the safety net hospital system in Jersey City and surrounding areas.

3.    The facts of this case reveal an intertwined web of schemes by RWJ and its conspirators to stifle marketplace competition that would otherwise benefit the consuming public by destroying the CarePoint system, which has been creating centers of medical excellence which benefit the Hudson County community.

4.    Specifically CarePoint has taken significant strides in partnering with Columbia University Hospital, New York Presbyterian and the Rothman Institute to bring world class specialty care to the Hudson County community – and with Saint Peter's Children's Hospital to improve pediatric care in Hoboken and Hudson County.  Further, CarePoint has operated and continues to operate neighborhood health clinics to further help uninsured and underinsured members of the community.

5.    While certain of RWJ's conspirators have individual motivations separate from the goals of RWJ, they are consistent with and symbiotic with RWJ's goal to dominate acute care in Hudson County through the destruction of CarePoint.

6.    RWJ's recent conduct is only part of the long history of RWJ's monopolistic conduct to tighten its control on general acute care hospital services and related health care services in northern New Jersey generally, and specifically in Hudson County.

7.    The relevant inquiry is the anticompetitive effect of RWJ's exclusionary practices considered together as a whole rather than considering each aspect in isolation.  RWJ's series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws.  This pattern is characterized by efforts to improperly steer patients from CarePoint facilities to RWJ facilities and to weaken the CarePoint facilities by creating uncertainty among their professional staff and employees, as well as referral sources, all to cripple the economic viability of each of the CarePoint facilities, as further described below.

8.    RWJ's conspirators have included real estate players Avery Eisenreich ("Eisenreich") and Yan Moshe ("Moshe") whose interests are unrelated to those of safety net hospitals and providing accessible healthcare to the community.  These conspirators have faced numerous legal challenges including insurance fraud allegations against Moshe's facilities, and RICO complaints against Moshe and Nizar Kifaieh ("Kifaieh") and a recent weapons-related federal investigation within Moshe-controlled and Kifaieh-run Hudson Regional Hospital ("HRH").

9.    Moshe and RWJ's President and CEO, Mark Manigan ("Manigan"), have worked together through Manigan's former role as a healthcare attorney. Manigan has represented Moshe and his surgery centers in connection with state investigations finding the centers' "using poor drug storage methods, an outdated infection control plan and unacceptable sterilization practices… may have exposed

4

nearly 3,800 former patients to hepatitis B, hepatitis C and HIV."[1] Other of Moshe's surgery centers have been and are the subject of ongoing litigation for insurance fraud and other illegal or unethical conduct.

10. Eisenreich, who has also maintained a close relationship with Manigan, was the subject of longstanding litigation brought by CarePoint in the Delaware Chancery Court for tortious interference with CarePoint's business dealings and had been involved in several actions adverse to CarePoint over the past few years. Each of these matters has now been resolved through settlement.

11. Eisenreich has transacted in the real property under the hospitals in Hoboken and Bayonne with RWJ's conspirators including Medical Properties Trust ("MPT") and HRH. Through controlling the land under the hospitals, the property owner was able, at times, to have "veto power" over any hospital operator it did not like – thereby controlling not only the real estate, but also the hospitals themselves. Eisenreich has at all pertinent times maintained this close relationship with Manigan and others in RWJ management and engaged in detailed conversations about RWJ's plan to destroy CarePoint. A key part of this plan was Manigan's and Eisenreich leveraging Eisenreich's control of the real estate under the Hospitals to frustrate potential transactions involving CarePoint and other parties.

---

[1] Two employees fired at NJ surgery center that exposed patients to HIV (https://www.northjersey.com/story/news/health/2018/12/28/two-employees-fired-nj-surgery-center-exposed-patients-hiv/2431140002/)

5

12.     Manigan has been the lead strategist for RWJ working to drive CarePoint to financial ruin.  In addition to the close relationships he maintains with Moshe and Eisenreich from his background as a healthcare attorney, Manigan also has close relationships with people who influence healthcare funding to hospitals in New Jersey, which he has used along with RWJ's vast political, administrative and real estate lobby to undermine competition – with a specific goal of eliminating CarePoint as a competitor of RWJ.

13.     RWJ's pattern of serial acquisitions of competing hospitals and health care providers, as well as of the real estate necessary to operate competing hospitals, has been tailored to destroy competition.  Indeed, the recent attempted acquisition by RWJ of St. Peter's Hospital in New Brunswick was blocked by antitrust enforcement action taken by the Federal Trade Commission, despite being approved by New Jersey regulators.

14.     Similarly, RWJ has utilized its clout with people who influence healthcare funding to hospitals in the state to disadvantage CarePoint and to frustrate CarePoint's ability to access federal Covid relief funds.

15.     In pursuing its plan to achieve and extend its dominance in Hudson County, RWJ also leveraged its preferred relationship with the state's largest health insurer, Horizon Blue Cross-Blue Shield ("Horizon"), to CarePoint's detriment.

6

16.    Not only did RWJ use the Horizon relationship to explicitly attract patients who were Horizon subscribers, but RWJ recognized the significance of emergency room traffic as a significant driver of inpatient volume, particularly among the uninsured and those covered by government programs, such as Medicare, Medicaid and TriCare.  To this end, RWJ – with the financial support and political backing of Horizon – established a Satellite Emergency Department ("SED") in Bayonne (in an area adjoining Jersey City), specifically targeting the CarePoint Hospitals to steer patients away from Bayonne Medical to RWJ's Jersey City Medical Center ("JCMC") facility.

17.    RWJ's SED was the only such facility of its kind in New Jersey.  An SED presents risks for emergency patients who are admitted in need of immediate, intensive therapies available only in an acute care hospital.  Rather than having patients who, upon information and belief are primarily walk-ins, go to the Emergency Department at Bayonne Medical (a fully-resourced acute care hospital mere blocks away), RWJ's SED provides only first-level triage to such patients – whereas patients requiring more specialized or next-level care would have to be sent miles away to RWJ's Jersey City Medical Center to continue treatment –losing valuable time and creating a serious risk of adverse outcomes.  RWJ's SED did not meet the regulatory criteria that would satisfy a narrow exception to a clear ban on

such facilities under state health regulations and therefore provided RWJ with an unfair advantage over other providers who properly complied with such regulations.

18.     In connection with the SED, Horizon offered RWJ "enhanced rates" to support RWJ's effort to eliminate CarePoint as a competitor.  Facially, Horizon's initial motivation to provide these higher rates to RWJ was to provide Horizon subscribers with an in-network option in Hudson County.  However, even now, with CarePoint being in network with Horizon for numerous years and despite CarePoint's superior outcomes, regional partnerships and national accolades, Horizon will not place CarePoint alongside RWJ in its "Omnia" tier of preferred providers.  It is believed that RWJ has influenced this decision because of its intimate relationship with Horizon.

19.     RWJ and its conspirators including, without limitation, HRH,[2] Horizon, Moshe and Kifaieh, have endeavored to hinder CarePoint from growing programs for the community, from receiving funds for serving the underinsured and underserved and also to interfere with CarePoint's initiatives to partner with leading New York and Pennsylvania institutions to bring innovative treatments to the Hudson County community.

---

[2]     As explained later herein, HRH and its principals, while not defendants in this litigation, were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals including controlling the real estate under the Hospitals, decimating CarePoint financially, and poaching CarePoint doctors.

8

20.     RWJ, through its collusion with others, has set out to destabilize and destroy competition with the goal that patients and revenue flow only to RWJ facilities. RWJ's efforts, both public and surreptitious, have sown uneasiness among CarePoint employees and doctors and have caused direct economic harm to the CarePoint Hospitals in the form of decreased revenue and increased costs.

21.     By way of example, and as discussed in greater detail herein, RWJ colluded with others including Moshe, HRH and Eisenreich in an effort to close down Bayonne Medical to boost HRH's same-day surgery practice, expand Eisenreich's skilled nursing facility empire, and clear the field for RWJ's SED to operate without competition in Bayonne. A significant part of RWJ's effort to push CarePoint toward bankruptcy was the signing of a 2019 LOI for the acquisition of Christ Hospital and HUMC – neither of which RWJ intended to actually acquire and operate. RWJ's true intent was to use the LOI to discourage other potential suitors from entering into discussions with CarePoint and, by accessing a data room set up by CarePoint, to gain market knowledge and competitive intelligence.

22.     As a natural and intended consequence of the LOI, CarePoint froze efforts at business development, including new programs and onboarding of new physicians, as well as planned for reductions in workforce. RWJ was directly aware of these actions (which it intended) because of discussions with CarePoint

9

management regarding the planned integration of the CarePoint facilities into the RWJ system.

23.    Notably, the LOI included a provision whereby RWJ would fund operational losses at Christ Hospital after a certain date in 2021.  Based on this provision, RWJ was intimately aware of that facility's cash burn rate, and knew that Christ Hospital and CarePoint would experience drastic consequences without additional funding – especially during the period of the LOI's pendency when other entities were discouraged from discussing a possible acquisition of one of more of the CarePoint Hospitals.  Based on this fact, RWJ knew it could push the CarePoint Hospitals closer to the brink of closure without having to buy them.

24.    At the same time that CarePoint welcomed this original proposal from RWJ, reasonably expecting that it was brought forward in good faith, RWJ and Eisenreich were engaging in backroom negotiations concealed from CarePoint – driven by Eisenreich's control of the Hospitals through the real estate.  RWJ's interest in acquiring any of the CarePoint Hospitals was contingent upon controlling the real estate under them.  Eisenreich endeavored to preclude direct contact between RWJ and CarePoint with respect to any potential transactions involving the real estate so as to hand-pick the suitor that best served Eisenreich and RWJ.

25.    Over the course of time, as the LOI remained pending, RWJ circulated rumors of closing of Christ Hospital or reducing it to a small Emergency

10

Department. These statements related to the consolidation and/or closure of Christ Hospital had a material adverse effect on the hospital's operations, leading to attrition of physicians, employees and patients.

26. This type of rumor-mongering forms part of the strategy of RWJ to depress the economics and professional staffing of the CarePoint Hospitals which negatively affected employee retention at HUMC and the other CarePoint Hospitals and resulted in the departure of a significant number of nurses.

27. The Hospitals were forced to cover the departures with a large number agency nurses paid at a premium rate about three times the rate of a typically-employed nurse. Specifically, HUMC incurred expenses averaging nearly $120,000 per pay period during 2022, or $3.1 million annually. Moreover, the CarePoint Hospitals, together, incurred an average of nearly 6,200 contract nursing hours per pay period during 2022 which totals approximately $20.1 million in additional cost to these Hospitals.

28. RWJ withdrew from the 2019 LOI ostensibly because of its inability to gain control of the real estate underlying the facilities. However, upon information and belief, RWJ never intended to pursue to closing the possible transactions outlined in that LOI. The LOI was a sham intended as a tool to achieve the negative impacts on CarePoint described above. Indeed, during the pendency of the LOI, the CarePoint facilities experienced a significant decrease (roughly 20%)

in inpatient volumes, even as CarePoint was re-establishing itself as an in-network provider with leading insurers, including Horizon.

29.     When RWJ's strategy did not succeed in pushing HUMC into bankruptcy, RWJ pursued another collusive strategy.   In 2021, RWJ engaged with HMHA to have Raymond James send out a Request for Indications ("RFI") to garner interest, without CarePoint's consent, for the sale of HUMC.   Ahead of this distribution, RWJ, through its leadership, John Doll and Manigan, engaged with HMHA and Raymond James.   This interaction with HMHA and Raymond James was calculated to devalue HUMC, and RWJ used confidential and proprietary information it procured during the 2019 LOI discussions to assist HMHA and Raymond James on a plan of attack.

30.     RWJ continued to spread false information and undermine confidence in the CarePoint system, with no intention to actually acquire CarePoint, but rather inflict upon it a "death by a thousand cuts," striking strategic blows and inflicting damage until it was eliminated such that RWJ could operate without significant competition in Hudson County.

31.     Further, RWJ tried to steer referrals away from CarePoint, sending letters to certain physicians who regularly referred patients to CarePoint specialists and facilities to induce these physicians to instead refer patients to RWJ specialists and facilities.   These letters included discussion of financial incentives (such as

enhanced rates and patient management fees) paid to these physicians in exchange for referrals of patients to RWJ instead of CarePoint. Furthermore, RWJ poached one of the CarePoint's leading practitioners by encouraging him to intentionally violate a restrictive covenant.

32. RWJ states its vision as to "[c]reate and sustain healthy communities, together," noting that it is "committed to the ongoing improvement of the health, quality of life, and vitality of our communities."[3] The idea that RWJ would use its influence to jeopardize the health of that community and the care providers of a competing hospital not only directly contradicts its own vision, but clearly demonstrates that RWJ is far more interested in anti-competitive and predatory business activities than serving the New Jersey community.

33. The efforts of RWJ and its conspirators have created a stalemate in the progress of health care in Hudson County, mired in litigation in two states with a very real risk of eliminating any Hudson County based provider from having a meaningful role in the delivery of acute hospital care.

34. Plaintiffs seek relief from this Court under the Federal Antitrust Laws.

---

[3]     RWJBarnabas Health – (https://www.rwjbh.org/)

## PARTIES

35.     Plaintiff CarePoint Nonprofit is a New Jersey non-profit corporation organized under the laws of the State of New Jersey, having a principal place of business located at 308 Willow Avenue, Hoboken, New Jersey 07030.

36.     Plaintiff Christ Hospital is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 176 Palisade Avenue, Jersey City, NJ 07306.

37.     Christ Hospital operates a 349-bed fully accredited acute care hospital. With a highly-qualified team – including more than 500 doctors with specialties ranging from allergies to vascular surgery – Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, respiratory, and newborn care.  As a state-certified Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions with outcomes that rank among the best of New Jersey.  In 2021, Christ Hospital was ranked the most "Socially Responsible" hospital in the United States by the prestigious Lown Institute, for equitable care.[4]

---

[4]     Christ Hospital ranked #1 on Lown Institute's Most Socially Responsible Hospitals in America list – (https://carepointhealth.org/2021/09/21/christ-hospital-ranked-1-on-lown-institutes-most-socially-responsible-hospitals-in-america-list/)

38.     Plaintiff Bayonne Medical is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey.

39.     Bayonne Medical operates a 244-bed, fully accredited acute care hospital that provides quality, comprehensive, community-based health care services to more than 70,000 people annually.  Its facilities include 19 full-service emergency room bays, 205 medical/surgical beds, 10 obstetrical beds, 14 adult ICU/CCU beds, and 15 adult, acute psychiatric beds.  The service complement consists of six inpatient operating rooms, two cystoscopy rooms, one full-service cardiac catheterization lab, 12 chronic hemodialysis stations, one MRI unit, emergency angioplasty services, elective angioplasty, two hyperbaric chamber units, and a PET-CT diagnostic imaging unit.

40.     Plaintiff HUMC is a limited liability company, organized under the laws of the State of Delaware, with its principal place of business at 308 Willow Avenue, Hoboken, NJ 07030.

41.     HUMC operates a 348-bed fully accredited general acute care hospital. HUMC provides advanced medical technologies in support of its medical staff, nursing team, and other caregivers, to enable state-of-the-art care to citizens of Hoboken and the surrounding communities.  HUMC offers excellence in emergency medicine in the 34-bay emergency room and the dedicated OB/GYN ED; inpatient

15

rehabilitation; transitional care; child and adult behavioral health; women's care; wound care; and numerous surgical subspecialties. The American Heart and Stroke Association awarded the Silver Award to HUMC for its dedication to improving quality of care for stroke patients. Overall, HUMC was ranked in the top ten hospitals in New Jersey for care quality among all hospitals in the state with 350 beds or fewer.

42.     Defendant RWJ is a New Jersey corporation with its principal place of business at 95 Old Short Hills Rd, West Orange, NJ 07052. RWJ is one of the largest health care systems in New Jersey. As described further below RWJ owns and operates Jersey City Medical Center, a full service, acute care hospital in Hudson County, the SED – a few blocks away from Bayonne Medical, and many other healthcare facilities.

### **VENUE AND JURISDICTION**

43.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and over the state law claims asserted herein under 28 U.S.C. § 1367.

44.     This Court has personal jurisdiction over the defendant RWJ as it resides, does business in, and has a principal place of business in New Jersey. Venue in this district is proper because the parties are located in and/or a substantial part of the events took place in this district.

16

# FACTUAL BACKGROUND

### A.    The CarePoint Hospitals

45.    Between 2008 and 2012, Vivek Garipalli, James Lawler and Jeffrey Mandler (together, the "Founders"), by and through various entities, purchased out of bankruptcy the assets of HUMC, Christ Hospital, and Bayonne Medical (the "CarePoint Hospitals" or the "Hospitals").

46.    Post-bankruptcy, the CarePoint Hospitals were controlled by the Founders through ownership of entities and trusts affiliated with the Founders.  The holding companies with a controlling interest in the CarePoint Hospitals were ultimately owned eighty percent (80%) by Vivek Garipalli via the Freehold Trust, ten percent (10%) by James Lawler individually, and ten percent (10%) by Jeffrey Mandler via the Mandler Family Trust.

47.    After buying the Hospitals' assets, the Founders invested time, labor, and capital to improve the Hospitals' physical plants, equipment, and finances, as well as the overall quality of healthcare services provided by the Hospitals.  Under the Founders' leadership and with the incredible support of all the physicians, nurses and staff, the Hospitals became leading acute health care service facilities in Hudson County and the State of New Jersey.

48.    In addition to demonstrably improving health care for New Jersey residents, the Founders' efforts to rescue the Hospitals from bankruptcy have saved

thousands of jobs and generated substantial economic benefits to Hudson County and, more generally, to the State of New Jersey.  The Founders' efforts to revitalize the economic health of the Hospitals generated huge economic benefits to Hudson County and the State.  CarePoint Hospitals create a significant positive economic impact for New Jersey in terms of both in-state operating expenditures of hundreds of millions of dollars annually (e.g. $384 million in 2014) and significant capital expenditures (e.g. $177.8 million for the years 2014-2017).

49.    To illustrate, the economic impacts for New Jersey of the above-referenced CarePoint expenditures include:

a. 8,167 direct and indirect jobs or job-years[5];

b. $815.2 million in gross domestic product;

c. $653.9 million in compensation to employees;

d. $23.5 million in state government revenues; and

e. $8.7 million in local government (county, municipal, school district) revenues outside Hudson County.

50.    Most recently CarePoint's leadership team transitioned the CarePoint Hospitals' ownership to a new non-profit entity, CarePoint Health Systems Inc. Operating under physician leadership, this transition  was a move lauded by the communities which the Hospitals serve.  Currently, the CarePoint Nonprofit is the

---

[5] Job year is defined as one job lasting more than one year.

18

ultimate owner of ninety percent (90%) of the interests in the holding companies that control the CarePoint Hospitals. Unless they are destroyed by the unlawful and predatory conduct of RWJ and others (which is the subject of this and other litigation), CarePoint's three hospitals will continue to operate in their current form and will be controlled by the CarePoint Nonprofit. CarePoint's top priority is to work collaboratively with the Hudson County community to maintain critical health care for those who need it most and bring world class specialty care to the Hudson County community through partnerships with top-flight medical systems in the region.

51. The announcement of CarePoint's ownership by a non-profit corporation was praised by Jersey City Mayor Steve Fulop, who stated that "Christ Hospital and CarePoint have been critical partners with the city and the community before and during the pandemic, ensuring residents throughout the area have access to the top-quality health care they deserve, and, so, if transitioning to a nonprofit organization is the best way to further the life-saving services they offer, then we will, of course, support that," noting that the move "only strengthens the importance of Christ Hospital for the entire community."[6]

---

[6]     Tom Bergeron - *CarePoint Health beginning process of becoming a nonprofit (here's why — and what happens next)*, ROI-NJ.com (https://www.roi-nj.com/2021/10/06/healthcare/carepoint-health-beginning-process-of-becoming-a-nonprofit-heres-why-and-what-happens-next/)

52.     Further, Bayonne Mayor Jimmy Davis stated that "CarePoint's conversion into a nonprofit will allow the residents of Bayonne to continue having the broadest range of quality health care services made available to them." *Id.*

**B.      RWJ Barnabas Health**

53.     RWJ is the largest and most comprehensive healthcare system in the state of New Jersey, providing treatment and services to more than three million patients each year.[7]  In 2021, RWJ reported approximately $6.6 billion in revenue.

54.     RWJ has become the largest healthcare system in New Jersey through a series of acquisitions.  In 2016, Barnabas Health and Robert Wood Johnson Health System merged to create RWJ, which then controlled eleven general acute care hospitals across New Jersey.

55.     On January 1, 2022, RWJ closed on its acquisition of Trinitas Regional Medical Center in Union County.  RWJ now operates 12 hospitals, several ambulatory surgical centers, a pediatric rehabilitation hospital, and a freestanding behavioral health center.  RWJ also operates many other health care facilities and medical practices, especially in Hudson County, which generate significant patient revenue and provide increased patient flow to its inpatient acute care hospitals.

56.     Starting in 2019, RWJ began discussions to acquire St. Peter's Healthcare, based in New Brunswick, Middlesex County, which operates an

---

[7] RWJ Barnabas - https://www.rwjbh.org/why-rwjbarnabas-health-/

independent hospital.  In addition to the hospital, Saint Peter's Healthcare employs physicians, and has other healthcare-related subsidiaries and joint ventures.  In 2021, Saint Peter's Healthcare reported approximately $579 million in revenue.

57.    New Jersey State officials and the NJDOH approved the merger in May 2022.  However, the FTC unanimously moved to block it, stating the RWJ-Saint Peter's merger would create an entity with control of 50% of the acute care market in Middlesex County.  FTC Bureau of Competition Director Holly Vedova concluded that "There is overwhelming evidence that this acquisition would be bad for patients[.]"[8]

58.    After the Federal Trade Commission commenced its proceeding to block the St. Peters acquisition, RWJ abandoned the proposed transaction, stating that it was "disappointed" that the FTC had acted to block the transaction after it had "received full approval from New Jersey's Attorney General" and received support from "managed care organizations and elected officials at all levels within the State of New Jersey."[9]

---

[8]    Spencer Kent - *Two N.J. health systems want to merge. But the feds say it's bad for patients.* NJ.com, June 3, 2022 (https://www.nj.com/healthfit/2022/06/two-nj-health-systems-want-to-merge-but-the-feds-say-its-bad-for-patients.html)

[9]    Jeffrey Kanige - *FTC moves to block RWJBarnabas-Saint Peter's deal,* NJBIZ June 3, 2022 (https://njbiz.com/ftc-moves-to-block-rwjbarnabas-saint-peters-deal/)

## C. RWJ's Decade-Long Mission to Monopolize New Jersey Healthcare Markets

59.     In its first foray directly into Hudson County, RWJ purchased Jersey City Medical Center in 2013.  At that time, high-level executives at RWJ conducted a series of transition meetings.  In particular, it is believed that these meetings included specific discussions concerning how to eliminate competition for emergency medical service, including in Bayonne, and ultimately to wrest control of Bayonne Medical from CarePoint.

60.     The CarePoint Hospitals, including Bayonne Medical did not participate in Horizon's network at that time, which caused a great deal of tension between Horizon and CarePoint.

61.     RWJ plotted to intentionally steer patients away from Bayonne Medical and toward RWJ facilities. Upon information and belief, an early step in this plan was the development of a satellite emergency department ("SED") in Bayonne, blocks away from Bayonne Medical, located five miles away from JCMC.  .  Not only is access to emergency care essential to the welfare of the community, it is also a major driver of inpatient admissions for hospitals.  CarePoint's role as an Emergency Department provider in the City of Bayonne was an important element in not only keeping Bayonne's residents healthy, but also keeping Bayonne Medical healthy as a community hospital.

22

62.     Upon information and belief, during the transition to RWJ's control of JCMC, Dr. Garay, JCMC's Chief Medical Officer, communicated with representatives at Horizon about "enhanced rates" – that is, rates substantially higher than what RWJ understood to be Horizon's prevailing in-network rates, if RWJ were to take over Bayonne Medical's market share in Bayonne.

63.     Upon information and belief, at that time, Jay Picerno, RWJ's Chief Financial Officer communicated with a Horizon representative about RWJ taking over the Bayonne market, leveraging Horizon's offer to provide enhanced rates, by starting a free-standing emergency department – which was not connected to a full-service facility.

64.     Indeed, beginning in at least the fall of 2015, RWJ "touted a 24/7 emergency department as a main feature of its medical facility planned for Broadway and 24th Street" in Bayonne.[10]  Picerno had several conversations with Horizon's leadership who actively supported RWJ creating the proposed SED at the Bayonne location.  Indeed, Horizon would prefer to deal with an in-network RWJ facility than an out of network competitor in CarePoint – even if RWJ monopolized GAC services in the market.

---

[10]     Jonathan Lin - *Battle looms between CarePoint and Barnabas Health over proposed Bayonne ER,* The Jersey Journal, November 2, 2016 (http://www.nj.com/hudson/index.ssf/2016/11/battle_looms_between_carepoint_and_barnabas_health.html)

65.    Horizon offered to pay RWJ enhanced rates at its Bayonne SED in order to ensure that the SED endeavor would be profitable and, thus, could serve its purpose to permit RWJ to so adversely impact the economics of Bayonne Medical as to force its closure.  Integral to the purpose of the Horizon-RWJ cooperation was the steering of patients away from CarePoint Hospitals, specifically Bayonne Medical, mere blocks away from the SED.

66.    While not in-network for Horizon members at the time, CarePoint is now in network with Horizon and all major insurers.  Even while out of network, the CarePoint Hospitals treated a large percentage of government insured and uninsured patients.  CarePoint has, at all times, provided a significant amount of charitable care to the uninsured.

67.    Notably, it was reported that "[t]he [RWJ] application was backed by a trio of health insurance companies, a variety of elected officials, and hundreds of people who signed a petition to support the Bayonne SED, according to state documents."[11]

68.    In that same article, it was reported that RWJ CEO Barry Ostrowsky told NJ Spotlight that Horizon "had encouraged his organization to construct a free-

---

[11]    Lilo H. Stainton - *The Battle of Bayonne: Turf Wars Over Satellite Emergency Departments,* NJ Spotlight News, August 2, 2017 (https://www.njspotlightnews.org/2017/08/17-08-01-the-battle-of-bayonne-turf-wars-over-satellite-emergency-departments/)

standing emergency facility as a way to connect more Horizon patients in the area with providers that are part of its network."[12]

69.    Since its opening in 2017, the SED has caused the disruption RWJ intended.  There has been a substantial decrease in emergency patients to Bayonne Medical, which in turn led to a substantial decrease in inpatient admissions.  This is the case notwithstanding the fact that after the CarePoint Hospitals became in-network with all major insurers, publically available data shows that the percentage of commercial payers remained flat rather than increased, as would have been expected.  This means that despite being in-network, RWJ's anticompetitive actions continued to suppress competition in the market.

70.    Specifically, many of the predominantly walk-in inpatient admissions lost by Bayonne Medical to RWJ's SED are now being transported miles away to JCMC.  The annual financial losses to Bayonne Medical as a result of the SED are approximately $20 million, and the total loss for the period from 2019 through 2022 is approximately $80 million.  Moreover, the SED results in a risk of patient morbidity stemming from the need for patients to be moved from the limited-purpose SED to RWJ's JCMC, a full-service hospital.

---

[12]    Notably, NJ Spotlight news lists "Major funding" provided by both "Horizon Blue Cross Blue Shield of New Jersey" and "RWJ Barnabas Health."

71. As noted above, RWJ has been engaged for many years in a continuing pattern of conduct, including agreements with others such as Horizon, to drive the CarePoint Hospitals out of business as independent competitors such that RWJ can operate, with no meaningful competition, in the Hudson County acute care market.

### 1. RWJ's Attempt to Induce CarePoint-Referring Doctors to Steer Patients to RWJ Facilities

72. RWJ's march towards monopoly continued to not only decimate the CarePoint facilities through steering paying emergency room patients to its own facilities, but also by seeking to incentivize doctors to stop referring patients to CarePoint facilities and start referring them only to RWJ facilities.

73. Beginning in mid-February 2016, RWJ in conjunction with Horizon, launched a campaign of sending letters (the "RWJ Letter") to physicians who have, over the years, consistently referred patients to CarePoint Hospitals for treatment (hereinafter the "CarePoint Referring Physicians"). The RWJ Letter was intended to induce physicians to refer patients to RWJ and away from the CarePoint Hospitals. The letter confirmed the collaboration between RWJ and Horizon, and touted incentives to physicians to refer patients to RWJ.

74. For example, the RWJ Letter stated that "If you have privileges at a Barnabas Health facility, you are eligible to join Barnabas Health Care Network (ACO). Through this network, you may receive **enhanced fee-for-service fees**, be

26

eligible for **patient management fees** and have the ability to **participate in shared savings** for most Horizon patients."

75.      In effect, Horizon, in conjunction with RWJ, sought to lure CarePoint Referring Physicians with financial incentives to steer paying, insured patients to Horizon's "Tier 1" hospitals at the expense of the CarePoint Hospitals.

76.      These decreases in revenue, which were directly caused by RWJ, contributed to the CarePoint Hospitals experiencing difficult economic times late in the prior decade.  Unlike a competitive situation where a customer may be attracted to a better product or lower price, here RWJ financially incentivized doctors to steer the ultimate customer (the patient) to RWJ, without regard to the fact the doctors were paid to do so.  This is far from a marketplace where customer choice is paramount, but rather a marketplace where someone other than the customer can create a monopoly that hurts the customer by removing options.

## 2.      CarePoint Explores Selling Hospitals

77.      Between 2011 and early 2018, CarePoint stabilized the operations of the Hospitals, employing thousands of people, serving hundreds of thousands of patients, and investing significant funds in the real estate on which each Hospital operated and in the community served by each Hospital. CarePoint further began the transition to be an in-network provider for all major health plans, including Horizon.

27

However, the latter portion of the prior decade presented significant financial challenges to the CarePoint Hospitals as a result of RWJ's monopolization efforts.

78.     In addition, efforts to navigate the economic shoals and develop a strategy for success, indeed survival, were complicated by the fact that the CarePoint Hospitals were not in full control of the real estate on which the Hospitals were located.  By way of example, MPT of Hoboken TRS, MPT of Hoboken Hospital, MPT of Hoboken Real Estate, and MPT of Bayonne (together "MPT") are limited liability companies that, at pertinent times, own(ed) portions of the real estate under the CarePoint Hospitals.  MPT is a national medical REIT.

79.     The property on which Christ Hospital operated was owned by Hudson Propco, LLC (owned 75% by the Founders and 25% by JC Opco, LLC, an entity owned by Eisenreich), and the property on which HUMC operated was owned 70% by an MPT entity and 30% by the Founders.  The Bayonne property was wholly owned by an MPT entity and was subleased to IJKG, the CarePoint affiliate that operated Bayonne Medical Center.

80.     Beginning in 2018, CarePoint began to explore strategic alternatives, including a sale of the Hospitals to new operators.  As one of his companies was the minority owner of Christ Hospital, Eisenreich was included in all of CarePoint's discussions involving strategic alternatives.

28

81. The primary goal for each of CarePoint's strategic alternatives was to ensure that all potential suitors agree that the Hospitals would continue operating as acute care facilities for the benefit of the communities that they serve. This crucial baseline requirement was communicated by CarePoint to all who expressed interest in acquiring or otherwise becoming involved in the operation of any of the CarePoint Hospitals. In selecting an acquirer or other strategic partner, CarePoint's primary focus has been to avoid any interruption in providing quality healthcare to the residents of Hudson County; therefore, CarePoint rejected any proposal that did not guarantee a seamless transition of employees, physicians, nurses, operations, and health care services.

82. In April 2019, RWJ expressed interest in all three CarePoint Hospitals. In July, 2019, RWJ tendered an LOI for CarePoint's HUMC and Christ Hospital facilities, but not for Bayonne Medical. CarePoint also engaged in discussions with another potential purchaser, Atlantic Health, which does not have acute care operations in Hudson County or in communities bordering Hudson County.

### 3. Eisenreich and His Affiliates Conspired with RWJ to Utilize the Ownership of Hospital Realty to Squeeze CarePoint

83. Potential acquirers, including RWJ and Atlantic, were aware of the importance of controlling the real estate on which the Hospitals were built, for predictability of cost and planning.

29

84. Eisenreich also recognized the critical relationship between hospital operations and control of the hospital real estate, and the opportunity for him to personally benefit from and control the sale of the CarePoint Hospitals. Eisenreich devised a scheme to do exactly that, in part by conspiring with RWJ.

85. In late August, 2019, RWJ advised CarePoint that it was not interested in purchasing HUMC at the offered price, but that it might still be interested in acquiring Christ Hospital's operations.

86. On September 10, Eisenreich (through his counsel) told CarePoint's counsel that RWJ was interested in bidding for only the assets of Christ Hospital – thereby hinting that RWJ did not intend to operate, but rather sell off the hospital's assets and eliminate Christ as a competitor to RWJ.

87. On September 17, MPT offered to sell the Hoboken and Bayonne real estate to CarePoint. CarePoint accepted this offer, but such a transaction never closed.

88. Eisenreich separately communicated to RWJ and to CarePoint that he had a "plan" that could work for everyone. He warned CarePoint that RWJ contemplated closing Bayonne Medical as an acute care hospital.

89. On September 23, RWJ emailed to CarePoint an offer for the Christ Hospital assets only – further reinforcing the notion that RWJ's goal was to remove

Christ Hospital from the equation, leaving RWJ to serve Jersey City through JCMC, unchecked by competition.

90.    From mid-September into November, Eisenreich orchestrated communications regarding the implementation of his "plan" to which RWJ had agreed.  Eisenreich endeavored to preclude direct contact between RWJ and CarePoint with respect to any potential transactions so as to further obfuscate RWJ's true motivation and plan.

91.    RWJ's interest in any acquisition was expressly contingent upon its ability to negotiate new leases.  On September 28, 2019, RWJ tendered a revised LOI for the assets of HUMC and Christ Hospital, with that contingency.

92.    Eisenreich, through his affiliate, Alaris Health ("Alaris"), executed an LOI with MPT for the sale of the HUMC and Bayonne Medical real estate and for the acquisition of MPT's minority equity interest in HUMC, on October 18, 2019. He promptly reported this to RWJ, but not to CarePoint.

93.    On October 21, RWJ submitted another LOI to CarePoint for the acquisition of Christ Hospital's assets and HUMC (expressly contingent on new leases for the HUMC and Christ Hospital real estate), which CarePoint accepted the next day.

94.     Eisenreich continued to meet secretly with Manigan regarding lease terms.  He and Manigan agreed that it would not respond to CarePoint's inquiry about lease terms.

95.     On October 27, without notice to CarePoint, Eisenreich (through Alaris) executed definitive agreements with MPT for the sale of the HUMC and Bayonne Medical real estate and MPT's minority equity interest in the operator of HUMC.  These transactions closed on November 5, 2019 and RWJ was aware of the transaction prior to closing, yet CarePoint did not learn of it until two days later.  Alaris subsequently assigned its interests to other Eisenreich affiliates – WTFK Bayonne and SB Hoboken.

96.     Simultaneously and unbeknownst to CarePoint, during 2019, Eisenreich engaged in ongoing dialogue with Manigan at RWJ.  Much of this dialogue was conducted secretly, and not disclosed to CarePoint.

97.     A focus of this collusion between Manigan and Eisenreich involved the calculated and strategically presented 2019 LOI from RWJ for Christ Hospital and HUMC – which RWJ never intended to see through to completion.  Rather, Manigan intended to use the LOI to gain valuable proprietary and/or confidential intelligence and use it to prevent any other potential operators or acquirers from engaging with CarePoint.

98.     After the LOI was submitted, RWJ and CarePoint were in close contact and, as is expected prior to an acquisition, CarePoint ceased business development expenditures and planned for potential staffing reduction in force in consolidation with its purported acquirer, RWJ.  In fact, RWJ was aware of CarePoint's precise financial situation and leveraged this knowledge to push the CarePoint Hospitals to insolvency.

99.     Behind the scenes, Manigan and Eisenreich were discussing each step in the plan and while RWJ represented to CarePoint that its interest in CarePoint was contingent upon a favorable proposal from Eisenreich with regard to the hospital real estate Eisenreich controlled, Manigan and Eisenreich never had any intention of brokering any agreement as to such real estate.  This is made clearer by Eisenreich going to great lengths to preclude RWJ and CarePoint discussing any aspect of the real estate.

100.    On November 1, 2019, RWJ filed an application with the NJDOH for expedited consideration of its request for a certificate of need to proceed with its proposed transactions concerning Christ Hospital and HUMC.

101.    Using the pretense of uncertainty over the real estate, but in truth knowing that the whole intention of the LOI was the damage it would cause to CarePoint, RWJ – in collusion with Eisenreich – intentionally backed out of the proposed transaction to acquire the Christ Hospital assets and HUMC.

102.    The sale of the real estate on which HUMC and Bayonne Medical operate and the assignment of the affected leases was subject to claims brought by, among others, HUMC and IJKG (the CarePoint affiliate that owns and operates Bayonne Medical) in the Chancery Court in Delaware in the matter entitled *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, C.A. No. 2019-0972-KSJM.

103.    In that litigation, the Court has issued a number of interlocutory rulings in favor of the CarePoint entities, including (i) a finding that MPT violated a right of first refusal when it purported to sell the HUMC equity interest to an Eisenreich affiliate, (ii) the Court has denied the Eisenreich parties efforts to obtain summary judgment on CarePoint's tortious interference claims against Eisenreich and (iii) struck all of Eisenreich's counterclaims against CarePoint.  The matter is now settled.

### 4.    Eisenreich, RWJ, Moshe and HRH Interfere with the Potential BMC Acquisition to Attempt to Bankrupt CarePoint

104.    In January 2020, shortly after RWJ "backed out" of its LOI to purchase the Christ Hospital assets and HUMC – a transaction Manigan orchestrated that RWJ never intended to close – HRH, owned by Moshe, approached CarePoint about a possible acquisition of all or part of, or investment in, the group of entities comprising CarePoint – by way of a merger, asset sale, or other transaction.

105. In connection with this potential transaction, HRH requested an extensive list of confidential information about CarePoint and each of its Hospitals. Accordingly, CarePoint granted HRH access to a "data room" where confidential data, including financial data, regarding Bayonne Medical and the other CarePoint Hospitals was stored.

106. As a condition to receiving information about the Company, HRH entered into a confidentiality agreement with CarePoint, dated January 9, 2020. Under the confidentiality agreement, HRH agreed to treat any "Evaluation Material" in "accordance with the provisions" of the confidentiality agreement.

107. After having access to, reviewing, and downloading copies of most of the Evaluation Material in the data room for not only Bayonne Medical – but all the CarePoint Hospitals – on March 16, 2020, HRH submitted an offer to IJKG, which included a provision that the offer was "[c]ontingent upon the ability to acquire the Land and Property for $30 million or less." Despite HRH revising its bid several times, no version of HRH's modified offer for the assets of Bayonne Medical included all of the requirements requested by IJKG.

108. At the same time it was negotiating with HRH, IJKG was negotiating with others, including BMC which was a newly formed entity, formed with the purpose of acquiring Bayonne Medical and continuing to operate it as an acute care hospital.

109.    Given the offers before it, IJKG determined that BMC presented the best bid for Bayonne Medical's assets, considering the potential for successful operation of the hospital, and financial stability.

110.    On March 23, 2020, BMC signed a letter of intent (the "BMC LOI") to purchase the assets of Bayonne Medical – keeping substantially all of Bayonne Medical's employees and staff, and providing the same services as an acute care hospital.

111.    Given the execution of the BMC LOI, IJKG informed the other bidders, including HRH, that it had an exclusive letter of intent with another bidder for the assets of Bayonne Medical, and could not entertain any further proposals or discussions about Bayonne Medical.

112.    In May 2020, notwithstanding the existence of the BMC LOI between IJKG and BMC, Eisenreich, through WTFK Bayonne agreed to sell the Bayonne Medical real estate to HRH – and HRH promptly and publicly announced its ownership and control of the Bayonne Medical real estate.

113.    In an op-ed for The Jersey Journal, Hudson County Executive Tom DeGise noted that the "supply of hospital beds cannot be simply be viewed as a source of private profit, but as a critical community resource." [13]

---

[13]    Terri West, *DeGise says he's ready to use eminent domain on 3 CarePoint Health hospitals*, The Jersey Journal, May 12, 2020 (https://www.nj.com/hudson/2020/05/degise-says-hes-ready-to-use-eminent-domain-on-3-carepoint-health-hospitals.html)

114.   Despite Moshe's HRH facility being licensed as a general acute care hospital, its main focus had been, and continues to be, on same day surgery, and it had no real incentive to expend significant resources to acquire Bayonne Medical.

115.   HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County, preferably at its existing Secaucus facility.

116.   Upon information and belief, the plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close.  Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical, as the specter of bankruptcy causes staff and doctor defection, a freeze on programmatic growth and expansion of other services and offerings.  Further, patients are reluctant to seek care at a facility they believe is "going out of business."

117.  Eisenreich and Moshe planned that, once the hospital closed, they would repurpose the building as Eisenreich's next skilled nursing facility ("SNF") and HRH would hire the surgeons then doing cases at Bayonne Medical to further expand HRH's same day surgery programs at HRH's Secaucus facility.

118.   Such a plan served to benefit Eisenreich, Moshe, HRH and RWJ. Eisenreich could expand his SNF empire with Moshe, HRH would eliminate surgery center competition, and RWJ would eliminate Bayonne Medical as a competitor, as a SNF does not provide inpatient GAC services.

119.   As a result, essentially all ER traffic from Bayonne would be routed through the SED and this would drive inpatient admissions to RWJ's JCMC facility. Notably, and by way of example, publically available data on hospital admissions in 2021 shows that RWJ and CarePoint account for 91.5% of ER admissions in Bayonne (07002). Eliminating Bayonne Medical would leave RWJ with nearly all ER admissions for such patients.

120.   The transaction through which HRH acquired the Bayonne Medical real estate from Eisenreich not only occurred the same day that CarePoint and BMC announced their asset purchase for Bayonne Medical, but was 100% seller-financed. That is to say that HRH did not put up one cent to acquire the Bayonne Medical real estate. The financing, also unsurprisingly, was through one of Eisenreich's entities.

### 5.   Eisenreich's Collaborators at HRH

121.   To further demonstrate HRH's penchant for greed and subterfuge, its Board of Directors is headed by Manigan's former client, Moshe, who has been sued

in at least half a dozen federal lawsuits, which have accused Moshe of RICO and insurance fraud over the last decade.[14]

122.   Moshe has such an extensive history of alleged fraud and wrongdoing that another Federal Court based its granting of a preliminary injunction on the then-seven prior lawsuits filed against Moshe alleging his engagement in fraudulent billing activities.  *See* In *Gov't Employees Ins. Co. v. Moshe*, 2020 WL 3503176, at *1 (E.D.N.Y. June 29, 2020).

123.   In fact, a putative class action was filed in this very Court, alleging that Moshe colluded with his sister, a New York-based physician, to refer New York-resident patients to HealthPlus – a Hackensack, NJ-based surgery center owned by Moshe, despite the existence of less expensive facilities closer to the patients.  The class alleges that poor sterilization and other deficiencies may have exposed these wrongly referred patients to HIV and hepatitis. *C.S. v. HealthPlus Surgery Center, LLC*, 2020 WL 6074457, at *1 (D.N.J. Oct. 14, 2020).

124.   Further, in a complaint filed late last year, State Farm alleged numerous claims, including fraud, based on Moshe's alleged orchestration of a fraudulent scheme to bill and profit from a series of medical facilities, a billing company, and a series of ambulatory surgical centers which he "secretly owns and controls." *State*

---

[14]     Peter D'Auria, *This man wants to create a new for-profit hospital chain in Hudson County. Can he do it?*, The Jersey Journal October 26, 2020 (https://www.nj.com/hudson/2020/10/this-man-wants-to-create-a-new-for-profit-hospital-chain-in-hudson-county-can-he-do-it.html)

*Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists, P.C.*, 21-cv-5523, Complaint ¶ 2 (E.D.N.Y. Oct. 5, 2021).

125.   About the same time as the State Farm suit, Allstate Insurance Company separately sued Moshe for having "engineered" a fraud scheme in which he, through affiliated entities, "aggressively" sought to collect payments from Allstate even though the entities were not eligible for reimbursement. *Allstate Ins. Co. v. Metro Pain Specialists P.C.*, 21-cv-5586, Complaint (E.D.N.Y. Oct. 7, 2021).

126.   Perhaps most relevant to the instant action is that Allstate also alleged that Moshe sought to evade prohibitions against his ownership of certain types of medical facilities and fraudulent billing of medical services from the same by installing "sham owner" physicians, but retaining operations, control, and profit for himself and the medical facilities he owns. *Id.*

127.   Moshe's colleague, HRH's President and Chief Executive Officer, Dr. Nizar Kifaieh, is the subject of an active litigation in Hudson County brought by CarePoint based on Kifaieh's legally binding separation agreement.

128.   As part of that separation agreement, and in return for over $2,600,000 in cash as well as other valuable consideration, Kifaieh agreed not to disparage CarePoint, yet after obtaining the CEO job with HRH, Kifaieh published and made a number of disparaging, false and defamatory statements in violation of his separation agreement.

129.   Also, most recently, Reuven Alonalayoff, Director of Marketing for HRH, was arrested after police found a "large cache of firearms and ammunition inside an office closet" at HRH.  Secaucus police "recovered 11 handguns, 27 rifles or shotguns, and a semi-automatic rifle with a high-capacity magazine, which is an assault rifle, inside [a] hospital closet," as well as "another high-capacity handgun magazine with 14 rounds." [15]

130.   Notably, Alonalayoff "who is also known as Reuven Alon and Rob Alon," has been named alongside Moshe as a co-owner of certain shell corporations in numerous lawsuits, including federal lawsuits brought by GEICO and State Farm in which he, with Moshe were accused of "submitting fraudulent claims for medical services related to car accidents."[16]

### D.    Raymond James Issues RFI and Colludes with RWJ to Interfere with CarePoint Hospitals

131.   In another effort to use its political strength, RWJ commandeered the previously dormant bureaucratic machinery of the Hudson Municipal Hospital Authority ("HMHA") to operate outside of its statutory authority to crush HUMC, such that RWJ could purchase it out of bankruptcy.

---

[15]     Emily Mae Czachor, *Hospital employee arrested after 39 guns, ammo found in office closet* August 9, 2022 CBS News (https://www.msn.com/en-us/news/crime/hospital-employee-arrested-after-39-guns-ammo-found-in-office-closet/ar-AA10u5IV)

[16]     Ed Shanahan - *Employee Kept Arsenal, Including Assault Rifle, at Hospital, Police Say* – NY Times, August 9, 2022  (https://www.nytimes.com/2022/08/09/nyregion/guns-hospital-employee-threat-new-jersey.html)

132. On or about December 18, 2020, the Hudson Municipal Hospital Authority (HMHA) was reconstituted, allegedly pursuant to the Local Hospital Authority Law, N.J.S.A. § 30:9-23.15, *et. seq.* which "authorizes municipalities to create, by ordinance, an instrumentality for the **sole purpose** of carrying out an acquisition and to operate and maintain a hospital." (emphasis added). However, HMHA neither obtained funding from the City of Hoboken that would permit it to acquire HUMC, nor otherwise raised funds to support an acquisition of HUMC. In fact, HMHA took no steps to acquire and operate a hospital.

133. The applicable Ordinance B-312 reconstituting HMHA stated that HMHA was created because "CarePoint Health has notified the City that it no longer desires to continue its operation of the Hospital [HUMC]." This assertion was false, as CarePoint never notified the City or any of its government officials that it intended to cease operating HUMC.

134. Instead of pursuing any of its statutorily permitted purposes under New Jersey Law, HMHA retained Raymond James and sought to broker a sale of CarePoint – a private hospital system – to another private hospital system. This is not a permitted purpose under the Local Hospital Authority Law.

135. RWJ had previous extensive professional dealings with Raymond James and colluded with Raymond James in order to further its goals of devaluing

HUMC to the point it would be forced into bankruptcy so RWJ could pursue an anticompetitive sale of HUMC to RWJ.

136.  In June 2021, RWJ was provided with advance notice that Raymond James was tasked with identifying a new operator of HUMC, and that an RFI would be circulated seeking potential buyers.

137.  Specifically, Vinton Rollins of Raymond James reached out to Mark Manigan of RWJ, noting their "prior introduction and past Zoom call," that Rollins was "[l]ooking forward to [his] next zoom" with Manigan on June 14, and to give Manigan "a Heads-up that Raymond James is now representing the City of Hoboken/Mayor in working to find a replacement operator/owner for CarePoint's Hoboken University Medical Center[.]"

138.  Even before this June 2021 advance notice, in February 2021 RWJ and Raymond James exchanged updates concerning CarePoint, including regarding Vivek Garipalli, the then-current majority owner of CarePoint– in an attempt to identify weaknesses that RWJ could leverage to devalue HUMC and to further its anticompetitive conduct.

139.  To set this plan in motion, Raymond James issued a RFI, which sought potential buyers for not only HUMC, the only hospital under HMHA's City of Hoboken jurisdiction, but, incredibly, CarePoint's other hospitals in Hudson County, over which HMHA (a municipal authority of *Hoboken*) possessed no authority.

43

140. On or about October 8, 2021, CarePoint publicly announced its intention to convert HUMC to non-profit ownership. Despite this announcement, on or about December 20, 2021, without CarePoint's knowledge or consent, Raymond James circulated the RFI to RWJ (who was informed it was coming nearly six months earlier) and other entities (who did not get the same "heads up" as RWJ), soliciting potential buyers or operators for the Hospital.

141. In an attempt to exclusively control the means and method of communication with RFI respondents and remove CarePoint from the negotiation of the sale of its own hospital(s), Raymond James warned in its RFI that "[i]n no event should any RFI Respondent directly contact any officer, member, agent or employee of . . . CarePoint without the prior consent of Raymond James." The RFI directed recipients to direct all questions to Raymond James, and not the supposed seller, CarePoint.

142. Boldly and without authority to do so, the RFI encouraged recipients to "consider expressing in their response whether they would be interested in proposing a transaction involving the other operations and/or assets of CarePoint in Hudson County, such as Bayonne Medical Center and Christ Hospital, as CarePoint has indicated its interest in maintaining a coordinated system of facilities in its service area."

44

143.  Raymond James then continued the conversation it started more than six months earlier with RWJ to discuss how to take over the CarePoint Hospitals, which led to RWJ, despite backing out of a previous potential acquisition of one or more of the CarePoint facilities, to express interest in operating and owning HUMC, and potentially other CarePoint Hospitals.

144.  Furthermore, the RFI enclosed confidential information concerning CarePoint and HUMC that Raymond James obtained without authorization, from self-described "private sources" and a "proprietary database."  It is believed that this data, at least in part, came from the information provided to RWJ during the 2019 LOI and/or from Eisenreich through his dealings with CarePoint.

145.  Inclusion of this confidential information in the RFI intentionally and misleadingly represented to third parties that HUMC and CarePoint authorized such data to be contained in the RFI.

146.  As a result of the RFI's circulation, and RWJ's interest, certain RFI recipients halted ongoing negotiations and reconsidered prospective business relationships with CarePoint.  More broadly, the RFI (which states that the current operator will be displaced) and RWJ's interest therein put CarePoint at a disadvantage to enter into any new agreements and retain staff.

147.  Upon information and belief, RWJ understood how CarePoint and, specifically HUMC, would be affected by the circulation of the RFI—and likely

intended these effects. Also, circulating the RFI improperly interfered with HUMC's operations and management—including HUMC's development of relationships with strategic partners.

148. CarePoint successfully brought an action against HMHA and others in Superior Court in Hudson County, NJ captioned *Carepoint Health Management Associates, LLC d/b/a Carepoint Health And Humc Opco, LLC d/b/a Carepoint Health – Hoboken University Medical Center v. Hoboken Municipal Hospital Authority, Raymond, James & Associates, Inc.* (Case No. HUD-C-000019-22) to enjoin distribution of the RFI. The matter is now settled.

149. Through all the above actions RWJ and its conspirators including, without limitation, HRH, Moshe, and Kifaieh have engaged in underhanded, self-serving, anti-competitive and improper actions for their own benefit and to damage CarePoint and the public.

150. RWJ has carried out these actions without intervention from, and sometimes with the explicit support and authority of state and local government and New Jersey healthcare providers such as Horizon.

151. RWJ's conduct, as alleged herein, has caused significant financial injury to CarePoint and, unless enjoined, will risk significant competitive harm to CarePoint and to the public through RWJ's elimination of all competition for general acute care in Hudson County.

## COUNT I – VIOLATION OF THE SHERMAN ACT
## SECTION TWO (15 U.S.C. § 2)

152.   Plaintiffs incorporate by reference paragraphs 1 through 151 above.

**A.    Relevant Markets**

153.   Inpatient general acute care ("GAC") services provided in Hudson County is a relevant market in which to assess RWJ's monopolistic effect on competition and consumers of GAC services.

### 1.    Relevant Product Market

154.   Inpatient GAC services is the relevant product market.  Inpatient GAC services include a broad cluster of hospital services— medical, surgical, and diagnostic services requiring an overnight hospital stay—for which competitive conditions are substantially similar.  Here, inpatient GAC services cover all such overlapping services that both RWJ and CarePoint provide.  GAC services implicate interstate trade and commerce in that supplies used in providing care, as well as funding for the services, travel in interstate commerce.

155.   Outpatient services (i.e., services that do not require an overnight hospital stay) are not included in the inpatient GAC services market because patients cannot substitute outpatient services for inpatient services in response to a price increase on inpatient GAC services.  This is because the decision to administer services on an inpatient or outpatient basis is a medical determination based on each patient's specific clinical need.

156.   A hypothetical monopolist of all inpatient GAC services could profitably impose a small but significant and non-transitory increase in the price of those services.

### 2.   Relevant Geographic Market

157.   Hudson County, New Jersey, is a relevant geographic market in which to evaluate RWJ's monopolistic effect on competition.  Hudson County is the focal area of competition between RWJ and CarePoint.

158.   Hudson County is the fourth-most populous, most dense, and fastest-growing, county in New Jersey, with a population of more than 700,000 residents.

159.   Hudson County is an area that is economically significant to commercial insurers.  Patients typically prefer to have access to inpatient GAC services close to where they live.  For this reason, a commercial insurer would be unable to sell a health plan successfully in Hudson County that did not include in its network any Hudson County GAC hospitals.

160.   Commercial insurers must meet regulatory requirements that mandate a certain level of geographic access.  Insurers could not meet geographic access requirements for marketing commercial plans in Hudson County if those insurers did not include any Hudson County hospitals as in-network hospitals in their commercial insurance plans.

161. Hudson County's population includes a disproportionately high number of patients who receive health care from government funded programs, or the uninsured. Hudson County has the most diverse population of any county in the eastern United States.

162. Hudson County also has a large number of patients for whom travel outside of Hudson County to receive GAC services would constitute a substantial hardship.

163. A hypothetical monopolist of all inpatient GAC services in Hudson County could profitably impose a small but significant and non-transitory increase in price of those services.

**B.    Market Effects**

164. There is direct evidence that the conduct of RWJ, injuring and threatening the elimination of the CarePoint facilities as independent competitors, is likely to further lessen competition in the relevant market. As it stands today, there is robust competition for general acute care services in Hudson County. That competition benefits commercial insurers and patients. However, if RWJ's various anticompetitive practices directed toward CarePoint are allowed to continue unfettered, RWJ will succeed in exerting nearly complete control over general acute care services in Hudson County. If CarePoint – an important competitor in the Hudson County GAC market – is eliminated, anticompetitive effects will follow.

### C. Competition Among Hospitals Benefits Consumers

165. Under a model of hospital competition that has been developed in merger enforcement cases brought by the Federal Trade Commission, competition among hospitals is viewed as a "two-stage" market, in which the first stage is centered on the formation of networks of providers, including hospitals, by commercial insurers. At this stage, both insurers and hospitals are viewed as competitors in the process of network formation. In theory, this process allows insurers to negotiate for lower prices and other favorable terms which, in turn, benefit consumers by lowering the insurers' costs that must be passed on to their subscribers.

166. Under this model, in the first stage of hospital competition, hospitals compete to be included in commercial insurers' health plan networks. To become an in-network provider in a health plan, a hospital negotiates with an insurer and enters into a contract if it can agree with the insurer on terms. The hospital's reimbursement terms for services rendered to a health plan's members are a central component of those negotiations. This is true regardless of whether reimbursements are tied to fee-for-service contracts, value-based contracts, or other types of contracts.

167. Insurers attempt to contract with local hospitals (and other healthcare providers) that offer services that current or prospective members of the health plan

want.  In-network hospitals are typically significantly less expensive for health plan members to seek care from than a hospital that is not included in the health plan's network (an "out-of-network provider").  A hospital likely will attract more of a health plan's members when it is in-network.  Hospitals, therefore, have an incentive to offer competitive terms and reimbursement rates to induce the insurer to include the hospital in its health plan network.

168.  From the insurer's perspective, having hospitals in-network is beneficial because it enables the insurer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically employers and their employees.

169.  A hospital has significant bargaining leverage if its absence would make the insurer's health plan network substantially less attractive (and therefore less marketable) to its current and prospective members.  This relative attractiveness to the insurer depends largely on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of the plan's members.  The presence of alternative, conveniently located, high-quality hospitals is important competition that constrains the ability of hospitals to raise prices and seek other terms adverse to consumers in negotiations with insurers.  Where there are fewer meaningful alternatives (i.e., less competition), a hospital will have greater bargaining leverage

51

to demand and obtain higher reimbursement rates and other more onerous contract terms.

170.   In the second stage of competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services.   Once patients select a health plan, they generally do not face different out-of-pocket costs to access hospitals included in their commercial health plan network.   As a result, in-network hospitals often compete on non-price features, such as location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, conveniences, and patient satisfaction.

171.   Non-price competition to attract patients benefits all patients at the competing hospitals, regardless of whether those patients are covered by commercial insurance, government funded programs, such as Medicare, Medicaid and Tri-Care, or are uninsured.   From the perspective of consumer welfare, the most important elements of competition among health care providers, including acute care hospitals, is access to care and quality of care.   CarePoint is endeavoring to maintain optimal access to acute care for the population of Hudson County, and to continue to enhance the quality of that care.   RWJ's efforts to control the provision of acute care in Hudson County will only reduce that access and reduce the incentive to upgrade the care available to the consuming public.

172.    In Hudson County, RWJ and CarePoint are close competitors to each other because they sell many of the same services in essentially the same place.

173.    RWJ and CarePoint currently serve as important alternatives to one another for insurers constructing networks that include Hudson County.  RWJ and CarePoint's Christ Hospital are two of the three largest hospitals in Hudson County, and they are the only hospitals in Jersey City, the largest city within Hudson County. Elimination of Christ Hospital as an independent acute care hospital would severely limit competition to the disadvantage of the public.

174.    Upon information and belief, quantitative analysis will provide direct evidence of the closeness of the competition between RWJ and CarePoint. Diversion analysis, an economic tool that measures substitution using data on where patients receive hospital services, will show that if CarePoint's hospitals were to become unavailable to patients for inpatient GAC services, a significant number of CarePoint's patients would seek care at an RWJ hospital.  Likewise, if RWJ were to become unavailable to patients for inpatient GAC services, a significant number of RWJ's patients would seek care at one of CarePoint's hospitals.

175.    RWJ and CarePoint compete with one another to attract patients to utilize their inpatient GAC services, regardless of a patient's insurer.  This competition incentivizes RWJ and CarePoint to improve quality, technology, amenities, equipment, access to care, and service offerings.

176.   RWJ is attempting to prevent CarePoint's hospitals from competing against RWJ, either as independent competitors or as competitors partnered with a different healthcare system.

177.   The provision of acute care hospital services, as well as subsets of those services, implicate interstate commerce, *inter alia*, in that they involve the use of medicines and supplies that travel in interstate commerce, involve reimbursement by insurance companies and federal and state funds that move in interstate commerce.

178.   RWJ has a dominant share of the acute care hospital services market in Hudson County, and enjoys power over the setting of prices to be charged to commercial insurers, as well as uninsured patients.

179.   If RWJ should succeed in eliminating the CarePoint Hospitals as independent competitors in Hudson County, RWJ's already significant market power would be greatly enhanced.

180.   As alleged above, RWJ and its conspirators have adopted a many-faceted strategy to pursue the goal of eliminating the CarePoint Hospitals as independent competitors.  While some of those activities, including seeking the aid of governmental actors, may not be separately actionable or even considered as material parts of a monopolistic scheme, they nonetheless provide evidence of RWJ's monopolistic intent and purpose.

181.   RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for GAC services in Hudson County.

182.   RWJ's conspirators in this effort include, without limitation, HRH, Moshe, and Kifaieh.

183.   CarePoint has suffered damage to its business or property in the form of lost revenues and resulting profits, as well as being forced to incur significant expenses to mitigate the anticompetitive effects of the conduct of RWJ and its conspirators.

184.   Accordingly, RWJ has monopolized, attempted to monopolize and/or conspired to monopolize the market for acute care hospital services in Hudson County, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

185.   The actions of RWJ and its conspirators have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

186.   Unless the continued unlawful conduct of RWJ and its conspirators is enjoined pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

## COUNT II – VIOLATION OF THE SHERMAN ACT SECTION ONE (15 U.S.C. § 1)

187. Plaintiffs incorporate by reference paragraphs 1 through 186 above.

188. The facts set forth above show that RWJ and its conspirators have engaged in a series of agreements in unreasonable restraint of interstate trade and commerce, affecting the markets for acute care hospital services in Hudson County, including but not limited to agreements intended to cripple and/or destroy the CarePoint Hospitals as independent competitors, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

189. The actions of RWJ have caused injury to CarePoint in its business or property, resulting in economic damages which CarePoint is entitled to recover under Section 4 of the Clayton Act, 15 U.S.C. § 16.

190. Unless the continued unlawful conduct of RWJ is enjoined pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, CarePoint remains at risk of being driven out of business, with a resulting harm to the public interest in the survival of an independent, non-profit hospital system in Hudson County.

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor, awarding them treble damages and reasonable attorneys' fees, along with an injunction preventing RWJ and/or its conspirators from continuing their unlawful course of conduct.

Date: February 8, 2023      By:    */s/ Patrick M. Harrington*
Patrick M. Harrington, Esquire
Dilworth Paxson LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
pharrington@dilworthlaw.com
Telephone: (856) 675-1900
Facsimile: (856) 663-8855

– and –

James J. Rodgers, Esquire*
Dilworth Paxson LLP
1500 Market St., Suite 3500E
Philadelphia, PA 19102
jrodgers@dilworthlaw.com
Telephone: (215) 575-7100
Facsimile: (215) 764-4603
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*