# EXHIBIT D

*Via ECF*
Hon. Cari Fais, U.S.M.J.
U.S. District Court for the District of New Jersey

Re:   *The CarePoint Litigation Trust v. Barnabas,* Case No. 22-cv-05421 (D.N.J.)
     *Discovery Dispute regarding Documents Subject to the Mandler Privilege Appeal*

Dear Judge Fais:

The CarePoint Litigation Trust and RWJ Barnabas Health, Inc. submit this joint letter to address a pending discovery dispute.[1]

## I.   THE CAREPOINT LITIGATION TRUST'S (THE "TRUST") POSITION

From the Trust's perspective, this discovery dispute is narrow and straightforward: Can Barnabas use privileged documents that are subject to the Trust's pending appeal of Judge Waldor's June 3, 2025 privilege-waiver order ("Privilege Order") in upcoming depositions.  ECF 233.  In the Privilege Order, Judge Waldor found privilege claims regarding documents produced by third-party Jeffrey Mandler (a prior owner of CarePoint) to have been waived.  The Trust appealed the Privilege Order (the "Mandler Privilege Appeal") and seeks a ruling maintaining the privilege; that appeal is fully briefed and pending before Judge Padin.  ECF 302.  The parties also dispute whether Mandler should be deposed before resolution of the appeal.

Having reached an impasse with Barnabas, the Trust seeks permission to file a motion for protection pursuant to FED. R. CIV. P. 26(c) to prevent Barnabas from (1) using the privileged documents subject to the pending Mandler Privilege Appeal during depositions while the appeal is pending and (2) conducting the deposition of Mandler until resolution of the Mandler Privilege Appeal.

Despite that narrow discovery dispute, which the Trust outlines in less than four pages (including its treatment of Barnabas-interposed red-herring issues), Barnabas wishes to upend the joint-letter process into a full merits brief with ***60+ exhibits***, relitigating the Mandler Privilege Appeal, and raising irrelevant discovery disputes far beyond the scope of this letter (i.e., alleged subject-matter waiver and privilege disputes regarding different third-party productions).  The Trust vehemently objects to such efforts, and particularly to Barnabas' improper insistence on including 60 exhibits—each of which is subject to a ***pending claim of privilege***.[2]

---

[1] Pursuant to L. CIV. R. 37.1, the parties certify they have met and conferred three times via Zoom (once with some participants in person) and written correspondence, but have been unable to resolve their dispute.

[2] Remarkably, this "record" started as roughly ***50*** exhibits, but Barnabas insisted on adding at least 10 more in one of its expansions of this letter.  Barnabas also asserts that the Trust threatened to move for sanctions if Barnabas filed its exhibits under seal.  That is inaccurate.  The Trust did not threaten sanctions; rather in response to the Trust's repeated requests that Barnabas not submit its tome of exhibits or at least to do so *in camera,* Barnabas raised the prospect of suspending this letter until a ruling in the Mandler Privilege Appeal, as it was concerned about being subjected to a sanctions motion.  The Trust responded that if Barnabas would submit the documents *in camera*, it would object, but committed not to seek sanctions for

### A.    *Background on Mandler Privilege Appeal*

Mandler, a third party and one of the prior owners of the CarePoint hospitals, produced 145,926 documents in response to a Barnabas subpoena.  It is unclear what, if any, privilege or relevance review Mandler conducted before the production was made.  After that production, CarePoint learned Mandler produced scores of documents subject to CarePoint's privilege, which CarePoint did not have the opportunity to assert before the documents were produced.

CarePoint clawed back a subset of the Mandler documents in August, 2024.  Barnabas rejected CarePoint's clawback and argued to Judge Waldor that any CarePoint privilege had been waived.  Judge Waldor issued the Privilege Order on June 3, 2025.  ECF 233.  Notably, Judge Waldor did not make a determination as to whether any Mandler-produced documents were in fact privileged, instead holding all CarePoint claims of privilege over the Mandler production were waived.  *Id.*

Shortly thereafter, the Trust substituted in as the plaintiff.  ECF 238, 259.  Believing the Privilege Order was issued in error on a key issue, the Trust timely sought reconsideration from Judge Waldor (which was denied, *see* ECF 296) and then timely appealed to Judge Padin on September 10, 2025.  ECF 302.  That appeal has been fully briefed and is currently pending resolution.  ECF 314, 316.

### B.    *Background on the instant dispute*

Barnabas sought to depose Mandler.  The Trust informed Barnabas of its belief that Mandler's deposition should not occur until the Mandler Privilege Appeal is resolved, as the appeal will dictate what documents from Mandler's production can be used in the deposition. Barnabas disagreed, and the parties conferred via Zoom on October 31, 2025, and reached an impasse.

In that conference and by email, Barnabas made clear that it also intended to use materials subject to the Mandler Privilege Appeal in other depositions.  The Trust made clear Barnabas should not use documents subject to the appeal in any deposition and asked whether Barnabas planned to use such materials at the upcoming deposition of CarePoint witness Marie Duffy.  Barnabas responded that it could use any document it wished, without regard to the Mandler Privilege Appeal.  Given that untenable position, the Trust said it would not present Duffy for deposition until the dispute was resolved.  Since, and continuing for weeks after this dispute arose *and* after the parties had already exchanged drafts of this letter, Barnabas has consistently larded the letter with *new* "disputes."  Those include claiming subject-matter waiver beyond the Mandler documents and seeking to compel an initially undisclosed number of depositions (now possibly just three per FN 7 below—one of a twice-hospitalized witness for whom no dates are presently even available), while as of a December 12, 2025 draft, having made *no* reference in its section to *any* motion to compel.  In fact, although objecting to this overt expansion of disputes, the Trust agreed again to confer with Barnabas on December 19, 2025, to try to cabin the disputed issues, but to no avail.[3]

---

that *in camera* submission solely in connection with this joint letter (notwithstanding Barnabas's arguably contrary characterization in footnotes 16 and 17).

[3] The Trust has also asked what depositions can proceed while this dispute is pending.  Barnabas has not identified *a single* witness it believes can be deposed without using Mandler Privileged Documents.

### C.    *Good cause exists for a protective order*

Rule 26(c) states: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. FED. R. CIV. P. 26(c). Good cause exists to prevent Barnabas from using documents in deposition when the privileged status of those materials is disputed and subject to a pending decision by Judge Padin. Avoiding questioning on those documents until that ruling is a sensible approach that prevents the injection of attorney-client privileged matters into the record. Otherwise, if Barnabas proceeds in such questioning, but the Trust succeeds in its appeal, then exhibits and entire lines of witness testimony will have to be retroactively excluded, causing significant record and admissibility issues and confusion. And Barnabas will argue that the documents' use in deposition is yet another ground for waiver. All this will impose burden and expense on the parties and the Court. It is wrong for Trust witnesses to testify on privileged issues before the Mandler Privilege Appeal is decided.

Barnabas mischaracterizes the Trust's request as an attempt to stop deposition discovery. Not true. The Trust wants to continue depositions, but in a manner that does not prejudice its rights in the Mandler Privilege Appeal. Granting a protective order simply postponing the Mandler deposition and limiting Barnabas' use of material subject to the Mandler Privilege Appeal in other depositions will preserve CarePoint's privilege during the appeal, while allowing discovery to proceed under the existing schedule. This result is sensible and will keep the case moving. *See Beckles v. Fed. Express Corp*., No. 10-22741-CIV, 2011 WL 13220783, at *2 n.1 (S.D. Fla. June 7, 2011) (granting Rule 26(c) motion for protective order to "prevent the injection of attorney-client privileged matters into a discovery deposition"); *Woodard v. Victory Recs., Inc*., No. 11 CV 7594, 2013 WL 4501455, at *3-4 (N.D. Ill. Aug. 22, 2013) (granting protective order and precluding party from using privileged documents in deposition "until they are deemed not privileged"). The Trust respectfully requests the Court's permission to file a motion for protection on these issues.

### D.    *Barnabas's "Stay" arguments are irrelevant.*

Barnabas spills much ink arguing why the Trust is not entitled to a stay of the Privilege Order—relief the Trust is not seeking.[4] As explained above, the Trust seeks to file a narrow motion for protection under Rule 26(c) to prevent Barnabas from (1) using documents subject to the Mandler Privilege Appeal in depositions and (2) deposing Mandler until resolution of that appeal. That requested relief is far different than seeking the broader relief of a stay. Because the Trust does not seek to file a stay motion, Barnabas' stay arguments can be ignored.

### E.    *Barnabas seeks to litigate merits issues reserved for Judge Padin, moot the Trust's appeal, and upend the joint-letter writing process.*

This discovery dispute began as, and in the Trust's view remains, a narrow dispute about what documents can be used at upcoming depositions and whether a particular witness should be

---

[4] Barnabas argues that, because two documents subject to the Mandler Privilege Appeal were used in the Horizon and MPT depositions, the Trust cannot meet the irreparable harm standard for a stay of the Privilege Order. First, no documents subject to the Mandler Privilege Appeal were used in the Horizon deposition despite Barnabas's assertion. Second, Barnabas's stay arguments remain irrelevant because the Trust is seeking narrower protection, where irreparable harm is not a required element.

deposed while the Mandler Privilege Appeal is pending.  But as evidenced by eleven-plus pages of argument and 60+ exhibits cited in Barnabas' portion of the letter, Barnabas upends the joint discovery letter process required by the Local Rules to argue the Trust waived privilege over documents not even at issue in this dispute, to litigate privilege issues already pending before Judge Padin, and to seek to moot the Mandler Privilege Appeal.  Indeed, Barnabas spends more than seven pages arguing the Trust committed broad subject-matter waiver based on issues *currently pending* in the Mandler Privilege Appeal, which purportedly separately entitles it to use the documents in upcoming depositions.  If this Court were to make such a ruling, then a ruling for the Trust on the Mandler Privilege Appeal could be nullified.  These broader waiver arguments as to other documents are irrelevant to this discovery dispute, would expand the scope far beyond protecting the Trust's privilege pending Judge Padin's ruling, and are inappropriate for this letter.

It is also wrong to ask the Court to issue a subject-matter waiver order through this joint discovery letter.  The Court has provided *clear* instructions on how the parties are to raise discovery disputes.  First, we meet and confer.  If we reach an impasse, we are to file a joint letter describing the discovery dispute, with one side arguing why it should be granted leave to file a discovery motion, and the other side presumably arguing why leave should be denied.[5]  Barnabas ignores that process.

Barnabas's tactics notwithstanding, the Trust understands the joint letter process is the prescribed means for seeking leave to file discovery motions.  The Trust thus submits its portion of this joint letter, even as it objects in the strongest possible terms to Barnabas's improper expansion of the scope of this letter and inclusion of 60 documents subject to a claim of privilege.

---

[5] This Court's September 30 Text Order denied Barnabas's application for leave to file a reply letter-brief in support of a discovery motion precisely because Barnabas did not follow this process. And as the Court stated in the October 30 status conference, "the purpose" of that hearing was not the merits of Barnabas's discovery motion, but rather, "to discuss whether there is going to be permission to file a motion." Barnabas's letter-briefing practice is: "not [the Court's] practice. It's the local rules. The local rules require permission from the Court to file a discovery motion. So I just -- my practice is the joint letter process, which might be a change for the parties[.]"

## II.    BARNABAS'S POSITION

CarePoint's request for a protective order is procedurally improper and substantively baseless.  Although characterizing it as "narrow," the relief CarePoint seeks would effectively halt all upcoming depositions, belatedly stay Judge Waldor's Waiver Order, and revive privileges CarePoint waived more than a year ago.[6]

The dispute arises from CarePoint *express* consent, over 20 months ago, for Barnabas to review and use the entire Mandler production.  After CarePoint, a year later, attempted to claw back the 60,000 documents at issue, Judge Waldor found CarePoint's consent and delay constituted an unequivocal waiver:

> "[G]iving your adversary all your documents and say[ing], 'Okay.  You look at them, and we'll assert privilege when we feel like it.'  It's kind of bizarre….  [Barnabas has] the documents.  They've seen the documents….  [T]here's no clawback at this point….  I do consider that you've waived your right to assert privilege over any of these documents.  ***And they can use them***….  I have not stayed the unstay."  June 3, 2025 Hrg. Tr. (ECF 240).

CarePoint never sought a stay of that ruling as required by the Local Rules, yet it now tries to achieve the same result through a Rule 26(c) motion.  That effort fails for four reasons.  *First*, the Mandler Waiver Order remains binding, unless and until overturned.  *Second*, even if a stay had been sought, CarePoint would not have been able to meet the stringent standard for relief.  *Third*, even if CarePoint were to prevail on its appeal, adequate post appeal remedies remain.  *Fourth*, CarePoint's own conduct since the Mandler Waiver further caused a sweeping subject-matter waiver that independently entitles Barnabas to use the same materials.[7]

### A.    *CarePoint Failed to File a Timely Motion to Stay the Mandler Waiver Order.*

Because CarePoint's never sought a stay of Judge Waldor's Waiver Order, that order remains fully operative and gives Barnabas the unqualified right to use the Mandler documents.  CarePoint argues that the Court should nonetheless decline to give effect to that Order because it is on appeal.  But the Local Rules are clear: "the filing of [an] appeal … ***does not operate to stay the order pending appeal to a District Judge.***"  L. Civ. R. 72.1(c)(1)(B); *see also 800 Cooper Fin., LLC v. Liu*, 2022 WL 970189, *3 (D.N.J. 2022); *Michelo v. Nat'l Collegiate Student Loan*

---

[6] Because CarePoint is seeking to prevent Barnabas from using the Mandler documents in "***any*** deposition," Barnabas also seeks leave to cross-move to compel.  This includes the two depositions – of Natasha Deckman (former CEO), and Marie Duffy (former COO and CHO) – for which CarePoint refuses to provide dates until this issue is resolved.  CarePoint has also refused to provide its availability for a third-party deposition, though the deponent has since encountered certain health issues that would prevent his deposition until after the new year.

[7] Barnabas believes CarePoint's request to file a Rule 26(c) motion should be denied.  But if granted, Barnabas requests the opportunity for full briefing to make its record.  This letter merely constitutes a summary proffer of the arguments and evidence it would highlight in such briefing.

*Trust 2007-2*, 2021 WL 1080673, \*2-3 (S.D.N.Y. 2021); *Shim-Larkin v. City of New York*, 2019 WL 4688703, \*2 (S.D.N.Y. 2019).

CarePoint does not dispute that the Waiver Order remains in effect. Instead, it seeks a Rule 26(c) protective order in aid of appeal. But a stay – not a protective order – is the only proper procedural vehicle to stop enforcement of a prior order pending appeal. Nothing in Rule 26(c)'s "good cause" standard, which is limited to protection "from annoyance, embarrassment, oppression, or undue burden or expense," permits its use as a backdoor stay or a means of negating an existing, enforceable court order. CarePoint cites no contrary authority. The only two cases it cites involved documents for which privilege had been properly invoked in the first instance – not cases where the Court had already rejected the privilege claim. That distinction is dispositive.[8]

### B.    CarePoint Fails to Present Good Cause to Delay the Waiver Order.

CarePoint cannot – and has not tried to – satisfy the stringent standard to stay the Waiver Order. To obtain a stay, an appellant must show a "likelihood of success" on appeal, "irreparable harm," lack of prejudice, and a public interest favoring a stay. *Att'y Gen. v. Dow Chem. Co.*, 2024 WL 3361395, at \*2 (D.N.J. 2024). Rather than address these elements, CarePoint tries to sidestep them, saying they "can be ignored." But by ignoring them, it has conceded them. And even if Rule 26(c) could be used to exclude the depositions from the effect of the Waiver Order, those same – ignored – factors would still govern the analysis.

***CarePoint Cannot Show a Likelihood of Success on the Merits.*** CarePoint argues that, unless it is granted relief, a "ruling for the Trust on the Mandler Appeal could be nullified." The argument lacks merit. Because there is no automatic stay and no automatic right to a protective order, CarePoint must show a likelihood of success on its appeal. It cannot.

Nowhere in its letter does it argue that its appeal has merit. Instead, it attempts to convey that *impression* by whitewashing the procedural history. It ignores that CarePoint expressly told Barnabas that it could review and use the Mandler documents, even after being notified that the production contains privileged information – because CarePoint did not want to spend the money to review them for privilege. The Trust also *wrongly* asserts that CarePoint "clawed back a subset of the Mandler production," which "Barnabas rejected." In reality, CarePoint attempted to claw back *all* 145,000 Mandler documents – not a "subset" – without claiming privilege over a single one. When Barnabas objected, CarePoint withdrew its claw back request to avoid raising the issue with the Court.

Judge Waldor found waiver based on CarePoint's own conduct: its **express** authorization for Barnabas to review and rely on the Mandler production, its months-long delay in asserting privilege, and its belated attempt to reverse course once the materials proved damaging. *See* June 3, 2025 Hr'g Tr. 15-16, 20 (ECF 240). Judge Waldor's ruling was firmly grounded in Rule 502(b), which requires a privilege holder to take all "reasonable steps" to prevent disclosure and promptly

---

[8] In *Beckles v. Fed. Express Corp.*, 2011 WL 13220783, \*2 n.1 (S.D. Fla. 2011), the court had previously found the documents *were* privileged; the opposite of here. In *Woodard v. Victory Recs., Inc.*, 2013 WL 4501455, \*3-4 (N.D. Ill. 2013), the court found that the inadvertently produced documents had been properly clawed back, again the opposite of here.

rectify any error.  This is exactly the type of fact-bound determination entrusted to a magistrate judge and protected by a highly deferential standard of review.  *Lithuanian Commerce Corp. Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 214 (D.N.J. 1997).[9]

*CarePoint Cannot Demonstrate Irreparable Harm.*  CarePoint does not claim irreparable harm absent a stay or protective order.  Nor can it.  In *Mohawk Indus., Inc. v. Carpente*r, 558 U.S. 100, 109 (2009), the Supreme Court concluded that disputes about privilege do not warrant interlocutory appeal because adequate post-appeal remedies exist.[10]  Here, there is no risk of having to redo trials.  As CarePoint concedes, at most, certain passages of certain depositions might "have to be retroactively excluded."  Indeed, admissibility issues are often handled after the deposition has occurred.  This is no different.  Nor is there any merit to CarePoint's argument that Barnabas may use admissions it obtains based on the Mandler documents to "argue that the use of the documents … constitutes another separate ground for waiver privilege."  CarePoint has preserved its objection to the use of those documents and the scope of any waiver will then be a matter for the Court to decide.  Having to decide an issue – which may never arise – is hardly irreparable harm.  Nor is there "good cause" for derailing discovery in this case.[11]

*CarePoint Does Not Dispute that its Request Prejudices Barnabas*.  CarePoint does not deny that the 60,000 Mandler Waiver documents touch virtually every issue in this case.  As a CarePoint Founder, long-time CEO, and key participant in the alleged fraud that drove CarePoint to financial ruin, Mandler knew everything and talked to everyone.  If Barnabas cannot use these documents, its ability to prepare its case will remain frozen, while CarePoint is free to develop its case against Barnabas through unrestricted offensive discovery.  That is the essence of prejudice.

In response, CarePoint argues that it is just "seeking narrow protection, where irreparable harm is not a required element."  Ignoring the element is a concession that it cannot be met.  And the relief CarePoint seeks is anything but "narrow."  No deposition of any CarePoint witness can go forward if Barnabas is barred from questioning witnesses about the Mandler documents.  Many such witness – including the Founders – are third-parties.  And some are third-parties in ill health. Barnabas has no automatic right to take multiple depositions of these individuals, and they would surely object if Barnabas tried to do so.  These depositions need to go forward now, and Barnabas must be allowed to ask witnesses about the subjects discussed in the Mandler Waiver documents.

Indeed, the prejudice is clear from depositions that have already occurred.  On September 29, 2025 – nearly a month after CarePoint filed its Waiver Appeal – Barnabas used three Mandler

---

[9] There is also no merit to CarePoint's arguments that Judge Waldor was required to give CarePoint a do-over once the Trust appeared.  As the Trust conceded on the motion for reconsideration, it "inherited" the case from the CarePoint debtors "with whatever warts there are."  Aug. 26, 2025 Hrg. Tr., at 23 (ECF 306).

[10] *See also In re Cnty. of Erie*, 473 F.3d 413, 417 (2d Cir. 2007) (same, noting privilege can be protected by restricting use of materials "during further discovery … and at trial"); *Doe v. Zucker*, 2021 WL 3046744, *3 (N.D.N.Y. 2021) (any privileged disclosure may be remedied through redaction or exclusion); *In re Hansainvest Hanseatische Inv.-GmbH*, 2019 WL 5939860, *3 (S.D.N.Y. 2019) ("The mere fact that information, once disclosed, cannot be 'undisclosed' is ... not enough by itself to warrant a finding of irreparable harm.").

[11] See *CBD & Sons, Ltd. v. Setteducati*, 2019 WL 8268543, *6 (D.N.J. 2019) (rejecting assertion of irreparable harm based on potential for increased discovery costs).

Waiver Documents at the deposition of Horizon Blue Cross Blue Shield, an alleged conspirator. Two days later, on October 1, 2025, Barnabas used two different Mandler Waiver documents with MPT, another alleged conspirator. CarePoint objected to none of these documents, though they are all subject to the Waiver Order appeal.[12]

*The Equities and Public Interest Weigh Heavily Against a Stay.* The equities also strongly favor enforcing the Waiver Order pending appeal. Barnabas has spent untold dollars preparing its case based on CarePoint's express consent to review and use these documents. It would be unjust to bar Barnabas from now using them. Moreover, enforcing discovery orders pending appeal promotes judicial efficiency and prevents litigants from using stay requests as a tool for delay. *Groark v. Timek*, 2014 WL 12908809, *2 (D.N.J. 2014) (holding that "immediate enforcement" of a discovery order "permit[s] the case to get 'back on track' so that fact discovery can finally be completed," and noting that the Confidentiality Order is sufficient to address concerns about privilege pending appeal); *Mi Familia Vota v. Fontes*, 2023 WL 8183146, *1 (D. Ariz. 2023) (denying stay pending privilege appeal and holding that discovery should proceed to "protect the status quo and allow the parties to continue their trial preparations").

### C.     Even if CarePoint's Appeal Succeeds, It Has Committed a Subject-Matter Waiver that Independently Entitles Barnabas to Use the Mandler Documents.

CarePoint seeks to prevent the use of the Mandler Privilege Documents based solely on the pending appeal of the Waiver Order. But even if it succeeds on appeal, Barnabas would still be able to use those documents because there are independent grounds for piercing the privilege. Specifically, CarePoint committed subject matter waiver over its *own* documents and those of its counsel, Louis Modugno. The scope of that subject matter waiver extends to the Mandler Privilege Documents.

As detailed below, each element of the Rule 502(b) subject matter waiver rule is satisfied by virtue of the privileged documents CarePoint intentionally produced from its own files, and its decision not to claim privilege (after conducting a privilege review) of documents produced by Mr. Modugno. Because these documents span all the key issues in this case – just like the Mandler documents – CarePoint's intentional waiver of the CarePoint/Modugno Privileged Documents also support the waiver over the Mandler documents. That is, there is a mutual two-way waiver—the waiver of the one, supporting the waiver of the other.

In response, CarePoint does not address Barnabas's argument about the CarePoint/Modugno subject matter waiver on the merits. Nor does it dispute that, if CarePoint committed subject matter waiver, it provides an independent reason why Barnabas should be permitted to use the Mandler Privilege Documents at any upcoming deposition.

---

[12] Nor does CarePoint claim that the use of the Mandler Waiver Documents at the Horizon and MPT depositions caused irreparable – or any – harm. Instead, it wrongly asserts that these documents are not "subject to the Mandler Privilege Appeal." But these documents are listed on the CarePoint log, and indisputably are subject to the Waiver Order. *See* Ex. 1 (Horizon Ex. 314, Mandler0305980); Ex. 2 (Horizon Ex. 315, Mandler0306038); Ex. 3 (Horizon Ex. 316, Mandler306088); Ex 4 (MPT Ex. 328, Mandler0379351); Ex. 4 (MPT Ex. 328, Mandler0379354); Ex 5 (Priv. log excerpts)

Instead, CarePoint rests its defense entirely on procedure, asserting that Barnabas has no right to assert subject matter waiver because, it says, this is CarePoint's pre-motion letter. That is both untrue (it is a joint letter) and beside the point. Barnabas is free to argue that CarePoint is not entitled to protection because there are independent grounds for using the Mandler Privilege Documents beyond the Waiver Order. And Barnabas also has the right to seek to compel depositions where the Mandler documents can be used based on the CarePoint/Modugno Waiver.[13]

The subject matter waiver here is clear. This waiver focuses on CarePoint's deliberate decision – *after conducting privilege reviews* – to affirmatively produce privileged documents from its own files and those of its outside counsel Lou Modugno. Under Federal Rule of Evidence 502(a), a party waives privilege through disclosure, and that waiver "extends to an undisclosed communication" if that waiver was intentional, concerns the same subject matter as the disclosed document, and "ought in fairness … be considered together." *See* Fed. R. Evid. 502(a); *In re G-I Holdings, Inc.*, 218 F.R.D. 428, 432 (D.N.J. 2003) ("Once a party waives the attorney-client privilege, it relinquishes the privilege for all purposes and circumstances thereafter.").[14]

CarePoint's production of the CarePoint/Modugno Privileged Documents was intentional, concerns the same subject matter as the Modugno Privileged Documents, and the two sets of waived privilege documents must, in fairness, be considered together.

*CarePoint's Production of the CarePoint/Modugno Documents Was Intentional*. CarePoint produced the bulk of its documents nearly two years ago in response to a court-ordered "substantial compliance" deadline. ECF 79. It did not, however, produce any privilege log—and to this day, it still has not produced a log for any of its custodians save two.

On May 8, 2024, Barnabas put CarePoint on notice that its production contained several privileged documents and requested "confirmation that that process we agreed to with respect to Mandler also applies to CarePoint's own production."[15] (This is the same process Judge Waldor found constituted a waiver). CarePoint confirmed this on a meet and confer, and Barnabas memorialized it in writing on July 19, 2024.

The same pattern occurred with respect to the Modugno documents. Under the agreed-upon procedures, Mr. Modugno produced his files to CarePoint in July 2024 so that CarePoint could conduct an independent privilege review. CarePoint agreed to conduct the privilege review

---

[13] Nor is there merit to CarePoint's assertion that Barnabas "larded" the joint letter with "new disputes." In its initial November 26th draft of this letter, Barnabas raised all grounds for the relief sought herein and has twice met and conferred over such relief since then. CarePoint's "new disputes" argument is simply an effort to prevent Barnabas from presenting the relevant arguments and evidence why deposition discovery should not be stayed.

[14] Based on CarePoint's privilege logs, it is clear that CarePoint is continuing to withhold many tens of thousands of CarePoint and Modugno documents. Because these concern the same subject matter as the Mandler Waiver and the CarePoint/Modugno-produced privilege documents, Barnabas believes those documents should be produced as well. This issue will be addressed in a separate joint letter.

[15] As a reminder, CarePoint expressly "agreed that Barnabas may review and use Mandler's documents without the need to sequester such documents." This is the same process that CarePoint confirmed would apply to the CarePoint produced documents.

by July 26, 2024.  When it failed to do so, Barnabas asserted waiver.  *Five months* later, in December 2024, CarePoint withheld roughly 50,000 Modugno documents.  By July, Barnabas had put CarePoint on notice that the log was deficient, and that "the Modugno production appears to contain some documents that may arguably contain privileged information," and that such product "constitutes a waiver."  CarePoint did not claw back the cited document, conduct any review of the Modugno production, or take any steps to assert privilege over the many privileged documents it had produced.

For both sets of documents, CarePoint represented that it conducted a privilege review, and affirmatively consented to Barnabas's review and use of the documents produced, expressly citing its desire to avoid the costs of any additional privilege review.  ***That again constitutes an intentional waiver of privilege***.  *See Murray v. Gemplus Int'l, S.A*., 217 F.R.D. 362, 367 (E.D. Pa. 2003) ("Gemplus's willful decision not to seek recovery of the documents for such an extended period of time convinces the Court that Gemplus *wante*d Plaintiff to see the privileged documents"); *Edwards v. Whitaker*, 868 F. Supp. 226, 228 (M.D. Tenn. 1994) (finding intentionality after considering the "reasonableness of precautions taken to prevent inadvertent disclosure," the "number of inadvertent disclosures," the "extent of the disclosure," and "promptness of [remedial] measures," and "interests of justice.").

CarePoint does not dispute any of this.  Instead, after Barnabas circulated a draft of *this* letter on November 24, 2025, CarePoint attempted to claw back the 50 specific documents Barnabas cites in support of its waiver argument.  But CarePoint has not attempted to carry its "burden of proving that the disclosure was truly inadvertent and that the attorney/client privilege has not been waived." *Edwards v. Whitaker*, 868 F. Supp. 226, 228 (M.D. Tenn. 1994) (finding broad subject matter waiver over all attorney-client communications despite claims of inadvertence).[16]  Moreover, CarePoint is doing exactly what the law forbids—using privilege as both sword and shield.  It cannot lie in wait until Barnabas uses a document and then claw it back to interfere with Barnabas's defense, while preserving its ability to use similar documents that favor it.  Having expressly consented to Barnabas's full access of these documents – even after being put on notice that they contain privileged information – CarePoint cannot now pull the rug out from under Barnabas.

*The CarePoint/Modugno and Mandler Documents Concern the "Same Subject Matter" and "Ought in Fairness Be Considered Together.*  CarePoint's intentional production of privileged attorney-client communications in the CarePoint/Modugno productions gives rise to a

---

[16] The parties are still conferring over CarePoint's belated claw back request and will raise any disputes via joint letter.  In the meantime, the parties agreed that the Confidentiality Order does not prevent Barnabas from citing or rely on these documents.

broad subject matter waiver that fully encompasses the Mandler documents. Here, space prevents us from making a full proffer of the scope of the waiver. But the following is a sampling:[17]

### 1.    Founder Fraud.

CarePoint voluntarily disclosed attorney-client and work-product communications that go to the heart of the Founders' cash extraction scheme, from its inception to its conclusion.



---

[17] The parties' dispute about the propriety of CarePoint's claw back request will be raised by separate joint letter. The parties agreed, however, that the Confidentiality Order does not prevent Barnabas from citing or relying on these documents for purposes of this letter. Though Barnabas believes that the proper procedure is to file the documents under seal, *see Securimetrics, Inc. v. Iridian Techs., Inc.*, 2006 WL 827889 (D.N.J. 2006), CarePoint threatened sanctions and, in a prior draft of this letter, "reserved the right to seek [such] relief" unless Barnabas submitted them for *in camera* review. To resolve that threat, for purposes of this letter only, Barnabas has complied with that demand.

[18] Ex. 6 (CP_Modugno_00066181 at 85).

[19] Ex. 7 (CP_Modugno_00066403 at 04).

[20] *Id.; see also, e.g.*, Ex. 8 (CP_MODUGNO_00066081); Ex. 6 (CP_MODUGNO_00066181); Ex. 9 (CP_MODUGNO_00066101); Ex. 10 (CP_MODUGNO_00143669); Ex. 11 (Mandler0166370) (email chain describing "consulting fees" paid to owners and expressly stating they were not distributions); Ex. 12 (Mandler0178203 at -05) ("Sometimes other entities need cash and it is advanced as needed by IJKG."; "Sometimes cash flow does not permit making payment all at once to majority owners."); Ex. 13 (Mandler0178176 at -77-78) (counsel noting "the tax distributions do not appear to be pro rata to ownership" and asking "Why are [members] not receiving distributions at the same time?"); Ex. 14 (Mandler0278569-70) (describes the use of affiliated entities and weekly "consultant" payments routed through owners' LLCs, supporting the shell-company and management-fee structure).

That waiver is further reinforced by CarePoint's production of communications ███████ [21] In 2019, after CarePoint agreed with the SCI to stop extracting sham management fees, it faced a problem:  it had previously taken out a $60 million loan – payable to the Founders – secured by future management fees.  To avoid default, the Founders decided to disguise the fees as "tax distributions."  As Founder James Lawler wrote in a note to CarePoint's outside counsel in a document that is *sitting on the public record today*:

> "Let['s] throw the big issue out there for comment – that is, should we assume that, starting July [2019], we will replace management fees with an equal income stream based on a 'profit distribution.'" ECF 95 at 4. [22]

This public document is subject to the Mandler Waiver Order.  And CarePoint independently produced from its own files the follow-up email, where the Founders – under counsel's supervision – implemented the scheme.  As the distributions were about to be made, Lawler sought counsel's advice to ensure there would no ████████████████████ [23]

One lie often begets another, and that is what the privilege documents show here. ████████

████████████████████████████████████████████████ [24]  Indeed, CarePoint produced from Modugno's files a detailed memo assessing these issues. [25]  All of these documents, in fairness, ought to be considered together.  CarePoint does not get to pick and choose which ones it withholds for privilege. [26]

### 2.    *The SCI Investigation.*

CarePoint also selectively produced attorney-client (and work-product) communications about the State Commission of Investigation's ("SCI") probe into the Founders' diversion of hospital revenues to themselves. These materials show counsel and executives collaborating on

---

[21] Ex. 15 (CP_MODUGNO_00336190); Ex. 16 (CP_MODUGNO_00336192); Ex. 17 (CP_0005570697); Ex. 18 (CP_MODUGNO_00020117).

[22] Ex. 19 (Mandler0347948).

[23] Ex. 20 (CP_10086892).

[24] *See* Ex. 21 (CP_10099853).

[25] Ex 22 (CP_Modugno_00271521).

[26] CarePoint also produced many other documents that discuss with outside counsel the propriety of using ████████████████████ *See* Ex. 23 (CP_0006681523); Ex. 24 (CP_0006681528); Ex. 25 (CP_0006981211); Ex. 26 (CP_0007210316); Ex. 27 (CP_0008327350); Ex. 21 (CP_10099853); Ex. 28 (CP_11135925); Ex. 29 (CP_11260586).

legal strategy, narrative framing, and the characterization of the ███████████████████
████████████████████

When the SCI commenced its investigation, CarePoint retained the prior Executive Director of the New Jersey Assembly Majority Office, William Caruso as *outside counsel*, who lamented in a privileged email CarePoint produced:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████[27]

In response, ██████████████████████████████████████
██████████████████████████████████████████
████████████[28] CarePoint produced these privileged communications, presumably in an effort to manufacture evidence against Barnabas. Mandler also produced dozens of documents from this exact e-mail thread, which is subject to the Mandler Waiver Order.[29]

When CarePoint's political efforts failed to derail the SCI investigation, CarePoint used counsel to influence the SCI to take out the most damaging parts of the report. Working with outside counsel, CarePoint also developed public messaging to respond to the SCI's findings of impropriety. Documents produced by both CarePoint and Mandler discuss how to present those transactions publicly, floating the idea that "these were incentive payments paid only after expenses, debt, meeting loan covenants," and that "business owners … are permitted to make a profit if they take a big risk … and it works out."[30] ████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████[31]

These communications were plainly intended to solicit and reflect legal advice about the company's response to an active investigation. CarePoint presumably produced these documents to show that it did not act with ill intent. But that is using privilege as a sword. It has, therefore, waived privilege over all discussions of founder-directed payments, the decision to frame them as "incentive" or "profit" distributions, and any advice about mitigating exposure or shaping responses to the SCI.

---

[27] Ex. 30 (CP_0007166957 at -58).

[28] *Id.* at -57.

[29] *See, e.g.,* Ex. 31 (Mandler0180127); Ex. 32 (Mandler0180137); Ex. 33 (Mandler0180238); Ex. 34 (Mandler0180310); Ex. 35 (Mandler0180324); Ex. 36 (Mandler0180905); Ex. 37 (Mandler0180937); Ex. 38 (Mandler0181038); Ex. 39 (Mandler0181051); Ex. 40 (Mandler0181053); Ex. 41 (Mandler0188674).

[30] Ex. 42 (Mandler0340769 at -72).

[31] Ex. 30 (CP_0007166957).

### 3.    *Out-of-Network Practices and the Horizon Dispute.*



For example, the Modugno production includes a



[32]

The selective production of these privileged communications constitutes a broad wavier over CarePoint's

That waiver extends to such documents in the Mandler production as well, which also discloses legal advice directing CarePoint's OON posture with respect to Horizon, including draft cease and desist letters from outside counsel, as well as draft Horizon settlement proposals in connection with litigation CarePoint filed.[33]

### 4.    *Hospital Sales Process.*

CarePoint's disclosures also create a broad subject-matter waiver concerning the hospital sales process, a central issue in this litigation. As the Founders sought to sell the CarePoint hospitals in 2018-2020, they did so under the direction and advice of counsel, who guided every aspect of the process: structuring exclusivity agreements, coordinating communications with the New Jersey Department of Health ("DOH"), and negotiating with potential buyers such as Barnabas and Atlantic Health. The documents CarePoint produced from its and Modugno's files reveal the Founders' and counsel's legal strategy, timing, and negotiation positions.

For example, the Modugno production includes October 2019 communications revealing

[34] By producing this document, CarePoint waived privilege over the full scope of communications concerning the sales process, including buyer selection, deal strategy, closing timing, and regulatory coordination.

---

[32] Ex. 43 (CP_MODUGNO_00142872 at -73).

[33] *E.g.*, Ex. 44 (Mandler0000932); Ex. 45 (Mandler0000933); Ex. 46 (Mandler0021965).

[34] Ex. 47 (CP_MODUGNO_00234180).

The Modugno production also contains communications between Modugno and CarePoint's outside counsel at Wilson Sonsini addressing  [35] The emails summarize

By producing these documents, CarePoint has waived privilege over the broader subject of its hospital sales strategy, including all related legal advice and internal discussions concerning exclusivity, LOIs, APA negotiations, lease rights, and regulatory coordination. This waiver also encompasses documents from the Mandler production on this topic.[36]

### 5.    Alleged Physician / Staff "Poaching."

CarePoint's selective disclosure of attorney-client and work-product communications concerning its allegations that Barnabas "poached" CarePoint-affiliated physicians and staff also gives rise to subject-matter waiver. These materials disclose detailed legal advice and litigation strategy about [37] These communications expose CarePoint's evidentiary theory and litigation tactics in developing its poaching claims. The Mandler Waiver documents similarly address this topic, giving rise to broad subject matter waiver over all documents relating to the alleged poaching allegations.[38]

---

[35] Ex. 48 (CP_MODUGNO_00226998-99); *see also* Ex. 49 (CP_MODUGNO_00226994).

[36] For example, Mandler produced documents detailing Modugno's legal advice, noting that Barnabas offer "is the only offer out there and should be strongly considered," and presenting a "gameplan" to speak to Barnabas to "make sure" they are "truly…interested vs just fishing for info." Ex. 50, (Mandler0382673 at -75); Ex. 51 (Mandler0377936).

[37] Ex. 52 (CP_0006484776); Ex. 53 (CP_0006478495); Ex. 54 (CP_0006478473); Ex. 55 (CP_0006478478); Ex. 56 (CP_0006485130).

[38] For example, a February 2019 email from Mr. Mandler to Modugno, CarePoint's then-CEO Natasha Deckmann, Lawler, and Garipalli asserts CarePoint's sensitivity to physician departures to Barnabas: "Physician relations are key. Dr Sandhu can easily go to Barnabas since his partner is head of the invasive lab. Please contact him." Ex. 57 (Mandler0334656). Likewise, CarePoint executives and counsel described Barnabas-affiliated outreach to a BMC physician as "a breach of the NDA" and an "attempt[] to recruit him to JCMC (to leave BMC)," and coordinating with outside counsel on a cease-and-desist while "preserv[ing] any litigation rights." Ex. 58 (Mandler0348779); Ex. 59 (Mandler0348821 at -22). And in discussing a physician's practice transition, Mr. Mandler discussed acquisition of a physician practice by a

\* \* \*

For these reasons, CarePoint's motion to block the use of the Mandler Waiver documents at deposition should be denied, and CarePoint should be compelled to make its witnesses available without any restriction on the use of such documents.

Respectfully submitted,

/s/ Robert M. Hirsh                                          /s/ William T. Walsh

Counsel for the CarePoint Litigation Trust          Counsel for RWJ Barnabas Health Inc.

---

Barnabas hospital in an internal thread among CarePoint executives and counsel. Ex. 60 (Mandler0268901); Ex. 61 (Mandler0270318).