# EXHIBIT 2

***Via ECF***
Hon. Cari Fais, U.S.M.J.
U.S. District Court for the District of New Jersey

Re: *The CarePoint Litigation Trust v. Barnabas,* Case No. 22-cv-05421 (D.N.J.)
*Dispute Concerning Subject Matter Waiver*

Dear Judge Fais:

Barnabas and The CarePoint Litigation Trust submit this joint letter to address a dispute over certain documents subject to CarePoint's assertion of privilege.[1]

## I. BARNABAS'S POSITION[2]

Barnabas seeks an order compelling CarePoint to produce the following due to privilege waiver:

- ***The Non-Logged Documents from 27 Custodians***. The unspecified number of documents CarePoint withheld based on privilege from the 27 custodians for whom CarePoint failed to produce any privilege log;

- ***The 15,000 Logged CarePoint Documents***. The over 15,000 documents CarePoint withheld from two custodians for whom it provided a belated and deficient privilege log;

- ***The 23,000 Logged Modugno Documents***. The over 23,000 documents produced by Louis Modugno[3] that CarePoint is currently withholding based on privilege.

For each document collection, there are several separate and independent grounds requiring production. As to all three document collections, CarePoint has effected a broad subject matter waiver based on its intentional waiver in connection with the *production* of privileged materials from Mandler, CarePoint, and Modugno. Moreover, apart from subject matter waiver, CarePoint has either waived privilege or failed to properly support its privilege claims as to each of the three collections. The Non-Logged Documents From 27 Custodians should be produced because – after more than three years after production and numerous follow-up requests – CarePoint has still failed to expressly assert privilege, disclose the number of withheld documents, or provide a privilege log. And for the over 15,000 Logged CarePoint Documents, CarePoint waived privilege both because it failed to *timely* provide a privilege log, and the log it provided does not comply with Rule 26(b)(5) and is insufficient to carry CarePoint's burden of establishing privilege. For the

[1] Pursuant to L. Civ. R. 37.1, the parties certify that they met and conferred in good faith via Zoom and written correspondence, but have been unable to resolve their dispute.

[2] Unless otherwise noted, all emphasis added, all internal citations and quotation marks are omitted, and capitalizations conformed without brackets.

[3] Modugno is CarePoint's former outside counsel, whose files were produced in response to a Barnabas subpoena.

23,000 Modugno documents, CarePoint's original and amended log similarly fail to establish privilege.

To be clear, these issues are not peripheral to this litigation. All told, the pending Claw Back Requests, along with the Joint Letter Regarding the Withheld Non-Privileged Modugno Documents, as well as this Joint Letter are preventing Barnabas from accessing approximately 65,558 documents, in addition to the unknown number of Non-Logged Documents From 27 Custodians. Refusal to provide these materials meaningfully prejudices Barnabas's ability to proceed with discovery in this case, beyond imposing the additional burden of having to litigate every single one of these issues for months on end as CarePoint continues to draw out these issues.

***A. CarePoint's Failure to Provide a Privilege Log For 27 Custodians and Nine Years of Documents Is Waiver Over its Withheld Documents.***

Following the Court's Order on Barnabas's motion to compel, CarePoint certified substantial compliance with its document production obligations over two years ago. *See* ECF 98. Those productions consisted of 27 custodians and spanned a 12-year period.[4] To this day, CarePoint has *never* produced a log for any of these documents, despite Barnabas's repeated efforts requesting compliance with the logging requirements.

In January 2025, CarePoint made a supplemental production by providing the files for two agreed-upon custodians – William Pelino and Richard Sarli, both former CFOs – that it had failed to include in its prior productions. And on November 5, 2025, CarePoint produced a privilege log for these two custodians, which it amended on November 10, 2025. (Barnabas served its original privilege log in January 2025, and a revised privilege log in April 2026). But the log only covered the Pelino and Sarli custodian files, and only covered the 3.5-year period between 2019 and 2022. Barnabas alerted CarePoint to this issue in an early draft of this letter on January 6, 2026 and in a subsequent January 19, 2026 letter.[5]

CarePoint has not produced any log for any of the other 27 custodians – or *any* documents from any custodian – for the *decade* prior to 2019. To withhold documents as privileged, Rule 26(b)(5) requires CarePoint to "(i) expressly make the claim; and (ii) describe the nature of the documents … not produced or disclosed … in a manner that … will enable other parties to assess the claim." CarePoint's failure to do this waives any privilege it may have had over all documents *not* listed on CarePoint's privilege log. *See, e.g.*, *In re Grand Jury Subpoena*, 274 F.3d 563, 576

---

[4] CarePoint produced documents from the following custodians, without providing any log covering their files: (1) Vivek Garipalli, (2) James Lawler, (3) Jeff Mandler, (4) Achintya Moulick, (5) Natasha Deckmann, (6) Leslie Prizant, (7) Jeeni Patel, (8) Ann Logan, (9) Alfredo Rabines, (10) Trina-Boyd Clyburn, (11) Marie Duffy, (12) Anthony Gagliardi, (13) Nicole Rosso, (14) Josiane Deronceray, (15) Jessica Magnotta, (16) Nizar Kifaieh, (17) Tucker Woods, (18) Jonathan Goldstein, (19) Sarah Veira, (20) Isamar Arias, (21) Peter Kelly, (22) Gargi Oza, (23) Frank Rodriguez, (24) Dr. John Rimmer, (25) Dr. Anthony Kyreakakis, (26) CarePoint, and (27) unidentified.

[5] Ex. 25 (01/19/2026 Ltr. to CP)

(1st Cir. 2001) ("A party that fails to submit a privilege log is deemed to waive the underlying privilege claim."); *Dorf & Stanton Commc'ns, Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir. 1996) (holding that failing "to provide a complete privilege log demonstrating sufficient grounds for taking the privilege" waives the privilege); *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216 (E.D. Pa. 2008) (independent of Rule 502, failure to list privileged documents on a privilege log by the required date effected waiver under Rule 26(b)(5)); *Gloucester Twp. Hous. Auth. v. Franklin Square Assocs*., 38 F. Supp. 3d 492, 498 (D.N.J. 2014) (failure to produce a privilege log is a factor in finding waiver over produced documents).

CarePoint's willful failure to comply with Rule 26(b)(5) constitutes waiver as to all documents withheld from 27 custodians for which CarePoint served no log, and for all the withheld documents from the nine years for which CarePoint served no log. They should all be produced.[6]

### *B. CarePoint Committed Broad Subject Matter Waiver By Disclosing the Mandler, CarePoint, and Modugno Documents.*

Independent of any log omissions, CarePoint has effected a broad subject matter waiver in connection with its affirmative consent to Barnabas to review and make use of privileged information. This subject matter waiver applies to all three categories of currently-withheld documents, including: (i) the 27 Non-Logged Custodians and 9 Year Period; (ii) the 15,000 CarePoint Logged Documents; and (iii) the 23,000 Modugno Logged Documents.

Under Rule 502(a), the intentional waiver of disclosed documents waives privilege over all withheld documents concerning the same subject matter that "ought in fairness to be considered together." Fed. R. Evid. 502(a). All three elements of Rule 502(a) are met here.

#### 1. *CarePoint Intentionally Waived Privilege Over the Mandler, CarePoint, and Modugno Produced Documents.*

CarePoint intentionally waived privilege over three sets of documents: (1) 60,000-plus documents produced by Mandler (as affirmed by Judge Padin, ECF 393); (2) the nearly 400 documents produced by CarePoint (some of which it has improperly attempted to claw back, *see* ECFs 381, 387); and (3) the over 200 documents produced by Modugno (and CarePoint, after it conducted a privilege review). Barnabas has extensively described the circumstances giving rise to these intentional waivers elsewhere. *See* ECF 314, 315.

***CarePoint Intentionally Waived Privilege Over the Mandler Waiver Documents***. CarePoint made a deliberate tactical choice. Rather than incur the time and expense of conducting a privilege review, it chose to place the entire universe of Mandler documents at issue and affirmatively consented to both parties' review and use of those documents in this case. That

[6] Despite being requested, CarePoint has declined to state how many non-logged documents it is withholding based on privilege.

consent was given with full awareness that the production contained privileged material. Such voluntary disclosure constitutes intentional waiver under Rule 502(a).

That the disclosure was intentional is no longer subject to dispute. The Court already found that CarePoint waived privilege by consenting to Barnabas's review and use of the Mandler documents and by failing to assert any privilege under Rule 26(b)(5) for more than a year. This was not an inadvertent disclosure or a negligent production error. It was, in Judge Waldor's words, "bizarre"—a conscious, knowing decision to provide a litigation adversary with documents that CarePoint understood contained privileged communications. As Judge Waldor observed, no reasonable litigant "would ever lay back on litigating [a privilege issue] … just to rely on giving your adversary all your documents and say, 'Okay. You look at them, and we'll assert privilege when we feel like." June 3, 2025 Hrg. Tr. 15:24-16:5.

That finding alone satisfies the first prong of Rule 502(a). Because the true workhorse of the rule – fairness – is addressed by the second and third prongs, the first prong of the Rule only serves a threshold screening function. Its purpose is merely to distinguish between "voluntary" disclosures of privileged information and "inadvertent" disclosures. *See* Fed. R. Evid. 502, *Advisory Comm. Note* (explaining that, under Rule 502(a), "voluntary disclosure" waives privilege as to that document and constitutes a "subject matter waiver" only if "fairness requires a further disclosure."); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424, 1427 (3d Cir. 1991) ("***voluntary*** disclosure" is "inconsistent with an assertion of the privilege"); *U.S. v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) ("Voluntary disclosure waives the attorney-client privilege because it is inconsistent with the confidential attorney-client relationship.").[7]

Because the Court already found waiver based on affirmative consent and lack of ***inadvertence***, Rule 502(a)(1) is satisfied. *See Owners Ins. Co. v. Reynolds Concrete Pumping, LLC*, 2023 WL 3166179, *6 (W.D. Ky. 2023) ("As to whether the waiver was intentional under Fed. R. Evid. 502(a)(1), for the same reasons the Court found the disclosure was not inadvertent, the disclosure of the EUO by Reynolds was intentional."). CarePoint's cite to *Shire LLC v. Amneal Pharms., LLC* does not counsel otherwise. 2014 WL 1509238 (D.N.J. Jan. 10, 2014). In that case, there was no evidence of a blanket refusal to meet and confer on log related issues, nor were belated and ad hoc attempts to claw back documents, as has been the case here. *See* ECFs 381, 387. And in that case, the basis for finding inadvertent disclosure was neglect during the review process, not the failure to properly act after being alerted of the disclosure of privileged documents – which is

[7] The Advisory Committee makes clear that, aside from exempting inadvertent disclosures, Rule 502 is not meant to abrogate state law concerning the conduct that constitutes an intentional waiver. Fed. R. Evid. 502, Advisory Comm. Notes ("The rule makes no attempt to alter federal or state law on whether a communication or information is protected … as an initial matter," nor does it "purport to supplant applicable waiver doctrine generally."). Under New Jersey law, voluntary disclosure constitutes an intentional waiver. N.J. Stat. Ann. § 2A:84A-29 ("A person waives his right or privilege to refuse to disclose … a specified matter if he … without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure."). In any event, New Jersey law and federal law are similar in that both find a knowing, voluntary disclosure of privileged information constitutes an intentional waiver.

the case here. *Compare Shire LLC*, 2014 WL 1509238, at *7 ("The basis for that decision was Defendants' inexcusable neglect in the review process."); *with* ECF 393 at 22-23 n.19 ("For the reasons discussed on the record ***and, more specifically,*** because Plaintiffs ***knowingly failed*** to take reasonable steps to prevent the disclosure and promptly rectify the error after being made aware of it.")

But even if the Court's waiver finding was not dispositive, the record independently establishes intentional waiver. The relevant question under Rule 502(a)(1) is whether the Court may find, by a preponderance of the evidence, that CarePoint's waiver of privilege over the Mandler documents was "intentional." *See* Fed. R. Evid. 104(a); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 & n.11 (3d Cir. 1994) (preponderance of the evidence standard governs).

In answering that question, courts do not require perfect knowledge, item-by-item awareness, or subjective intent as to the legal *effects* of the disclosure. Instead, "actual or constructive" intent to waive privilege can be inferred from the "***natural and probable consequences***" of a party's actions. *Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398, 404 n.23 (5th Cir. 1982) ("knowledge includes constructive knowledge," and "either actual or constructive knowledge will support … a waiver."); *United Forest Prods. Co. v. Baxter*, 452 F.2d 11, 16 (8th Cir. 1971) (same; noting that this rule is so "generally accepted … so that citation of authority is unnecessary."); *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) ("one is presumed to intend the natural and 'probable' consequences of one's acts."); *United States v. Graves*, 394 F. Supp. 429, 433 (W.D. Pa. 1975) ("One is presumed to intend the natural and probable consequences of the acts knowingly done or knowingly omitted.").

There are two independent ways of establishing the requisite *mens rea* for intentional waiver—both present here.

*First*, waiver can be based on conduct inconsistent with the continued assertion of privilege. As the Third Circuit explained, although "waiver is the intentional relinquishment or abandonment of a known right or privilege," it "may be established by conduct inconsistent with claiming the waived right or any action or failure to act evincing an intent not to claim the right." *Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3d Cir. 1987). Here, Barnabas expressly notified CarePoint that their productions contained privileged information. CarePoint nevertheless affirmatively permitted Barnabas to review and use the documents in the litigation. That is fundamentally incompatible with the continued assertion of privilege and establishes actual or constructive intent to waive. *See also U.S. v. Coburn*, 2022 WL 357217, *7 (D.N.J. 2022) ("by disclosing this information to the Government while under threat of prosecution, Cognizant handed these materials to a potential adversary and destroyed any confidentiality they may have had,

undermining the purpose of both attorney-client and work-product privileges;" finding subject matter waiver).[8]

*Second*, intentional waiver may be established by "***willful blindness.***" A party acts with willful blindness when it believes there is a "high probability" that the production contains privileged information but takes "deliberate actions to avoid learning … that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766–769 (2011). Such conduct is treated as "intentional" because parties "who behave in this manner are just as culpable as those who have actual knowledge." *Id*.

CarePoint's conduct fits squarely within that doctrine. It deliberately chose not to review the Mandler documents. Instead of conducting a privilege review, it adopted a more expedient course—affirmatively consenting to the use of the documents by both sides. That choice avoided the costs of review, deferred privilege disputes until after the bankruptcy proceedings, and preserved CarePoint's own ability to use any Mandler document it wished. But that choice also came at the expense of privilege preservation. It was a strategic, deliberate decision.

The decision was also made in the face of a "high probability" – indeed, a virtual certainty – that the production contained troves of privileged information on virtually every issue in the case. Mandler was a CarePoint Founder and its long-time CEO, involved in every major legal decision for the company for over a decade. Even a cursory review would have revealed pervasive privileged communications. When CarePoint eventually reviewed the documents, it asserted privilege over one-third of them, approximately 60,000 documents. This suffices to show willful blindness under *Global-Tech*, and intentional waiver under Rule 502(a)(1).

***CarePoint Intentionally Waived Privilege Over the Documents CarePoint Withheld from its Production for Privilege.*** For the same reason CarePoint intentionally waived privilege over the Mandler Waiver Documents, it also waived privilege over the CarePoint Privileged Production. Both of these document collections were subject to the same consent. Again, Barnabas put CarePoint on notice that the CarePoint collection contained privileged communications. Not only did Barnabas identify specific documents, it raised red flags about the fact that CarePoint had produced its former general counsel's files.[9] As Barnabas noted on July 8, 2024,

> "***Privilege Disputes***: … We note, for example, that CarePoint has produced documents from the custodial files of Leslie Prizant, former general counsel.

---

[8] There is no merit to CarePoint's argument that it made these documents available under a reservation of rights. *First*, Barnabas explained that it did not agree to the reservation. *See* ECF 176. *Second*, the Court has already rejected the argument that this purported reservation negates waivers. *See* ECF 233. *Third*, the effect of a reservation of rights is a legal issue, and so, the fact that CarePoint was mistaken as to its effect constitutes, at most, an error of law, not a negation of intentional waiver. Indeed, the fact that CarePoint felt it needed a reservation of rights demonstrates that it knew that its conduct could be construed as an intentional waiver.

[9] *See e.g.*, Ex. 2 (07/8/24 Ltr. to CP, requesting priv. log); Ex. 9 (7/28/25 Ltr. to CP).

> We assume CarePoint has engaged in a reasonable search to identify, in good faith, all privileged documents in its production, and has determined that all such documents are not privileged. We similarly assume that applies to all other documents in your production.
>
> As we previously explained, Barnabas is not undertaking the task of performing your privilege review for you." Ex. 2 at 4.

After being notified of the fact that its production contained privileged information, CarePoint nonetheless agreed that these documents would be governed by the same process as the Mandler Waiver Documents, meaning that Barnabas was free to review and use these documents without any further notice obligations under the Confidentiality Order. *See* Ex. 3 (7/19/24 Ltr. to CP, memorializing meet and confer providing confirmation). As such, if the Court finds intentional waiver over the Mandler Waiver Documents, it should also find intentional waiver over the CarePoint Privileged Production.

***CarePoint Intentionally Waived Privilege Over Modugno Privileged Documents***. CarePoint's disclosure of the Modugno Privileged Documents constitutes intentional waiver for three independent reasons.[10]

*First*, the Modugno Privileged Production was produced only after an extensive, multi-month privilege review. Over the course of approximately five months, each document was reviewed by at least three separate outside law firms: counsel for CarePoint, counsel for Mandler and counsel for Garipalli/Lawler.[11] Each firm had an opportunity to assess privilege, and in fact asserted privilege where it was believed to apply. Given Modugno's dual role as outside general counsel and business consultant, each made an independent determination of whether to waive privilege or to assert it. This process forecloses any claim that the waiver was not intentional. At a minimum, it establishes, by a preponderance of the evidence, that the documents were voluntarily disclosed and privilege was intentionally waived.[12] *Owners Ins. Co. v. Reynolds Concrete Pumping, LLC*, 2023 WL 3166179, *6 (W.D. Ky. 2023) (finding intentional waiver because the document had already gone through a privilege review).

*Second*, CarePoint's post-production conduct constitutes independent evidence of intentional waiver. In July 2025, Barnabas put CarePoint on notice that the Modugno production contained privileged documents and identified specific examples. As we noted,

---

[10] Even if the Court only finds intentional waiver over the Mandler Waiver Documents (or the Mandler Waiver Documents and the CarePoint Privileged Documents), the breadth of the waiver is so great that it suffices to find subject matter waiver over the Relevant Issues, irrespective of the intentionality of the Modugno waiver.

[11] *See* Ex. 16 (noting separate assertions of privilege by counsel for CarePoint, Mandler, and Garipalli/Lawler).

[12] In that regard, CarePoint has not introduced any contrary evidence to show lack of intentional waiver. And thus, the weight of the evidence supports a finding of intentional waiver.

> "The Modugno production appears to contain some documents that arguably contain privileged information. *See* CP_MODUGNO_00255627.
>
> We do not know why CarePoint chose to assert privilege over some but not all such documents in the Modugno production, but we believe this also constitutes waiver, particularly as the Court has already found CarePoint has been delinquent in protecting its privilege….
>
> Nonetheless, we will sequester this document for two weeks, pursuant to Paragraph 13 of the Protective Order (ECF 73)." Ex. 8.

CarePoint did not respond. Barnabas reiterated its concerns again in August 2025, noting that CarePoint still has not indicated any intent to assert inadvertent production over any Modugno document.[13] Again, CarePoint did not attempt to claw back any documents, sequester or suspend use, conduct any re-review, or investigate or remediate the error. This supports a finding that the waiver was intentional. To the contrary, CarePoint permitted Barnabas to continue reviewing and using the materials, did not seek to seal when Barnabas quoted a Modugno privileged document in a court filing, and only attempted a limited claw back after Barnabas relied on a subset of the documents in the Joint Mandler Waiver Letter. ECF 350. That is, it attempted to do what is not permitted: use privilege as both sword and shield. *See Silverstein v. Fed. Bureau of Prisons*, 2009 WL 4949959, *13 (D. Colo. 2009) ("the failure to cure the disclosure of the October 2004 Document lends support to an inference of intentional waiver.")

Third, CarePoint repeatedly permitted Barnabas – its litigation adversary – access to CarePoint's most privileged documents, operating under the mistaken belief that it could claw back any document Barnabas attempted to use. But "a waiver of the attorney client privilege operates to vitiate the privilege as to all and for all purposes and time." *See Mine Safety Appliances Co. v. N. River Ins. Co.*, 73 F. Supp. 3d 544, 572 (W.D. Pa. 2014). CarePoint cannot adopt a policy of allowing Barnabas to review and use tens of thousands of privileged documents, and then say that it did not intentionally waive privilege over the entire collection of produced privileged documents. Put simply, CarePoint manifested an intent to waive privilege over its produced privileged documents.

**2. *The Withheld Documents Concern the Same Subject Matter and Ought to Be Considered with the Disclosed Privileged Documents.***

Under Rule 502(a), the primary protection against broad subject matter waiver is "fairness." Do the withheld documents concern the same subject matter as the disclosed documents, and ought they be considered together "in fairness"? That standard is plainly met.

---

[13] *See* Ex. 8 (07/25/25 Barnabas Ltr. to CP re Modugno documents); Ex. 9 (07/28/25 Barnabas Ltr. to CP re Modugno documents); Ex. 10 (08/12/25 Barnabas Ltr. to CP re Modugno document).

CarePoint committed broad subject matter waiver by intentionally waiving documents covering virtually every Relevant Issue in this litigation, including:

- CarePoint's financial arrangements with, or payments to, founder-related entities;
- The New Jersey State Commission of Investigation's investigation of CarePoint;
- CarePoint's out-of-network strategy, the New Jersey's Out-of-network Consumer Protection, Transparency, Cost Containment, and Accountability Act, and dealings with insurers;
- Regulatory or lobbying efforts about Barnabas's or CarePoint's proposed satellite emergency departments;
- The solicitation or use of non-competes for CarePoint doctors, nurses, or staff;
- CarePoint's dealings with Medical Properties Trust, Inc. (MPT), Eisenreich, or HRH;
- CarePoint's dealings with Barnabas;
- The sales process or any potential sales transaction; and
- Litigation with Horizon, creditors, the Founders, Eisenreich, HRH, or Barnabas.

CarePoint disclosed scores of privileged documents on each Relevant Issue, selecting documents to rely on, while attempting to shield the full facts. [redacted]

This is precisely the type of "sword and shield" behavior Rule 502(a) was designed to prevent. *In re Urethane Antitrust Litig*., 2011 WL 322675, *4 (D. Kan. 2011) ("To otherwise permit Dow to disclose some information or communication on this subject but to hide, for tactical reasons, other information or communication on the subject would be unfair."); *Katz v. A.T.&T. Corp.*, 191 F.R.D. 433, 439 (E.D. Pa. 2000) ("It would be fundamentally unfair to allow a party to disclose opinions which supports its opposition and simultaneously conceal those that are unfavorable or adverse to its position.").

---

[14] *See* Ex. 17 (CP_MODUGNO_00066403).

The scope of the problem is reflected in Exhibit 1,[15] which provides a sample of the correlation between the intentionally waived document sets and the withheld documents.[16] It should be noted, however, that this is only a sample. CarePoint has produced 98,000 documents from the files of its former General Counsel, Leslie Prizant, alone, making her CarePoint's eleventh largest custodian. Moreover, it is impossible in this short letter to cross-reference the 60,000+ documents in the Mandler Waiver documents against the 15,000 documents on the CarePoint log, and the 50,000 documents on the first Modugno Log.

Correlating the entries across logs is even more difficult because CarePoint has obscured the identity of those documents with the inconsistent ways they are described. In the Modugno log, CarePoint includes the file name or subject line, but no description of the document or the nature of the privilege or legal advice. In the CarePoint log, CarePoint includes a cursory description, but omits the file name or subject line, even where that would not reveal any privileged information. And in the Mandler log, it includes neither the name of the file nor a description of the document or privilege claim. Moreover, CarePoint made no effort to identify the documents on the CarePoint and Modugno logs that are substantially identical to the Mandler Waiver documents, meaning it is unclear whether the log is just preserving its overruled privilege claim or whether it is asserting additional privilege beyond those waived claims.

While Exhibit 1 itself is telling, a few additional examples make clear CarePoint's broad subject matter waiver. After the SCI found that CarePoint used sham management companies to divert $157 million from the system, CarePoint agreed to end the practice. But to comply with the letter of the prohibition, but not its spirit, [redacted][17] CarePoint produced this document six times, twice by CarePoint, twice by Mandler, and twice by Garipalli. But it still seeks to assert privilege over at least eight versions of this same produced document.[18]

---

[15] Barnabas is submitting these documents for *in camera* review and has also identified them in a separate docket entry via declaration. If the Court prefers, Barnabas can also file them under seal.

[16] That some of the documents listed on Exhibit 1 originate from the Mandler production does not require the Court to defer its analysis for a decision on the Mandler Waiver Appeal. Because the selective waiver concerns CarePoint's conduct in the CarePoint and Modugno productions – not solely the Mandler production – CarePoint's handling of the latter is not outcome-determinative.

[17] Ex. 18 (Mandler0384666).

[18] CarePoint takes a similar position with respect to the documents for which it has lodged claw back requests. As reflected in ECF 381, many of the documents over which CarePoint asserts claw back rights are similar to, if not identical to, those found in the Mandler Production. When Barnabas asked CarePoint whether it could review those documents to determine if depositions could proceed, CarePoint refused. Ex. 13 (6/30/2026 Ltr. to CP); Ex. 14 (7/2/26 Ltr. from CP); Ex. 15 (7/3/26 Ltr. to CP). CarePoint should not be permitted to withhold documents that bear on the

Indeed, CarePoint's logs are replete with entries concerning the legality of "owner payment distributions," "tax distribution issues," and related-party transactions.[19] Whether these cash extractions were truly designed to pay Uncle Sam – and thus are ordinary business expenses – or were devious ways of channeling money the hospitals needed to survive is a hotly contested issue. Similarly, whether the management fees that extracted 95% of the profits from Bayonne Hospital, and a comparable amount from Hoboken and Christ hospitals were real or – as the SCI found – "questionable," given the lack of any employees, time records, or evidence of services, are issues discussed in the waived documents and further addressed in the withheld documents. These documents ought to be considered together.

Another example concerns Barnabas's ***alleged*** interference with the CarePoint sales process in 2019. CarePoint alleges that Barnabas and Avery Eisenreich conspired in "secret" to buy out MPT's interest in the real estate for Bayonne and Hoboken hospitals. But, as Barnabas noted in its Counterclaim, Eisenreich presented his plan directly to CarePoint, and Garipalli *approved* it. Indeed, the Counterclaim even has a snapshot of the document proving that [redacted].[20] CarePoint even produced from Modugno's files a ***draft*** of this document just between CarePoint's own outside counsel.[21] Yet, CarePoint still lists what appears to be multiple versions of this document on its Modugno log.[22]

After the document was sent, there were further discussions about this proposal. And CarePoint again produced communications between Garipalli and CarePoint's two outside law firms about this proposal. They discussed, for example, how – if their other bidder (Atlantic) walked away – they would "just agree to everything with Avery and B [Barnabas] and cut a deal ASAP."[23] At least three versions of this document – with the same email subject but later in the day – appear on the Modugno log, and are still being withheld.

---

very issues in dispute, particularly where Barnabas has already reviewed those documents and the Court has found waiver over substantially identical materials in the Mandler production.

[19] Ex. 19 (PrivLog_000051; _00005988; _007223; _007224; _007589; _007591; _007642; _007799). The Modugno log also has at least 60 entries discussing "tax distribution[s]."

[20] This document was produced by Eisenreich, and several versions of it appear in the Modugno production. Though this document includes Eisenreich, CarePoint has asserted privilege over hundreds of communications with Eisenreich and his associate David Sussman based on his role as a CarePoint board member. *See* Ex. 20 (AEisen0007491, HUMC v. MPT, 2019-0972, Second Am. Cmplt., ¶ 194 (Oct. 20, 2020 Del. Ch.).

[21] *See* Ex. 21 (CP_Modugno_00257647).

[22] *See* Ex. 16 (R00075120; R00074983; R00074982; R00074965).

[23] *See* Ex. 22 (Mandler0422713). Notably, this document has two bates numbers, suggesting that CarePoint had already waived privilege over this document in prior litigation.

In fact, over this five-day period between October 3, 2019 and October 7, 2019, there are no fewer than 95 entries between CarePoint's two-custodian log (47 entries) and the Modugno log (48 entries) concerning these transactions, with only three overlapping entries.[24] And this is not even the most important period in this case, it is just an example. There are literally thousands of documents relating to the CarePoint sales process that Barnabas allegedly conspired to interfere with that are being withheld. These documents ought to be considered together.

* * *

We could go on. But at this point, we believe the subject matter waiver is clear. CarePoint has intentionally given Barnabas access to vast treasure troves of privileged materials, it should not be permitted to continue to selectively withhold either the unlogged documents or the logged documents that address the same issues.

### *C. CarePoint's Delayed, and Facially Deficient, Log Waived Privilege.*

Another basis for finding that CarePoint waived privilege over the documents it withheld on privilege grounds also results from its failures to comply with the basic tenets of Rule 26's requirement for producing a privilege log. This delay is worth recounting in detail.

Shortly after CarePoint's certification of substantial completion over two years ago, ECF 98, CarePoint proposed identifying a date to mutually exchange privilege logs. Barnabas followed up by requesting that CarePoint provide a date to exchange logs,[25] and since then, Barnabas has regularly followed up on its request.[26] Finally, on September 23, 2025, CarePoint indicated that it would provide its log on November 1, 2025.[27] On November 1, 2025, CarePoint did not serve its log. Four days later, it served its first ever privilege log in this case. And then five days later, on November 10, 2025, it amended that log.

The delayed service of the log given the timeline above cannot save CarePoint from the fact that this delay is unreasonable and constitutes waiver. *See, e.g.*, *Wachtel v. HealthNet, Inc.*, 239 F.R.D. 81, 106 (D.N.J. 2006) (a privilege log must be provided within a sufficient time after requests to preserve privilege, otherwise privilege is waived); *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514, *38 (S.D. Ohio 2012) (failure to assert privilege in a "timely manner amounts to a waiver of that protection"); *Burlington N. & Santa Fe Ry. Co. v. United States District Court*, 408

---

[24] Pelino is only identified on three of the 48 transaction-related Modugno documents. *See* Ex. 16 (R0050014; R0005078; R00050079). As such, there are at least 92 unique documents relating to these transactions being withheld as privileged over this five-day period.

[25] *See* Ex. 2 (07/8/24 Barnabas Ltr. to CP re Priv Log).

[26] Ex. 3 (07/19/24 Ltr. to CP re Priv Log); Ex. 4 (08/12/24 Ltr. to CP re Priv Log); Ex. 5 (08/28/24 Ltr. to CP re Priv Log); Ex. 6 (01/07/25 Ltr. to CP re Priv Log); Ex. 7 (01/25/25 Ltr. to CP re Priv Log); Ex. 9 (07/28/25 Ltr. to CP re Priv Log); Ex. 10 (08/12/25 Ltr. to CP re Priv Log); Ex. 11 (09/17/25 Ltr. to CP re Priv Log).

[27] Ex. 12 (09/23/25 Ltr. to CP re Priv Log).

F.3d 1142, 1149 (9th Cir. 2005) (finding waiver of privilege where log was not filed until five months after the document request), *Get-A-Grip, II, Inc. v. Hornell Brewing Co.*, 2000 WL 1201385 (E.D. Pa. 2000) (finding waiver where the privilege log was approximately two months late). To be clear: Unilateral refusal to produce a privilege log for over two years is not reflective of reasonable steps to protect privilege; it is exactly the opposite.

But CarePoint's delay is not the sum total of its deficiencies. As Barnabas explained in detail in its January 19, 2026 letter to CarePoint, CarePoint's only privilege log to date failed to provide the basic information necessary for Barnabas to assess CarePoint's privilege claims. Among other defects, the log: (1) provided vague descriptions; (2) failed to include discernable author and recipient data; and (3) repeatedly referred to unidentified "legal agents"[28] without providing the basis for treating them as covered by any applicable privilege. These are not one-off omissions or cherry-picked examples. These defects are pervasive and weigh in favor of finding a waiver.

The vast scope of this problem is underscored by the numbers. Attachments to emails – which make up approximately 44% of the 15,039 entries on the log – overwhelmingly fail to list any attorney in connection with the document: 5,126 of those 6,589 (roughly 78%) have no attorney identified with the entry.[29] And many of these attachments appear to be clearly public documents – such as court filings,[30] documents filed with the government,[31] public articles or press release,[32] or business communications.[33] And others still include documents that appear to have been produced at other times in this litigation, such as operating documents for its shell corporations previously produced by MPT.

The lack of information in the log becomes even more apparent when examining the substance of the descriptions of documents contained on the log. As Barnabas also explained in its January 19, 2026 letter that CarePoint's privilege log included numerous documents and communications that are plainly not subject to the attorney-client privilege or work-product doctrine. Most notably, CarePoint's log claimed privilege over at least 1,364 communications[34] with third parties, including ***Barnabas*** and its own internal and external counsel,[35] parties directly

---

[28] The phrase appears approximately 615 times in the log, noted in Exhibit 23 in green.

[29] Noted in Exhibit 23 in yellow.

[30] At least 164 instances. *See, e.g.*, PrivLog_003817 ("Court filing attached to email chain"); PrivLog_004544 (same); PrivLog_006138 (same); PrivLog_006740 (same); PrivLog_007464 (same).

[31] At least 86 instances. *See, e.g.*, PrivLog_002860 ("Government filing attached to email"); PrivLog_003508 (same); PrivLog_005056 (same); PrivLog_006307 (same); PrivLog_006571 (same).

[32] At least 49 instances. *See, e.g.*, PrivLog_006365; PrivLog_000866; PrivLog_009089.

[33] At least 478 instances. *See, e.g.*, PrivLog_000531; PrivLog_000562; PrivLog_007082.

[34] Noted in Exhibit 23 in blue, orange, and purple.

[35] At least 6 instances. See, e.g., PrivLog_3696; _4624; _4757; _13220; _14157.

relevant to this litigation (i.e., Avery Eisenreich & Alaris Health[36] and MPT[37]), and other clearly independent parties, such as Department of Health employees,[38] investment bankers,[39], public relations, insurance, or other consultants,[40] or financial advisors.[41] These assertions make clear that CarePoint's privilege designations cannot be accepted at face value.[42]

Barnabas raised these deficiencies with CarePoint eight months ago. Despite requests for CarePoint to promptly produce a revised, compliant privilege log with a corresponding production of any non-privileged documents, CarePoint has failed to respond to Barnabas on this issue and provided no timeline for curing the deficiencies or for amended production, despite repeated reminders for a response. Any further delay is unjustified. This deficient privilege log, particularly when coupled with delay and refusal to cure after notice, warrants a finding of waiver. *Schaeffer v. Tracey*, 2017 WL 465913, *3 (D.N.J. 2017) (finding privilege waived when a party fails to "describe the nature of the … communications … in a manner that … will enable other parties to assess the claim"); *Murphy v. Twp. of Millstone*, 2022 WL 2118185, *15 (D.N.J. 2022) (rejecting claw back where log "fails to meet the standard of a proper privilege log."); *D'Onofrio v. Borough of Seaside Park*, 2012 WL 1949854, *12 (D.N.J. May 30, 2012) ("[O]nce a producing party is on notice that something is amiss with its document production and privilege review, then that party has an obligation to *promptly* re-assess its procedures and re-check its production.").

### ***D. CarePoint's Delayed, and Facially Deficient, Modugno Log Waived Privilege.***

Similar to CarePoint's failures with respect to the log it produced for its own documents is its comparable deficiencies with respect to the log it made for the production of third party Lou Modugno. Independent of, but supporting its broad subject matter waiver, CarePoint waived privilege over the 50,000 documents listed on the January 2025 Modugno log, and the 23,000 documents on its February 2026 Amended Modugno Log. Pursuant to agreement among the parties, CarePoint was obligated to assert privilege over these documents by August 6, 2024. It did not. Since then, Barnabas has followed up – repeatedly – requesting this log. And only six months later did CarePoint produce its first log, and then almost a year later did it produce its second log, with less than half of the entries.[43]

---

[36] At least 36 instances. *See, e.g.*, PrivLog_1109; _2574; _7127; _7397; _10281.

[37] At least 20 instances. *See, e.g.*, PrivLog_000328; _1377; _2538; _3181; _3205.

[38] At least 54 instances. *See, e.g.*, PrivLog_003585; _3588; _3590; _3595; _3601.

[39] At least 541 instances. *See, e.g.*, PrivLog_000219; _519; _1004; _1599; _1863.

[40] At least 287 instances. *See, e.g.*, PrivLog_001069; _2558; _2677; _2788; _3183.

[41] At least 430 instances. *See, e.g.*, PrivLog_000358; _368; _378; _587; _665.

[42] It is also unclear why CarePoint has decided to withhold, as opposed to redact, all of these documents.

[43] Barnabas addresses CarePoint's improper removal of over half of those entries in a separate Joint Letter Regarding the Withheld Non-Privileged Modugno Production, ECF __.

Attached as Exhibit 16 is the Modugno Log. It is a 1,263 page, computer-generated, metadata-only log.[44] It contained no description of *why* any document might be privileged, and did not disclose whether any of them contained legal advice or requests for it. Many of the entries contained clearly public information (such as press releases), or reflected communications with third parties.[45] Most seemed to lack any basis at all, other than the fact that a lawyer may have been copied on an email string. There were even entries claiming privilege over communications with ***Barnabas's*** General Counsel.[46]

When Barnabas originally notified CarePoint of these deficiencies, CarePoint took no corrective action.[47] That is enough to find waiver. *Schaeffer*, 2017 WL 465913 at *3 (finding privilege waived when a party fails to "describe the nature of the … communications … in a manner that … will enable other parties to assess the claim"); *Murphy*, 2022 WL 2118185, *15 (D.N.J. 2022) (rejecting claw back where log "fails to meet the standard of a proper privilege log.").

On February 11, 2026—while the joint letter was being drafted, without notice to Barnabas, and more than a year after the agreed-upon deadline—CarePoint served an amended Modugno Log. In serving the log, CarePoint conceded that its original log was overinclusive, admitting that it removed a "small subset" of non-privileged documents from the log with plans to produce them.[48] That admission confirms that the original log improperly asserted privilege. *Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007) (finding waiver when "Plaintiff's amended privilege log is essentially a concession that the initial privilege log was inadequate"); *S.E.C. v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 162 (S.D.N.Y. 2014) (same). CarePoint cannot now avoid the consequences of that failure through post hoc revision.

In any event, the Amended Modugno Log remains deficient and riddled with inaccuracies and boilerplate language. An example: Modugno_PrivLog_000393, 394, 395 and 396 appear to

---

[44] The only column in the Modugno log that does not reflect metadata is the "PrivReason_edit" column. But that column only indicates that attorney-client privilege is asserted. These designations do not disclose the nature of the privilege claim and are not document specific.

[45] *See, e.g.*, Ex. 16, R00002599 (HRH); R00004539 (David Sussman, Alaris); R00026272 (NJHA); R00005218 (Avery Eisenreich); R00042847 (John Doll, Barnabas); R00074827 (Mark Manigan, Barnabas); R00042054 (Michael Prilutsky, Barnabas); R00043776 (Matthew Fulton, Barnabas); R00043811 (Mary Twomey, Barnabas); R00044533 (Bob Taylor, Barnabas); R00045221 (Sean Matthews, Barnabas); R00045154 (Deb Lienhardt, Barnabas); R00045891 (Rob Irwin, Barnabas); R00045992 (Margaret Campbell, Barnabas); R00047532 (Karen Rostello, Barnabas); R00048059 (Michael Knecht, Barnabas); R00084653 (Maureen Taylor, Barnabas).

[46] Ex. 16, R00045992.

[47] *See* Ex. 8 (7/25/25 Ltr. to CP, noting the "log fails to meet even the most basic requirements of the Protective Order," and noting that the "deficiencies" constitute a waiver of the privilege) (citing cases).

[48] To date, CarePoint has not produced these documents. CarePoint also improperly removed thousands of documents produced by Modugno that it unilaterally decided were not relevant. That improper removal is the subject of a separate dispute and joint letter.

be PDF attachments to an email (entry 391) with the following file names: "Lease Agreement," "Management Agreement," "SCI Report," and "Subordination of Management Agreement," respectively.[49] The SCI Report is a publicly accessible document. And the remaining three entries share the same blanket description— "Draft agreement attached to Email Chain between employees and outside counsel, providing information for the purpose of legal advice regarding response to external correspondence"—but none of the attorneys the log lists as associated with these documents are apparently associated with the email these documents are attached to (entry 391). And in any event, to the extent that these documents bear on CarePoint's former relationship with its landlord MPT, they have likely been produced elsewhere in this litigation. To be clear, the amended log does not remedy the deficiencies in the original log. And even if it did, CarePoint's failure to justify the compliance of its first privilege log with Rule 26, does not change the fact that privilege was waived well before the drafting of this letter or the service of its amended log.

To be clear, CarePoint's conduct with respect to the Modugno log is not an isolated lapse—it mirrors its failures with the CarePoint custodian logs and reflects a pattern of noncompliance that satisfies the Third Circuit's standard for waiver. *In re Teleglobe Comms.*, 493 F.3d 345, 386 (3d Cir. 2007) (disclosure of privileged documents "may be imposed only if the District Court finds bad faith, willfulness, or fault.") CarePoint's years-long refusal to produce a compliant log, its repeated failures to respond to Barnabas's requests, and its blanket refusal to meet and confer on these issues establish, at minimum, "fault" warranting waiver.

* * *

In its section of the joint letter, for the first time, CarePoint claims that this joint letter is procedurally improper as the parties have not met and conferred on the issues that it raises. That is not true. On January 6, 2026, after CarePoint sent its deficient logs, Barnabas sent CarePoint the first draft of this letter. It then followed up on January 19, 2026, specifically asking for a meet and confer about deficient logs.[50] CarePoint refused to respond to those deficiencies or provide dates for a meet and confer on those issues in any subsequent correspondence. It cannot claim to have not met and conferred when it has refused to provide its availability to discuss the issue. In any event, since then, the parties have met and conferred at least three times on privilege and log-related issues.

CarePoint's characterization of finding of waiver as an "extreme sanction" misses the mark. Waiver here is not punitive—it is the natural and direct consequence of CarePoint's failure to comply with Rule 26(b)(5)'s requirement to "expressly" assert privilege and describe withheld documents "in a manner that . . . will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). The cases CarePoint cites for the proposition that courts exercise discretion to excuse

---

[49] Ex. 16 (R00000642, 643, 644, 645).

[50] Ex. 25 (1/19/2026 Ltr. to CP).

log deficiencies—*Margulis and D'Ambly*—did not include scenarios where parties refused to meet and confer, respond to inquiries about privilege, or otherwise engage in the years-long pattern of stonewalling present here.

For the first time, CarePoint argues that it hired a third party vendor to assist with reviewing terabytes of data and will provide a log "in due course." This was a decision allegedly made in March—almost ***nine months*** after Norton Rose took on this case, and ***six months*** from the submission of this letter. Since that decision to hire the vendor, Barnabas has received nothing from the CarePoint updating its logs or indicating a timeline for when it would do so. This explanation cannot save CarePoint from a finding of waiver. CarePoint's claimed diligence is belied by the record. CarePoint certified substantial compliance with its production obligations over two years ago, and Barnabas has been requesting a privilege log since at least July 2024. CarePoint never once indicated – in any correspondence or meet and confer – that documents were missing from a review database or that it was undertaking a terabyte-scale remediation effort. This is the opposite of diligence.

In any event, internal logistical issues, such as how documents were stored or the scale of review do not excuse noncompliance with the Federal Rules. *See Shire LLC*, 2014 WL 1509238, at *5 (rejecting argument that privilege waiver was excused by time constraints and inadequate review as experienced and sophisticated parties are expected to manage discovery properly); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839 (N.D. Ill. 2021) (counsel – not vendors – bear responsibility for discovery compliance); *Branhaven, LLC v. BeefTek, Inc.*, 288 F.R.D. 386, 292–93 (D. Md. 2013) (counsel remains responsible for discovery compliance notwithstanding vendor issues).

CarePoint's reliance on the Protective Order's claw back provision is similarly unavailing. The claw-back mechanism addresses the inadvertent production of specific documents—it does not excuse wholesale failure to provide a compliant privilege log for tens of thousands of documents over multiple years. The Protective Order does not suspend Rule 26(b)(5) or permit indefinite deferral of logging obligations. CarePoint's suggestion that it can simply claw back documents whenever Barnabas attempts to use them inverts the discovery process and permits exactly the "sword and shield" behavior that Rule 502(a) was designed to prevent.

Neither can CarePoint's reliance on the absence of a court-ordered deadline for the providing of a privilege log as reason not to find waiver. Rule 26(b)(5) imposes an independent obligation to "expressly" assert privilege and describe withheld documents "in a manner that … will enable other parties to assess the claim." In fact, the November 5 deadline – which came after the close of discovery under the then operative schedule, *see* Second Amended Pretrial Scheduling Order, ECF 213 – was self-imposed by CarePoint. It told Barnabas that it was serving ***its privilege log*** – not a portion of the log or only a log for certain custodians.[51] That there was no court-ordered

[51] Ex. 24 (10/24/2025 Ltr. from CP stating that "CarePoint's forthcoming privilege log" would be produced "the first week of November").

deadline does not suspend Rule 26(b)(5)'s requirements or excuse years of noncompliance. Barnabas made this clear during the August 26, 2025 status conference (Aug. 26, 2025 Tr. 38:19–25 ("They didn't give us a deadline. They didn't say you're going to get it at a specific time, 45 days. 30 days isn't enough; we need 45 days. They didn't try to negotiate with us on that. They didn't try -- you know, parties try to negotiate and reach agreement. They didn't try to. They just said we'll get to it when we get to it. They forced our hand."). Barnabas has been requesting a privilege log from CarePoint since July 8, 2024.[52] And CarePoint has refused to meet with Barnabas about this issue. At what point must Barnabas throw its hands up and continue to endure this litigation?

CarePoint's claim that discovery is in abeyance and therefore Barnabas has suffered no prejudice has it exactly backwards. The discovery abeyance is itself a result of CarePoint's discovery failures. Barnabas has been prevented from taking depositions with knowledge of what documents exist, from challenging CarePoint's privilege assertions, and from even knowing how many documents are being withheld. The entire litigation timeline has been derailed by CarePoint's noncompliance. That CarePoint's own conduct has caused the delays that now shield it from a prejudice finding cannot be a basis for excusing further noncompliance. *See Bautech USA, Inc. v. Resolve Equip., Inc.*, 2024 WL 1929486, *2 (S.D. Fla. 2024) (delay of producing privilege log prejudiced party "as it attempts to complete depositions and other discovery without the benefit of documents to which it may be entitled"); *In re VeroBlue Farms USA, Inc.*, 2021 WL 1583150, *4 (Bankr. N.D. Iowa 2021) (failure to provide a privilege log prejudiced party because party was unable to assess the factual merits of privilege claim.) CarePoint cannot indefinitely withhold documents on the basis of privilege while refusing to meet and confer, or assert that privilege or provide a log.

As CarePoint noted during the August 26, 2025 status conference, it has taken this case "with whatever warts there are." Aug. 26 Hr'g Tr. 23:13–14. This is one of them. CarePoint must turn over those privileged documents.

## II. THE CAREPOINT LITIGATION TRUST'S POSITION

Barnabas continues to manufacture satellite privilege disputes in its transparent effort to litigate anything and everything except the merits of this case, which involves serious allegations of antitrust violations to the detriment of CarePoint, patients in and around Hudson County, and the competitive process. Its latest attempt is this omnibus-style joint letter. Barnabas seeks leave to file a motion asking this Court for four distinct forms of relief, including:

1. An order deeming privilege waived over all documents withheld from the files of 27 of CarePoint's 29 custodians;

[52] Ex 2 (7/8/2024 Ltr. to CP)

2. An order finding that CarePoint committed a broad subject-matter waiver, requiring disclosure not only of the above-mentioned documents, but every single document withheld by CarePoint and Modugno;

3. An order finding that the Trust waived privilege over 15,000 logged documents withheld by CarePoint because, in Barnabas's view, the Trust's privilege log was deficient and served too late; and

4. An order finding that the Trust waived privilege over 23,000 logged documents withheld by Lou Modugno because, in Barnabas's view, Modugno's privilege log is deficient and served too late.

In short, Barnabas seeks a blanket order allowing it access to each and every privileged document in the case—a sweeping argument unsupported by the facts or the law. Through this joint letter, Barnabas hopes to begin yet another year, if not more, of protracted privilege disputes that will derail this case entirely. Yet it identifies no prejudice it has suffered; it can't produce a single example of a privileged communication that the Trust seeks to affirmatively use as a "sword"; it entirely ignores CarePoint's intervening bankruptcy and the significant period of time where this case was stayed; it mischaracterizes the prior privilege rulings of Judge Waldor and Judge Padin, which directly contradict Barnabas's arguments; it likewise ignores Judge Waldor's rejection of Barnabas's prior request to set a deadline for privilege logs; and it fails to account for the diligent efforts, since the Trust took over the claims, to gain access to terabytes of data, and review and provide updated privilege logs in this matter.

Barnabas improperly conflates three separate disputes—clawback requests, the amended Modugno privilege log, and this letter—to manufacture an aggregate figure of 65,558 documents. These are distinct matters governed by different standards and separate processes. Barnabas identifies no concrete prejudice arising from any individual issue, let alone from the manufactured collective total.

It goes without saying that this joint letter is procedurally improper on several grounds. As with joint letters filed on January 5, 2026 and March 27, 2026, ECF Nos. 350, 381, Barnabas has larded up the instant joint letter with countless privileged documents (*i.e.*, Exhibit 1). Moreover, due to the Trust amending the Modugno privilege log on February 11, 2026, the parties have not sufficiently met and conferred on the issues raised regarding the Modugno privilege log.[53] Accordingly, Barnabas's last request is not properly before this Court due to Barnabas's failure to comply with Local Rule 37.1. Similarly, sending a draft of a joint letter including the 27-custodian issue—which the parties have never directly met and conferred on—is likewise insufficient to comply with Local Rule 37.1 and thus improperly before this Court. And Barnabas includes an

[53] The parties have met and conferred regarding certain documents CarePoint removed from its Amended Modugno Privilege Log, which is the subject of a separate joint letter writing process.

extended discussion of a "Counterclaim" that is not currently in the case, since Barnabas has not been granted leave to file its proposed counterclaim.

These procedural errors only emphasize the more basic fact that Barnabas cannot shoulder its burden with respect to any of its requests. For example, Barnabas's request for a finding of subject-matter waiver, which requires that the waiver be "intentional," is grounded in what this Court has already deemed an inadvertent, *i.e*., unintentional, disclosure. ECF No. 233 (Order Granting Barnabas's Request to Deem Privilege Waived) (the "Mandler Order"). The District of New Jersey has held that such contradictory relief is untenable. S*hire LLC v. Amneal Pharm., LLC*, No. 2:11-cv-03781, 2014 WL 1509238, at *7 (D.N.J. Jan. 10, 2014) (Waldor, J.). Barnabas's three other requests each fail for the simple fact that serving delayed and/or deficient privilege logs—which, to be sure, the Trust does not concede has happened in this litigation—does not justify a finding of waiver. Thus, the Trust respectfully asks that this Court deny each of Barnabas's requests.

The Trust will address each of Barnabas's arguments in the order in which they are presented above.

### *A.* The Trust Has Not Waived Privilege Over The Withheld CarePoint Documents.

Barnabas's characterization that CarePoint "has never produced a log" and ignored "repeated efforts" is purposefully misleading. Barnabas first raised concerns that CarePoint's privilege log covers only 2 of the 29 CarePoint custodians on January 19, 2026—the first time this issue was brought to the Trust's attention—yet the parties have ***never*** conferred on it as required by Local Rule 37.1. Had Barnabas fulfilled its meet and confer obligations ***before*** unilaterally inserting this issue into this joint letter, it would know that the Trust has been diligently working through the significant complexities involved in collecting, processing, hosting, reviewing, logging and/or producing this data, and that work remains ongoing. Although the Trust maintains this issue is not properly before the Court, it addresses each of Barnabas's arguments in turn.

Barnabas argues that the Trust has waived privilege over all privileged communications in the files of 27 CarePoint custodians. Unlike the Mandler documents, none of these documents have ever been disclosed to Barnabas. Barnabas's argument rests entirely on the fact that the Trust is still in the process of reviewing and logging these documents, which Barnabas seeks to characterize as a discovery violation warranting the extreme sanction of compelling production of privileged materials. This argument flouts governing Third Circuit law and ignores the Trust's diligent efforts to address an issue that was raised by Barnabas and predates current counsel's involvement in this matter.

The Third Circuit has noted that: "[d]isclosure [of privileged documents] is a serious sanction, but one that may be imposed ***only*** if the District Court finds bad faith, wilfulness [*sic*], or fault." *In re Teleglobe Communications*, 493 F.3d 345, 386 (3d Cir. 2007) (emphasis added). Barnabas's conclusory assertions of willfulness notwithstanding, the facts show that the Trust has

not engaged in bad faith, willfulness, or fault. Rather, the Trust has instead acted in good faith throughout.

In early November 2025, just a few months after entering the case and conducting an expedited review of the millions of pages of produced documents in this case, the Trust served initial and amended privilege logs totaling over 15,000 entries for the CarePoint productions. In late January 2026, after Barnabas noted that the log did not contain documents from 27 CarePoint custodians, the Trust immediately began investigating and soon learned that the withheld documents had not been maintained in an active review database. In March, the Trust determined it would have to engage a third party vendor to analyze the ***over 10 terabytes*** of data received from prior counsel in order to replicate the original production searches and identify the universe of potentially privileged documents associated with the 27 custodians. Over the following five months, the vendor processed over 2 terabytes of that data, and the Trust has been working diligently to deduplicate, apply search and privilege terms, and determine the universe of documents requiring review and logging. That work is ongoing, and a supplemental privilege log will be served in due course. The timeline reflects the complexity of a previously unresolved legacy data problem, not bad faith.

The Trust has also not waived privilege because "[c]ourts in [the Third] Circuit generally apply the severe sanction of privilege waiver only when a party fails to timely disclose a privilege log ***pursuant to a Court-ordered deadline*.**" *Drone Technologies, Inc. v. Parrot S.A.*, No. 2:14-cv-00111, 2015 WL 12752848 (W. D. Pa. Feb. 20, 2015), *rep. and recommend. adopted by* 2015 WL 12752849 (W. D. Pa. Feb. 24, 2015) (emphasis added); *Rhoads Industries, Inc. v. Building Materials Corp. of America*, 254 F.R.D. 216, 222 (E. D. Pa. 2008) (reviewing several cases where privilege was deemed waived because litigant failed to produce privilege log by court-ordered date).[54]

This Court has never entered such an order: not in its original pretrial scheduling order, nor its first, second, and third amended pretrial scheduling orders. ECF Nos. 67, 213, 297. Indeed, this Court summarily rejected Barnabas's specific request to include a deadline for the production of privilege logs. *See* ECF No. 293-1 at 1-2 (Barnabas's Proposed Third Amended Pretrial Scheduling Order) (proposing that the Court set deadlines for serving privilege logs); *see* ECF No. 297 (Third Amended Pretrial Scheduling Order) (excluding such proposed language).[55]

---

[54] Thus, *Rhoads v. Building Materials*, which Barnabas cites, in truth supports the Trust's position. In *Rhoads*, the Court found that privilege had been waived because plaintiff did not serve a privilege log until four months after the date the Court demanded it be served. *Rhoads*, 254 F.R.D. at 226.

[55] The Federal Rules do not provide a default deadline for serving a privilege log. *Theia Tech. LLC v. Theia Group, Inc.*, No. 20-97, 2020 WL 6450468, at *4 (E.D.P.A. Nov. 3, 2020) ("the rules do not define 'timely' production[]" in the context of the duty to produce a privilege log). The appropriate date for service will depend on the unique facts of the case. *See Babbs v. Block*, No. 4:15–cv–0194, 2017 WL 1628959 (W.D. Mo. May 1, 2017) (denying plaintiff's request that court compel documents subject to a claim of privilege after defendant did not serve privilege log for sixteen months); *Dosier v. City of Atlanta, Georgia,* No. 1:20-cv-04477, 2023 WL 12148401 (N.D. Ga. Feb. 28,

Additionally, Barnabas cannot plausibly argue that it has been prejudiced because a log has yet to be produced. *Chimel v. Harry*, No. 1:06-cv-02098, 2023 WL 4747684, at *5 (W.D. Pa. July 25, 2023) ("Petitioner does not claim that he suffered prejudice that would have been avoided had Respondents filed the privilege log at an earlier point[.]"). Discovery in this case is far from over; discovery deadlines have been held in abeyance since March 2026, and will not be renegotiated until this Court rules on Barnabas's Motion for Leave to Amend and Motion to Consolidate. ECF No. 380. Barnabas, thus, will have more than enough time to review each and every assertion of privilege that the Trust makes before the end of discovery.

Barnabas's argument that the Trust should be subject to the extreme discovery sanction of waiver of privilege as to the 27 custodians' documents that the Trust is in the process of logging contradicts Third Circuit precedent, and is only the first of the many examples of Barnabas's extreme overreach in its effort to divert this litigation from focusing on Barnabas's own wrongdoing. No motion is necessary or should be permitted as to the CarePoint documents.

### ***B. There Has Been No Subject-Matter Waiver.***

Barnabas next argues that, through the disclosure of privileged CarePoint, Mandler, and Modugno documents, CarePoint has effected a subject-matter waiver of all CarePoint and Modugno's privileged, hitherto undisclosed documents. This Court can make a finding of subject-matter waiver only if Barnabas proves that: the waiver was intentional, FED. R. EVID. 502(a)(1); the disclosed and undisclosed communications concern the same subject matter, *id*. 502(a)(2); and the disclosed and undisclosed communications "ought in fairness to be considered together[,]" *id.* 502(a)(3). Barnabas must shoulder the burden with respect to each of the three elements. *See Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 442 (W. D. Tex. 2017) ("such speculation is insufficient, at this time, to satisfy [proponent's] burden to show broad, subject-matter waiver."). Barnabas cannot meet its burden with respect to at least the first and third elements.

#### **1. All Disclosures Were Inadvertent, *i.e.*, Not Intentional.**

Following the Mandler Order, Barnabas is estopped from arguing that CarePoint's waiver of privilege over the Mandler documents was intentional. Thus, Barnabas cannot show that "the waiver [was] intentional[.]" FED. R. EVID. 502(a)(1).

"Every inadvertent disclosure is an unintentional disclosure"—thus said this Court in 1995, *CibaGeigy Corporation v. Sandoz Ltd.*, 916 F.Supp. 404, 410 (D.N.J. 1995), and repeated in 2012 and 2014, *D'Onofrio v. Borough of Seaside Park*, No. 09-cv-6220, 2012 WL 1949854 (D.N.J. 2012) (quoting *CibaGeigy*); S*hire*, 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (same). Put differently, when a Court finds that a disclosure is inadvertent pursuant to Fed. R. Evid. 502(b)(1), it cannot, in the same breath, find that the disclosure was "intentional" under Fed. R. Evid.

---

2023) (denying plaintiff's request that privilege be waived even though privilege log was served fourteen months after production and two months after close of discovery.).

502(a)(1). Thus, in *Shire LLC v. Amneal Pharm.*, Judge Waldor held that the Court could not find that a litigant's waiver was "intentional" pursuant to Federal Rule 502(a)(1):

> This Court has already found that Defendants unintentionally produced privileged documents to Shire. The basis for that decision was Defendants' inexcusable neglect in the review process. It follows that the Court cannot find that Defendants waived subject matter privilege when that privilege must be intentionally waived."

*Shire*, 2014 WL 1509238, at *7. The facts here are indistinguishable from those of *Shire*.[56] "This Court has already found that [Mandler] unintentionally produced privilege documents to" Barnabas. This Court has already found that the disclosure was inadvertent. ECF No. 233; ECF No. 393 at 24 (Opinion Accompanying Denial of Trust's Appeal) ("In sum, Judge Waldor was on firm ground when she determined that CarePoint's actions after learning of ***this inadvertent disclosure*** were neither prompt nor reasonable under Rule 502(b).") (emphasis added). "It follows that the Court cannot find that Defendants waived subject matter privilege when that privilege must be intentionally waived." *Shire*, 2014 WL 1509238, at *7.

For the same reason, CarePoint and Modugno's disclosure of privileged documents were also inadvertent, *i.e.*, not "intentional." While Fed. R. Evid. 502(b) does not define the word "inadvertent," *T&W Holding Co. LLC v. City of Kemah, TX*, 641 F.Supp.3d 378, 382 (S.D. Tex. 2009), "[t]o determine if plaintiff's production was inadvertent the Court must look at a multitude of factors, including" the size of the production and "whether plaintiff took reasonable precautions to prevent errors." *United States v. Sensient Colors, Inc.*, No. 07–cv–1275 , 2009 WL 2905474, at *4 (D.N.J. Sept. 9, 2009). CarePoint's document production was massive, having produced 1,344,752 documents over the course of this litigation. As was Modugno's 91,022-document production. When Barnabas noted the existence of a handful of privileged documents in these productions, the Trust immediately clawed those documents back (as expressly authorized in the protective order). Additionally, the Trust undertook an additional review of the produced documents to identify any other inadvertently produced privileged documents, and clawed those back as well (again, pursuant to the protective order). The Trust then revised its privilege logs accordingly. This is not subject matter waiver; on the contrary, it is exactly how the process set up under the protective order is designed to work. Thus, CarePoint and Modugno's disclosures were inadvertent, *i.e.*, not intentional.

Indeed, as a number of courts have held, "the analysis under subpart (b)(1) is intended to be much simpler, essentially asking whether the party intended a privileged or work-product protected document to be produced or whether the production was a mistake." *Coburn Group, LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1038-39 (N.D. Ill. 2009); *City of Kemah*, 641 F.Supp.3d at 382 (S.D. Tex. 2009) (same); *Sleep Number Corp. v. Young*, No. 20-cv-1507,

---

[56] Barnabas attempts to distinguish *Shire* by pointing to alleged meet-and-confer refusals and "ad hoc" clawbacks is unsupported. The clawbacks were made pursuant to the Protective Order and reflect precisely the process the parties negotiated—conduct that is categorically inconsistent with sword-and-shield abuse.

2021 WL 5644322, at *18 (D. Minn. Dec. 1, 2021) (same); *Wyman v. Wyman*, No. 19-cv-0343, 2020 WL 6680355 (D. Col. Nov. 12, 2020); *Thermoset Corp.*, 2015 WL 1565310, at *7 (S.D. Fla. Apr. 8, 2015) (same); *Amobi v. Dist. of Columbia Dep't of Corr*., 262 F.R.D. 45, 53 (D.D.C. 2009) (same). *FTC v. Amazon.com*, No. 2:23-cv-00932, 2024 WL 3620467, at *5-*6 (W.D. Wash. Aug. 1, 2024) (same). This standard has been recognized and applied by district courts in this circuit as well. *See Royal Mile Company, Inc. v. UPMC*, 2013 WL 12349724, *3 (W.D. Pa. 2013), *report and recommendation adopted,* 2016 WL 462856 (W.D. Pa. 2016) (disclosure was inadvertent because it was not clear and intentional). Since all privileged documents which CarePoint and Modugno disclosed to Barnabas were disclosed by mistake, those disclosures were "inadvertent," *i.e*., not intentional.

### 2. Barnabas Distorts the Mandler Order Beyond Recognition.

Barnabas rests its subject matter waiver argument largely on its gross mischaracterization of the Court's order finding waiver of the previously produced Mandler documents. Barnabas broadly asserts that this Court "found that CarePoint waived privilege by consenting to Barnabas's review and use of the Mandler documents and by failing to assert any privilege under Rule 26(b)(5) for more than a year." But that is simply not the case.

On the contrary, when issuing the Mandler Order, the Court answered the question presented to it at the time: whether the privilege holder had taken reasonable steps to prevent and then rectify the inadvertent disclosure pursuant to Fed. R. Evid. 502(b)(2) and (3). Mandler Order (granting Barnabas's application "for the reasons discussed on the record ***and, more specifically,*** because Plaintiffs knowingly failed to take reasonable steps to prevent the disclosure and promptly rectify the error after being made aware of it. *See* Fed. R. Evid. 502(b).") (emphasis added). The Court did not find intentional waiver. What it found in the portion of the hearing quoted by Barnabas was that plaintiff did not take reasonable steps to rectify the error, once it was discovered.

This Court need not simply take the Trust's word for it. Judge Padin has already rejected Barnabas's "lack of inadvertence" argument. In her opinion accompanying the denial of the Trust's appeal of the Mandler Order, Judge Padin characterized Judge Waldor's discussion of CarePoint's conduct after learning of the inadvertent disclosure as the "root" of her Rule 502(b) analysis. As the Court explained: "Judge Waldor ***rooted*** her decision in the fact CarePoint allowed Barnabas to review the entire Mandler Production, waited four months before asserting a privilege log of over 60,000 documents, and in the time between then and her decision, had not litigated the clawback issue or sought judicial intervention." ECF No. 393 at 21 (emphasis added). Barnabas cannot construe Judge Waldor's analysis as an independent finding of "intentional waiver" under Rule 502(a)(1).

### 3. In Any Event, CarePoint's Actions After Learning of the Inadvertent Disclosure Do Not Amount to Intentional Waiver.

Even if this Court were to consider CarePoint's conduct after learning of the inadvertent disclosures, as opposed to the inadvertent disclosures themselves, Barnabas cannot meet its burden

under Rule 502(a)(1). Plaintiff did not "intend" to put protected information into this litigation. By all accounts, CarePoint intended to assert privilege over protected information that had been inadvertently produced once it had the resources to do so. And CarePoint in fact ***did*** assert privilege over the inadvertently disclosed documents by serving: (1) a privilege log in August 2024 over documents inadvertently produced by Mandler; (2) a privilege log in November 2025 over documents withheld from CarePoint's production in 2025; and (3) clawback demands in December 2025 and January 2026.

Third Circuit caselaw confirms that "intentional waiver," as the concept is used in Fed. R. Evid. 502(a)(1), means deliberately placing the protected information in the hands of individuals outside the attorney-client relationship. *Montanans for Community Development v. Motl*, 14-cv-55, 2016 WL 922785, at *3 (D. Mon. Mar. 10, 2016) ("the focus of the Court's inquiry must be on the intentional act of disclosure to individuals outside the attorney-client relationship[.]"). Courts have found that including privileged information in an affidavit or declaration supporting a motion is intentional waiver under Fed. Rule Evid. 502(a)(1). *Hawk Mountain LLC v. Mirra*, No. 13-2083, 2016 WL 690883 (D. Del. Feb. 19, 2016); *Thomas v. City of Philadelphia*, No. 17-cv-4196, 2019 WL 265138 (E. D. Pa. Jan. 18, 2019) (same); *Kickflip, Inc. v. Facebook, Inc.*, No. 12-cv-1369, 2015 WL 13446263 (D. Del. Jan. 21, 2015) (same). Calling one's attorney as a fact-witness in a related case would also be intentional waiver. *U.S. v. Titchell*, 261 F.3d 348, 352 (3d Cir. 2001) ("calling one's attorney as a fact witness in a prior proceeding constitutes a waiver of the attorney-client privilege, at least regarding the subject of the testimony adduced in the prior proceeding.").

These are all a far-cry from what CarePoint did in each of Barnabas's three examples of purported intentional waiver: informing Barnabas that a privilege log was forthcoming (in the case of Mandler and CarePoint's document productions), or (in the case of Modugno's document production), not responding to Barnabas's notice of inadvertent disclosure (sent to the Trust barely a month after it entered the case) as soon as Barnabas wanted.

### 4. CarePoint Did Not Seek Litigation Advantage Through its Inadvertent Disclosures.

Barnabas also cannot show that the disclosed and undisclosed communications "ought in fairness to be considered together." FED. R. EVID. 502(a)(3). These were inadvertent disclosures. CarePoint did not make any such disclosures to gain a litigation advantage.

As the Advisory Committee notes explain, "a subject matter waiver is reserved for ***those unusual situations*** in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." FED. R. EVID. 502(B), Advisory Committee Notes. In the District of New Jersey, the proponent of subject-matter waiver must show that the privilege holder wielded the privilege as both a "sword" and a "shield"—or, in other words, that the privilege holder disclosed communications that "support[] its position" while "simultaneously conceal[ing] those that are unfavorable or adverse to its position." *Katz v. A.T.&T. Corp.*, 191 F.R.D. 433, 439 (E.D. Pa.

2000); *see, e.g., Shire LLC v. Amneal Pharm., LLC*, No. 2:11-CV-03781, 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (detailing the "sword and shield" analysis).

It cannot be said that any of CarePoint's disclosures were made with the intent to obtain a litigation advantage. Quite the opposite. The Trust has spent the better part of the last year attempting to preserve privilege as to any and all documents. If Barnabas were truly concerned about the Trust using some of the documents as a "sword" against Barnabas, it could remedy that easily enough by acceding to the Trust's consistent effort to preserve privilege. It is too cute by half for Barnabas to fight tooth and nail to secure a privilege waiver finding, and then claim the documents it won access to might be used against it, so it should somehow now be entitled to see every ***other*** privileged document in CarePoint's files. The inadvertent disclosures were just that: inadvertent disclosures.

Barnabas's nine "Relevant Issues" span virtually every issue in this litigation. That is precisely the type of overbroad subject matter waiver theory Rule 502(a) was designed to prevent. Barnabas identifies no specific instance in which the Trust has affirmatively relied on a privileged document as a litigation sword while concealing contradictory privileged material. The nine categories are not a fairness argument—they are a fishing expedition.

"The inadvertent production of a privileged document is a specter that haunts every document intensive case." *CibaGeigy Corporation v. Sandoz Ltd.*, 916 F.Supp. 404, 410 (D.N.J. 1995) (quoting *Federal Deposit Ins. Co. v. Marine Midland Realty Credit Corp*., 138 F.R.D. 479, 479–80 (E.D. Va. 1991). So too here. Thus, this case is comparable to *D'Onofrio v. Borough of Seaside Park*, where the Court did not find subject matter waiver because: "[c]learly, the [disclosing party] in unintentionally disclosing over 800 pages of otherwise privileged information were not attempting to use the attorney-client privilege as both a sword and a shield." *D'Onofrio v. Borough of Seaside Park*, 2012 WL 1949854 (D.N.J. 2012); *see also Shire*, 2014 WL 1509238, at *7 (finding that, because the disclosure was inadvertent, neither the "intent" nor "fairness" elements of Rule 502(b)(3) can be met).

Because the Trust has not sought to wield the inadvertent disclosures as a "sword," Barnabas has no argument that the disclosed and undisclosed communications "ought in fairness to be considered together." FED. R. EVID. 502(a)(3). Thus, there has been no subject-matter waiver.

### *C.* Purported Delays and Deficiencies in CarePoint's and Modugno's Privilege Logs Do Not Constitute Waiver.

Barnabas's remaining arguments, that purported delays and deficiencies in CarePoint's and Modugno's privilege logs justify waiver, can be disposed of easily.

As stated above, "[c]ourts in [the Third] Circuit generally apply the severe sanction of privilege waiver only when a party fails to timely disclose a privilege log pursuant to a Court-ordered deadline." *Drone Technologies*, 2015 WL 12752848 (W. D. Pa. Feb. 20, 2015) (emphasis

added). Accordingly, *Get-A-Grip, II, Inc. v. Hornell Brewing Co., Inc.*, relied on by Barnabas, is inapposite because it involved a litigant that failed to serve a privilege log for several months after the precise date upon which the Court ordered that it be served. No. 99-cv-1332, 2000 WL 1201385, at *2 (E.D. Pa. Aug. 8, 2000). The fact that the Trust and Modugno did not serve privilege logs within Barnabas's preferred timeline does not justify waiver.

The Trust does not concede any of the purported deficiencies that Barnabas points out in either CarePoint's or Modugno's privilege logs. But to the extent that any privilege log served by the Trust or Modugno contains deficiencies, those are of no moment because arguable deficiencies in a privilege log do not justify the waiver of privilege.

Barnabas's statistical critique does not establish waiver on any document. The absence of an attorney name on an attachment does not render it unprivileged—attachments transmitted as part of privileged communications are appropriately withheld. References to "legal agents" are shorthand and can be clarified through supplementation or targeted inquiry—and shorthand descriptions have never been held to effect blanket waiver. Third-party communications are also not automatically unprivileged. Categories such as investment bankers, consultants, and financial advisors may fall within the common-interest doctrine, involve agents facilitating legal advice, or otherwise be properly withheld depending on context. Barnabas's raw counts, drawn from log descriptions rather than underlying documents, provide nothing about privilege and cannot support a waiver argument.

This Court has, on several occasions, made clear that deficiencies in a privilege log do not inherently result in a privilege waiver. For instance, in *Margulis v. Hertz Corp*., the court noted that defendant's privilege log was "problematic," "unfair to an adversary who is inherently challenged in making arguments in a privilege dispute and must rely on what is on the log to do so," and "not an effective way to argue privilege disputes, which must be assessed document-by-document." No. 14-cv-1209, 2017 WL 772336, at *4 (D.N.J. Feb. 28, 2017). Nonetheless, the Court refused to find waiver because "given how important the privilege is, and how much time has already been spent on the issue, the Court [was] not convinced that such an approach would be in the interests of justice." *Id.* And in *D'Ambly v. Exoo*, the Court found that the privilege log was "not exemplary," "overly generic," "repetitive," and non-specific in a way that made it "somewhat difficult to fully assess claims of privilege based on the log alone." No. 20-cv-12880, 2024 WL 4880322, at *5 (D.N.J. Nov. 25, 2024). Even so, the Court denied plaintiff's demand for the "wholesale production of Defendants' privileged documents based on an allegedly deficient privilege log." This was because, as in *Margulis*, the Court recognized "'how important the privilege is, and how much time has already been spent on the issue,' and 'is not convinced that waiver would be in the interests of justice.'" *Id*. (quoting Margulis, 2017 WL 772336, at *4). Barnabas's attempt to distinguish *Margulis* and *D'Ambly* is unavailing. The Trust has never refused to meet and confer, never declined to respond to privilege inquiries, and is not "stonewalling"— it is simply seeking to preserve legitimate privilege claims to which it is entitled.

Barnabas's invocation of *In re Teleglobe Communications* is misplaced as to both the CarePoint and Modugno logs. 493 F.3d 345 (3d Cir. 2007). *Teleglobe* requires a finding of bad

faith, willfulness, or fault. *Id.* at 386. The Trust served privilege logs totaling over 38,000 entries within months of entering the case, immediately investigated the 27-custodian gap upon learning of it, engaged a third-party vendor to process over 10 terabytes of legacy data, and has been actively working toward addressing the issue. That is the opposite of a "pattern of noncompliance."

If Barnabas wishes to confer with the Trust regarding any purported deficiencies with its privilege logs, it can request a genuine meet & confer on these issues. But waiver is unjustified. Thus, the Trust respectfully asks this Court to reject Barnabas's request to compel production of the 15,000 documents logged in the CarePoint privilege log, and the 23,000 documents logged in the Modugno privilege log.

Barnabas's attempt to attribute all discovery delays to the Trust is both inaccurate and misleading. The Trust has diligently pursued its discovery rights at every stage, engaging in good-faith efforts to resolve disputes without Court intervention—including seeking Barnabas's agreement to proceed with depositions without reliance on the disputed privileged documents. To the extent discovery has been held in abeyance, it is a direct consequence of Barnabas manufacturing disputes and seeking wholesale waiver of the Trust's privileged documents. As this joint letter makes clear, live discovery disputes remain, and Barnabas's position that the Trust must waive all of its privileges as a precondition to depositions is unsupported by the facts and the law.

* * *

For all these reasons, the Trust asks the Court to deny Barnabas's request to file a motion seeking waiver of privilege on any of the grounds asserted in Barnabas's portion of this (unnecessary and improperly voluminous) joint letter.

Respectfully submitted,

*/s/ Robert M. Hirsch*

*Counsel for the CarePoint Litigation Trust*

*/s/ William T. Walsh*

*Counsel for RWJ Barnabas Health Inc.*